# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA      :

                          :      Criminal Action No. 05-47-JJF

          Respondent/Plaintiff,   :      Civil Action No. 07-789-JJF

    v.                         :

                          :

NELSON LORA-PENA,        :

                          :

         Movant/Defendant.     :

## THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S § 2255 MOTION

NOW COMES the United States of America, by and through its counsel, Colm F. Connolly, United States Attorney, and Seth M. Beausang, Assistant United States Attorney, and hereby responds to Movant/Defendant Nelson Lora-Pena's motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct sentence.[1] The Government respectfully requests that the Court deny Defendant's motion without an evidentiary hearing.

## BACKGROUND

On September 16, 2005, Defendant was convicted by a jury of forcibly assaulting, resisting, and interfering with members of the United States Marshal Service Fugitive Task Force who arrived at his house to arrest him. (Crim. Action No. 05-47-***, Doc. No. 32.) Count I of the Indictment charged that Defendant forcibly assaulted Deputy United States Marshal Jack Leo

---

[1]This is Defendant's first § 2255 Motion and it is timely filed within the one-year period of limitation imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Defendant's conviction was upheld by the Court of Appeals on May 7, 2007, and Defendant's § 2255 Motion was filed December 6, 2007. Defendant filed a request to amend his Motion on December 26, 2007. (Doc. No. 51.) Also on that date, Defendant filed an AEDPA election form agreeing to amend his § 2255 Motion within 30 days to include all his grounds for relief. (Doc. No. 50.) More than 30 days have passed and Defendant has not filed any additional requests to amend his Motion. Accordingly, Defendant's Motion is now ripe for adjudication.

and thereby "inflicted bodily injury to the officer" in violation of 18 U.S.C. §§ 111(a)(1) & (b). (Doc. No. 11 at 1.) Count II charged that Defendant forcibly assaulted, resisted, interfered with, and impeded Deputy Marshal Robert Denney, and "in doing so used a dangerous weapon, to wit, a pit bull terrier," in violation of 18 U.S.C. §§ 111(a)(1) & (b). (*Id.* at 1.) Count III charged that Defendant forcibly assaulted, resisted, interfered with, and impeded Deputy Marshal William David, and "in doing so used a dangerous weapon, to wit, a pit bull terrier," in violation of 18 U.S.C. §§ 111(a)(1) & (b). (*Id.* at 2.) Finally, Count IV charged that Defendant forcibly assaulted, resisted, and interfered with Marshal David Thomas in violation of 18 U.S.C. § 111(a)(1). (*Id.* at 2.) Defendant was convicted of all four counts.

On December 20, 2005, the Court sentenced Defendant to 87 months in prison for the above convictions, and to 5 months in prison, to be served consecutively, for a violation of the Defendant's supervised release. Defendant argues that his 87-month sentence should be vacated and he should be re-sentenced because, he claims, the Court made two errors when it calculated Defendant's Total Offense Level under the advisory United States Sentencing Guidelines ("Guidelines" or "USSG"). Defendant alleges that his trial and appellate attorneys were ineffective because they failed to raise these purported errors at the sentencing hearing and during Defendant's appeal. Finally, Defendant argues in his proposed amendment to his Motion that the Government violated the discovery rule in *Brady v. Maryland*, 373 U.S. 83 (1963), and knowingly relied on perjured testimony, and asks as relief that the Court either reduce his sentence or grant him a new trial. As explained below, none of Defendant's claims have any merit and his Motion should be denied.

A.    **Summary Of The Government's Evidence That Was Introduced At Defendant's Trial.**[2]

David, Leo, Thomas, and Denney all testified for the Government at Defendant's trial.

David testified that on April 9, 2005 he arrived at Defendant's residence at around 1:30 or 2:00

in the afternoon to look for Defendant, who was the subject of a federal arrest warrant. (N.T.,

9/15/05; Ex. 1 at A-85-86.) Upon seeing Defendant, David "radioed additional members of the

[fugitive] task force" and told them Defendant was present.

David testified that Leo, Thomas, and Denney arrived thereafter with additional state and

local law enforcement officers. (*Id.* at A-87.) Thomas and Denney proceeded to the rear of

Defendant's residence to "cover the back" in case Defendant tried to "flee out the back of the

residence," (*id.* at A-88), while David and Leo approached the front door of Defendant's

residence, (*id.* at A-97). All of the officers were wearing vests that had "police" written in white

letters across the front. (*Id.* at A-89.)

David testified that as he and Leo approached Defendant's front door, he could see

Defendant through a glass storm door. (*Id.* at A-98.) David told Defendant "police, let me see

your hands" and ordered him to come to the door. (*Id.* at A-99 – A-100.) Defendant began to

walk to the door, at which time David noticed "two very large pit bulls at [Defendant's] feet" that

were "barking, growling, snarling," and "lunging against the door." (*Id.* at A-100.) David then

drew his weapon and told Defendant to control his dogs. (*Id.* at A-101.) Defendant, "in a

simultaneous motion, pushed the [front] door open as he turned and fled to the rear of the

residence." (*Id.*) One of the pit bulls then "lunged out of the door" at David and Leo but failed

---

[2]Only the facts necessary to respond to Defendant's Motion are set forth herein.

to get out of the house because David "kicked the door shut, catching the dog in the side of the mouth as he was coming out." (*Id.* at A-103.)

Denney testified that he arrived at Defendant's residence around 2:00 to 2:30 in the afternoon on April 9, 2005 and proceeded to cover the rear of the residence with Thomas. (*Id.* at A-163 – A-164.) Denney described hearing David on the radio announcing that Defendant was "coming to the back" and then seeing Defendant "run out the rear of the residence." (*Id.* at A-165.) Defendant got to within "eight-or-ten feet" of the officers who were "screaming for him to 'stop, police,'" before Defendant "turned around and ran back into the residence." (*Id.* at A-166.) Defendant left the rear sliding glass door open after he re-entered the residence, at which time Denny saw that "a large ferocious pit bull was running towards us inside the residence, coming towards that sliding glass door. Thomas reached over and slammed the door shut to prevent the dog from getting out into the yard with us." (*Id.* at A-168.)

A minute or two later Denny saw that Defendant "had gotten his head and torso out of the back window, attempting to come out the window when [another member of the Task Force, State] Trooper Hahn[,] reached up and tried to grab him, and [Defendant] slipped [Trooper Hahn's] grasp and slid back into the residence again." (*Id.* at A-170.) After another minute or so Denney, who was still outside, saw Defendant through the sliding glass door as Defendant came into the kitchen. (*Id.* at A-171.) Defendant had his hands up and was asking Denney, "What is this about? What do you want?" (*Id.* at A-172.) Denney kept saying "Come to me" and took two steps towards Defendant, who then "took off running" towards the living room, with Denney in pursuit. (*Id.* at A-172 – A-173.)

Defendant reached a back bedroom door at which time Denney "attempted to pin him

4

against the door with my forearm." (*Id.* at A-175.) "The door popped open and [Defendant] and [Denney] stumbled into that bedroom." (*Id.*) Denney "then attempted to gain control of [Defendant] by placing him on the ground." (*Id.*) Defendant was able to break free and as Denney turned he "saw the pit bull right at my feet, barking, growling, showing his teeth." (*Id.* at A-176.) Denney kicked the dog away as he "lost control and sight of [Defendant]." (*Id.* at A-177.) Dennery and David then were able secure both dogs in a room and close the door. (*Id.* at A-177 – A-178.) At that time Denney heard a gun shot and both he and David turned and ran towards the sound of the gun shot. (*Id.* at A-178.)

Denney then saw Leo and Hahn struggling with Defendant in the living room. (*Id.*) Defendant "was fighting to attempt to not be cuffed, to not be taken into custody." (*Id.* at A-179 – A-180.) Denney testified that he heard a "lot of screaming" and Leo telling Defendant, "Give me your hand. Stop fighting." (*Id.* at 179.) After another "minute of so," Defendant was taken into custody. (*Id.*)

Thomas was the next government witness. Thomas testified he was in the rear of Defendant's residence with Denney when he "saw [Defendant] running out of the house" and then Defendant "turned around and ran back into the house." (*Id.* at A-196.) Thomas testified that he followed Denney into the house and saw Defendant struggling with "some deputies who were trying to restrain him." (*Id.* at A-197 – A-198.) Thomas grabbed Defendant's knees and Defendant and the other officers "fell to the ground." (*Id.*) Defendant was throwing his arms. He was just basically trying to get away, hitting and just flailing his arms." (*Id.* at A-199.) Defendant's hands "were hitting the people trying to restrain him." (*Id.* at A-207.) Eventually, Defendant was handcuffed, but "he was still very uncooperative. He was kicking. He was

causing such a problem that [Thomas] actually had to stand on the back of his legs and he was still kicking." (*Id.* at A-200.)

Leo was the last government witness. Leo testified that he was behind David as they approached the front door of Defendant's residence. (*Id.* at A-212.) Leo was carrying a handgun in a holster and a rifle in front of him. (*Id.* at A-213.) He described seeing Defendant through the glass storm door. (*Id.* at A-214.) He also described how Defendant's pit bulls "were acting aggressively," by "snarling, showing their teeth and scratching at the door." (*Id.*) Defendant approached the front door, paused, and then "pivoted on his foot, opened the door and ran towards the back of the house." (*Id.* at A-215.) The pit bulls attempted to get out of the door so David "forced the door shut with his foot." (*Id.* at A-216.)

Leo then described seeing Defendant running through the house pursued by Thomas and Denney, who were being chased by the dogs. (*Id.* at A-217.) At that time, Leo and David entered the residence to "defend our other officers." (*Id.*) Leo could see Thomas and Denney in a hallway struggling with both Defendant and the dogs. (*Id.* at A-218 – A-219.) Defendant "was able to break free" from those officers because they "were under assault by the pit bulls" and then Defendant charged into Leo. (*Id.* at A-219.) Leo testified that at that time he was concerned about, among other things, protecting his rifle which was in front of him:

> Q: All right. And when [Defendant] charged into you, what happened?
>
> A: My concerns were to protect the weapon, to protect myself and to keep him from getting away from me. So I had to maintain control of the weapon with my right hand and I grabbed him with my left hand in an effort to keep him from getting away.

(*Id.* at A-220.)

6

Leo testified that he and Defendant fell backwards into a wall as Defendant "was trying to escape. He was scratching. He was clawing. He was punching. He was digging his nails into my hands, into my scalp. He was grabbing my weapon. And he was, he was basically trying to get it away from me." (*Id.* at A-221.) Leo was using his right hand to control his weapon, holding onto Defendant with his left hand, and defending himself by striking Defendant "in the upper face area with my forehead very hard, very hard on a couple of occasions, at least two that I can recall distinctly." (*Id.* at A-223.) Defendant continued to struggle so Leo struck Defendant with his elbow, fist and forearm, all to no avail – Defendant "continued to struggle after that." (*Id.* at A-224.)

At that point, "it really got stepped up because while [Defendant] was clawing at [Leo's] hands and trying to get the rifle, he caused it to discharge or fire a round through this door here and out into the neighborhood." (*Id.* at A-225.) When Leo was asked to explain what he meant when he stated that the Defendant "caused [the gun] to discharge," Leo responded, "He [the Defendant] had hit the trigger basically." (*Id.* at A-226.) On cross-examination, Leo made it clear that he assumed that the Defendant accidentally caused the gun to discharge, but did not know for sure:

> As he [the Defendant] was pulling at it [the gun] and pulling at my hands, his finger slipped into the trigger. Well, I assume. I don't know for sure. I don't know how he discharged the weapon. All I know is that I'm trained to maintain a straight trigger finger and I've done so hundreds of times before, but the weapon did go off and it could only have went off from somebody depressing that trigger in there.

(N.T., 9/16/05; Ex. 2 at B-16 - B-17.)

The Defendant refused to give up even though he had caused the gun to discharge. (Ex.

1 at A-231.) "He continued to struggle. He continued to do the same thing. He continued to

punch and scratch and claw. However, at the same time, the marshal was assisting me and we

were able to direct [Defendant] to the ground." (*Id.*) Leo testified that at "that point,

[Defendant] continued to kick. He continued to try to get up, and again grabbing our arms,

grabbing at our faces, things of that nature." (*Id.*) Finally, the officers were able to get

Defendant "handcuffed and leg cuffed and subdued." (*Id.* at A-232.) Afterwards, Leo noticed

that he had cuts on his hands from the Defendant's fingernails. (*Id.* at A-235.)

**B.      Defendant's Sentencing Hearing.**

On December 20, 2005, Defendant was sentenced for the above convictions. During the

hearing the district court reviewed the Presentence Investigation Report (PSR) which, among

other things, recommended that under the Guidelines the Defendant should receive a Total

Offense Level of 29, and a Criminal History Category of I, meaning the Defendant's advisory

Guidelines sentence range was 87-to-108 months. (Ex. 4 ¶ 81.)[3]  Counsel for Defendant made

two objections to the PSR. First, defense counsel argued that the Defendant's four convictions

should be grouped, which would have yielded a lower Total Offense Level. (N.T., 12/20/05; Ex.

3 at 11.) The district court rejected that argument, and Defendant does not contest that ruling in

his Motion.

Next, defense counsel argued that the PSR was wrong to recommend that the district

court apply USSG § 2A2.2(b)(2)(A) and increase the Total Offense Level calculation for Count I

by five due to the fact that a firearm was discharged during the Defendant's assault of Leo. (*Id.*

---

[3]A copy of the PSR is attached hereto to provide context to Defendant's sentencing
challenges. The PSR is filed under seal due to the policy of the federal judiciary and the
Department of Justice that the PSR remain confidential.

at 15.) According to defense counsel, the "discharge of the weapon had nothing to do with" the Defendant. (*Id.*) The district court rejected that argument, stating, "I conclude that that weapon was discharged as a result of and as a direct consequence of the struggle which was going on between the marshal and the defendant." (*Id.* at 16.)

After allowing both defense counsel to make additional arguments and affording the Defendant his opportunity to make an allocution, the district court imposed its sentence. The district court agreed with the PSR the the Defendant's Total Offense Level was 29, and his Criminal History Category I. (*Id.* at 31-32.) The district court acknowledged that the corresponding advisory Guidelines sentence range subjected the Defendant to "very severe consequences," but the district court concluded that "those consequences are warranted." (*Id.* at 32.) Accordingly, the district court sentenced the Defendant to the lowest end of the advisory Guidelines range – 87 months in prison – for the Defendant's four assault convictions.

**C.    Defendant's § 2255 Motion.**

On December 6, 2007, Defendant filed the present Motion alleging that his trial and appellate counsels were ineffective for failing to raise two issues with the PSR. First, Defendant claims that his appellate counsel should have appealed the district court's decision to apply the discharge-of-a-firearm enhancement in USSG § 2A2.2(b)(2)(A). (Doc. No. 47 at 4.) Defendant argues that enhancement should not have applied because the firearm's discharge was "not due" to Defendant's "action" but was "totally an accidental dischargement on the exclusive part of the U.S. Marshal." (*Id.*) Next, Defendant appears to claim that both his trial and appellate counsels were ineffective for failing to argue that the district court should have looked to the USSG § 2A2.3, which covers Minor Assaults, for sentencing guidance instead of USSG § 2A2.2, which

9

covers Aggravated Assaults.[4] (*Id.* at 6-7.) Finally, Defendant argues in his proposed amendment

to his Motion that the Government violated the *Brady* discovery rule and knowingly relied on

perjured testimony, and requests as relief either a reduced sentence or a new trial. (Doc. No. 50

at 4-5.) As explained below, none of Defendant's claims have any merit.

**ARGUMENT**

**I.    STANDARD OF REVIEW.**

As a "general rule . . . claims not raised on direct appeal may not be raised on collateral

review unless the petitioner shows cause and prejudice." *United States v. Massaro*, 538 U.S.

500, 504 (2003). An exception is made for ineffective assistance of counsel claims, which may

be raised for the first time on collateral review without a showing of cause and prejudice. *Id.*

Defendant did not raise any of his claims in his direct appeal. Accordingly, Defendant must

show cause for failing to raise his claims, and actual prejudice therefrom, except with respect to

the two claims that allege ineffective assistance of counsel.

The Court should deny Defendant's Motion without a hearing if the Motion raises "no

legally cognizable claim or the factual matters raised by the motion may be susceptible of

resolution through the district judge's review of the motion and records in the case." *United*

*States v. Costanzo*, 625 F.2d 465, 470 (3d Cir. 1980).

**A.    Defendant's Ineffective Assistance Of Counsel Claims.**

To prevail on a claim of ineffective assistance of counsel, Defendant must meet the two-

_____

[4]Defendant's Motion is somewhat confusing on this point, in that Defendant states that USSG § 2A2.2 "was the appropriate starting point for his base offense level," even though Defendant appears to be arguing that the Court should have looked to the Minor Assualt provision, USSG § 2A2.3. (Doc. No. 47 at 6-7.)

part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1985). First, "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. "Judicial scrutiny of counsel's performance must be highly deferential," and there exists "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Second, the Defendant must show that his counsel's deficient performance prejudiced him. *Id.* at 687. In other words, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Third Circuit has emphasized that the second part of the test – whether the defendant was prejudiced – should be addressed first. *See, e.g., McAleese v. Mazurkiewicz*, 1 F.3d 159, 170 (3d Cir. 1993).

Both of Defendant's ineffective assistance of counsel claims are based on purported errors in calculating the Defendant's advisory Guidelines sentence range. Had Defendant's counsel raised these issues on appeal – as Defendant claims his counsel should have done – the Third Circuit would have reviewed the district court's findings of fact for clear error, *see United States v. Miele*, 989 F.2d 659, 663 (3d Cir. 1993), and would have applied plenary review to the district court's construction of the Guidelines, *see United States v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir. 1995). Thus, to show actual prejudice from his appellate counsel's supposed errors, the Defendant must show that there is a "reasonable probability" that the Third Circuit would have reversed the district court on direct appeal using these standards of review.

**B.    Defendant's *Brady* And Knowing-Use-Of-Perjured-Testimony Claims.**

Because the Defendant did not raise his *Brady* and knowing-use-of-perjured-testimony claims on direct appeal, he must show cause and actual prejudice. *See, e.g., Strickler v. Greene*,

527 U.S. 263, 282 (1999). To show actual prejudice the Defendant must show that there is "a

reasonable probability that the result of the trial [or sentencing] would have been different" but

for the alleged errors. *Id.* at 289.

Accordingly, all of the Defendant's claims require that he show a "reasonable

probability" that but for the supposed errors, the result of the Defendant's trial or sentencing

would have been different. As explained below, Defendant cannot make that showing for any of

his claims.

## II.    THE DISTRICT COURT DID NOT ERR IN CALCULATING THE DEFENDANT'S ADVISORY GUIDELINES SENTENCE RANGE.

### A.    The Discharge-Of-A-Firearm Enhancement In USSG § 2A2.2(b)(2)(A) Applies To The Defendant.

The PSR recommended that the Court increase the Defendant's Total Offense Level for

Count I by five levels due to the fact that a firearm was discharged during the Defendant's assault

on Leo. (Ex. 4 at 5.) Counsel for Defendant objected to this enhancement at the hearing, but the

Court overruled the objection, stating, "I conclude that that weapon was discharged as a result of

and as a direct consequence of the struggle which was going on between the marshal and the

defendant." (Ex. 3 at 16.) Defendant claims his appellate counsel was ineffective for failing to

challenge this finding on appeal. Defendant is wrong.

Had the Defendant appealed the district court's factual finding that the "weapon was

discharged as a result of and as a direct consequence of the struggle which was going on

between" Leo and the Defendant, the Third Circuit would have reversed that finding only if it

found that the district court committed a clear error. *Miele*, 989 F.2d at 663. Thus, to succeed

with this Motion the Defendant must show that there is a reasonable probability that the Third

Circuit would have found that the district court's factual finding was a clear error, i.e., that it was "completely devoid of [a] credible evidentiary basis." *Shire U.S., Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 352 (3d Cir. 2003). Defendant cannot meet this burden.

At trial, Leo testified that Defendant "charged into" Leo and was "grabbing" for his weapon, "basically trying to get it away from me." (Ex. 1 at A-220 - A-221.) Leo testified that as the Defendant was "trying to get the rifle, he caused it to discharge or fire a round through this door here and out into the neighborhood." (*Id.* at A-225.) On cross-examination, Leo made it clear that the firearm was discharged as a direct result of the Defendant's decision to assault him, even if the Defendant accidentally caused the discharge:

> As he [the Defendant] was pulling at it [the gun] and pulling at my hands, his finger slipped into the trigger. Well, I assume. I don't know for sure. I don't know how he discharged the weapon. All I know is that I'm trained to maintain a straight trigger finger and I've done so hundreds of times before, but the weapon did go off and it could only have went off from somebody depressing that trigger in there.

(Ex. 2 at B-16 - B-17.)

The above testimony plainly shows that the district court had a credible evidentiary basis to conclude that Leo's "weapon was discharged as a result of and as a direct consequence of the struggle which was going on between the marshal and the defendant." Defendant's appellate counsel therefore had no basis to appeal the district court's finding, meaning the Defendant could not have been prejudiced by his counsel's failure to do so. *See, e.g., Parrish v. Fulcomer*, 150 F.3d 326, 328 (3d Cir. 1998) (holding that the defendant's counsel could not have been ineffective for failing to raise meritless claims).

Even if the Defendant had claimed on appeal that the district court's application of the

13

discharge-of-a-firearm enhancement in USSG § 2A2.2(b)(2)(A) was a legal error (as opposed to a factual error), which arguably would have entitled the Defendant to plenary review, the Defendant's appeal still would have been rejected. USSG § 1B1.3(a)(1)(A) subjects defendants to enhancements based on "all acts . . . willfully caused by the defendant." Accordingly, courts have consistently and appropriately subjected defendants to discharge-of-a-firearm enhancements under the Guidelines when the defendant willfully induces a struggle that leads to the discharge of a firearm, even if the defendant did not intend to cause the firearm's discharge. *See, e.g.*, *United States v. Henderson*, No. 02-4236, 2002 WL 31255447, at *1-2 (4th Cir. Oct. 9, 2002) (non-precedential) ("[E]ven if the firearm in this case was not discharged by Henderson, the district court did not err in finding that the enhancement for discharge of a firearm applies because Henderson induced the struggle during which the shotgun was discharged, or at the very least, could reasonably foresee that the gun might be discharged during the home invasion."); *United States v. Roberts*, 203 F.3d 867, 870 (5th Cir. 2000) ("[W]e think it beyond question that Roberts's specific actions (punching Deputy Gray in the face) willfully caused Deputy Gray to fire his handgun. Therefore, we find *Gordon* distinguishable, and hold, on these facts, that the 7-level enhancement is proper."); *cf. United States v. Wright*, 215 F.3d 1020, 1030 (9th Cir. 2000) (holding that the defendant was subject to the discharge-of-a-firearm enhancement in USSG § 2A2.2(b)(2)(A) even though the defendant accidentally fired the weapon). For all these reasons, Defendant's appellate counsel was not ineffective for failing to appeal the district court's application of USSG § 2A2.2(b)(2)(A).

14

**B.    During Sentencing The District Court Correctly Looked To USSG § 2A2.2, Which Covers Aggravated Assaults, Instead Of USSG § 2A2.3, Which Covers Minor Assaults.**

Defendant also claims his trial and appellate counsels should have challenged the district court's decision to look to USSG § 2A2.2, which covers Aggravated Assaults, during sentencing instead of USSG § 2A2.3, which covers Minor Assaults. The district court agreed with the PSR that the Aggravated Assault Guideline applied to the Defendant's convictions for Counts I, II, and III (the assaults of Leo, Denney, and David. (Ex. 4 ¶¶ 13, 20, 26.) Defendant counters that the evidence at trial demonstrated that any assault was "minor." (Doc. No. 47 at 6.) As explained below, Defendant is wrong.

The Application Notes to USSG § 2A2.2 explain that for purposes of the Guidelines, an "Aggravated Assault" is, among other things, a "felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon." A "Dangerous Weapon" is, among other things, "an instrument capable of inflicting death or serious bodily injury." USSG § 1B1.1, Application Note 1(D). "[C]ourts have found that, in the proper circumstances, almost anything can count as a dangerous weapon, including walking sticks, leather straps, rakes, tennis shoes, rubber boots, dogs, rings, concrete curbs, clothes irons, and stink bombs." *United States v. Dayea*, 32 F.3d 1377, 1379 (9th Cir. 1994).

The PSR concluded that the Defendant "attempt[ed] to release the dogs on the Deputies." (Ex. 4 ¶ 5.) The Defendant did not object to that portion of the PSR and it was adopted by the district court. Accordingly, had the Defendant then appealed this finding by the district court he would have had to convince the Third Circuit that the finding was a clear error. He could not have met this burden because there was a sufficient evidentiary basis for the district court to

15

conclude that the Defendant used his two pit bulls as dangerous weapons with the intent to cause bodily injury to Leo, Denney, and David.

Leo and David testified that when they arrived at the Defendant's front door they noticed "two very large pit bulls at [Defendant's] feet" that were "barking, growling, snarling," and "lunging against the door." (Ex. 1 at A-100.) David then drew his weapon and told Defendant to control his dogs. (*Id.* at A-101.) Defendant, "in a simultaneous motion, pushed the [front] door open as he turned and fled to the rear of the residence." (*Id.*) One of the pit bulls then "lunged out of the door" at David and Leo but failed to get out of the house because David "kicked the door shut, catching the dog in the side of the mouth as he was coming out." (*Id.* at A-103.)

Denney testified that Defendant ran out the back of the residence, stopped, and ran back inside. (*Id.* at A-165 - A-166.) Defendant left the rear sliding glass door open after he re-entered the residence, at which time Denny saw that "a large ferocious pit bull was running towards us inside the residence, coming towards that sliding glass door. Thomas reached over and slammed the door shut to prevent the dog from getting out into the yard with us." (*Id.* at A-168.)

Accordingly, the district court had a sufficient evidentiary basis to conclude that Defendant's convictions for assaulting Leo, Denney, and David (Counts I, II, and III), involved the Defendant's use of a dangerous weapon, i.e., two pit bulls, with intent to cause bodily injury. As a result, those convictions qualified as Aggravated Assaults under the Guidelines. Defendant's trial and appellate counsels could not have been ineffective for failing to raise a meritless challenge to that finding.

16

III.    **THE GOVERNMENT DID NOT VIOLATE THE *BRADY* DISCOVERY RULE OR KNOWINGLY USE PERJURED TESTIMONY.**

On December 26, 2007, Defendant moved to amend his Motion and add claims that the Government violated the *Brady* discovery rule and knowingly relied on perjured testimony at Defendant's trial. Defendant did not raise these claims on his direct appeal, meaning the Defendant must show actual prejudice from his failure to do so. In other words, Defendant must show that there is "a reasonable probability that the result of the trial [or sentencing] would have been different" but for the alleged errors. *Strickler*, 527 U.S. at 289. Defendant cannot meet this burden because his *Brady* and perjured testimony claims have no merit.

A.    **The Government Did Not Violate The *Brady* Discovery Rule.**

*Brady* requires the Government to disclose to the defense evidence that is "material to either guilt or to punishment." *Brady*, 373 U.S. at 87. To prevail on a *Brady* claim, the defendant must prove the evidence was (1) suppressed, (2) favorable, and (3) material to the defense. *Riley v. Taylor*, 277 F.3d 261, 301 (3d Cir. 2001). Evidence is material if its suppression "undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985). Defendant claims that the Government should have disclosed a Report from a Delaware State Trooper[5] that states, in relevant part, that "during a lengthy struggle with the [Defendant], a firearm was accidentally discharged by a U.S. Marshal - - - - causing no injury." (Doc. No. 51 at 3; Attach. A.)[6] Because the Report was neither favorable to the Defendant nor material, the

---

[5]No state law enforcement officers testified at Defendant's trial, so the Government was not required to produce the Report pursuant to the Jencks Act.

[6]Defendant also attaches to the proposed amendment to his Motion a report from Leo, but the Defendant does not allege that the Government failed to disclose Leo's report. Leo's report contains a Bates number indicating that it was disclosed. Indeed, Counsel for Defendant

17

Government did not violate *Brady* even assuming it failed to disclose the Report.

The Report had no bearing on the Defendant's guilt or innocence because none of the Counts in the Indictment required the Government to prove that the Defendant discharged a firearm. That a firearm was discharged during the Defendant's assault on Leo was only relevant to the district court's decision to apply the discharge-of-a-firearm sentencing enhancement in USSG § 2A2.2(b)(2)(A). However, there are at least two reasons why the Report could not have affected the district court's decision to apply that enhancement.

First of all, the statement in the Report that Defendant points to – i.e., "during a lengthy struggle with the [Defendant], a firearm was accidentally discharged by a U.S. Marshal - - - - causing no injury" – substantially corroborates Leo's testimony. Leo testified that the firearm discharged during his struggle with the Defendant, just like the Report states. The Report also states that the gun was discharged accidentally, which is what Leo assumed happened (although he did not know for sure):

> As he [the Defendant] was pulling at it [the gun] and pulling at my hands, his finger slipped into the trigger. Well, I assume. I don't know for sure. I don't know how he discharged the weapon. All I know is that I'm trained to maintain a straight trigger finger and I've done so hundreds of times before, but the weapon did go off and it could only have went off from somebody depressing that trigger in there.

(Ex. 2 at B-16 - B-17.) Because the Report corroborated Leo's testimony that the firearm was discharged during his struggle with the Defendant, it was neither favorable to the Defendant nor

_____

repeatedly referred to Leo's report during his cross-examination of Leo. (*See, e.g.,* Ex. 2 at B-21 - B-22.)

material.[7]

Moreoover, even if the district court had relied on the Report to conclude that "during a lengthy struggle with the [Defendant], a firearm was accidentally discharged by a U.S. Marshal," rather than by the Defendant, the court still would have applied the discharge-of-a-firearm enhancement in USSG § 2A2.2(b)(2)(A). That enhancement applied because the Defendant willfully induced a struggle with Leo that led to the discharge of the firearm. *See* USSG § 1B1.3(a)(1)(A) (subjecting defendants to enhancements on the basis of "all acts . . . willfully caused by the defendant"); *Henderson*, 2002 WL 31255447, at *1-2; *Roberts*, 203 F.3d at 870. Whose finger accidentally squeezed the trigger during the struggle is irrelevant – the point is the firearm discharged as a result of the Defendant's willful decision to assault a federal officer who was holding a rifle. In doing so, the Defendant caused the gun to discharge and endangered his own life and the lives of all the law enforcement officers who were present. Fortunately the bullet did not strike anyone or the Defendant likely would have faced far more serious charges. In sum, the district court would have applied the discharge-of-a-firearm enhancement even if the Report had been submitted into evidence.

**B.    The Government Did Not Knowingly Rely On Perjured Testimony.**

Defendant's final claim is that the Government knowingly relied on perjured testimony at trial. Presumably, Defendant believes that the Report shows that Leo was lying when he testified that he assumed the Defendant accidentally caused the gun to discharge. There are a number of reasons why this claim has no merit.

---

[7]Though the Report states the firearm was accidentally discharged by a Marshal, rather than by the Defendant, even that does not directly conflict with Leo's testimony because Leo stated he did not "know for sure" how the gun discharged.

First of all, as explained above, the Report does not suggest that Leo lied – if anything, it substantially corroborates Leo's testimony. Moreover, even if the Report did conflict with Leo's testimony, that would not by itself show that Leo was lying – it might simply mean that the State Trooper who wrote the Report was mistaken, either in his perception of the events or in his recording of those events in his Report. *See, e.g., United States v. Payne*, 940 F.2d 286, 291 (8th Cir. 1991) ("it is not enough that the testimony is challenged by another witness" for it to be considered perjured).[8]

Also, even if one were to somehow conclude from the Report that Leo was lying, that would not show that the prosecutor knew that Leo was lying. *See, e.g., United States v. Jackson*, No. 04-2412, 192 Fed. App'x 96, 98-99 (3d Cir. Aug. 17, 2006) (non-precedential) ("In this case, the prosecution was presented with only conflicting testimony, and without definitive evidence to determine whose testimony was credible, it was not possible at the time of the suppression hearing for the prosecution to know if the police testimony constituted perjury."). For all these reasons, Defendant's claim that the Government knowingly used perjured testimony should fail.

---

[8]Defendant's suggestion that there is not "one iota of evidence that [Defendant] had ever touched the Marshal's gun" is wrong. (Doc. No. 51 at 5.) Leo repeatedly testified that the Defendant was grabbing for his weapon, pulling on it, and trying to get it away from Leo. (Ex. 1 at A-221; Ex. 2 at B-16.)

## CONCLUSION

For all of the above reasons, Defendant's Motion should be denied.  Because the Motion does not raise any legally cognizable claim, and because all the factual issues may be resolved by reviewing the Motion and records in this case, the Motion should be denied without a hearing.  A proposed Order is attached hereto.

DATED: February 13, 2008.                    Respectfully Submitted,

                                             COLM F. CONNOLLY
                                             United States Attorney

                                             By:_____/s/ Seth M. Beausang_____
                                                 Seth M. Beausang (I.D. No. 4071)
                                                 Assistant United States Attorney
                                                 1007 Orange Street, Suit 700
                                                 Wilmington, Delaware 19801