# Exhibit 1
# Part 1

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4    UNITED STATES OF AMERICA,        :      CRIMINAL ACTION
                                      :
5              Plaintiff,             :
                                      :
6         v.                          :
                                      :
7    NELSON LORA-PENA,                :
                                      :
8              Defendant.             :      NO. 05-47 (KAJ)

9                          - - -

10                     Wilmington, Delaware
            Thursday, September 15, 2005 at 9:30 a.m.
11                   JURY TRIAL - VOLUME A

12                         - - -

13   BEFORE:   HONORABLE **KENT A. JORDAN**, U.S.D.C.J., and a jury

14                         - - -

15
     APPEARANCES:
16

17             APRIL M. BYRD, ESQ.
               Assistant United States Attorney
18
                    Counsel for Government
19

20             LAW OFFICES OF CHARLES PERUTO, JR.
               BY:  CHARLES PERUTO, JR., ESQ., and.
21                  RAYMOND C. DRISCOLL, ESQ.
                    (Philadelphia, Pennsylvania)
22
                    Counsel for Defendant
23

24

25                            Brian P. Gaffigan
                              Registered Merit Reporter

1                                 - oOo -

2                         P R O C E E D I N G S

3                   (REPORTER'S NOTE:  The following jury trial was

4       held in open court, beginning at 9:30 a.m.)

5                   THE COURT:  Please be seated.  Good morning.

6       We're going to be having the jury venire here in a moment.

7       I want to put on the record that the defendant has chosen

8       to appear in court this morning in a prison issue jumpsuit.

9       That is evidently his choice, although civilian nonissue

10      prison clothing was available.

11                  Is there anything else that either side wants to

12      put on the record in that regard?  The Government?

13                  MS. BYRD:  No, Your Honor.

14                  THE COURT:  Mr. Peruto?

15                  MR. PERUTO:  No, Your Honor.

16                  THE COURT:  Okay.  Is there any other matter?

17      I left on the desk for each of you a copy of the voir dire

18      that I intend to use and the preliminary jury instructions

19      so hopefully there is not an issue with either of those

20      things.  Ms. Byrd?

21                  MS. BYRD:  No issue from the Government.

22                  THE COURT:  Mr. Peruto?

23                  MR. PERUTO:  None, sir.

24                  THE COURT:  Thank you.

25                  Let me just note, I know you have appeared in

1    this courthouse before, Mr. Peruto, but I haven't had the

2    pleasure of having a trial with you previously.  The way we

3    will conduct the voir dire and the jury selection is akin to

4    how I believe the other judges do it.  But let me just tell

5    you real quickly.

6           I will ask the question generally to everybody.

7    Then I will ask people if they have a "yes" answer to any of

8    those questions.  We'll bring those people one at a time.

9    I'll give you folks a chance to ask any questions within

10   bounds of reason.  We'll seat 12 and two alternates.

11          The selection will be by a silent struck juror

12   method.  That is, we'll select at random a sufficient number

13   of jurors to fill not only the box but the first couple of

14   rows here and then all those names will be on the clipboard.

15   The courtroom deputy will take that clipboard back and forth

16   between counsel table and you will have a chance to make

17   your strikes and to see the other side strikes.

18          When everybody has exercised all the strikes

19   they want to exercise, if there is still more than 14, those

20   people beyond the number of 14 will be excused and the first

21   12 will be the jurors and the numbers 13 and 14 will serve

22   as the alternates.

23          Nobody needs to say "content" or anything like

24   that.  I just need to get to the point where in silence you

25   guys make your strikes and then the deputy will let me know

1    we're done, and then we'll go ahead and excuse those that

2    will be excused and we'll have our jury.

3                Okay.  Are there any questions about that, sir?

4                MR. PERUTO:  No, sir.

5                THE COURT:  Okay.  Fine.

6                (Pause.)

7                THE COURT:  Okay.  Mr. Lora-Pena, we're going to

8    have you cooperate here for a second and we'll take those

9    leg irons off during the trial; all right?

10                THE DEFENDANT:  (Nodding yes.)

11                (Leg irons taken off defendant.)

12                THE COURT:  All right.  I thought we had the

13    arrival of the venire imminent but apparently not, so we'll

14    go ahead and check and see what the hold-up is.  I'll go

15    ahead and leave the bench.  And when we get the venire in

16    the room, I'll come back in and we'll reconvene.  We're in

17    recess.

18                (Brief recess taken; prospective jurors enter

19    the courtroom.)

20                THE COURT:  Good morning, ladies and gentlemen.

21    Please be seated.

22                I'll introduce myself.  My name is Kent Jordan.

23    I'm the judicial officer that has been selected to preside

24    at this trial.  And as you know by now, you're the folks

25    who have been selected to come here and participate in the

1    process of picking a jury and we appreciate your being here.

2    Here is how we'll proceed.  I'm going to ask you

3    a series of questions.  And you don't need to respond out

4    loud or raise a hand or anything.  In fact, I wish you

5    wouldn't.  I just want you to keep track in your own minds

6    of whether you have a "yes" answer to any of the questions

7    that I'm going to ask you; okay?

8    When I've gone through this series of

9    questions -- and there are not that many of them.  I think

10    we have a total of nine questions here, about.  At that

11    point, I'll say, "did any of you have a 'yes' to one or more

12    of my questions?"  At that point, just raise your hand and

13    then we'll get a sense of how many folks we need to speak to

14    further.

15    After we've done that, I'll come over here to

16    this part of the courtroom that we call side bar and the

17    Assistant United States Attorney who is here on behalf of

18    the Government, Ms. Byrd, and Mr. Peruto, the defense

19    attorney, and perhaps his colleague who is here with him

20    will come to side bar with me and we'll speak to you one at

21    a time, those of you who had a "yes" to one or more of my

22    questions.

23    So that process is going to require a little bit

24    of patience on your part because while we're speaking to

25    folks one at a time, the rest of you are going to be back

1    there sitting quietly, for which we're grateful, although

2    we recognize that is not the most interesting thing to be

3    doing.  So we'll try to be as efficient as we can, but

4    we'll ask you to indulge us because the defendant here,

5    Mr. Lora-Pena has the absolute right to a fair and impartial

6    jury, and this helps us make sure we get such a jury, okay?

7             When all that is done, we've asked everybody

8    questions, the couple of gentlemen here in the front with

9    me, my courtroom deputy clerks are going to select at random

10   a series of numbers that are associated with your names on a

11   list.  And we'll have those folks who are selected at random

12   seated in the jury box and across the front row here of

13   the benches back there behind the bar.  And we'll pass a

14   clipboard back and forth between counsel table and nobody is

15   really going to be saying anything.  It's just going to be

16   the lawyers working with their clients to decide who on that

17   list they would like to see kept on the jury and who they

18   prefer not kept on the jury.

19            After all that is done, we're going to excuse

20   the folks who have been struck through the exercise of the

21   parties' rights to challenge jurors and we'll be left with

22   14 people seated in this jury box, the first 12 of whom will

23   be the jurors and the other two will be alternates in the

24   case.

25            So that is how it's going to go.  The whole

1   process takes a little bit of time.

2          First, here are the questions.

3          Oh, thank you very much.  My courtroom deputy

4   reminded me that as much I like you and I hope you like me,

5   I have to make sure you are not fibbing when I ask these

6   questions.  I'm going to have you all sworn to tell the

7   truth right at the get-go.  Go ahead.

8          (Potential jurors placed under oath at 9:57

9   a.m.)

10         THE COURT:  Thanks very much.

11         Do you know any of the following potential

12  witnesses in this case:  David Thomas, Robert Doug Denney,

13  Jack Leo, William David?

14         This case involves charges of assault on federal

15  officers.  Is there anything about the nature of the charges

16  that would prevent you from being an impartial juror?

17         Have you, or any close relative, ever been

18  investigated by, or arrested by, the United States Marshal's

19  Service?

20         Do any of you own, or have you owned, a pit

21  bull?

22         Have you served on a jury for a criminal case

23  before?

24         Have you been arrested for anything other than a

25  minor traffic offense?

1          Have you ever testified in a criminal case?

2          This trial should last only one day, although

3     jury deliberations may go beyond today.  Is there anything

4     about the length of the trial that would prevent you from

5     serving as a juror on this case?

6          Does any member of the panel know of any other

7     matter which you believe should be called to the Court's

8     attention as having some bearing upon your qualifications or

9     ability to sit as a juror, or which you think may prevent

10    you from rendering a fair and impartial verdict based solely

11    upon the evidence and my instructions to you on the law?

12         All right.  Did any of you have a "yes" to one

13    or more of my questions, please raise your hand.

14         (Jurors respond by raising their hands.)

15         THE COURT:  Okay.  Thanks.

16         We'll go ahead and proceed with that side bar

17    set of discussions that I described to you.

18         Counsel, I'll see you at side bar.

19         (Conference held at side bar out of presence of

20    jury.)

21         THE COURT:  All right.  We're going to proceed

22    row by row, moving from the center aisle over toward the

23    wall; okay?  So the first person on the first row who had a

24    "yes" to one or more of my questions, would you please come

25    forward at this time.

Schantz - voir dire

1          (Potential juror approaches side bar.)

2          THE COURT:  Hi.  Good morning.  I'll have you

3   stand right here.  Thanks very much, ma'am.

4          First, I need to ask you your name for our

5   record.

6          THE JUROR:  My last name is Schantz,

7   S-C-H-A-N-T-Z.

8          THE COURT:  Ms. Schantz, you had a "yes" to

9   one or more of my questions.  Can you tell me about that,

10  please?

11         THE JUROR:  Yes.  You asked if we had a been a

12  juror in a criminal case before.  I have.

13         THE COURT:  Okay.  How long ago was that?

14         THE JUROR:  About 20 years ago.

15         THE COURT:  Was that here in Delaware?

16         THE JUROR:  That was in Superior Court, District

17  of Columbia.

18         THE COURT:  Do you remember what kind of charge

19  the case involved?

20         THE JUROR:  It was a robbery case.

21         THE COURT:  All right.  Do you remember what the

22  outcome of the case was?

23         THE JUROR:  The defendant was convicted.

24         THE COURT:  He was convicted?

25         THE JUROR:  Yes, sir.

O'Neill - voir dire

1          THE COURT:  Okay.  Was there anything about your

2     participation in that process that you think would prejudice

3     you against the criminal defendant in this case, would

4     prevent you from being fair and impartial?

5          THE JUROR:  I don't think so.

6          THE COURT:  Was there anything else that I asked

7     that you had a "yes" to?

8          THE JUROR:  No.

9          THE COURT:  All right.  Ms. Byrd, any follow-up

10    questions?

11         MS. BYRD:  No, thank you.  Good morning.

12         THE COURT:  Mr. Peruto?

13         MR. PERUTO:  No.  Thank you.

14         THE COURT:  Okay.  Thanks very much.

15         THE JUROR:  Thank you.

16         (Potential juror leaves side bar and returns to

17    the back of the courtroom.)

18         THE COURT:  Any applications from the

19    Government?

20         MS. BYRD:  No, Your Honor.

21         THE COURT:  Mr. Peruto?

22         MR. PERUTO:  No, Your Honor.

23         THE COURT:  The next individual on that row who

24    had a "yes," please come forward.

25         (Potential juror approaches side bar.)

O'Neill - voir dire

1    THE COURT:  Good morning, ma'am.  I'll have you

2    stand right here, if I could, ma'am.  And, first, I'll ask

3    you to identify yourself for the record.

4    THE JUROR:  Maureen O'Neill.

5    THE COURT:  O'Neill.  Ms. O'Neill.

6    THE JUROR:  Yes.

7    THE COURT:  Okay.  You had a "yes" to one or

8    more of my questions.  Please tell me about that.

9    THE JUROR:  Two.  The one was a long time ago,

10   but my brother was arrested for draft evasion.

11   THE COURT:  Okay.  Does that go back to the

12   sixties?

13   THE JUROR:  (Nodding yes.)

14   THE COURT:  That was awhile ago.

15   THE JUROR:  But it was a question so it was a

16   "yes."

17   THE COURT:  Yes, you are right.  Thank you very

18   much for being honest and candid about that.

19   Is there anything about your brother's

20   experience with the criminal justice system that would

21   prejudice you for or against one side or the other in this

22   case?

23   THE JUROR:  He is gone now.  (Shaking head no.)

24   THE COURT:  I'm sorry for your loss.

25   THE JUROR:  That's okay.

1            THE COURT:  Do you think you could be fair and

2  impartial in deciding this case only on the evidence that is

3  in the case if you were selected to serve?

4            THE JUROR:  I don't think that would have any

5  bearing.

6            THE COURT:  Okay.

7            THE JUROR:  My other thing is during this time,

8  they're laying off a number of people in the next two weeks.

9  It's happening now.  Some of these people worked for over

10  20 years.  I came today because I felt that I had to, but if

11  this would last longer, I would appreciate being excused.

12           THE COURT:  Okay.  This won't last long.

13           THE JUROR:  Okay.

14           THE COURT:  I think the parties agree, they

15  believe the evidence can come in today.  It might take up a

16  little bit of time tomorrow.  Even if the evidence finished

17  today, the deliberations of the jury might take into

18  tomorrow.  So you might want to say, well, I might have to

19  come tomorrow, too, but it shouldn't last past tomorrow I

20  don't think unless something unexpected arises.  Your jury

21  selection might be such that it lasts longer but I talked

22  with this with both counsel.  I think it's a fair statement

23  that it's unlikely to last past tomorrow.

24           Is that something where you could serve?

25           THE JUROR:  I think if it doesn't last past

Everett - voir dire

1     tomorrow.   (Nodding yes.)

2                 THE COURT:  Okay.  Any follow-up questions,

3     Ms. Byrd?

4                 MS. BYRD:  No.

5                 Thank you, ma'am.

6                 MR. PERUTO:  Thank you.

7                 THE JUROR:  Thank you.

8                 (Potential juror leaves side bar and returns to

9     the back of the courtroom.)

10                 MR. PERUTO:  Yes, I think we'll finish up.

11                 MS. BYRD:  No applications.

12                 THE COURT:  Applications?

13                 MR. PERUTO:  (Shaking head no.)

14                 THE COURT:  Okay.

15                 (Potential juror approaches side bar.)

16                 THE COURT:  Good morning, ma'am.  I'll have you

17     stand right here, if you could please.

18                 THE JUROR:  Good morning.

19                 THE COURT:  I'll first ask you to give us your

20     name for the record.

21                 THE JUROR:  My name?

22                 THE COURT:  Yes.

23                 THE JUROR:  Juanita Everett.

24                 THE COURT:  Okay.  Ms. Everett, you had a "yes"

25     to some of the questions I asked.

Everett - voir dire

1              THE JUROR:  The first question, a David Thomas.

2              THE COURT:  Yes.

3              THE JUROR:  I know a David Thomas with the State

4      Police.

5              THE COURT:  With the State Police?

6              THE JUROR:  Uh-huh.

7              THE COURT:  Okay.  Now, do you remember this

8      gentleman, anything about how he looks or ...

9              THE JUROR:  David Thomas?

10             THE COURT:  Yes.

11             THE JUROR:  He is African-American and I believe

12     he is a corporal with the State Police.  It has been awhile

13     since I have seen him.

14             THE COURT:  Okay.  How long?

15             THE JUROR:  How long since I have seen him?

16             THE COURT:  Quite awhile?

17             THE JUROR:  Maybe five years.

18             THE COURT:  Well, you know what?  The David

19     Thomas who is in this case is a gentleman, an

20     African-American gentleman who was a State Police Officer,

21     is now the United States Marshal, so it's possible it's the

22     same Dave Thomas, although frankly that is a name that is

23     not unusual so it's possible there is another David Thomas

24     on the State Police force.  Would you recognize this Dave

25     Thomas if you saw him again?

Everett - voir dire

1              THE JUROR:  Yes.

2              THE COURT:  Okay.  You know what?  We'll just

3    sort of hold that in abeyance.  I think we'll ask the

4    marshal to step up here, this potential juror, and have you

5    take a look at him and then maybe have some follow-up

6    questions for you because if it's a different person, it

7    won't make a difference.  If it is -- you know, I'll just

8    ask you hypothetically, let's assume it were the same David

9    Thomas.

10             THE JUROR:  Yes.

11             THE COURT:  How did you know this gentleman?

12             THE JUROR:  I guess a working relationship.  I

13   worked for a bank and he was a customer.

14             THE COURT:  Okay.  So you would see him

15   occasionally when he would come in and do his banking?

16             THE JUROR:  Yes.

17             THE COURT:  No personal relationship with him of

18   any sort?

19             THE JUROR:  No.

20             THE COURT:  Okay.  I assume since you haven't

21   seen him for five years, whatever business relationship

22   there was no longer exists; is that correct?

23             THE JUROR:  It might be longer than five years.

24   I'm just guessing.

25             THE COURT:  Okay.

Everett – voir dire

1     THE JUROR:  It's been a while.

2     THE COURT:  Now again, assuming it's the same

3  person, would the fact that you had a professional customer

4  service relationship with this gentleman prevent you from

5  being fair and impartial to any testimony he would give in

6  this case?  In other words, would you be more inclined to

7  see him because you had a professional relationship or would

8  you weigh what he had to say with an open mind?

9     THE JUROR:  Oh, I think I would have an open

10  mind.  I would be able to weigh the evidence.

11     THE COURT:  Is there anything else about the

12  relationship you have with this gentleman that might

13  prejudice you, one way or another, in this case?

14     THE JUROR:  Not at all.

15     THE COURT:  All right.  Did you say "yes" to any

16  of my other questions?

17     THE JUROR:  No, sir.

18     THE COURT:  Okay.  Ms. Byrd?

19     MS. BYRD:  No questions, ma'am.  Thank you.

20     THE COURT:  Mr. Peruto?

21     MR. PERUTO:  No questions.

22     THE COURT:  All right.  Thank you, ma'am.

23     THE JUROR:  Okay.  Thank you.

24     (Potential juror leaves side bar and returns to

25  the back of the courtroom.)

1              MR. PERUTO:  That is assuming that is the same

2     one, his credibility is directly involved in the case.  So

3     because it's such is a short trial and there are so many

4     other potential jurors, I would move to excuse the juror

5     because we don't need her.

6              THE COURT:  Okay.  Ms. Byrd?

7              MS. BYRD:  I don't strenuously object to that,

8     Your Honor.  I don't think there are any grounds based on

9     the juror's answers.  I think she stated quite candidly she

10    would be impartial so I don't think there are any grounds

11    based on what she said.  However, I don't have any strong

12    objection to Mr. Peruto's request.

13             THE COURT:  Well, I'm going to take it under

14    advisement.  I'll see how we do and we'll see if it's really

15    the same Dave Thomas.  Okay?

16             Next person, please come forward.

17             (Potential juror approaches side bar.)

18             THE COURT:  Hi.  Good morning, ma'am.

19             THE JUROR:  Good morning.

20             THE COURT:  Could you please tell me your name?

21             THE JUROR:  Mary Lou Hurd.

22             THE COURT:  Ms. Hurd.  Okay.  You had a "yes" to

23    one or more of my questions.  Could you tell me about that,

24    please?

25             THE JUROR:  About 10 or I think 15 years ago, I

Hurd - voir dire

1    served on a murder trial in Dover for six weeks.  I was

2    excused on the next to the last day of trial.

3                THE COURT:  Okay.  Well, before we go into that,

4    which we will, is there a "yes" to any of my other

5    questions?

6                THE JUROR:  No.

7                THE COURT:  Okay.  First, can you tell me why

8    you were excused?

9                THE JUROR:  Yes.  They brought in a previous

10   gynecologist from North Carolina and it was my gynecologist.

11               THE COURT:  I see.

12               THE JUROR:  So they excused me because of that.

13               THE COURT:  Was there anything about -- so let

14   me make sure.  You didn't participate in the deliberations

15   at all?

16               THE JUROR:  No, I did not.

17               THE COURT:  Was there anything about your

18   participation as a juror in that trial that you think would

19   prejudice you, one way or another in this case, or could

20   you be fair and impartial to both sides in looking at the

21   evidence in this case if you were selected to serve?

22               THE JUROR:  I think I could be fair and

23   impartial to both sides.

24               THE COURT:  Good.

25               Ms. Byrd, any questions?

Catts - voir dire

1              MS. BYRD:  I have no questions.  Thank you,

2     ma'am.

3              THE COURT:  Mr. Peruto?

4              MR. PERUTO:  No, thank you.

5              THE COURT:  Thank you, ma'am.

6              THE JUROR:  Thank you.

7              (Potential juror leaves side bar and returns to

8     the back of the courtroom.)

9              THE COURT:  Applications?

10             MS. BYRD:  No, Your Honor.

11             MR. PERUTO:  No, sir.

12             THE COURT:  Okay.  Anybody else on that first

13    row who had a "yes" to one or more of my questions?

14             Okay.  Let's go to the next row back, beginning

15    at the center aisle.

16             (Potential juror approaches side bar.)

17             THE COURT:  Hi.

18             THE JUROR:  Hi.

19             THE COURT:  Sir, if you would please just stand

20    there and begin by identifying yourself for the record.

21             THE JUROR:  Douglas Catts, C-A-T-T-S.

22             THE COURT:  Okay.  Mr. Catts, you had a "yes" to

23    one or more of my questions.  Can you tell me about that?

24             THE JUROR:  Yes.  I've been a witness in a

25    criminal trial.

Catts - voir dire

1          THE COURT:  Okay.  As to any of my other

2  questions?

3          THE JUROR:  No.

4          THE COURT:  When were you a witness in a

5  criminal trial, sir?

6          THE JUROR:  It was back in the 80s.  Maybe the

7  middle of the 80s.

8          THE COURT:  Was that here in Delaware?

9          THE JUROR:  Yes.

10         THE COURT:  In Superior Court?

11         THE JUROR:  Yes.

12         THE COURT:  What kind of a case was it?

13         THE JUROR:  Murder.

14         THE COURT:  And were you a witness who was

15  called because you had seen something or were you involved

16  with law enforcement?  What was the capacity about you being

17  a witness during the trial?

18         THE JUROR:  I'm an attorney and my client had

19  been murdered.  He had been killed.

20         THE COURT:  Was there anything about your

21  experience as a witness in that case that would prevent

22  you from being fair and impartial in this case, if you were

23  selected to serve?

24         THE JUROR:  No.

25         THE COURT:  Okay.  Now, you mentioned that

Catts - voir dire

1   you're an attorney.  Is there anything about your training

2   and experience as a lawyer that you think would affect your

3   ability to be a fair and impartial and to decide this case

4   solely on the evidence and the law as I would instruct the

5   jury?

6                THE JUROR:  No.

7                THE COURT:  Okay.  Ms. Byrd, any follow-up

8   questions?

9                MS. BYRD:  Sir, what type of law do you

10  currently practice?

11               THE JUROR:  Personal injury.

12               MS. BYRD:  Did you do criminal law?

13               THE JUROR:  Yes a little bit.

14               MS. BYRD:  Defense?

15               THE JUROR:  Yes.

16               MS. BYRD:  Mow many years ago was that?

17               THE JUROR:  More than two.

18               MS. BYRD:  Thank you, sir.

19               THE COURT:  Mr. Peruto, follow-up questions?

20               MR. PERUTO:  (Shaking head no.)

21               THE COURT:  Okay.  Thank you, Mr. Catts.

22               (Potential juror leaves side bar and returns to

23  the back of the courtroom.)

24               MS. BYRD:  Nothing from the Government.

25               MR. PERUTO:  Nothing, sir.

1          THE COURT:  Okay.  Next individual on that

2   second row who had a "yes" to one or more of my questions,

3   if you would please come forward.

4          (Potential juror approaches side bar.)

5          THE COURT:  Okay.  Sir, please stand right here.

6   We'll start by asking you your name for the record.

7          THE JUROR:  Nicola Nastasi.

8          THE COURT:  Mr. Nastasi?

9          THE JUROR:  Nastasi.

10         THE COURT:  I got it right that time?

11         THE JUROR:  Yes, perfect.

12         THE COURT:  Mr. Nastasi, you said "yes" to one

13  or more of to one or more of my questions.  Tell me about

14  that, please.

15         THE JUROR:  When I was 18, I was charged with

16  drinking under age.

17         THE COURT:  Okay.  How long ago was that?

18         THE JUROR:  About 22 years ago.  It was a "yes"

19  answer to the question.  I needed to tell you.

20         THE COURT:  You did and you are holding your age

21  well, sir.  Is there a "yes" to any of my other questions?

22         THE JUROR:  No.

23         THE COURT:  Is there anything about your

24  experience, that experience you had with the criminal

25  justice system that would prevent you from being fair and

Sneeringer - voir dire

1  impartial in deciding this case, if you were selected to

2  serve?

3          THE JUROR:  No.

4          THE COURT:  Ms. Byrd?

5          MS. BYRD:  I have nothing.  Thank you, sir.

6          THE COURT:  Mr. Peruto?

7          MR. PERUTO:  No.

8          THE COURT:  All right.  Thank you sir.

9          (Potential juror leaves side bar and returns to

10  the back of the courtroom.)

11          MS. BYRD:  No application.

12          THE COURT:  No application.

13          MR. PERUTO:  I'm glad I'm not on trial.

14          THE COURT:  I'll take that as a "no"

15  application.  Good.  We'll move on.

16          (Potential juror approaches side bar.)

17          THE COURT:  Good morning, sir.  I'll have you

18  stand right here and start by asking you to give your name

19  for our record.

20          THE JUROR:  David Sneeringer.

21          THE COURT:  How are you saying that, sir?

22          THE JUROR:  David Sneeringer.

23  S-N-E-E-R-I-N-G-E-R.

24          THE COURT:  Okay.  Mr. Sneeringer.  You said

25  "yes" to one or more of my questions.  Please tell me about

Sneeringer - voir dire

1      that.

2                    THE JUROR:   Sitting on a criminal trial.   It's

3      been at least 10 years.

4                    THE COURT:   Okay.   Was that here in Delaware?

5                    THE JUROR:   Yes.   State.

6                    THE COURT:   Superior Court?

7                    THE JUROR:   Correct.

8                    THE COURT:   Do you remember what kind of case it

9      was?

10                   THE JUROR:   It was a drug possession case.

11                   THE COURT:   How long did it last?

12                   THE JUROR:   It lasted approximately a day.   No

13     more than a day.

14                   THE COURT:   Do you remember what the outcome

15     was?

16                   THE JUROR:   The defendant was found guilty.

17                   THE COURT:   Okay.   Was there anything about that

18     experience you had that would bias you one way or another

19     in this case, for either side or against either side, do you

20     think?

21                   THE JUROR:   No.

22                   THE COURT:   So do you think you could be fair

23     and impartial and decide this case with an open mind, if you

24     were selected to serve?

25                   THE JUROR:   Yes.

Hamby - voir dire

1          THE COURT:  Is there anything else to say?

2          THE JUROR:  No.

3          THE COURT:  Ms. Byrd, any questions?

4          MS. BYRD:  Nothing, sir.  Thank you.

5          THE COURT:  Mr. Peruto?

6          MR. PERUTO:  No, thank you.

7          THE COURT:  Okay.  Thank you, sir.

8          (Potential juror leaves side bar and returns to

9    the back of the courtroom.)

10          MS. BYRD:  No application.

11          MR. PERUTO:  No application.

12          THE COURT:  Okay.  Next individual on that

13   second row, if any, who had a "yes" to one or more of my

14   questions.

15          All right.  Let's move back to the third row

16   then, beginning closest to the aisle, the first person on

17   that row who had a "yes" to one or more of my questions,

18   please come forward.

19          (Potential juror approaches side bar.)

20          THE COURT:  Hi.  I'll have you stand right here.

21   Ma'am, could you give me your name for the our record,

22   please.

23          THE JUROR:  Ellen Hamby.

24          THE COURT:  Okay.  Ms. Hamby, you had an

25   affirmative response to something I asked.  Would you tell

Hamby - voir dire

1    me about that?

2              THE JUROR:  Well, my brother is a retired

3    captain of detectives in the County Police and my ex-husband

4    is a County Policeman.  And I've owned a pit bull in the

5    past and I have really strong opinions about the owners of

6    pit bulls and rottweilers and stuff nowadays.  You know,

7    that I feel like if they would train their dog, and I think

8    they use a dog --

9              THE COURT:  Just a little more quiet.

10             THE JUROR:  I think they used the dogs in the

11   wrong manner.  So I'm afraid I would be more on the side of

12   the officer.

13             THE COURT:  Okay.  And if I were to instruct

14   you, as I would, that it was important for you to set aside

15   your own experiences and listen to the evidence here, would

16   you have a hard time with that instruction or could you

17   follow it?

18             THE JUROR:  I probably would have a hard time.

19             THE COURT:  Okay.  Any questions from you?

20             MS. BYRD:  No.  Thank you, ma'am.

21             THE COURT:  Mr. Peruto?

22             MR. PERUTO:  No, sir.

23             THE COURT:  Thank you.

24             THE JUROR:  Okay.

25             (Potential juror leaves side bar and returns to

Stone - voir dire

 1    the back of the courtroom.)

 2                THE COURT:  Okay.  Applications?

 3                MS. BYRD:  I won't object to Mr. Peruto's

 4    application.

 5                MR. PERUTO:  And I do have an application.

 6                THE COURT:  Okay.  For cause?

 7                MR. PERUTO:  Yes.

 8                THE COURT:  And I agree.  She was candid and I

 9    think she could not be impartial.  So she is struck for

10    cause.

11                Sir, if you would come forward, please.

12                (Potential juror approaches side bar.)

13                THE COURT:  Good morning, sir.

14                THE JUROR:  Good morning.

15                THE COURT:  I need to ask by start asking your

16    name.

17                THE JUROR:  Robert Stone, S-T-O-N-E.

18                THE COURT:  You had a "yes."  Please tell me

19    about that.

20                THE JUROR:  I was arrested and charged and pled

21    guilty to DWI.

22                THE COURT:  How long ago was that, sir?

23                THE JUROR:  It's been '87.  So 18 years ago.

24                THE COURT:  Okay.  Is there anything else I

25    asked that you had a "yes" to?

Stone - voir dire

1          THE JUROR:  No.

2          THE COURT:  Okay.  Now, did your experience

3   with the criminal justice system leave you with feelings

4   or a bias that you think would affect your ability to be

5   impartial in this case or could you decide the case with a

6   fair and open mind?

7          THE JUROR:  I think I could decide the case.  It

8   was kind of a joke.  I got in on Thursday, got caught two

9   weeks later and it was done with.  So it was pretty simple.

10         THE COURT:  So it was minor?

11         THE JUROR:  Well, it wasn't minor but it was.

12         THE COURT:  Thank you.  It was a minor process?

13         THE JUROR:  It was a small town.  I just came

14   in, showed up and that was done with.

15         THE COURT:  Okay.  So what I think I hear you

16   telling me is that wouldn't affect your ability to be fair

17   to both sides in this case?

18         THE JUROR:  I don't think so.

19         THE COURT:  And you could decide this case, if

20   you were selected to serve, solely on the evidence and the

21   law as instructed; is that correct?

22         THE JUROR:  Yes.

23         THE COURT:  Ms. Byrd, do you have any questions?

24         MS. BYRD:  No.  Thank you, sir.

25         THE COURT:  Mr. Peruto?

Boxmeyer - voir dire

1          MR. PERUTO:  No.  Thank you, sir.

2          (Potential juror leaves side bar and returns to

3     the back of the courtroom.)

4          MS. BYRD:  No application.

5          MR. PERUTO:  No application.

6          THE COURT:  All right.  Next individual on that

7     row, if any, who had a "yes" to one or more of my questions.

8          (Potential juror approaches side bar.)

9          THE COURT:  Sir, if you would.

10          THE JUROR:  I have a bit of a problem with this.

11     My son --

12          THE COURT:  I'm sorry.  I need to have you stand

13     right here.  Before you start, I need to know who you are so

14     please tell me.

15          THE JUROR:  My name is Dave Boxmeyer, number

16     four.

17          THE COURT:  Mr. Boxmeyer?

18          THE JUROR:  Yes, sir.

19          THE COURT:  Okay.

20          THE JUROR:  My son is a detective with the

21     federal agency and I've seen some of the damage and some

22     of the horror stories here so I would be a little bit

23     prejudiced in this case.

24          THE COURT:  Okay.

25          THE JUROR:  And it's going to take some serious

Boxmeyer - voir dire

1   convincing for me to not -- for me to let this guy go,

2   basically.

3                    THE COURT:  Okay.

4                    THE JUROR:  I mean I can give it a shot, if you

5   would like, but I would not want me on this jury.

6                    THE COURT:  Well, that's a powerful statement.

7   I'm sorry to hear that.

8                    THE JUROR:  I'm trying to be honest with you

9   here.

10                    THE COURT:  Honesty is --

11                    THE JUROR:  Yes, I've seen the damage that can

12   occur.

13                    THE COURT:  Well, where does your son work?

14                    THE JUROR:  He is with HUD.  He works out of

15   Baltimore.

16                    THE COURT:  What does he do?

17                    THE JUROR:  Basically, kicks down doors at 3:00

18   o'clock in the morning.

19                    THE COURT:  Okay.  Any questions?

20                    MS. BYRD:  No.  Thank you, sir.

21                    THE COURT:  Mr. Peruto?

22                    MR. PERUTO:  No.

23                    THE COURT:  Thank you, sir.

24                    THE JUROR:  Thank you.

25                    (Potential juror leaves side bar and returns to

 1    the back of the courtroom.)

 2                    MS. BYRD:  Move for cause.

 3                    MR. PERUTO:  No objection.

 4                    THE COURT:  He is struck.

 5                    Okay.  Next individual on that row, if any, who

 6    had a "yes" to one or more of my questions, please come

 7    forward.

 8                    All right.  Moving back to the next row.

 9                    (Potential juror approaches side bar.)

10                    THE COURT:  Good morning, ma'am.  Stand right

11    here.  Thanks.

12                    You had a "yes" to one or more of my questions I

13    asked?

14                    THE JUROR:  Yes.

15                    THE COURT:  I've got to start by asking you to

16    identify yourself for the record.

17                    THE JUROR:  My name is Janine Torbert.

18                    THE COURT:  Okay.  Ms. Torbert, tell me about

19    the question.

20                    THE JUROR:  It's the time frame.

21                    THE COURT:  Okay.  What is happening over the

22    next day or two?

23                    THE JUROR:  My daughter-in-law is expecting any

24    moment, so I don't know.

25                    THE COURT:  She is due imminently?

Williams - voir dire

1            THE JUROR:  Yes, she is.  And her mother doesn't

2     live here.

3            THE COURT:  You're sort of the mom on the scene?

4            THE JUROR:  Yes, exactly.

5            THE COURT:  That is a big and happy event.

6     Congratulations.

7            THE JUROR:  Thank you.  It's the first grand

8     child.

9            THE COURT:  Okay.  Any questions, Ms. Byrd?

10           MS. BYRD:  No.  Thank you, ma'am.

11           THE COURT:  Ms. Peruto?

12           MR. PERUTO:  No.

13           THE COURT:  Okay.  Thank you, ma'am.

14           THE JUROR:  Thank you.

15           (Potential juror leaves side bar and returns to

16    the back of the courtroom.)

17           THE COURT:  Applications?

18           MS. BYRD:  Move for cause.

19           MR. PERUTO:  No objection.

20           THE COURT:  I agree.  She is struck.

21           (Potential juror approaches side bar.)

22           THE COURT:  Ma'am, thanks so much.  You have to

23    start by stating your name for the record.

24           THE JUROR:  Susan Williams.

25           THE COURT:  Ms. Williams, tell me about your

Williams - voir dire

1    "yes" answers.

2                THE JUROR:  A "yes" answer was I served on a

3    criminal case about five years ago.  An arson case.

4                THE COURT:  Here in Delaware?

5                THE JUROR:  Yes.  Never went to deliberations.

6    They reached an agreement.

7                THE COURT?  Before you guys started?

8                THE JUROR:  Before we did.  Uh-huh.

9                THE COURT:  Okay.  Is there anything about

10   your experience of serving as a juror in that case that

11   prejudices you or biases you one way or another in this case

12   or could you approach this case with a fair and open mind?

13               THE JUROR:  I could.

14               THE COURT:  Okay.  Did you have a "yes" to any

15   of my other questions?

16               THE JUROR:  No.

17               THE COURT:  All right.  Ms. Byrd?

18   MS. BYRD:  No.

19   Thank you, ma'am.

20               THE JUROR:  You're welcome.

21               THE COURT:  Mr. Peruto?

22   MR. PERUTO:  No.

23               THE COURT:  Thank you.

24               THE JUROR:  You're welcome.

25               (Potential juror leaves side bar and returns to

Wright - voir dire

```
 1    the back of the courtroom.)

 2              THE COURT:  Applications?

 3              MS. BYRD:  No, Your Honor.

 4              MR. PERUTO:  No.

 5              THE COURT:  All right.  The next individual in

 6    the last row, please.

 7              (Potential juror approaches side bar.)

 8              THE COURT:  Good morning, ma'am.  I'll have you

 9    stand right here, if we could.

10              THE JUROR:  Hi.

11              THE COURT:  And we'll start by you stating your

12    name.

13              THE JUROR:  Claire Wright.

14              THE COURT:  All right.  Ms. Wright, you had a

15    "yes" to something I asked?

16              THE JUROR:  Yes.  I had served on a jury on a

17    criminal case.

18              THE COURT:  Okay.

19              THE JUROR:  Quite a few years ago.  It's been

20    about 15 years maybe.

21              THE COURT:  Was it here in Delaware?

22              THE JUROR:  Yes.  Uh-huh.  In the old

23    courthouse.

24              THE COURT:  Superior Court?

25              THE JUROR:  No, Circuit -- or Petit Jury.
```

B-35

Wright - voir dire

1              THE COURT:  It was a petit jury?

2              THE JUROR:  Yes.

3              THE COURT:  Do you remember the kind of case?

4              THE JUROR:  Yes, it was about drugs and some

5     mother had put drugs in the baby crib or something.

6              THE COURT:  That is a sad case.  Do you remember

7     how that case came out?

8              THE JUROR:  I think she was guilty.  There were

9     a couple people involved in it, but I don't remember exactly

10    all what happened or you know.

11             THE COURT:  Okay.  Was there anything about your

12    experience on that jury that would prevent you from being

13    fair and impartial if you were selected to serve on this

14    jury?

15             THE JUROR:  Not that I can think of.

16             THE COURT:  Did you have a "yes" to any of my

17    other questions?

18             THE JUROR:  No, just that one question.

19             THE COURT:  Okay.  Ms. Byrd, any questions?

20             MS. BYRD:  Nothing.

21             Thank you, ma'am.

22             THE COURT:  Mr. Peruto?

23             MR. PERUTO:  No.

24             THE COURT:  Thank you.

25             (Potential juror leaves side bar and returns to

1    the back of the courtroom.)

2              THE COURT:  Any application?

3              MS. BYRD:  No.

4              THE COURT:  Mr. Peruto?

5              MR. PERUTO:  (Shaking head no.)

6              THE COURT:  All right.  Next person on that row.

7              (Potential juror approaches side bar.)

8              THE JUROR:  Good morning.

9              THE COURT:  Good morning, sir.  I'll have you

10   stand right there.

11             And we'll start by asking you to identify

12   yourself for our record, if you would, please.

13             THE JUROR:  Henry Bardsley.

14             THE COURT:  Mr. Bardsley, can you tell me about

15   the "yes" answer or answers you had for my questions?

16             THE JUROR:  I was on two criminal cases, a

17   jury on two criminal cases.  It was about 10 years ago or

18   20 years ago.

19             THE COURT:  Were those cases here in Delaware?

20             THE JUROR:  New Jersey.

21             THE COURT:  Do you remember the nature of the

22   charges in those cases?

23             THE JUROR:  One was a police officer who was

24   accused of arson.  The other was a drug case.

25             THE COURT:  Okay.  And what was the outcome of

1    those cases, if you recall?

2                THE JUROR:  The drug case, we found insufficient

3    evidence and we found him not guilty.  And the arson case, I

4    never found out the outcome.

5                THE COURT:  Was there anything about your

6    experience serving on those two juries that would prevent

7    you from being fair and impartial juror if you were selected

8    to serve on this case?

9                THE JUROR:  No.

10                THE COURT:  All right.  Ms. Byrd?

11                MS. BYRD:  I have nothing.  Thank you, sir.

12                THE COURT:  Mr. Peruto?

13                MR. PERUTO:  No.

14                THE COURT:  Thank you, sir.

15                THE JUROR:  Thank you.

16                (Potential juror leaves side bar and returns to

17    the back of the courtroom.)

18                THE COURT:  Any application?

19                MS. BYRD:  No, Your Honor.

20                MR. PERUTO:  No.

21                THE COURT:  Anybody else on that row?

22                All right.  Let's move down to the first row on

23    this side of the courtroom, closest to the aisle, and moving

24    in.  Anybody on that row with a "yes" to one or more of my

25    questions?  No?

1            Okay.  Moving to the next row back.

2            Okay.  Then I think that concludes the

3    questioning.  If you would give us just a moment, please,

4    ladies and gentlemen.

5            Why don't we go ahead and I'll have the

6    courtroom deputy here give you the names of the folks that

7    didn't show up because we had some no shows.

8            On the individual as to whom I reserved, I will

9    strike.

10           THE DEPUTY CLERK:  You will strike?

11           THE COURT:  Strike her.  And that should give us

12   the final list.

13           THE DEPUTY CLERK:  Nine.  `The absentees are No.

14   3, Barnes; No. 6, Chaivre; No. 8, Domian; No. 16, Lenhart;

15   No. 30, Robinson; No. 34, Shields.

16           THE COURT:  Okay.  All right.  We'll go ahead

17   and draw the jury.

18           (Conference at side bar ends.  Proceedings

19   continue in open court.)

20           THE DEPUTY CLERK:  Marilyn Monk, please come

21   forward and take the first seat in the first row of the jury

22   box.

23           Linda Pryslak, please take the second seat in

24   the first row of the jury box.

25           Mary Hurd, please come forward, take the third

1    seat in the front row.

2                    MS. BYRD:  What was the name?

3                    THE DEPUTY CLERK:  Mary Hurd.

4                    Carla Probst, please come forward, take the

5    fourth seat in the front row.

6                    Luladey Tadesse, please take the fifth seat.

7                    David Sneeringer, please come forward, take the

8    sixth seat in the front row.

9                    Pamela Smith.  Ma'am, please take the seventh

10   seat in the first row.

11                   James Logan, Jr.  Sir, please take the first

12   seat in the second row.

13                   Kathy Phinney.  Please come forward, take the

14   second seat in the second row.

15                   Susan Scott.  Please come forward, take the

16   third seat in the second row.

17                   Paul VanHorn.  Sir, please take the fourth seat

18   in the second row.

19                   Henry Bartsly.  Please take the fifth seat in

20   the second row.

21                   Willard Franklin.  Please take the sixth seat in

22   the second row.

23                   Karen Wittland.  Ma'am, please take the last

24   seat in the jury box, second row.

25                   Patricia Poet.  Ma'am, if you would take a seat

1    in the first row of the pew.

2             Claire Wright.  Please have a seat next to her

3    in the front row.

4             Jorie Protas.  Ma'am, please have a seat next to

5    the other lady.

6             Maureen O'Neill.  Please have a seat in the

7    front row.

8             Constance Schantz.

9             Sheree Reibsome.  Please have a seat in the

10   front row.

11            Sandra Sarjeant.  Please have a seat in the

12   front row.

13            Sheryl Lanouette.  Ma'am, if you would, please

14   have a seat on the chair next to the other lady.  Thank you.

15            Angela Allen.  Ma'am, if you would have a seat

16   in the chair next to her.

17            Kevin Hayden.  Sir, if you would have a seat in

18   the first chair.  That's it.  Thank you.

19            James Kelley, Jr.  Sir, if you would have a seat

20   in the second chair.

21            Karen Robertson.  Ma'am, if you would have a

22   seat on the bench right next to the other gentlemen.

23            Susan Williams.  Please come forward and have a

24   seat in the front row next to the other lady.

25            Nicola Nastasi.  Sir, if you would have a seat

1   next to the other lady in the front row.

2              Joan Troutman.  Please have a seat next to the

3   other gentleman.

4              Cynthia Marchioni.

5              Margaret Patchell.

6              And I ask you all to please slide down towards

7   the aisle.  We have one more to put there.

8              Thank you.

9              Lyndsay St. Ange.  Please take a seat all the

10  way down against the wall.

11             (Silent striking process takes place.)

12             THE COURT:  You've been very patient.  Thank

13  you, ladies and gentlemen.  I need to see counsel at side

14  bar for just a moment.

15             (Conference held at side bar out of presence of

16  jury.)

17             THE COURT:  We've got a problem.  I understand

18  after saying he was content, he went back up to the pool and

19  struck again.  That is not permissible but maybe I'm not

20  getting the story right.  Go ahead and explain to me what

21  happened.  I'll have the courtroom deputy put on the record

22  what happened, and you guys can tell me if it's accurate or

23  not.  Go ahead, Mr. Cruickshank.

24             THE DEPUTY CLERK:  Okay.  On your tenth strike,

25  you indicated to me that you were content and I told you I

1    would strike from the bottom of the list.  And you said you

2    were okay with that.  So I struck Juror No. 32.

3            Okay.  Then I went back to the Government and

4    informed the Government that the defense was content and she

5    struck.  She also informed me that she was content and

6    struck No. 31.  I struck No. 31 because she told me she was

7    content.

8            I came back to you for your last strike which is

9    No. 11.  You struck No. 6.

10           THE COURT:  Yes.  I don't understand.  Once

11   content, it's done; right?

12           MS. BYRD:  (Nodding yes.)

13           MR. PERUTO:  What I was told was if I basically

14   said the word "pass," saying you can't do that.  If you want

15   to do that, I'm going to strike the last one as No. 10.  I

16   said fine.  Then when it came back to me, I reconsidered,

17   because I still had one left, and took No. 6 and I don't

18   know what is impermissible about that.

19           THE COURT:  Well --

20           MR. PERUTO:  Because I still had one left.  If

21   -- well, go ahead, Ms. Byrd.

22           MS. BYRD:  Your Honor, my understanding of the

23   practice in this court is that you can't pass.  You're

24   either content or not content.  Once you exercise restraint,

25   you are out of the game.  I was advised by the deputy that

1    Mr. Peruto was content and therefore the deputy had struck

2    the last juror on his behalf.  I therefore, based on that

3    representation, said that I was content.  That thereafter

4    the game was still in play.

5                THE COURT:  Yes, she has it right.  To the

6    extent there was any miscommunication, I mean you can't

7    pass.  You either exercise your strike or you don't.  The

8    act by the courtroom deputy of just marking out the person

9    at the bottom of the list is nothing more than indicating

10   those people at the bottom aren't going to be in the final,

11   because it's the first 12 who remain on the list --

12                THE DEPUTY CLERK:  14.

13                THE COURT:  -- plus the next two.  Twelve plus

14   two.  So when you said pass, that was in effect saying

15   content.  What the courtroom deputy is saying they keep

16   track of the way the strikes have run.  He was just going to

17   hit the bottom name because that name goes off anyway, not

18   that you were still in the mix, because once content, you're

19   content.

20                Now, in short, having declared yourself content,

21   the list can't be reopened to strike.  So this may not have

22   been a model of clarity but if you need to make a record,

23   I'll let you do that.  But I can't let you have the last

24   strike because the Government, rightly in reliance on your

25   saying "pass," which was communicated to them as "content,"

1    said "fine," and the game was up.

2             THE DEPUTY CLERK:  Your last strike should be

3    Juror No. 30.

4             THE COURT:  Well, there are no more strikes.  I

5    think that is the source of the confusion.  The courtroom

6    deputy is maybe using the word "strike" but the effect is

7    that you've passed on it.

8             Mr. Looby.

9             THE CASE MANAGER:  I was going to say when he

10   said he was content, he takes the last two that he has and

11   done.

12            THE COURT:  Then you mark them as done.

13            MR. PERUTO:  Just for the record, I didn't say

14   "content."  What I said was "I passed" and I understand it's

15   a play on words.  Because I still had one left.  And it was

16   just a strategy on my part.  I didn't know you couldn't do

17   that because I still had one left.

18            THE COURT:  If you say "I'm done" or "pass,"

19   then you're done.  That's in effect saying I'm content with

20   the first 12 plus the two alternates.  So that is where we

21   are.  If you have an exception for the record, it's noted.

22            We'll go ahead and take care of the excusing the

23   rest of the jurors.  Give me just a moment.

24            THE CASE MANAGER:  They'd substitute 30 if you

25   do that the way they're been talking because that was listed

1    as his 11th strike which should have been down here.

2    THE COURT:  Yes.

3    THE CASE MANAGER:  What I'm saying, that juror

4    stays on.

5    THE COURT:  Correct.  That's the way it goes.

6    THE CASE MANAGER:  Okay.

7    THE COURT:  All right.  Thanks.

8    (Conference at side bar ends.  Proceedings

9    continue in open court.)

10    THE COURT:  Okay.  At this juncture, The

11    courtroom deputies will call some names and the names he

12    calls, I will ask you to go ahead and move back to the rear

13    of the courtroom; okay?

14    THE DEPUTY CLERK:  When I call out your names,

15    will the following jurors take a seat in the back of the

16    courtroom?

17    Linda Pryslak.

18    Mary Hurd.

19    Luladey Tadesse.

20    Pamela Smith.

21    James Logan.

22    Kathy Phinney.

23    Willard Franklin.

24    Karen Willard.

25    THE JUROR:  Wittland.

1              THE DEPUTY CLERK:  I'm sorry.  There is a strike

2      through your name.

3              Patricia Poet.

4              Jorie Protas.

5              Maureen O'Neill.

6              Sheree Reibsome.

7              Cheryl Lanouette.

8              Kevin Hayden.

9              Susan Williams.

10             Margaret Patchell.

11             Lyndsay St. Ange.  And,

12             Cynthia Marchioni.

13             Now, what I'm going to do is I'm going to move

14     the rest of you into the box.

15             Ma'am, if you would move to the second seat.

16             Sir, please take the third seat.

17             Ma'am, come forward and take the fourth seat.

18             Sir, the fifth seat.

19             Sixth seat, sir.

20             Ma'am, if you would come forward and take the

21     seventh seat, first row.

22             Ma'am, I'll ask you to come forward and sit in

23     the first seat in the second row.

24             And second seat in the second row.

25             Third seat in the second row.  Watch your step.

1            Sir, fourth seat in the second row.

2            Fifth seat, sixth seat and seventh seat.

3            Your Honor, the jury is impanelled.

4            THE COURT:  Thank you.

5            Ladies and gentlemen, those of you who are still

6    seated in the rear of the courtroom, I hope you are not

7    unduly pleased or disappointed that you were not selected to

8    serve.  Your presence here this morning has been essential

9    to our being able to seat a jury and I thank you very much

10   for your service.  You are now excused.

11           We'll give a moment for the courtroom to clear

12   and then we will swear you folks who are in the jury box who

13   have been selected to serve.

14           Go ahead and swear the jury.

15           (Jury placed under oath at 11:11 a.m.)

16           THE COURT:  Thank you.

17           Okay.  Ladies and gentlemen, I'm going to ask

18   you to indulge me for about five to ten minutes here.  I

19   have some quick preliminary instructions.  Then we'll give

20   you a chance to go get settled in the jury room for a minute

21   or two and contact people if you need to contact anyone to

22   let them know you have been selected to serve; okay?

23           Now that you have been sworn, I have the

24   following preliminary instructions for your guidance.

25           It will be your duty to find what the facts are

1 | from the evidence as presented at the trial. You, and you

2 | alone, are the judges of the facts.

3 | Let me hesitate to say here for a moment that

4 | the two folks on the back row furthest over to your left,

5 | you are alternate jurors. It's critical for you folks to be

6 | fully engaged, too, because we don't know, hopefully nothing

7 | happens to the first folks, but you have to be ready to move

8 | in at a moment's notice should we need your assistance in

9 | deliberations.

10 | Now, I'm going to give you further instructions

11 | on the law at the close of the evidence. And I ask to you

12 | take the instructions I'm going to give you now and those

13 | and consider them together. You are going to need to take

14 | all instructions and apply them to the facts, as you find

15 | them. You must follow my instructions on the law whether

16 | you agree with them or not.

17 | Nothing I may say or do during the course of the

18 | trial is intended to indicate what your verdict should be.

19 | That is going to be for you alone.

20 | The evidence from which you will find facts may

21 | consist of the testimony of witnesses and documents and

22 | other thing admitted into evidence. In addition, the

23 | evidence may include certain facts as agreed to by the

24 | parties or as I instruct you.

25 | But certain things are not evidence.

1          Statements, arguments and questions by lawyers

2     are not evidence.

3          Objections to question are not evidence.

4     Lawyers have an obligation to their clients to make an

5     objection when they believe testimony or exhibits being

6     offered into evidence are not admissible under the Federal

7     Rules of Evidence.  You should not be influenced by a

8     lawyer's objection or by my ruling on the objection.  If I

9     sustain or uphold the objection, you should ignore the

10    question or the document that is in question.  If I overrule

11    an objection and allow the matter into evidence, you should

12    treat that testimony or document like any other evidence.

13    If I instruct you that some item of evidence is admitted for

14    a limited purpose, you must follow that instruction and

15    consider that evidence for that purpose only.  If I do give

16    such a limiting instruction during the trial, I will try to

17    clarify the issue for you at that time.

18          I reemphasize, you should not consider testimony

19    and documents that I determine must be excluded and not

20    admitted into evidence.

21          Anything you see or hear outside the courtroom

22    is not evidence and must be disregarded.  You are to decide

23    this case solely on the evidence presented here in the

24    courtroom.

25          There are two kinds of evidence:  direct and

1  circumstantial.   Direct evidence is direct proof of a fact,

2  such as the testimony of an eyewitness.   Circumstantial

3  evidence is proof of facts from which you may infer or

4  conclude that other facts exist.   I will give you further

5  instructions on these as well as other matters at the end of

6  the case, but have in mind that you may consider both kinds

7  of evidence.

8          It will be up to you to decide which witnesses

9  to believe, which witnesses not to believe, and how much of

10  any witness's testimony to accept or reject.   I will give

11  you some guidelines for discussing the credibility of

12  witnesses again at the end of the case.

13          This case involves allegations that the

14  defendant, Mr. Lora-Pena, forcibly resisted arrest by

15  members of the United States Marshal's Service, that he

16  assaulted those officers, and that in the course of the

17  assault, he turned an attack dog, a pit bull, on certain of

18  the officers.   These are allegations only at this point.

19  Because this is a criminal case, it is the Government's

20  obligation to prove the allegations to you.   At the end of

21  the case, before you begin your deliberations, I will give

22  you a more detailed instruction on the burden of proof that

23  the Government bears, but for now I want to simply note for

24  you that the burden is upon the Government to prove beyond a

25  reasonable doubt the criminal charges it has brought against

1    the defendant.

2            Now, a few words about your conduct as jurors.

3            First, I instruct you that during the trial and

4    until you have heard all the evidence, you are not to

5    discuss the case with anyone, not even among yourselves.  If

6    anyone should try to talk to you about the case, bring it to

7    my attention promptly.  There are important reasons for

8    this, including the need for you to keep an open mind

9    throughout the presentation of the evidence.

10           Second, do not read or listen to anything

11   touching on this case that is not admitted into evidence.

12   By that, I mean if there is a newspaper article or radio or

13   television report relating to this case, do not read the

14   article or watch or listen to the report.  In addition, do

15   not try to do any independent research or investigations on

16   your own on matters relating to the case.  Please don't go

17   investigate on the Internet, for example.  You are to decide

18   this case upon the evidence that is presented here in this

19   courtroom.

20           Again, do not reach any conclusion as to the

21   claims, the charges until all of the evidence is in.  Keep

22   an open mind until you start your deliberations at the end

23   of the case.

24           If you wish to, you may take notes during the

25   evidence, the summations of the attorneys at the conclusion

1    of the evidence, and during my instructions to you on the

2    law.  My courtroom deputy will arrange for pens, pencils and

3    paper.  If you do choose to take notes, take them with you

4    when you leave the courtroom and please leave them in the

5    jury room when you leave at night.  And remember they are

6    for your own personal use -- they are not to be given or

7    read to anyone else.

8         As you see, we have a court reporter here who

9    will be transcribing the testimony during the course of the

10   trial.  However, you should not assume that the transcripts

11   are going to be available for your review during your

12   deliberations.  Nor should you consider your notes or the

13   notes your fellow jurors take as a kind of written

14   transcript.  Instead, as you listen to the testimony, keep

15   in mind that you will be relying primarily on your

16   recollection of the testimony during your deliberations.

17   Here are some other specific points to keep in mind about

18   note taking:

19         First.  Each of you can take notes but no one is

20   required to take notes.

21         Second.  Be brief.  Do not try to summarize all

22   the testimony.  Notes are for the purpose of refreshing your

23   memory.  They're helpful when dealing with measurements,

24   times, distances, identities, and relationships, perhaps.

25   Overindulgence in note taking may be distracting.  You, the

1    jurors, must pass on the credibility of witnesses, so you

2    must observe the demeanor and appearance of each person on

3    the witness stand to assist you in passing on his or her

4    credibility.  Note taking must not distract you from that

5    task.  If you wish to make a note, you need not sacrifice

6    the opportunity to make important observations.  You may

7    make your note after having made an observation itself.

8           In your deliberations, give no more and no less

9    weight to the views of a fellow juror just because that

10    juror did or did not take notes.  Don't chose your notes, in

11    other words, as authority to persuade fellow jurors.  As I

12    mentioned earlier, your notes are not official transcripts.

13    They're not evidence.  They are by no means a complete

14    outline of the proceedings or a list of the highlights of

15    the trial.  They are valuable, if at all, only as a

16    stimulant to your memory.  Your memory is what you should be

17    relying on when it comes time to deliberate and render your

18    verdict in the case.

19           Finally, as I said before, at the end of the

20    day, please leave your notes in the jury room.  When the

21    case is over, after you have used your notes in

22    deliberations, a court officer will collect and destroy

23    those notes to protect the secrecy of your deliberations.

24           Some quick statistical information.

25           First.  If we need to come back tomorrow for the

1    taking of further evidence, we're going to move with as much

2    dispatch as we can to try to get all the evidence in today.

3    But if we have to come back into the courtroom, you might

4    consider dressing in layers just in case it gets too hot or

5    cold in here.  It's tough for our landlord, the GSA, to keep

6    a constant temperature, particularly at this time of year

7    when the seasons are changing and the temperatures tend to

8    fluctuate.

9         Second.  Jury stickers.  I note that you have

10   them on.  Please keep them on and have them visible.  We

11   don't have specialized access for you in and out of the

12   building so you are going to be sharing elevators and other

13   common areas with the representatives of the parties and

14   others who have business in the court.  And everybody wants

15   to help you maintain the appropriate detachment that you

16   have to have in order to avoid being influenced by things

17   outside the courtroom.  So by wearing your stickers, you

18   help the parties and others who might be in the building to

19   recognize the special role you have and to help you preserve

20   that detachment.  Please don't be offended if the attorneys

21   or court personnel or others involved in the trial seem

22   standoffish when you see them in the elevators or elsewhere

23   in the building.  Again, we're all not trying to be

24   unfriendly but just are obligated to avoid contact with

25   you outside the context of the presentations here in the

1    courtroom.

2              You will recall when you came into the building,

3    you had to go through a security screening process. And if

4    you had a cell phone, you had to leave that behind with a

5    court security officer. As you know, screening like this

6    can cause delays. So after we take a break or if we have to

7    come back tomorrow, please plan your return to court in a

8    manner that will allow you to be in the jury room before the

9    time we are to begin taking evidence.

10             I should note that sometimes the other

11   participants, including myself, may cause you to wait. You

12   will have done your part, gotten back in time, and you will

13   end up waiting in the jury room. I promise you that all of

14   us here are going to do our utmost to see that that doesn't

15   happen or if it does, it's kept to an absolute minimum, but

16   we may not be able to eliminate all delays. There are times

17   during the course of a trial when matters arise which could

18   not reasonably have been anticipated and which require the

19   Court's attention. For example, the attorneys may have a

20   legal issue which they need help resolving and in which it

21   would be inappropriate to have you involved. If we have to

22   deal with matters outside your presence, either having you

23   wait in the jury room or occasionally having a whispered

24   conversation over here at side bar, please understand that

25   we don't mean you any disrespect by that delay. On the

1    contrary, your willingness to serve and the sacrifice of

2    your time is deeply appreciated by all of us.

3            Here is how we'll handle the rest of the day.

4    We're going to take a few minutes now, no more than 10, to

5    give you a chance, as I said, to use the restroom if you

6    need to, make a phone call if you need to.  Then we're going

7    to come back in here, shortly at 11:30, and we'll begin with

8    opening statements, if the parties wish to do that.

9            The opening statements are presented to you to

10   give an overview of what evidence is expected to come in.

11   It's not argument.  After the opening statements, we'll see

12   how far we get with that.  We're going to try to take a

13   break at 12:30 for an hour for lunch.  And when we come

14   back, we'll either be finishing opening statements or we'll

15   be already at the point where we can begin taking evidence.

16           When all the evidence is in, the attorneys are

17   going to have a chance to make closing arguments to

18   summarize and interpret the evidence for you.  And after

19   that, I'll give you the instructions on the law and you will

20   retire to deliberate on the verdict.

21           All right.  Let's go ahead and have the jury

22   out.

23               (Jury left courtroom.)

24               THE COURT:  Please be seated.

25               Ms. Byrd, do you know how long you expect your

1   opening statement to be?

2           MS. BYRD:  Your Honor, I'll try to keep it

3   brief.  No more than 15 minutes.

4           THE COURT:  Okay.  Mr. Peruto, do you expect to

5   make an opening statement?

6           MR. PERUTO:  Yes.  Probably less than that.

7           THE COURT:  All right.  Fine.  Well, if we're

8   really on that schedule, that's great, and we'll probably be

9   able to start with the first witness before we take our

10  12:30 break.  I assume you have witnesses stacked and ready

11  to go, Ms. Byrd?

12          MS. BYRD:  Yes, Your Honor.

13          THE COURT:  Okay.  Fine.  Is there anything that

14  we should be talking about during this morning break before

15  things get going, Ms. Byrd?

16          MS. BYRD:  No, Your Honor.

17          THE COURT:  Mr. Peruto?

18          MR. PERUTO:  Not that I can think of.

19          THE COURT:  Fine.  Thanks.  Then we stand in

20  recess.

21              (Brief recess taken.)

22          MS. BYRD:  Your Honor, may I address the Court?

23          THE COURT:  Yes, you may.

24          MS. BYRD:  Your Honor, just as a matter of

25  efficiency, I provided to Mr. Peruto a copy of the

1    documentary exhibits the Government intend to offer into

2    evidence at this time.  I also have copies for the Court and

3    for the Court Clerk just as a matter of efficiency again

4    because obviously it's not the trial, but I wanted to give

5    these at this time.  That way, we wouldn't have to do it

6    during the trial.

7              THE COURT:  That's fine, if you want to hand

8    them up, but of course we'll make the record during the

9    course of the trial.

10             MS. BYRD:  Yes, Your Honor.

11             THE COURT:  Thanks.

12             Just by way of explanation real quick,

13   Mr. Peruto, I give you some latitude in the courtroom, but

14   not too close to the jury box.  In other words, when you are

15   questioning witnesses, I prefer you to be at the lectern.

16   If you need to move over some and you want to move away from

17   the lectern, I ask that you not move past the Government's

18   counsel table.  And if you want to approach the witness,

19   please just ask and I'll grant it freely.  All right?

20             Let's go ahead and bring the jury in.

21             (Jury returned.)

22             THE COURT:  Thank you, ladies and gentlemen.

23   Please be seated.

24             Ms. Byrd, your opening statement.

25             MS. BYRD:  May it please the Court, counsel,

1   ladies and gentlemen of the jury.  It's still good morning.

2            Ladies and gentlemen, this case is about

3   determination.  It is about a man who was so determined to

4   stay out of jail that he did everything in his power to

5   forceable resist the federal law enforcement officers who

6   came to arrest him.  And that man, ladies and gentlemen, is

7   the defendant, Nelson Lora-Pena.

8            The defendant is charged with four counts of

9   one crime.  That crime is assaulting or resisting a federal

10  officer during the performance of that officer's official

11  duties.  There are four counts of that crime, one count for

12  each of the federal officers:  the United States Marshal

13  for the District of Delaware and three Deputies U.S. Marshal

14  who were resisted or assaulted by the defendant, Nelson

15  Lora-Pena.  And you will hear during the course of the day,

16  ladies and gentlemen, that the defendant committed these

17  crimes and then, after he was finally subdued, confessed to

18  these crimes.

19            Now let's go back.  Let's go back to earlier on

20  this year, April 9th of 2005.  You going to hear from the

21  United States Marshal and the deputies who were present

22  during the defendant's arrest on that date.

23            You are going to hear first from Deputy U.S.

24  Marshal William David.  And he is going to tell you how on

25  that day, April 9th, members of the Marshal Services

1    Fugitive Task Force went to a residence, 4 Dunbar Road in

2    Newark, Delaware in search of the defendant.

3             You are going to hear that those marshals

4    had a federal arrest warrant, an arrest warrant for the

5    defendant's arrest.  And they went to that location on

6    that date at around 2:30 or so in the afternoon to effect

7    that arrest warrant, to place the defendant under arrest.

8             Now, Deputy David will tell you how he was the

9    first person to go to that residence and he was doing some

10   surveillance.  And during his surveillance, he did indeed

11   see the defendant coming out of the residence in the yard

12   for a moment or so and going back in.  And Deputy David

13   will describe the residence to you.  He will tell you it

14   is a single family ranch-style house in a residential

15   neighborhood.

16            Now, you are going to hear that after Deputy

17   David saw the defendant, the person for whom they had a

18   federal arrest warrant, coming in and out of this house,

19   other federal officers were notified and other officers

20   came to that location.  And you are going to hear it wasn't

21   just the United States Marshal, it wasn't just Deputies

22   U.S. Marshal.  There were also other state and local law

23   enforcement who came to the residence in Newark to assist

24   in apprehending the defendant.

25            Now, you are going to hear that at a certain

1    point, Deputy David, along with Deputy U.S. Marshal Jack

2    Leo, began to approach the front door.  They began to

3    approach the front door just as other individuals, including

4    the United States Marshal for the District of Delaware,

5    David Thomas, and Deputy U.S. Marshal Robert Denney went

6    around to the back to provide coverage and make sure that

7    the defendant or anyone else did not escape through the

8    back.

9            Deputy David is going to tell you that as he

10   and Deputy Leo approached the front door of the residence,

11   they were able to see inside.  They were able to see inside

12   because the storm door was closed but it was a glass door.

13   The interior door was open, enabling them to see straight

14   into the house and into the hallway.  And he is going to

15   tell you what they saw.

16           He is going to tell you that as they approached,

17   he saw the defendant coming out from the hallway into full

18   view of the front door.  And as soon as Deputy David saw the

19   defendant, the defendant looked up and saw Deputy David.

20   And Deputy David identified himself as "police" and told the

21   defendant to show him his hands.

22           Now, you are going to hear from all the

23   individuals I just mentioned, the U.S. Marshal, David

24   Thomas, Deputy David, Deputy Leo and Deputy Denney.  And

25   they will all tell you that on that date, because they were

1    there to effect a federal arrest warrant, they had on

2    `police attire, as you might expect, ladies and gentlemen.

3    And Deputy David particularly will tell you and describe

4    `for you what that looked like.  They all had on vests.

5    They were blue.  You will actually get to see one of those

6    vests, ladies and gentlemen.  Navy blue vests with the U.S.

7    Marshal's insignia on one the top shoulder corners.  Also

8    the word "police" on the front, and then the words "police"

9    and "marshals" on the back of that vest.  They were all

10   identified as such.

11          And when the defendant came to the hallway, you

12   will hear Deputy David tell you that he instructed him,

13   "police.  Let me see your hands."  And he will tell you that

14   the defendant initially complied.  He in fact did show his

15   hands.  He raised his hands up and Deputy David said "come

16   here to the door."

17          The defendant, he will tell you, did initially

18   comply with that and started to approach the door.  But as

19   he did so, ladies and gentlemen, Deputy David will tell you

20   that something happened.  And that something that happened

21   was that two pit bulls joined the defendant at either side

22   of him.  And as he approached the door, they joined him and

23   Deputy David will tell you that those pit bulls were going

24   wild.  They were barking.  They were snapping.  They were

25   jumping up and they were lunging at the door.

1          Deputy David will tell you that he was alarmed,

2   as will Deputy Leo, by these pit bulls.  And so before being

3   able to make an entrance and to arrest the defendant, Deputy

4   David had to tell him, "control your dog."  And he will tell

5   you that he instructed the defendant to control your dogs.

6          But, ladies and gentlemen, as you will hear,

7   that is not what the defendant did.  Instead, ladies and

8   gentlemen, you will hear the defendant did something

9   quite different.  While he did indeed approach the door,

10  accompanied by his pit bulls, you will hear that the

11  defendant, upon being told to control his dogs, did the

12  following:  He looked, made direct eye contact with Deputy

13  David, looked down at the dogs, looked back up at Deputy

14  David and then pushed the door open while he simultaneously

15  began to run to the back.

16          And Deputy David will tell you that because of

17  the defendant's actions, one of those pit bulls that was

18  growling and snarling and jumping and lunging was able to

19  get part of the way out of the door before the deputy was

20  able to kick that door shut, at first actually ensnaring the

21  pit bull in the door but finally able to kick the door shut.

22  And as a result of the defendant's actions, Deputy David

23  will tell you he was not able to initially get into the

24  residence, and all the while you will hear the defendant,

25  having pushed the door open for his dogs, ran to the back.

1          Now, what happened at the back, ladies and

2     gentlemen?  Well, again, as I said, you will hear this is a

3     single family, one story ranch-style house.  You are going

4     to hear the defendant ran to the back door.  There was a

5     back sliding door that went off into the back fenced-in

6     yard.  And you are going to hear from Deputy U.S. Marshal

7     Robert Denney and from the U.S. Marshal, himself that they

8     were positioned in that backyard waiting for just this type

9     of eventuality.

10         And, sure enough, you are going to hear that,

11    sure enough, the defendant came charging out the door,

12    opening the sliding door.  And while he was charging out, he

13    ran outside, got eight-to-ten feet outside before he was

14    confronted by the U.S. Marshal and Deputy Denney, who again

15    yelled "police, stop,"  who again were dressed in the same

16    way, with the police gear, clearly marked as "U.S.

17    Marshals."

18         And they will tell you the defendant didn't

19    stop.  He stopped initially, ladies and gentlemen, you will

20    hear, looked -- it might be described to you by one of the

21    marshals that he had sort of a "deer in the headlights" look

22    when he saw there were two people in the back as well as two

23    people in the front.  He stopped, looked, didn't listen to

24    the command to "stop, show your hands.  Stop, police."

25    Instead, did exactly what he had done at the front door,

1    turned around and went back through the house.  And you are

2    going to hear during this time, ladies and gentlemen, that

3    one of those pit bulls was still at the front door,

4    preventing deputies from entering the front door.

5           You are going to hear that when the defendant

6    fled back into his house, he left the sliding door open.

7    And so the U.S. Marshal and the deputy started to pursue

8    him, only they were stopped.  Why, ladies and gentlemen?

9    Because you will hear that that second pit bull was charging

10   right at the door and what they had to do was close that

11   glass door because of their fear for their safety by that

12   pit bull.

13          Now, ladies and gentlemen, you might thing the

14   story ends here, but it doesn't.  Because you are going to

15   hear the defendant kept on running.  So he ran from one

16   side of his house to the other side of his house, and this

17   time attempted to go out of a back window into that same

18   backyard.  He tried to go out through a back window and in

19   fact was initially successful in getting his upper body out

20   of the window, only then, you will hear, ladies and

21   gentlemen, to encounter yet another law enforcement officer

22   who tried to obtain control of the defendant.

23          But the defendant, you will hear, didn't yield,

24   didn't stop.  Three times encountering law enforcement

25   officers, three times hearing officers say, "stop, police."

1    Dogs running around the house.  Defendant, you will hear,

2    did not stop.  He went back in the house again.

3         Then you will hear, ladies and gentlemen, that

4    he figured that he would run back into that sliding door,

5    back into that room to see whether he can get out that way.

6    You will hear in fact that he did go back to the sliding

7    door.  Marshal and the deputy who were out there initially

8    were still out there.  They could see each other through the

9    sliding door.  And in fact, one of the deputies had a brief

10   conversation with the defendant where he said "stop, police.

11   We are here.  Stop.  Stop."

12        And the defendant, he did actually stop for a

13   minute, you will hear, for a moment.  He did stop for a

14   moment.  And then when the deputy opened the sliding glass

15   door, thinking that he could now finally place the defendant

16   under arrest, started to come into the kitchen, the

17   defendant, you will hear, ran again.

18        Now, this time, ladies and gentlemen, the

19   deputies were in the house.  This time they were finally

20   able to get in because you will hear the dogs were running

21   around but they weren't right at the kitchen.  And you are

22   going to hear how the defendant ran through the house, back

23   towards his back hallway.  That he was being pursued by one

24   of the deputies, by another law enforcement officer.  That

25   they were being pursued by the dogs the defendant had

1    initially tried to release through the front door.

2              You are going to hear that back in the hallway,

3    although he was ordered multiple times to "stop, you are

4    under arrest, police, police, police," he did not stop.  In

5    fact, you are going to hear from Deputy Denney that when

6    Deputy Denney tried to grab control of the defendant, tried

7    to put him up against a wall and thereby handcuff him, that

8    the defendant continued to struggle.

9              And you are going to hear a lot about the

10   struggle.  You are going to hear the defendant pulled, he

11   pushed, he scratched, he scraped, he twisted, he turned, he

12   pulled his arms, he flailed his legs.  You are going to

13   hear that at times he was using various profanities but all

14   along, you will hear one theme, ladies and gentlemen.  The

15   defendant just didn't give up.  Because while Deputy Denney

16   tried to subdue him, the defendant, you will hear, continued

17   to struggle.

18             Now, that might have been the end of the story,

19   ladies and gentlemen, but it isn't.  And it's not end of

20   the story because you are going to hear that while Deputy

21   Denney finally was able to lay hands on the defendant and

22   even though he was having a hard time, he may have been

23   able to subdue him, the pit bulls ran at the officers.  The

24   defendant's pit bulls ran at Deputy Denney and one lunged

25   at Deputy David.

1           You are going to hear how the one that lunged

2    at Deputy David caused Deputy David to draw his gun and

3    stand in a defensive posture while the dog was snapping and

4    snarling and appeared that it was going to attack.  You are

5    going to here while Deputy Denney was struggling with the

6    defendant, there was a pit bull at his leg and at one point

7    appeared to grab hold of his pant cuff, causing Deputy

8    David, fearing for his colleagues' safety, to draw on that

9    pit bull.

10          And it was only then, ladies and gentlemen,

11   after these dogs had chased the officers throughout the

12   house, after one had cornered Deputy David, you will hear,

13   after one had gone after Deputy Denney, you will hear, it's

14   only then that these dogs turned on each other, turned on

15   each other, began to fight each other and it was only after

16   they began to fight each other and not chase the officers

17   that these marshals were finally able to kick the dogs into

18   a room and lock the door.

19          That might be the end of the story.  No more

20   dogs, no more delay, you might say.  But it's not, ladies

21   and gentlemen.  Because as I said, there is one constant

22   theme.  And that is the defendant just would not submit.

23   Because as two marshals were dealing with these two pit

24   bulls that were worked up into a fury, so much so that they

25   began to fight each other, the defendant was charging Deputy

1    U.S. Marshal Jack Leo, charging him down the hall, running

2    right into Deputy Leo.

3         Now, Deputy Leo had something that other

4    officers did not.  All the officers were armed, you will

5    hear.  But Deputy Leo had a semiautomatic rifle.  Deputy Leo

6    had this rifle, and he will describe it as a powerful rifle,

7    had it in his hand.  Deputy Leo, he will tell you, had to

8    maintain control of that rifle because his safety, the

9    safety of the defendant, the safety of the other officers,

10   the safety of, quite frankly, any passersby was of paramount

11   importance to him.  So when he was charged by the defendant,

12   you will hear, he could only hold off the defendant with one

13   hand because he had to have his other hand on that rifle.

14        And what did the defendant do?  You are going to

15   hear that he started in the next course of conduct where he

16   wouldn't give up.  He lunged at Deputy Leo.  He charged him.

17   He continued to drive Deputy Leo backwards and, all the

18   while, tried to disarm the deputy by tugging, grasping and

19   pulling at this rifle.  And this struggle went on.  You

20   will hear the defendant tugged, that he pulled, that he

21   scratched, that he dug in his nails on to Deputy Marshal

22   Leo, all the time trying to take this rifle from the

23   marshal.

24        And the marshal, he will tell you -- the deputy,

25   he is going to tell you that he did what he had to do.

1    First thing he did was he headbutted the defendant.  He

2    had no other weapon except for his one free arm and he

3    headbutted the defendant.  And you are going to hear about

4    that.  He head butted the defendant several times.

5            And what happened?  The defendant didn't stop.

6    He continued to grab at the gun.  In fact, he grabbed and

7    pushed so hard that the two of them went slamming into a

8    wall, causing it to break open.  And you are going to get to

9    see a picture of that, how they slammed into the wall and

10   you will get to see the wall as it looked after they slammed

11   into it and you are going to hear that even after they

12   slammed into the wall, the defendant continued to struggle

13   with Deputy Leo.

14           And, ladies and gentlemen, I'm going to tell

15   you something right now.  Deputy Leo is a big man.  You are

16   going to see him.  He is going to come in here.  He is a big

17   man.  He is tall and he is big.  And you are going to look

18   at him and you are going to look at the defendant and you

19   are going to say "Huh.  Deputy Leo is a lot bigger and

20   taller than the defendant" and Deputy Leo is going to tell

21   you how hard the defendant fought over and over for that

22   gun.  And after they bounced off that wall, ladies and

23   gentlemen, you are going to hear they spilled out into the

24   front hallway, the one that led to the front door.

25           The defendant continued to fight.  Deputy Leo

1    stopped headbutting the defendant, that wasn't working, and

2    began to punch the defendant in the face.  And, you know,

3    ladies and gentlemen, that is what he did.  That is what the

4    evidence is going to show.  It's going to show that Deputy

5    Leo began to punch the defendant with his one free hand, not

6    using the butt of a gun, not using a bat, not using a billy

7    club, not using anything other than his one fist that he

8    could possibly use.

9         So headbutting didn't work to try to get this

10   defendant subdued.  But the defendant, even when punched in

11   the face, wouldn't stop.  And, in fact, not only would he

12   not stop, he continued to struggle so hard for the gun, so

13   hard for that semiautomatic rifle, he continued to dig his

14   nails in and push and tug, that he discharged the gun.  The

15   rifle went off.  The rifle went off because the defendant

16   dug his nails in and discharged that gun.

17        And what happened to that bullet, ladies and

18   gentlemen?  What happened to the bullet?  Well, you are

19   going to hear.  You are going to hear the bullet went out

20   the front door, out the front.  Fortunately, you are going

21   to hear that it made an indentation in the ground in the

22   front outside the front door.  It didn't go further.  You

23   are going to actually see the hole in the door from both

24   the inside and the outside.  You are going to see the shell

25   casing.  Ladies and gentlemen, you are going to hear they

1    couldn't recover the bullet, they didn't find the bullet,

2    but it went out the front door, out the front door because

3    the defendant would not stop.

4           Now, this might be the end of the story but I

5    isn't. Because even after you hear that the defendant

6    discharged this gun, even after he was punched in the

7    face by a man who was definitely bigger than he was, the

8    defendant kept on going, you will hear. And you will hear

9    that finally it took four law enforcement officers, holding

10   an arm, holding a leg, holding another arm, trying to get

11   the defendant subdued, that they were finally able to take

12   him into custody.

13          And by that, ladies and gentlemen, I mean the

14   defendant, you will hear, fought so hard that they had to

15   put him not only in handcuffs but in leg irons because when

16   they put him in handcuffs he continued to fight. And even

17   once they put him in leg irons, you will hear that he

18   continued to try to stand up.

19          Now, ladies and gentlemen, you have a question

20   about how worked up the pit bulls were. You are going to

21   hear and you are going to see for yourselves the results

22   of their actions. You are going to hear that once the

23   defendant was arrested, the pit bulls had to be taken care

24   of. They were locked in this room and so the Animal Control

25   Department was called out and the Animal Control Department

1  went in along with Deputy David, and they saw a sight -- a

2  sight you are going to get to see. They saw a room covered

3  with blood because that is what the pit bulls did to each

4  other after they finally turned against themselves instead

5  of the officers. You are going to see pictures of the pit

6  bulls where they have blood all over them. The pit bulls

7  were taken away.

8         Now, ladies and gentlemen, that is almost the

9  end of the story, but you are going to hear just one more

10  thing. And you are going to hear the defendant was injured.

11  He was injured. He had a broken bone in his eye area,

12  occular bone. And you are going to actually see a picture.

13  You are going to see a picture. Deputy David is going to

14  show you a picture, a picture of how he looked after he

15  was injured during the struggle with Deputy Leo, when he

16  discharged the firearm while trying to take the gun away.

17  You will hear that is when the injuries occurred and you

18  will see what he looked like.

19         And, ladies and gentlemen, I would suggest to

20  you it might not be a pretty picture. You are going to hear

21  he was taken to the hospital. And at the hospital, you are

22  going to hear that Deputy David was there and the defendant

23  began to speak to him. Deputy David told him "don't talk.

24  Don't talk." But the defendant kept going on and on and on.

25  And you know what he said, ladies and gentlemen? You are

1    going to hear the defendant said, "you know, I've been on

2    the run for 10 years.  I had to give it a shot."  You are

3    going to hear him acknowledge what he did.  "Been on the run

4    for 10 years.  I had to give it a shot."

5            You are going to hear that he asked Deputy

6    David, "when I saw you guys were the U.S. Marshals, I

7    wondered how did you find me here?  Been here so long."

8    Told Deputy David, "you know, you guys were really lucky

9    because I was about to get a shower and drive up to New York

10    and you would never have found me because as soon as I heard

11    you were at my house I would never come back to Delaware."

12    And then he finally acknowledged his situation and said,

13    again, that he had to give it a shot.  But after all, it was

14    destiny and he was looking forward to going back to Rhode

15    Island to face the charges that he has there.

16            Ladies and gentlemen, my name is April Byrd.

17    I'm an Assistant U.S. Attorney with the U.S. Attorney's

18    Office for the District of Delaware.  Seated at the table

19    with me is Deputy U.S. Marshal William David, who represents

20    the United States of America in this matter and it's our

21    privilege to do so.

22            I ask you all for your patience.  Thanks for

23    your patience so far.  I ask you to listen to the evidence

24    as it comes in, to view the evidence as it comes in, to

25    evaluate it critically in light of your judgment, your

1    reason, your common sense and the instructions Judge Jordan

2    will give you at the end of this trial.  And at the end, I

3    will have an opportunity, as well as my colleague, William

4    Peruto, to stand before you.  And at that time, I'll have

5    the opportunity to tell you why the evidence will have

6    proven the defendant is indeed guilty, guilty as charged, of

7    assault on federal officers.

8              Thank you very much.

9              THE COURT:  All right.  Mr. Peruto.

10             MR. PERUTO:  Thanks.

11             Counsel.  Good morning, ladies and gentlemen.

12             (The jurors respond, "Good morning.")

13             MR. PERUTO:  All right.  My name is Charles

14    Peruto, Jr.  I represent Nelson Lora-Pena.

15             There is a couple things I'd like to advise you

16    preliminarily.  Evidence doesn't come from lawyers, it comes

17    from the witness stand.  You can either accept or reject

18    that evidence.  I thought I was going to talk for about

19    30 seconds to outline our case but because the prosecutor

20    got so detailed, I feel responsible to answer some of the

21    things on my opening so that you could follow the case.

22             An opening statement is just so you could follow

23    what you are about to hear from the witness stand.  If I say

24    something that is inconsistent with what you believe came

25    from the witness stand, then reject it.  Lawyers are funny

1    people.  We have to present the evidence in a light most

2    favorable to our case.  I obviously want to present this

3    case in a light most favorable to Mr. Pena.

4              However, this case isn't about a story, a story

5    where it begins and ends.  It's about facts.  This is the

6    United States of America vs. Nelson Lora-Pena.  Whenever a

7    lawyer comes into federal courts, it's common sense.  When

8    you put a juror badge on, it doesn't relieve you of that

9    common sense.  You know, it's a big deal.  It's not state

10   court, it's not municipal court, it's not the district

11   justice.  It's federal court.

12             I don't have the tools available to me that the

13   prosecution does.  I can't run the Grand Jury system and

14   present witnesses to that, subpoena witnesses to that Grand

15   Jury and obtain evidence from them.  They can do this.

16             And the only reason I point that out is because

17   I want you to follow the evidence.  The evidence will be of

18   three different types:  direct evidence, that is, what

19   marshals and the defendant saw, heard and smelled;

20   circumstantial evidence, other things that point to facts;

21   and physical evidence.

22             Physical evidence that you may hear or may not

23   hear.  Physical evidence that I can't control because I

24   wasn't at the crime scene.  I wasn't there.  I'm not going

25   to tell you too much about what happened there.  I'd rather

1    it unfold from the witness stand to make up your own minds.

2    But I want you to look to see if the physical evidence in

3    this case jives, comports with, corroborates with what the

4    prosecutor just told you.  I want you to see what damage

5    or lack thereof these pit bulls inflicted to these U.S.

6    Marshals, if there was any cuts, torn pants, anything of

7    that nature.

8             And, of course, you have to understand that

9    their witnesses are listening to me as well as the

10   prosecutor give opening statements.  And you could rest

11   assured that when the United States of America brings a case

12   in federal court, they're prepared.  That these witnesses

13   the Government will call are not going to be asked these

14   questions for the first time on the witness stand.  This

15   case is prepared.

16            Now, the prosecutor told you that the defendant

17   confessed to these crimes.  The crimes that what you're

18   deciding my client's fate on are assaulting federal officers

19   and assaulting federal officers with weapons, that is, the

20   pit bulls.  He is not on trial for the fact that he ran from

21   Rhode Island for 10 years.  He is conceding that.  He is

22   conceding that.  That is not an issue.  He was supposed to

23   report to his probation officer in Rhode Island 10 years ago

24   and didn't.  He ran.  He had full knowledge of that and it's

25   conceded.

1          He didn't confess to anything in this case.  He

2    did nothing but complain to a nurse and made certain

3    statements to a nurse which were overheard by the marshals.

4    And if they want to say that that is a confession, so be it.

5    You determine, as jurors, what was said and the logic of it.

6    It is our belief that the evidence will show what he said

7    was "I tried to run out the backdoor.  Of course, I gave it

8    a shot.  I was on the run for 10 years.  But, boy, was I met

9    with a big surprise."  This is as his wounds are being

10    treated, some serious wounds.

11          Now, lawyers are funny people.  Sometimes when

12    the evidence is that there is a telephone booth -- an

13    elephant in a telephone booth, you can't say "what

14    elephant."  You've got to face it.  So when you have the

15    burden of proof and you go first, what you want to do as a

16    lawyer is present the evidence that hurts you the most in

17    your case to make it look like we're presenting it.  We have

18    nothing to hide.  We're going to show you this first because

19    it's irrelevant.  Because the prosecution knows that we're

20    going to show that no one, no one got so much as a scratch

21    to their clothing to their bodies or to their hands except

22    that Nelson Lora-Pena had broken orbital sockets, a broken

23    jaw, swelled eyes, head bleeding in five different places,

24    both elbows damaged, both knees damaged, after being thrown

25    into a wall, that busted the wall.  And I hope the

1    prosecution does show you all these things because then I

2    won't have to.  But the fact that the prosecution shows you

3    doesn't mean it didn't occur or doesn't mean that you should

4    overlook it.

5         This is a case where the U.S. Marshal's Office

6    saw that he was in there, surrounded the house.  The

7    defendant has two pit bulls which all of his neighbors, any

8    of his neighbors would show are the nicest dogs in the

9    world.  Everyone gets scared because we all think we're

10   geniuses about what we know a pit bull is.  Pit bulls, pit

11   bulls, pit bulls.  Hopefully, hopefully, some of you have

12   experience with pit bulls.

13        Ladies and gentlemen, these dogs lived in the

14   house with Nelson Lora-Pena and have done so for years.

15   They are not trained attack dogs.  They are pets.  When the

16   marshal came to the front door, we concede that the full

17   view, full view glass was there.  And the dogs are free to

18   roam around the house.  The dogs were somewhere there.  The

19   defendant can't honestly tell where the dogs were.

20        But when he saw the marshal, which was clear the

21   way it said "police" or "marshal" or whatever it was on him

22   that it was the marshals, as soon as he saw the marshal at

23   the front door, he bolted for the backdoor.  This is a guy

24   that has been on the run for 10 years.

25        When he bolted for the backdoor, he saw, bam,

1    the house is surrounded there.  He ran back into the house,

2    and upon running back into the house, he was tackled from

3    behind and can't honestly tell which marshal tackled him

4    from behind because there were so many.  You're now in close

5    quarters.  It's a small house, but the rooms are even

6    smaller.

7              In these close quarters, the defendant doesn't

8    know exactly who did what.  He knows he was thrown by a very

9    strong individual into the wall, busting the wall.  He went

10   down, started to crawl, literally started to crawl and was

11   beaten severely for 60 seconds.  Sixty seconds may not

12   sound like a long time but the defendant is not going to

13   exaggerate.  Sixty seconds, when you are being punched with

14   a closed fist on the ground, is an extremely long time when

15   someone is that much bigger than you and when several people

16   are that much bigger than you.

17             He will testify that he did hear the dogs

18   barking.  He heard them shrilling.  He believes that the

19   dogs were being kicked because the different types of noises

20   they were making, noises that he is used to their making

21   when they get hurt.  The dogs always play with themselves,

22   that is, wrestle with each other.  And if one bites the

23   other too hard, they'll yelp.  He will testify that he heard

24   that type of yelping consistently from the two dogs and was

25   worried for the two dogs and was looking out for the dogs.

 1          He saw for a split second one of them with a

 2    rifle.  And at that point, he believed his dogs were going

 3    to be shot.  But there was nothing he could do about it.

 4    Nothing he could do about it.  And then heard, a shot rang

 5    out.  The defendant was absolutely powerless.

 6          After this occurred -- and, by the way, some

 7    pictures, some of the marshals, somebody had a camera there.

 8    The defense didn't have a camera there.  We can't control

 9    what pictures they took and what pictures they didn't take.

10    But the prosecution has turned over some pictures.  We

11    think they may be interesting for you to view.  So if the

12    prosecution doesn't show them to you, I will.  But they

13    will show that this defendant is in handcuffs.  His face is

14    in an abomination.  His face, not his body, not with all

15    these marshals -- I don't know if they're going to testify

16    they couldn't contain him or not but that is for your

17    common sense.

18          He was very worried about his dogs.  He loves

19    his dogs.  You are going to hear that Animal Control did

20    come out, just like the prosecution said.  And they had no

21    trouble with these dogs whatsoever.  They know how to deal

22    with the dogs.  You are going to see the slack in the

23    pictures where the Animal Control people opened up the door.

24    They are walking the dogs out and the dog is jumping right

25    into the Animal Control vehicle.  They weren't fighting with

1   anybody.  They weren't doing anything.  They're not vicious

2   attack pit bulls.  Look at the circumstantial evidence and

3   pay careful attention to the Animal Control people.

4         Look for the physical evidence to see if it

5   corroborates what the prosecution contends.  Keep an open

6   mind throughout the case, and I ask just give him a fair

7   trial.  Keep an open mind until the end of the case, until

8   all of the evidence is in, also keeping in mind that the

9   defendant has no burden of proof whatsoever.

10        This is nothing to do with what he faces in

11   Rhode Island at a later time.  Regardless of what your

12   verdict is, he has to go up there and face the music.  This

13   is the United States of America vs. Nelson Lora-Pena, an

14   assault case on marshals with count one being assault on

15   marshals and the rest of the counts being assault on

16   marshals with a deadly weapon, that is, the dogs.

17        This is a most serious case, a most serious

18   case.  Common sense tells you that.  We just ask that you

19   pay careful attention and decide it on the evidence and not

20   on emotion.  Thank you.

21        THE COURT:  All right.  Thank you.  We'll go

22   ahead and ask the Government to call their first witness,

23   please.

24        MS. BYRD:  Your Honor, the Government calls

25   Deputy U.S. Marshal William David.

David - direct

1              Your Honor, the Government knows its witnesses

2   other than the case agent Deputy David have been sequestered

3   and have not been in the courtroom during any time during

4   this proceeding.

5              THE COURT:  All right.  Let's go ahead and swear

6   witness.

7                            - - -

8                    GOVERNMENT'S TESTIMONY

9       ... DEPUTY MARSHAL WILLIAM DAVID, having been placed

10              under oath at 12:19 p.m. as a witness, was

11                 examined and testified as follows ....

12                           - - -

13             THE COURT:  You may proceed.

14                    DIRECT EXAMINATION

15  BY MS. BYRD:

16  Q.     Good afternoon, sir.

17  A.     Good afternoon.

18  Q.     Deputy, will you please tell us where you are

19  employed?

20  A.     United States Marshal Service here in Wilmington,

21  Delaware.

22  Q.     How long have you been so employed?

23  A.     In Delaware?

24  Q.     Yes.

25  A.     Approximately six years.

1    Q.      Were you employed with the U.S. Marshal Service prior

2    to coming to Delaware?

3    A.      Yes, two different locations.

4    Q.      Where were they?

5    A.      Philadelphia, Pennsylvania and Miami, Florida.

6    Q.      And how long have you been with the Marshal Service

7    in total?

8    A.      Approximately, ten years.

9    Q.      Will you tell us please or tell the jury, please,

10   what your position is with the Marshal Service?

11   A.      Currently in the District of Delaware, I'm the

12   Warrant/Task Force Coordinator of the Fugitive Task Force

13   located here in Wilmington, Delaware.

14   Q.      And how long have you held the position with the

15   Fugitive Task Force here in Wilmington, Delaware?

16   A.      Approximately, four years.

17   Q.      And during that tenure, if you would just briefly

18   describe for the ladies and gentlemen of the jury what your

19   duties are?  What do you do?

20   A.      We attempt to locate and apprehend wanted persons,

21   whether on the federal, state or local level.

22   Q.      Does that mean, sir, that if you have a state arrest

23   warrant or a local arrest warrant, that might also come into

24   your purview during the course of your duties?

25   A.      Yes, ma'am.

David - direct

1    Q.    As well as federal warrants?

2    A.    Correct.

3    Q.    Now, Deputy David, I'm going to direct your attention

4    to April 9th of this year and ask you if you participated in

5    the arrest of an individual named Nelson Lora-Pena on that

6    date?

7    A.    Yes, I did.

8    Q.    And is that individual in the courtroom today?

9    A.    Yes, he is.

10   Q.    Will you please identify him by stating where he is

11   seated in the courtroom and describe something he is

12   wearing?

13   A.    A male individual next to defense counsel, wearing a

14   white shirt.

15   Q.    Now, Deputy David, did you have occasion on April 9th

16   of 2005 to be in the area of 4 Dunbar Road in Newark,

17   Delaware?

18   A.    Yes.

19   Q.    What type of neighborhood is that?

20   A.    Residential, single family home neighborhood.

21   Q.    And 4 Dunbar Road itself, what type of building is

22   there?

23   A.    It is a single family ranch-style house with a

24   garage?

25   Q.    And by "ranch-style," is that a one floor?

1    A.    Yes.

2    Q.    And is there any type of backyard to that residence?

3    A.    Yes, there was.  There was a fenced-in backyard.

4    Q.    Now, about what time did you arrive there?

5    A.    Early afternoon, mid-afternoon, approximately

6    1:30-2:00 o'clock.

7    Q.    And for whom were you looking?

8    A.    Looking for the defendant.

9    Q.    Did you have a federal arrest warrant for his arrest?

10   A.    Yes, I did.

11   Q.    Now, you said you got there about what time, sir?

12   A.    About 1:30-2:00 o'clock.

13   Q.    After you got there at about 1:30-2:00 o'clock, did

14   there come a point when you saw the defendant?

15   A.    Yes.

16   Q.    And what was he doing?

17   A.    He exited the front door of the residence, walked

18   around the front yard and went to the passenger side of his

19   vehicle for a short period and then reentered the house.

20   Q.    Now, at some point -- well, actually let me ask you

21   this question:  What did you do upon seeing the defendant at

22   that residence?

23   A.    I radioed additional members of the task force and

24   advised them of what I had.

25   Q.    And what do you mean what you had?

David - direct

1   A.      I had observed the subject exiting that particular

2   location.

3   Q.      I'm sorry.  "Subject," that is cop speak.  Who are we

4   talking about here?

5   A.      The defendant.

6   Q.      All right.  Some of us might not be in the law

7   enforcement business.

8   A.      I apologize.

9   Q.      All right.  Having notified other officers, are we

10  talking about federal marshals?  Are we talking about other

11  individuals?

12  A.      Federal, state and local law enforcement officers.

13  Q.      Did other individuals come to that residence in

14  response to your call?

15  A.      Yes.

16  Q.      Were there other -- let's start with employees of the

17  United States Marshal Service located here in Delaware.  Did

18  other individuals come?

19  A.      Yes.

20  Q.      Tell me who -- or tell the jury please who came.

21  A.      U.S. Marshal Dave Thomas, Supervisory Deputy United

22  States Marshal Robert Denney, Deputy United States Marshal

23  Jack Leo, and then we had additional state and local law

24  enforcement officers.

25  Q.      State and local, you said?

1    A.    Yes.

2    Q.    All right.  And starting with these other officers,

3    let's talk about the marshal and the other individuals from

4    the U.S. Marshal Service.  How were they positioned about

5    the residence?

6    A.    Supervisory Deputy Marshal Robert Denney was in

7    the back rear cover as well as U.S. Marshal Dave Thomas, and

8    he was also positioned rear cover.  By "rear cover," I mean

9    it's their objective to cover the back in the event someone

10   tries to exit and flee out the back of the residence.

11   Q.    Now, if you would, Deputy David, you testified you

12   were there to essentially effect a federal arrest warrant?

13   A.    Yes.

14   Q.    Or you had a federal arrest warrant?

15   A.    Yes.

16   Q.    Now, describe, please, for the jury what you had on,

17   what you were wearing?

18   A.    My attire for that day, I had blue jeans, a T-shirt,

19   a utility belt with various equipment as well as a ballistic

20   vest with an outer carrier which depicts "police," with the

21   Marshal Service badge on the left shoulder.

22   Q.    Keep your voice up, if you would, there a little bit.

23         All right.  So on the left shoulder, there is

24   the U.S. Marshal badge?

25   A.    Yes.

David - direct

1    Q.    All right.  Of this vest?

2    A.    Yes.

3    Q.    What color is the vest?

4    A.    Blue.

5    Q.    All right.  And is there anything written on the

6    front of the vest?

7    A.    Yes.  In white letters, it says "police" across the

8    front.

9    Q.    Is there anything written on the back of the vest?

10   A.    It says "Police, U.S. Marshal."

11   Q.    And you were wearing one of those?

12   A.    Yes.

13   Q.    What about U.S. Marshal Thomas?  Was he wearing one

14   of those?

15   A.    Yes.

16   Q.    What about Deputy U.S. Marshal -- Supervisory Deputy

17   U.S. Marshal Robert Denney?  Was he wearing one?

18   A.    Yes.

19   Q.    What about Deputy Jack Leo?  Was he wearing one of

20   the vests as you described it?

21   A.    Yes.

22              MS. BYRD:  Your Honor, may I approach?

23              THE COURT:  You may freely approach.

24   BY MS. BYRD:

25   Q.    Deputy David, I'm going to show you two items that

1    have been marked for identification.  One has been marked

2    for identification as Government's Exhibit 1 and one has

3    been marked for identification as Government's Exhibit 14.

4    All right?  Take a look at those.  Don't show them to

5    anybody yet until we've talked about them.  Let's start off

6    with Government's Exhibit 1.  Is that the federal arrest

7    warrant that you had for the defendant's arrest on April

8    9th, 2005?

9    A.    Yes, it is.

10                 MS. BYRD:  At this time, Your Honor, the

11   Government moves the admission of Government's 1.

12                 THE COURT:  Mr. Peruto?

13                 MR. PERUTO:  No objection.

14                 THE COURT:  It's admitted without objection.

15   *    *    *  (Government's Exhibit No. 1 was received into

16   evidence.)

17   BY MS. BYRD:

18   Q.    And that arrest warrant was issued by what court?

19   A.    The United States District Court for the District of

20   Rhode Island.

21   Q.    On what date?

22   A.    April 4th, 1996.

23   Q.    Now, if you would please turn to Government's

24   Exhibit 14.  Don't hold it up, just look at it to yourself.

25   And will you identify that item?  Again, do not hold it up.

David - direct

1    A.    This is an outer carrier that contains ballistic

2    panels that we wear when we effect an arrest warrant.

3    Q.    Okay.  Now, this may be just because I'm not

4    technical, but you say "outer carrier."  Is it a vest?

5    A.    Yes.

6    Q.    And is there anything significant about the vest that

7    you are looking at?

8    A.    It has a United States Marshal badge sown on the top

9    left corner.  It has the word "police" in bold white

10   lettering across the front.

11   Q.    How does the vest that has been marked as

12   Government's Exhibit 14 compare to the vest that you were

13   wearing, the vest that your colleagues were wearing when you

14   went to arrest the defendant?

15   A.    The same.  It's the same.

16            MS. BYRD:  Your Honor, at this time the

17   Government moves the admission of Government's 14.

18            THE COURT:  Mr. Peruto?

19            I'm sorry.  You have to state it out loud enough

20   for the --

21            MR. PERUTO:  No objection.

22            THE COURT:  Thank you.

23            MR. PERUTO:  Just --

24            THE COURT:  I have got you.  It's admitted

25   without objection.

1    \*    \*    \*    (Government's Exhibit No. 14 was received into

2    evidence.)

3                     MS. BYRD:  And if I could just have -- instead

4    of having it passed around at this time, Your Honor, if the

5    witness could hold up the front?

6                     THE COURT:  That's fine.

7                     THE WITNESS:  (Indicating.)

8    BY MS. BYRD:

9    Q.     Now, what is in the top corner?

10   A.     This is the marshal badge that says "United States

11   Marshal" on it, and this is the rear.

12   Q.     At on the rear, it says "Police, U.S. Marshal?"

13   A.     Correct.

14                    MS. BYRD:  Your Honor, at this time I'm going to

15   go into a little bit of a lengthy demonstration and I ask --

16                    THE COURT:  All right.  That's an appropriate

17   time to break then.  We're right close to the hour.

18                    Okay.  Ladies and gentlemen, we'll take that

19   one-hour break I mentioned.  I'll ask you to be back here

20   shortly before 1:30 so you can come through the screening

21   system and be up in the jury room so we can have you in the

22   jury box at 1:30; okay?

23                    Once again, I need to caution you please

24   remember don't speak about the case, even amongst

25   yourselves, at this point.  I know that is a lot because you

David - direct

1    all have been listening to the opening statements and the

2    start of the evidence but you need to direct any

3    conversation amongst yourself to other topics.

4                All right.  We're in recess.

5                (Jury left courtroom.)

6                THE COURT:  Thanks.  Please be seated.

7                Sir, you may step down, if you would like,

8    during the break.

9                Is there anything we need to take up during the

10   lunch break, Ms. Byrd?

11               MS. BYRD:  Actually, Your Honor, may I just have

12   a moment with Mr. Peruto?

13               THE COURT:  Sure.

14               (Pause.)

15               MS. BYRD:  Your Honor, I just asked Mr. Peruto

16   whether he believes, since he thinks his client will be

17   testifying, if he thinks we'll finish in one day.  He said

18   he believes so.  That is the only thing I wanted to check

19   on.

20               THE COURT:  Nothing else from the Government?

21               MS. BYRD:  No, Your Honor.

22               THE COURT:  Nothing from you, Mr. Peruto?

23               MR. PERUTO:  No, Your Honor.

24               THE COURT:  Thank you, on that last objection,

25   for rising and speaking.  I appreciate that.  And we'll go

David - direct

1    ahead and be in recess until 1:30.

2                    (Luncheon recess takes place from 12:30 p.m.

3    until 1:25 p.m.)

4                    THE COURT:  Thank you.  Please be seated.

5                    Let's get the jury in the box.

6                    Marshal, would you go ahead and take the stand.

7                    (Witness resumes witness stand.  Jury returned.)

8                    THE COURT:  Thank you, ladies and gentlemen.

9    Please be seated.  It's always a relief to see everyone come

10   back after the lunch break.

11                   We'll go ahead and have Ms. Byrd continue with

12   the direct examination of the Government's first witness.

13                   MS. BYRD:  Thank you, Your Honor.

14   BY MS. BYRD:

15   Q.    Deputy David, we were talking about what you did when

16   you first arrived at the site of the defendant's arrest, 4

17   Dunbar Road in Newark, Delaware on April 9th of this year.

18   You had described how I believe other officers, federal,

19   state and local, were situated about the house and I just

20   wanted to clarify as to U.S. Marshal Thomas and Deputy Doug

21   Denney or Robert Denney, where were they situated?

22   A.    In the rear of the location, rear of the residence.

23   Q.    I'm sorry?

24   A.    Rear of the residence.

25   Q.    Do you know whether they're inside or outside of the

A-95

David - direct

1    fenced-in area you described earlier?

2    A.      Initially, I'm not sure.

3    Q.      Now, deputy, if you will indulge me for a moment, I'm

4    going to show you what has been marked for identification as

5    Government's Exhibit 1A.  I'm going to ask you to --

6              MS. BYRD:  May I stand here for a moment, Your

7    Honor?

8              THE COURT:  You may.

9    BY MS. BYRD:

10   Q.      I'm going to ask you, deputy, to take a look at it

11   and tell me, first of all, what it is that we're looking at.

12   Is it a diagram in the picture?  What is it?

13   A.      It's a diagram.

14   Q.      Is this a diagram you prepared?

15   A.      Yes.

16   Q.      And by "prepared," I mean did you actually draw the

17   diagram and someone else did the computer imaging?

18   A.      I drew a rough draft and it was transposed into what

19   you see here.

20   Q.      And it is a diagram of what, sir?

21   A.      To the best of my recollection, the house at 4

22   Dunbar.

23   Q.      And the exterior of the house or the interior of that

24   house?

25   A.      The interior.

David - direct

1    Q.    Does it depict various rooms in that house as you

2    recall them?

3    A.    Yes.

4    Q.    Was it drawn to scale, sir?

5    A.    No.

6              MS. BYRD:  At this time, Your Honor, the

7    Government moves the admission of Government's Exhibit 1A.

8              MR. PERUTO:  No objection.

9              THE COURT:  Admitted without objection.

10   *    *    *  (Government's Exhibit No. 1A was received into

11   evidence.)

12             THE COURT:  You can position that in a way that

13   will allow to you display it to the jury.

14             MS. BYRD:  Thank you, Your Honor.

15             Actually, Your Honor, for ease of reference for

16   some of this, if I may ask the deputy to come down?  I will

17   resume the podium but just so he can access and the jury can

18   see.

19             THE COURT:  That's fine.

20             MS. BYRD:  When I'm referring to Government's

21   Exhibit 1A, deputy, I would just ask you step down with

22   reference to your testimony.

23             Ms. Lotharp.

24             May we dim the lights, Your Honor, for better

25   viewing?

1    THE COURT:  If you want to take down one of the

2    lights, that's fine.  The ones directly overhead.

3    MR. PERUTO:  Can we go on that side?

4    THE COURT:  That's fine.  Sure.

5    (Defendant and his counsel move to the other

6    side of their table.)

7    THE COURT:  Go ahead, Ms. Byrd.

8    BY MS. BYRD:

9    Q.    Now, about what time was it that you began to

10   actually approach the door of the residence, having seen the

11   defendant enter the residence?

12   A.    Approximately, 2:30 p.m.

13   Q.    And as you were approaching the door, was anyone with

14   you?

15   A.    Yes, I had Deputy Jack Leo as well as other state and

16   local law enforcement with me.

17   Q.    Was anyone actually with you approaching the door

18   other than Deputy Leo?

19   A.    Not approaching the front door itself, no.

20   Q.    All right.  At the time that you were approaching the

21   front door, is it your understanding that Deputy Denney and

22   Marshal Thomas were positioned as you described earlier?

23   A.    Yes.

24   Q.    If you would, please, tell us what, if anything, you

25   observed as you approached the front door?

A-98

David - direct

1   A.      As I walked up to the front door, I could clearly see

2   inside.  The interior door was open.  The storm door was

3   closed but it's made of glass.  I could observe inside.  And

4   as I approached, I saw the defendant exit out of the hallway

5   directly in front of me.

6   Q.      All right.  What we're going to do, deputy, I'm going

7   to give you this pointer.  Let's try this out, first.  Let's

8   try, so that everyone can see all at once, if you could

9   point out with that laser where the front door is that you

10  were approaching when you saw the defendant.  There is a

11  little button.  You just hold it in.

12  A.      That's the front door.

13  Q.      All right.  And you said that you saw, as you were

14  approaching the front door, the defendant come from out of a

15  hallway.  What hallway are you referring to?

16  A.      This hallway.  The defendant came in this direction,

17  when I first saw him right here.

18  Q.      And there are two hallways that are depicted on

19  Government's Exhibit 1A; is that correct?

20  A.      Yes.

21  Q.      For lack of a better reference, one is kind of in the

22  rear of the house and one is in the front of the house?

23  A.      Correct.

24  Q.      And the hallway that you just denoted on the exhibit

25  was the rear hallway?

David - direct

1    A.    Correct.

2    Q.    Okay.  And show us what you saw or how you saw the

3    defendant walking.  What direction?

4    A.    The defendant came from this direction and stopped

5    here.

6    Q.    All right.  At the time that you saw the defendant

7    stop, what happened?

8    A.    He looked out the front door.  I said "police, let

9    me see your hands."  The reason I indicated "let me see

10   your hands" is the defendant had a towel in his left hand.

11   Q.    Now, you said "police, let me see your hands."  Were

12   you in a nice conversational voice?

13   A.    I gave him a command of "let me see your hands."

14   Q.    All right.  And how firmly did you make that command,

15   sir?

16   A.    Very.

17   Q.    And what tone of voice did you use?

18   A.    Loud, deep.

19   Q.    All right.  What was the defendant's response?

20   A.    The defendant took both his hands, palms outward and

21   hands up, did not release the towel.  But I could see that

22   he had no weapon in his hand.

23   Q.    After the defendant complied -- he complied

24   initially, would that be fair to say?

25   A.    Yes.