# Exhibit 1
# Part 2

David - direct

1    Q.    All right.  After he did that, what happened?

2    A.    I told him to come to the door.  He began to walk in

3    to my direction, towards the front door.  By the time he

4    reached the front door, he had two very large pit bulls at

5    his feet.

6    Q.    So there were two very large pit bulls at the

7    defendant's feet.  How close to the door did the defendant

8    get?

9    A.    Inches.

10    Q.    Inches from the interior of the door?

11    A.    Yes.

12    Q.    And what about these two large pit bulls that you

13    have described?  How close to the door did they get?

14    A.    They were actually lunging against the door.

15    Q.    And if you could, you said they were "lunging against

16    the door."  Is there anything else you would describe about

17    the demeanor or actions of these pit bulls at the front

18    door?

19    A.    Very agitated to the point of barking, growling,

20    snarling, saliva coming from their mouth, lunging at the

21    door, banging into it.

22    Q.    Now, what, if anything -- strike that.  At the time

23    that you saw the defendant actually inches in front of the

24    door with these two pit bulls acting in the manner you have

25    just testified, what did you do?

David - direct

1   A.    I drew my weapon and told him to control his dogs.

2   Q.    You told the defendant to control his dogs?

3   A.    Yes, I did.

4   Q.    When you say "control his dogs," did you speak in a

5   nice conversational tone?

6   A.    Again, it was loud, deep voice.  It was a command for

7   him to control his dogs.

8   Q.    And did you say that once or more than once?

9   A.    Once.

10  Q.    Did the defendant comply?

11  A.    The defendant made eye contact with me.  The

12  defendant looked down at his dogs, looked back at me, made

13  eye contact again and, in a simultaneous motion, pushed the

14  door open as he turned and fled to the rear of the

15  residence.

16          MS. BYRD:  Your Honor, with the Court's

17  indulgence, I would ask at this time that Deputy David be

18  allowed to step down and demonstrate what he was just

19  saying.

20          THE COURT:  That's fine.  Go ahead.

21          (Witness leaves witness stand.)

22  BY MS. BYRD:

23  Q.    Now, so we're clear, Deputy David, is it your

24  testimony that you were in the front hallway right inches --

25  excuse me -- that the defendant whose dogs were in the front

David - direct

1    hallway inches in front of the front door?

2    A.    Yes.

3    Q.    Now, if you would, we have a court reporter so keep

4    in mind when you are describing, you need to describe

5    exactly what you are doing with your body.  All right?  I

6    would like to you demonstrate as much as you can what you

7    saw the defendant do after you told him or commanded him to

8    control his dogs.

9    A.    The defendant was facing the door, facing me, eye

10   contact.  I instructed him to control his dogs.  He looked

11   at me, looked down at his dogs, looked back at me, pushed,

12   turned and ran.

13   Q.    All right.  And just so the record can reflect, you

14   used one of your arms, I believe it was your right arm, to

15   push, and you indicated a pushing forward motion; is that

16   correct?

17   A.    Yes, pushing against the door.

18   Q.    And at the time the defendant pushed the door open,

19   did he also do something else?

20   A.    He turned his body and fled.

21   Q.    Towards where?

22   A.    Towards the rear of the residence.

23   Q.    Thank you very much.

24   A.    (Witness resumes witness stand.)

25   Q.    Now, once you are seated again, deputy, if you could

David - direct

1    show us on Government's 1A the direction in which you saw

2    the defendant run after he pushed open the door?

3    A.    The defendant pushed, ran to the rear right, into

4    this direction.

5    Q.    And you are showing us that he ran down the hallway,

6    turned toward the right into what is marked as the living

7    room?

8    A.    Correct.

9    Q.    Okay.  Toward the rear of the house on that side of

10   the house, the right side of the house if you are looking at

11   the house from the front?

12   A.    Yes.

13   Q.    Okay.  Now, when the defendant pushed the door open,

14   what happened?

15   A.    Immediately, the dog closest to the opening edge of

16   the door, lunged out of the door.  At this time, I took my

17   left leg and kicked the door shut, catching the dog in the

18   side of the mouth as he was coming out.

19   Q.    All right.  And was the pit bull successful in

20   getting out of the house?

21   A.    No.

22   Q.    Why not?

23   A.    Because I held the door shut with my foot.

24   Q.    Now, you said one of the pit bulls.  That was the one

25   that was closest to the door?

David - direct

1    A.    Yes.

2    Q.    What about this other pit bull?  What happened with

3    him?

4    A.    I'm not sure.  The dog fled in a direction of the

5    defendant.

6    Q.    Okay.  So only one stayed at the door?

7    A.    Yes.

8    Q.    Now, did you go into the house at that time?

9    A.    No.

10   Q.    You were armed; right?

11   A.    Yes.

12   Q.    Why didn't you go into the house?

13   A.    The dog was completely out of control.  Again,

14   lunging, barking, snapping.  I wasn't about to step inside

15   that door.

16   Q.    Well, what did you do?

17   A.    I immediately yelled that the defendant was going out

18   the back.

19   Q.    All right.  Now, after yelling defendant is going

20   out the back and seeing him lunge towards the right rear of

21   the residence, did you see the defendant again?

22   A.    A few moments later, yes.

23   Q.    All right.  "A few moments later."  Tell the jury

24   what you saw.

25   A.    I saw the defendant coming back into my direction

David - direct

1       from the right-hand rear side of the residence, going past

2       the front door into that same hallway and then proceeding

3       down the hallway that he had initially come from.

4       Q.      All right.  If you would please show us, on

5       Government's 1, the trail that you observed the defendant

6       running?

7       A.      I next spotted the defendant in this area.

8       Q.      That would be the living room area?

9       A.      Correct.  He came towards the left, past the front

10      door, and back down this hallway.

11      Q.      And that would be the rear hallway?

12      A.      Correct.

13      Q.      Where was that pit bull that had tried to get out of

14      the door?

15      A.      At that particular time, he was still at the door.

16      Q.      And the second pit bull, did you have an eyeball at

17      this time, him, her or it?

18      A.      No.

19      Q.      And you said that the defendant did this second

20      flight moments after he disappeared into the right rear part

21      of the house?

22      A.      Yes.

23      Q.      Did you see the defendant again?

24      A.      Yes.

25      Q.      How soon thereafter?

David - direct

1    A.    I had enough time to yell that the defendant was

2    going left.   Moments later, I observed the defendant coming

3    back out of this hallway again, running back towards the

4    right into the living room area and proceeded towards the

5    rear of the residence again.

6    Q.    When you say "back out of this hallway," you are

7    referring to the rear hallway?

8    A.    Yes.

9    Q.    So essentially backtracking and running past you

10   again in the initial direction?

11   A.    Yes.

12   Q.    Now, during this time, did you hear any noises?

13   A.    I heard commands being yelled from the back on two

14   different occasions:   The first time when he initially fled

15   from the front door, and then I heard additional commands

16   when he fled back into the residence and went towards the

17   left.

18   Q.    Okay.   When the defendant -- and when you say "he,"

19   are you referring to the defendant?

20   A.    Yes.

21   Q.    Okay.   When the defendant initially fled from you,

22   having pushed open the door with the pit bull, what commands

23   did you hear?

24   A.    I just heard yelling in the back.

25   Q.    Okay.

David - direct

1    A.    I couldn't determine what they were.

2    Q.    And what about when he ran the other way?

3    A.    When he ran back through?

4    Q.    Yes.

5    A.    I just heard yelling again after he was out of my

6    sight in the rear left side of the residence.  I heard

7    additional yelling.  I could not determine what it was.

8    Q.    And what about the pit bull that was at the front

9    door?  When the defendant came back, running back and

10   backtracking back from the back hallway into the front

11   hallway, back into the living room, going toward the back of

12   the house again, where was that pit bull?

13   A.    The pit bull that had initially remained at the front

14   door left at that point.

15   Q.    And do you know where that second pit bull was during

16   that time?

17   A.    No, I do not.

18   Q.    Now, did you see the defendant again?

19   A.    Yes.

20   Q.    When did you see him in relation to the last time

21   when he ran back past you?

22   A.    The defendant again came from the rear right area of

23   the residence, came back through into this first hallway.

24   At this point, I saw the defendant running.  And behind him,

25   I saw Supervisor Denney right behind him, running with him.

David - direct

1    I saw Marshal Thomas behind Supervisor Denney.  And then I

2    saw both dogs at their feet.

3    Q.      "Their" meaning whom?

4    A.      Supervisor Denney and Marshal Thomas.

5    Q.      And if you could, tell us whether you heard -- you

6    told us what you saw.  Did you hear anything going on in the

7    house?

8    A.      Yes.

9    Q.      Tell us what you heard.

10   A.      In addition to the barking and the growling from the

11   dogs, I could also hear someone yelling "stop, police."  I

12   can't say who it was but I distinctly heard "stop, police"

13   as they were running by.

14   Q.      And you said you heard some noises emanating from the

15   dogs.  Can you describe what their demeanor was?

16   A.      Very agitated, barking, growling.  Very worked up.

17   Q.      Now, is there a point when you entered the house?

18   A.      Yes.

19   Q.      When was that?

20   A.      As soon as I saw the defendant, Supervisor Denney and

21   Marshal Thomas go running by, I entered.

22   Q.      Now, let me ask you a question.  You used the term

23   "fled" quite a few times during your testimony.  What

24   precisely is it that you observed the defendant doing?

25   A.      Running.

David - direct

1  Q.    At any point, was he walking?

2  A.    No.

3  Q.    At any point, was he strolling?

4  A.    No.

5  Q.    What type of pace are we talking about here?

6  A.    Very fast.  Runs as fast as he could inside the

7  house.

8  Q.    And could you discern whether the defendant was

9  saying anything?

10  A.    No.

11  Q.    All right.  You said you entered the house after you

12  saw the defendant fleeing back toward the back hallway?

13  A.    Yes.

14  Q.    Followed by Marshal Thomas and Deputy Denney?

15  A.    Correct.

16  Q.    Who were followed by the dogs?

17  A.    Correct.

18  Q.    Where did the defendant run to that time?

19  A.    The end of the hallway, right here.

20  Q.    Okay.  You are pointing to the far end of the rear

21  hallway that abuts against the rear bedroom?

22  A.    Correct.

23  Q.    And there are these little what look like little half

24  or semi-circles for various rooms.  Are those doors?

25  A.    Yes.

David - direct

1    Q.    Okay.  What did you do?

2    A.    I entered the right-hand side of that back hallway,

3    turned and proceeded down that hallway to the left.

4    Q.    All right.  And what did you see once you got there?

5    A.    I saw a struggle between Supervisor Denney and the

6    defendant in this room, in this area.

7    Q.    And by "this room, this area," you are referring to

8    the back bedroom that is the far end of the house; is that

9    correct?

10   A.    Correct.

11   Q.    All right.  Far end on the left side of Government

12   Exhibit 1; is that correct?

13   A.    Correct.

14          THE COURT:  Is this Exhibit 1?

15          MS. BYRD:  Excuse me.  1A, I apologize.

16   Government's Exhibit 1A.

17   BY MS. BYRD:

18   Q.    Is that correct?

19   A.    Yes.

20   Q.    All right.  You said a struggle.  Please describe,

21   for the ladies and gentlemen of the jury, what it is that

22   you saw.

23   A.    I saw Supervisor Denney attempting to grab ahold of

24   the defendant and get him on to the floor.  I saw him grab

25   his shoulder, trying to push him on to the floor.  I saw the

David - direct

1    defendant spinning and turning in an attempt to get around

2    Supervisor Denney.

3    Q.    All right.  At that time, was there anyone else

4    involved in this struggle with hands on the defendant?

5    A.    Not that I could see, but I had Marshal Thomas at

6    this doorway of that same bedroom.

7    Q.    All right.  Now, you went into that hallway, you saw

8    what you just testified to.  What did you do?

9    A.    I proceeded down the hallway, attempted to help out

10   and get into that bedroom.

11   Q.    Were you able to?

12   A.    No.

13   Q.    Why not?

14   A.    One of the pit bulls that was at the feet of

15   everybody at the end of that hallway lunged at me, forcing

16   me to back up into this bedroom which is all the way to the

17   rear left of the residence.

18   Q.    Okay.  And is that the one that has the back window

19   as marked on Exhibit 1A?

20   A.    Yes, it is.

21   Q.    Okay.  So after the pit bull lunged at you, you went

22   into that bedroom?

23   A.    Correct.

24   Q.    Why is that?

25   A.    To try and get some distance from the dog.

David - direct

1   Q.    All right.  And what happened while you were in the

2   bedroom with the pit bull?

3   A.    It became a stand-off with the dog.  The dog took a

4   position at the doorway, continued to growl and bark at me.

5   I had my weapon on the dog itself.  I was trying to gain

6   some distance.

7   Q.    You said that the pit bull continued to growl and

8   bark at you?

9   A.    Yes.

10  Q.    You said you had the gun on the dog.  What do you

11  mean by that?

12  A.    I had my sidearm aimed in on the dog.

13  Q.    Did you shoot him?

14  A.    No.

15  Q.    Why not?

16  A.    The dog didn't lunge at me.

17  Q.    You testified that the dog had lunged at you, which

18  forced you to go into that bedroom; is that right?

19  A.    Yes.

20  Q.    All right.  Why didn't you shoot him once you were in

21  the bedroom?

22  A.    Various reasons.  One is I didn't feel I had a safe

23  enough shot.  Directly behind that dog was Marshal Thomas,

24  Supervisor Denney and the defendant struggling, just behind

25  that dog.

David - direct

1   Q.    All right.  So did you continue to have your gun

2   drawn at the dog?

3   A.    Yes.

4   Q.    Now, was the door that you had come into open or

5   closed?

6   A.    Open.

7   Q.    Could you see out into the hallway?

8   A.    Yes.

9   Q.    What, if anything, did you see?

10  A.    I saw the struggle between the defendant, Supervisor

11  Denney and Marshal Thomas proceed back out of that hall,

12  that bedroom into the hallway.

13  Q.    Okay.  Did it come within your view?

14  A.    Yes.

15  Q.    And you said the struggle.  What was the defendant

16  doing?

17  A.    Attempting to flee down this hallway.

18  Q.    You said "attempting to flee."  What was he doing?

19  Tell us physically what you observed him doing.

20  A.    Running and pushing past Supervisor Denney and

21  Marshal Thomas.

22  Q.    All right.  What, if anything, else did you see while

23  you were in the bedroom looking out through the door into

24  the hallway?

25  A.    The defendant had made it past the doorway.

David - direct

```
 1    Supervisor Denney was positioned at the end of the hallway,

 2    moving to the right.  I could see Supervisor Denney was the

 3    last person in that hallway coming out of the bedroom.  And

 4    at that time, I saw the second dog have what appeared to me

 5    his pant leg in his mouth.

 6    Q.    The second pit bull --

 7    A.    Yes.

 8    Q.    -- had what appeared to be whose pant leg?

 9    A.    Supervisor Denney's pant leg.

10    Q.    And Deputy Denney was standing somewhere in the rear

11    of the hallway?

12    A.    He was proceeding down the hallway, attempting to

13    grasp ahold of the defendant.

14    Q.    And once you saw the second pit bull appear to have

15    or going to have Deputy Denney's pant leg in his mouth,

16    what, if anything, did you do?

17    A.    I turned my weapon on to that dog.

18    Q.    And what was your intent?

19    A.    I was going to shoot that dog.

20    Q.    Did you shoot him?

21    A.    No.

22    Q.    Why not?

23    A.    Supervisor Denney turned and began to kick the dog

24    away from him.

25    Q.    And was Deputy Denney successful in kicking this pit
```

1    bull away from his leg?

2    A.    A few inches, yes.

3    Q.    What, if anything, happened then?

4    A.    At that point, the dog that had me cornered into that

5    bedroom, turned and jumped on to the pit bull that was in

6    the hallway and the two dogs began to fight in the hallway.

7    Q.    What happened then?

8    A.    Supervisor Denney instructed me to try to get the

9    dogs into one of the bedrooms so that we could close the

10   door and contain them.

11   Q.    And were you and Deputy Denney successful in doing

12   so?

13   A.    Yes.

14   Q.    And which bedroom was that, sir?

15   A.    The rear bedroom.

16   Q.    Is that the rear bedroom that the defendant had

17   struggled -- in which the defendant had struggled with

18   Deputy Denney?

19   A.    Yes.

20   Q.    Now, you said that at some point you saw this pit

21   bull at Deputy Denney's feet.  Where was the defendant?

22   A.    The defendant was continuing to flee down this

23   hallway with Marshal Thomas on him.

24   Q.    Was Deputy Denney able to pursue the defendant at

25   that point?

David - direct

1    A.    No.

2    Q.    Why not?

3    A.    He was preoccupied with the dogs.

4    Q.    And how about you?  Were you able to pursue?

5    A.    No.

6    Q.    After you and Deputy Denney were able to get these

7    fighting dogs into the bedroom -- actually, let me ask you

8    a question about that.  You said they started to fight?

9    A.    Yes.

10    Q.    Now, do you have any pets?

11    A.    Yes.

12    Q.    Do you ever see dogs playing together?

13    A.    Yes.

14    Q.    Cats playing together?

15    A.    Yes.

16    Q.    Even kind of roughhousing?

17    A.    Yes.

18    Q.    Did you ever see that?

19    A.    Yes.

20    Q.    Was it like that?

21    A.    No.

22    Q.    Tell us what it was like?

23    A.    They were attacking each other, very violently.

24    Biting, mauling, lunging at each other by the throat, by the

25    face.

1    Q.    All right.  Now, after these lunging, biting dogs

2    were secured in the bedroom, what, if anything, did you do?

3    A.    As soon as we got the bedroom door shut, I heard a

4    gun shot.

5    Q.    A gun shot.  Did that cause any alarm to you?

6    A.    Yes.

7    Q.    Why?

8    A.    A great deal.  I wasn't aware of what was going on

9    because I was back in that hallway.

10   Q.    What did you do?  And by the way, at the time you

11   heard the gun shot, was Supervisor Deputy Denney still with

12   you?

13   A.    Yes.

14   Q.    All right.  What, if anything, did the two of you do

15   upon hearing the gun shot?

16   A.    I immediately ran out that hallway to the end and

17   observed Marshal Thomas on the floor, attempting to gain

18   control of defendant's legs.  I saw the defendant obviously

19   on the floor.  I saw Deputy Jack Leo on his knees along the

20   right side of the defendant.

21   Q.    All right.  And what was the defendant doing?  Please

22   describe for the jury.

23   A.    The defendant was thrashing around, turning his body,

24   kicking his legs, attempting to get up, crawling, just

25   everything he could do not to be taken into custody.

David - direct

1    Q.    Did you hear whether anything was coming out of his

2    mouth?  I'm not asking for specifics but did you hear if he

3    was saying anything?

4    A.    I heard a lot of profanity.

5    Q.    Coming from the defendants?

6    A.    Yes.

7    Q.    Was that whispered profanity or was it some other --

8    A.    It was very loud.

9    Q.    At the time you saw Deputy Leo and Marshal Thomas

10   attempting -- on the floor attempting to subdue the

11   defendant, what did you do?

12   A.    I proceeded to the left side of the defendant and

13   attempted to gain control of his left arm.

14   Q.    Okay.  And where was his left arm?

15   A.    His left arm was underneath of the left side of his

16   body.

17   Q.    And were you able to easily do that?

18   A.    I was able to, after a few moments of struggling, get

19   his left arm out, yes.

20   Q.    All right.  And you said he was struggling.  What did

21   the defendant do, if anything, in relation to you trying to

22   move his left arm?

23   A.    Kept attempting to move away from me, struggle away,

24   struggle forward, left, right, twist on the floor,

25   everything he could do to keep me from getting his arm.

David - direct

1    Q.    All right.  Now, describe now for us as you are down

2    there attempting to get his arm, you have now gotten his

3    arm, what happens?

4    A.    Deputy Leo is attempting to get his right arm behind

5    him so we could apply handcuffs.

6    Q.    Okay.  And what happened?

7    A.    Deputy Leo was pulling very hard to try to get that

8    arm out.  The defendant had it cupped underneath his body.

9    Q.    Now, the fact that the defendant -- first of all, was

10    the defendant face up or face down?

11    A.    He was partially on his side as well as face down.

12    Q.    Okay.  Now, the fact that the defendant had his right

13    arm, one of his arms under him in a way where he was

14    struggling, did that cause any concern on your part?

15    A.    Yes.

16    Q.    Well, why is that?

17    A.    I heard a gun shot, was not aware of where it came

18    from.  And for all I knew, the defendant could have had a

19    weapon.

20    Q.    Describe now how -- you had successfully gotten the

21    defendant's left arm, that Deputy Leo is now trying to get

22    the defendant's right arm, the defendant is struggling.

23    What happens as Deputy Leo tries to get the defendant's

24    right arm?

25    A.    Eventually, Deputy Leo was able to get the arm out

David - direct

1    from underneath of the body, put it behind the defendant's

2    back and we applied handcuffs.

3    Q.    All right.  And was handcuffs enough to -- actually,

4    let me stop.  Let me strike that.

5              After the handcuffs are put on to the defendant,

6    did he stop struggling?

7    A.    No.

8    Q.    What did he do?

9    A.    Continued to kick his legs, attempted to try to get

10   up.  We again had to try and contain and control him.  So we

11   held his legs.  I asked for someone to retrieve a set of

12   what we call full restraints from my vehicle, which includes

13   leg irons.

14   Q.    And did someone in fact bring leg irons?

15   A.    Yes.

16   Q.    And by the way, as far as procedures, is that

17   something that you always do, put leg irons on people?

18   A.    Not typically, no.

19   Q.    And why were they brought out in this case then?

20   A.    Because the defendant was completely out of control.

21   Q.    Were you able to get the leg irons on the defendant?

22   A.    Yes.

23   Q.    How long did that take?

24   A.    It took some time.

25   Q.    How long is some time?

David - direct

1   A.      From the time we attempted to start to put them on,

2   maybe 30-45 seconds.

3   Q.      And what was the defendant doing during that time?

4   A.      Struggling, moving his legs, attempting to get up.

5   Q.      At some point, they were put on, however?

6   A.      Yes.

7   Q.      And did the defendant, having been handcuffed -- and

8   that was behind his back; correct?

9   A.      Correct.

10  Q.      (Continuing):  -- and having been leg cuffed, at that

11  point did the defendant stop struggling?

12  A.      No.

13  Q.      He didn't.  What did he do?

14  A.      He continue to do try and get up, move about on the

15  floor.

16  Q.      Was he saying anything?

17  A.      He began to ramble incoherently about a lot of

18  different things.

19  Q.      All right.  At some point, however, was the defendant

20  finally subdued?

21  A.      Yes, we eventually put a waist-chain on him.

22  Q.      And how long after the waist-chain did the defendant

23  calm down?

24  A.      Shortly after.

25  Q.      And what is a waist-chain, for those in the jury who

1    aren't aware, including myself?

2    A.    It is a link-metal chain that goes around the

3    defendant's waist, and handcuffs are weaved through it to

4    keep the defendant's hands from coming away from his body.

5    Q.    Now, after of the defendant was taken into custody

6    and finally subdued, did some attention turn to the pit

7    bulls that were in that back bedroom?

8    A.    Yes.

9    Q.    And what was done with regard to those pit bulls?

10   A.    Animal Control was contacted to come to the residence

11   and deal with the animals.

12   Q.    All right.  And did you have any involvement with

13   Animal Control once they got to the residence?

14   A.    Yes.

15   Q.    All right.  What was your involvement?

16   A.    My involvement was to go back to that hallway with

17   the Animal Control officer and assist him in retrieving one

18   animal at a time out of that bedroom.

19   Q.    Did you in fact go into the bedroom?

20   A.    I did not go into the bedroom, no.

21   Q.    Did you in fact look in the bedroom?

22   A.    We cracked the door open enough for the Animal

23   Control officer to put the snare that they use inside the

24   door and lasso one dog at a time.

25   Q.    Okay.  Let's talk about that process.  Is it your

David - direct

1  testimony that both of you, you and the Animal Control

2  person, stood outside of the door, did not actually enter

3  into the room?

4  A.    Correct.

5  Q.    All right.  And you said "a snare."  Will you

6  describe for the jury what you mean by that?

7  A.    It's a long rod with a wire that feeds down through

8  the end into a loop.  That is placed over the dog's head.

9  The rear of that cable is pulled tight so that the Animal

10  Control officer can safely move an animal from a safe

11  distance.  I believe that rod is approximately eight feet

12  long.

13  Q.    And this process of ensnaring the first pit bull, how

14  easy of a process was that?

15  A.    Very difficult.

16  Q.    Why was that?

17  A.    The dogs were agitated at the door.

18  Q.    Okay.  At some point, was the Animal Control person

19  successful in snaring that pit bull?

20  A.    Yes.

21  Q.    And then what happened with that pit bull?

22  A.    That pit bull was led out of the house and placed

23  into a cage in the back of the Animal Control officer's

24  vehicle.

25  Q.    And did the same thing happen with regard to the

David - direct

1    second pit bull?

2    A.    Yes.

3    Q.    After the pit bulls were removed from the bedroom,

4    did you have an opportunity to go inside of that bedroom?

5    A.    Yes, I did.

6    Q.    And can you describe for the jury what, if anything,

7    you saw?

8    A.    I saw a lot of blood throughout that room, on the

9    bed, on the floor, clothing that was on the floor.

10   Q.    And had that blood been in the room before?

11   A.    No.

12   Q.    Did you have an opportunity to observe the physical

13   appearance of the two pit bulls when they came out?

14   A.    Yes.

15   Q.    Can you tell us whether you noticed anything in

16   particular about their appearance?

17   A.    They had lacerations, cuts, bite marks on their face,

18   back, and legs.

19   Q.    Did they have any blood on them?

20   A.    Yes.

21   Q.    Deputy, I'm going to show you now what has been

22   marked for identification as Government's Exhibits 3, 4, and

23   12.

24            MS. BYRD:    Your Honor, may I inquire from here

25   for a moment?

David - direct

1          THE COURT:   You may.

2     BY MS. BYRD:

3     Q.      Let's start with No.3.  Is that a photograph?

4     A.      Yes.

5     Q.      And what is that a photograph of?

6     A.      One of the pit bulls.

7     Q.      Is that before or after it was taken from the room?

8     A.      That is after it was taken from the room.

9     Q.      Is there a person from Animal Control depicted in the

10    picture?

11    A.      Yes.

12    Q.      Does that picture fairly and accurately depict how

13    that pit bull appeared after it was removed from the bedroom

14    as you have testified?

15    A.      Yes.

16    Q.      Let's go to Government's 4.  First of all, what is

17    that?  Is that a picture?

18    A.      Yes, it is.

19    Q.      And what is that a photograph of?

20    A.      The second pit bull.

21    Q.      And is this again while the pit bull is being led by

22    the Animal Control person?

23    A.      Yes.

24    Q.      And this is after it was led out of the bedroom?

25    A.      Correct.

David - direct

1    Q.    And does this exhibit fairly and accurately depict

2    how that pit bull appeared after it was led from the

3    bedroom?

4    A.    Yes.

5    Q.    And finally, Government's 12, is that also a

6    photograph?

7    A.    Yes.

8    Q.    What is that a photograph of?

9    A.    The bedrooms that the dogs were contained in.

10    Q.    And does that photograph fairly and accurately depict

11    how the bedroom looked after the dogs were taken from the

12    bedroom?

13    A.    Yes.

14              MS. BYRD:  At this time, Your Honor, the

15    Government moves of the admission of Government's Exhibits

16    3, 4 and 12.

17              MR. PERUTO:  No objection.

18              THE COURT:  They're admitted without objection.

19    *    *    *  (Government's Exhibit Nos. 3, 4 and 12 were

20    received into evidence.)

21    BY MS. BYRD:

22    Q.    Okay.  We've now put on the screen, Deputy David,

23    Government's Exhibit 12.  You testified that this was the

24    photograph of the bedroom after the dogs were removed from

25    it; is that correct?

David - direct

1    A.    Yes.

2    Q.    All right.  Now, you said there was blood in the

3    bedroom?

4    A.    Yes.

5    Q.    Can you show us on the exhibit where the blood is?

6    A.    On the floor, all of this is blood splatter.  On this

7    sheet, that is blood splatter.  And on this mattress, there

8    is blood splatter.

9    Q.    Thank you.  I'm going to show you Government's

10   Exhibit 3.  And, of course, the jury will get a chance to

11   see these up close so that to the extent there is some

12   detail you can't see, I want you to describe it for us.  But

13   is this a photograph of, as you testified, one of the pit

14   bulls?  Is that correct?

15   A.    That's correct.

16   Q.    Could you point out to us, to the extent you can see

17   it from this distance on the projector, the physical

18   condition of this dog?

19   A.    Well, I can see the right side of the dog in this

20   picture.  The pointer is not working.  There we go.  Here on

21   the rear right leg, there is the laceration.  And on the

22   face of the dog, there are several lacerations that you

23   could actually see in the photograph.

24   Q.    And when you saw the photograph a few moments ago up

25   close, did you actually see blood as well?

David - direct

1    A.    Yes.

2    Q.    Now, I noticed in the photograph there is this long

3    pole that seems to be somehow attached to the dog.  Do you

4    see that?

5    A.    Yes.

6    Q.    What is that?

7    A.    That is the snare that I was speaking of earlier.

8    Q.    That is the pole.  And is there something around the

9    dog's neck?

10   A.    Yes.  From this end of the pole, there is a metal

11   wire that comes out that loops around the dogs neck.

12              MS. BYRD:  Can I have the other one?

13              (Next exhibit placed on Elmo.)

14   BY MS. BYRD:

15   Q.    Government's Exhibit 4.  Again, this is a photo of

16   the second pit bull?

17   A.    Yes.

18   Q.    All right.  If you can point out from your vantage

19   point on the witness stand what the physical condition is of

20   this dog?

21   A.    On this dog's back, you can see an area in the middle

22   of the back that has a laceration to it.

23   Q.    All right.  When you look at this photograph up

24   close, could you see blood on the dog?

25   A.    Yes.

David - direct

1    Q.    Now, you said that the dogs were still agitated upon

2    Animal Control being called and trying to ensnare them in

3    the room; is that correct?

4    A.    That's correct.

5    Q.    At any point, did they lose their steam?

6    A.    Yes.

7    Q.    When was that?

8    A.    As they were coming out of the hallway.

9    Q.    And how long did it take, by the way, to get these

10   dogs removed?

11   A.    From the time Animal Control got there, it took

12   several minutes per dog.

13           MS. BYRD:   Thank you.

14           (Exhibit 4 removed and hallway diagram placed

15   back on Elmo.)

16   BY MS. BYRD:

17   Q.    Now, Deputy David, you testified extensively about

18   how the defendant struggled.  Was the defendant injured

19   during this encounter?

20   A.    Yes.

21   Q.    I'm going to show you now what has been marked for

22   identification as Government's Exhibit 10.  Is that a

23   photograph?

24   A.    Yes.

25   Q.    Is it a photograph of the defendant?

David - direct

1    A.    Yes.

2    Q.    Is it a photograph of the defendant after he was

3    subdued?

4    A.    Yes.

5    Q.    Does it depict injuries to his face and some injuries

6    to the upper portion of his body?

7    A.    Yes, it does.

8    Q.    Is he handcuffed in that photograph?

9    A.    He has a waist-chain and handcuffs on, yes.

10   Q.    And does the picture fairly and accurately depict

11   how the defendant looked at the time when he was finally

12   subdued?

13   A.    When he was finally subdued, yes.

14           MS. BYRD:  At the time, the Government moves the

15   admission of Government's Exhibit 10.

16           MR. PERUTO:  No objection.

17           THE COURT:  Admitted without objection.

18   *    *    *  (Government's Exhibit No. 10 was received into

19   evidence.)

20   BY MS. BYRD:

21   Q.    When was the first time you had physical contact with

22   the defendant, that you laid your hands on him in any way?

23   A.    When I came out of the hallway, after the gun shot

24   went off and moved to the left side of the defendant.

25   Q.    And what was he doing at that time?

David - direct

```
 1    A.      He was struggling.

 2    Q.      Do you know -- you testified the defendant was

 3    injured.  Do you know how he was injured?  What injuries he

 4    sustained?

 5    A.      I know from being at the hospital with him that he

 6    sustained bruising, broken eye socket, orbital bone, if you

 7    will, on the right side orbital bone and contusions to his

 8    upper body.

 9    Q.      And that's the defendant; is that correct?

10    A.      Yes.

11    Q.      All right.  And is it fair to say, Deputy David, that

12    the defendant has a pretty bruised up face at this point?

13    A.      Yes.

14    Q.      Is it fair to say he looks like he has a fat lip?

15    A.      Yes.

16    Q.      Closed eye?

17    A.      Yes.

18    Q.      And blood on his face?

19    A.      Yes.

20    Q.      And although it might be a little unclear from your

21    vantage point, is it fair to say he has some bruises on his

22    upper body?

23    A.      Yes, there appears to be redness.

24    Q.      Now, did all that -- was all that -- I'm sorry.  Let

25    me restate.  The bruises and the damage to his face, when
```

David - direct

1   did that happen?

2   A.      I'm not sure.

3   Q.      Were you part of that?

4   A.      No.

5   Q.      All right.  Now, you stated that the defendant was

6   injured.  Was he taken to the hospital?

7   A.      Yes, he was.

8   Q.      What hospital?

9   A.      Christiana Hospital, Emergency Room.

10  Q.      And did you accompany the defendant?

11  A.      Not initially, but at a later point I did arrive at

12  the hospital.

13  Q.      And once you got to the hospital, did you have any

14  contact with the defendant?

15  A.      Yes.

16  Q.      Will you tell us the nature of that contact?

17  A.      The defendant was placed in an exam room adjacent to

18  a nurses' station.  It was an actual room itself, not just

19  curtains with a closing door.

20  Q.      Keep your voice up.

21  A.      It was an actual room itself with walls and a closing

22  door, not just an area with curtains.

23  Q.      Okay.

24  A.      When I arrived, the defendant was inside with two

25  officers.

David - direct

1    Q.      And what happened?

2    A.      I entered.  The defendant had been examined by

3    several nursing staff, one doctor, and we were basically in

4    a waiting position, waiting for additional consultation with

5    doctors.

6    Q.      Okay.  While you were waiting for additional

7    consultation with doctors in this room with the defendant,

8    what, if anything, happened?

9    A.      The defendant tried to strike up a conversation with

10   me.

11   Q.      All right.  You said he tried to strike up a

12   conversation with you.  What do you mean by that?

13   A.      The defendant initially apologized.  Then the

14   defendant started making statements to the affect of "I've

15   been on the run for 10 years.  I had to give it a shot."

16   Q.      All right.  Now, did you engage him in conversation,

17   deputy?

18   A.      I told him I wasn't interested in hearing anything he

19   had to say.

20   Q.      And when you told the defendant that you weren't

21   interested in hearing any statements he was making, did the

22   defendant stop talking?

23   A.      No.

24   Q.      What was his demeanor?

25   A.      Very nonchalant.

David - direct

1    Q.    Nonchalant?

2    A.    Yes.

3    Q.    How about the tone of his voice?

4    A.    At that time, it appeared to be friendly, very --

5    just wanted to have a conversation.

6    Q.    And after the defendant continued to talk, even

7    though you told him you didn't want to hear what he had to

8    say, what is it -- and please be as specific as possible --

9    the defendant said to you?

10    A.    He said many things.  Things that come to mind, "I've

11    been on the run for 10 years and had to give it a shot."

12    Q.    "I had to give it a shot?"

13    A.    Yes.  He stated, "I know you guys were at my father's

14    funeral.  That's why I didn't go."

15          He stated that he -- his words were "I saw your

16    police stuff and marshal stuff and tried to figure out how

17    you knew I was here."

18          He said "I know you have a snitch.  I know the

19    snitch gave me up because I stayed here too long."  He

20    indicated that he bounced from place to place, including

21    Florida, and that he knew he stayed here too long.

22          He then stated that he is glad it's over.  He

23    had tried but things happen, it's destiny.

24    Q.    Did he say anything about what he was doing or about

25    to do when he first encountered you?

A1-135
David - cross

1    A.    Yes.  He stated that if we had arrived 20 minutes

2    later, he wouldn't have been there.  He was preparing to get

3    a shower and leave to go to New York.  And that if he had

4    found out we were at his house, he would have never come

5    back and we would have never gotten him.

6    Q.    And when the defendant, you said, initially said that

7    he was on the run for 10 years, and had to take a shot at

8    it.  Did he say that once or more than once?

9    A.    He said that more than once.

10             MS. BYRD:  Your Honor, may I have a moment?

11             THE COURT:  You may.

12             (Pause.)

13             MS. BYRD:  I have no further questions.  Thank

14   you very much.

15             THE COURT:  All right.  Mr. Peruto, your

16   cross-examination.

17             And, sir, are you going to be wanting to use

18   that overhead projector?

19             MR. PERUTO:  I won't be using it.

20             THE COURT:  Then I'll go ahead and have the

21   courtroom deputy go ahead and turn the lights back on.

22                        CROSS-EXAMINATION

23   BY MR. PERUTO:

24   Q.    Deputy David, did you prepare any reports at or

25   contemporaneously or subsequently to this incident in order

David - cross

1    to refresh your recollection for today's testimony?

2    A.    I prepared a report, yes.

3    Q.    And did you prepare a report or more than one report?

4    A.    Two reports.

5    Q.    Two reports?

6    A.    Yes.

7            MR. PERUTO:  I'd like to mark this Defense

8    Exhibit No. 1 for identification purposes.

9            May I approach?

10           THE COURT:  Sure.  Why don't we mark it and then

11   you can approach.

12   BY MR. PERUTO:

13   Q.    I'll ask if this is the report that you referred to

14   that you prepared in connection with this case?

15   A.    This is a copy of a supplemental report, yes.

16   Q.    That's a supplemental report?

17   A.    Yes.

18   Q.    So there is another report?

19   A.    Yes.

20           MR. PERUTO:  I would ask for production of that

21   report.  It's the only one we've got.

22           THE COURT:  All right.  Why don't we have a side

23   bar.

24           (Conference held at side bar out of presence of

25   jury.)

David - cross

1          THE COURT:  Okay.

2          MR. PERUTO:  Judge, this is a statement of a --

3     this is an eyewitness to a crime and I'm entitled

4     mandatorily to get a statement of an eyewitness, and the

5     only thing turned over to the defense was this, what now he

6     is referring to as a supplemental report.

7          THE COURT:  Okay.  Ms. Byrd.

8          MS. BYRD:  First, I think supplemental means

9     supplemental to the first report that was written in the

10    case, not with him.  Second, I'm unaware of a second report.

11    I don't know if he is referring to an internal document, but

12    certainly I'm unaware of it.  Maybe through further

13    questioning.  I believe the discovery that was provided,

14    Mr. Andrews is unaware of any other report.

15          THE COURT:  Okay.  Well, go ahead and cross him

16    and we'll see what we can find out.  Thank you.

17          (Conference at side bar ends.  Proceedings

18    continue in open court.)

19    BY MR. PERUTO:

20    Q.    Sir, would it be a fair statement that what I showed

21    you that has previously been marked as Defense Exhibit No. 1

22    picks up at the hospital?

23    A.    Yes.

24    Q.    So there is nothing in your statement whatsoever that

25    deals with the incident or the crimes in question?

David - cross

1    A.    Not in that report, no.

2    Q.    Okay.  Do you know where your initial report is?

3              MS. BYRD:  I'm sorry.  Go ahead.

4              THE COURT:  Go ahead.  You can answer.

5    A.    I have a copy of my report and the Government has a

6    copy.

7              MR. PERUTO:  I would ask for a production of

8    that report.

9              (Counsel confer.)

10             THE COURT:  You know what?  We're a little early

11   in the day to be doing it.  We've only had you back in the

12   box for less than an hour, but we appear to have hit a snag.

13   So here is what we're going to do.  I'll ask the courtroom

14   deputy to move the easel back.  We'll go ahead and take a

15   short break now as opposed to at 3:00 o'clock which is when

16   we would usually break.  And we'll try to keep this to about

17   ten minutes.  Okay?

18             (Jury left courtroom.)

19             THE COURT:  Okay.  Please, be seated.

20             It sounds like we got a record that there is an

21   earlier reported statement by this gentleman.

22             MS. BYRD:  We're going to ask for the file

23   downstairs just to be reviewed; to have the report, if one

24   in fact exists, be produced.

25             THE COURT:  Yes, it will need to be produced.

David - cross

1    So far, this gentleman said twice there is such a report and

2    so --

3                    MS. BYRD:  And, Your Honor, the Government is

4    going to go through its discovery.  And so we appreciate the

5    break.

6                    THE COURT:  Okay.

7                    MR. PERUTO:  Your Honor, one request.

8                    THE COURT:  Yes.

9                    MR. PERUTO:  Because this witness is on

10   cross-examination, I ask he not be permitted to speak with

11   anyone.

12                   MS. BYRD:  And, Your Honor, certainly Mr. Peruto

13   I'm certain would know the Government would not be coaching

14   its witness during the break.  It's not --

15                   THE COURT:  Okay.  Good.  We're all on the same

16   page.  And I think the witness, if he doesn't understand,

17   I'll explain it now.  Once you are under cross-examination,

18   you can't talk about the case with anybody.  Okay?

19                   THE WITNESS:  Yes, sir.

20                   THE COURT:  All right.  Let's take ten minutes.

21   Well, actually we'll take less than ten.  I'll try to give

22   you as close to ten as I can, but I'm going to try to get

23   back in here and have the report from you folks about where

24   we stand in a little less than ten minutes so we're moving

25   along with the jury.  We're in recess.

David - cross

1           (Brief recess taken.)

2           THE COURT:  All right.  Please be seated.

3           What explanation do we have?  Can we handle it

4   in open court or do we have to have a side bar?

5           MR. PERUTO:  Your Honor, I would want to handle

6   it front of the witness.

7           THE COURT:  No, that's fine.

8           MR. PERUTO:  I think in a nutshell, we have an

9   agreement there is no other report made by this witness.

10           THE COURT:  All right.  That's all we need to

11   say.

12           Good enough.  Let's get the jury back in the

13   box.

14           (Jury returned.)

15           THE COURT:  Thank you.  Please be seated.

16           Mr. Peruto, you may continue with your cross

17   examination, sir.

18           MR. PERUTO:  Thank you, Your Honor.

19           May I approach once again.

20           THE COURT:  Yes, you may freely approach.

21   BY MR. PERUTO:

22   Q.    I'm showing you again what is marked as Defense

23   Exhibit No. 1.  Agent, I noticed that several of the

24   statements contain -- first of all, let me back up.  That

25   was made by you; correct?

David - cross

1   A.      This was authored by me, yes.

2   Q.      Okay.  And it contains several quotes from the

3   defendant; correct?

4   A.      Yes.

5   Q.      Did you have a pad out and were you writing

6   simultaneously with the defendant speaking?

7   A.      No.

8   Q.      But yet you wrote it down in your report as they were

9   quotes?

10  A.      Yes.

11  Q.      And could you read for the jury just those parts that

12  are quoted?

13  A.      "You know I've been on the run for 10 years.  I had

14  to give it a shot."

15          "I saw your police stuff and marshal stuff and

16  was thinking how did they find me here.  I know you got a

17  snitch that gave me up because I stayed here too long."

18          "Yo, I used to bounce around like Florida and

19  stuff but I just got comfortable.  If you guys would have

20  come maybe 20 minutes later, you would never have gotten me

21  because I was getting ready to get in the shower and head to

22  New York and I would never have come back once I found out

23  you were here."

24          "I almost forgot who I was, being on the run for

25  10 years.  I know you guys were at my father's funeral.

David - cross

1    That's why I didn't go."

2              "That's okay.  I'll go back to Rhode Island and

3    see my people because I don't know nobody down here.  At

4    least up there in jail, I can see my people and family.  I'm

5    glad it's over.  I had to try but I'm glad it's over.

6    Everything happens for a reason.  It's destiny."

7    BY MR. PERUTO:

8    Q.    Now, when you say he had to try, did you assume he

9    meant run?

10   A.    Yes.

11   Q.    How much after he made these quotes to you did you

12   reduce them to writing?

13   A.    The next day.

14   Q.    So you remember these --

15   A.    Within a day or two.

16   Q.    You remembered these as being quotes until the next

17   day?

18   A.    Yes.

19   Q.    Now, sir, when you were prepared for testimony for

20   court today, were you in the presence of other people who

21   claimed to be eyewitnesses while they were being prepared as

22   well?

23   A.    I don't understand your question.

24   Q.    Were you interviewed by the prosecutor's office?

25   A.    Yes.

David - cross

1    Q.    Individually or collectively with the other agents,

2    other marshals?

3    A.    We had meetings that consisted of both.

4    Q.    So would it be a fair statement that you did not go

5    over your testimony individually all the time?  Sometimes

6    you did it in front of the other witnesses?

7    A.    No, that would not be accurate.

8    Q.    What would be accurate?

9    A.    My testimony is my testimony.  And I'm stating what

10   happened.  And I've stated that to the prosecutor, not in

11   front of anybody else.

12   Q.    All right.  But that is not my question.  My question

13   was the interview, it took place with you.  Was it with you

14   and the interviewer or was it with you and other alleged

15   eyewitnesses, together at the same time?

16   A.    Myself and the interviewer.

17   Q.    Just you and the interviewer?

18   A.    Yes.

19   Q.    So you were by yourself?

20   A.    When talking about my testimony, yes.

21   Q.    Did you use the reports prepared by other

22   eyewitnesses or alleged eyewitnesses in order to refresh

23   your recollection?

24   A.    No.

25   Q.    So let me ask you this.  Did you read the reports

David - cross

1    made by other marshals in connection with their testimony?

2    A.      Not in connection with their testimony, but I have

3    read the report shortly after it was authored back when the

4    incident happened.

5    Q.      You read what reports?  The report made by someone

6    else?

7    A.      Yes.

8    Q.      And is that "someone else" someone who claims to have

9    been there and seen it?

10   A.      Yes.

11   Q.      So you read the report or the version of someone

12   else; correct?

13   A.      I read the report, yes.

14   Q.      And were you interviewed about that, about the events

15   that are contained in that report?

16   A.      Yes.

17   Q.      And you agree with them; correct?

18   A.      I know what happened, if that is what you are asking.

19   Q.      This report that you reviewed, was it available to

20   all the witnesses who were there?

21   A.      I don't know.

22   Q.      Well, where did you get it?

23   A.      In the case file.

24   Q.      So there is no rule against going in the case file;

25   correct?

David - cross

1    A.    I have custody of the case file.  I have control of

2    that case file.

3    Q.    Okay.  And if someone wants to read that case file in

4    preparation for their testimony, they're permitted to do so;

5    correct?

6    A.    I don't know if that would be their purpose.

7    Q.    I'm not asking their purpose.  If they wanted to read

8    a report in that file, would they be permitted to do so?

9    A.    They would have permission to read, to have the file.

10    Q.    Even if they didn't write a report themselves;

11    correct?

12    A.    Yes, sir.

13    Q.    Because you didn't write a report containing the

14    facts and circumstances of this takedown or this arrest, you

15    wrote a report that had to do with the hospital; correct?

16    A.    Yes.

17    Q.    Now, you told this jury on direct examination that

18    the defendant apologized for his actions?

19    A.    Yes.

20    Q.    Where in your report -- in your "detailed report"

21    with quotation marks -- does it state anywhere in there that

22    he apologized?

23    A.    This report does not.

24    Q.    It does not?

25    A.    It does not.

David - cross

1   Q.    So in your own report it doesn't say that, yet you

2   told the jury that he apologized?

3   A.    He did, yes.

4   Q.    Why didn't you put it in your own report?

5   A.    I don't know.

6   Q.    Are you testifying here today with your recollection

7   being refreshed by other persons' reports?

8   A.    No.

9   Q.    Did you interview any of the neighbors of the

10  defendant prior to coming to court today?

11  A.    No.

12  Q.    Did any of the neighbors appear during this skirmish?

13  A.    Not that I'm aware of.

14  Q.    Oh, there was a gun shot fired?

15  A.    Yes.

16  Q.    And wall broken?

17  A.    Yes.

18  Q.    A lot of noise?

19  A.    Yes.

20  Q.    Nobody out there?

21  A.    Not that I noticed.

22  Q.    What time of the day or night was this?

23  A.    Mid-afternoon.

24  Q.    Nice clear day?

25  A.    Yes.

David - cross

1    Q.    Now, this front door where you were, who was with

2    you?

3    A.    Deputy Leo.

4    Q.    Deputy Leo?

5    A.    Yes.

6    Q.    And do you know if he wrote a report?

7    A.    Yes.

8    Q.    And did you read his report prior to testifying?

9    A.    I attached a report I was referring to that I read

10    after the incident happened.

11    Q.    Now, had you ever been in this residence prior to

12    this day?

13    A.    No.

14    Q.    When you told the jury that the defendant ran from

15    the front door to the backdoor, how did you know he was

16    running to the backdoor and not somewhere else in the house?

17    A.    Because he attempted to go out the backdoor.

18    Q.    I understand you know that now, but you can't see the

19    backdoor from the front door from your vantage point, can

20    you?

21    A.    No.

22    Q.    You learned from others that he tried to go out the

23    backdoor; correct?

24    A.    Yes.

25    Q.    So therefore you're testifying what others told you;

1   correct?

2   A.      Yes.

3   Q.      Now, at the point where you were at the front door,

4   you believed that the person you are viewing is the person

5   that is wanted and the person you are supposed to arrest;

6   correct?

7   A.      Correct.

8   Q.      And you understand that if your life is in danger or

9   endangered by those dogs, you are permitted to shoot the

10  dog; correct?

11  A.      Correct.

12  Q.      When the defendant first ran out of your sight into

13  another room, you had no idea if he was going for a weapon

14  or what he was doing; correct?

15  A.      Correct.

16  Q.      And it's your testimony that you didn't enter

17  the premises because you were worried about the dog?

18  A.      Very.

19  Q.      Even though the defendant would then be able to go

20  secure a weapon?

21  A.      I was concerned about that dog, yes.

22  Q.      Did the defendant ever say anything to the dog like

23  sic him or get him or anything like that?

24  A.      Not that I heard.

25  Q.      Now, the dogs were both placed in the same room

David - cross

1  after, or whatever word you want to put on it, after the

2  defendant was struck by other individuals; correct?

3  A.    Well, classified as "struck," no.

4  Q.    Struck.  I don't want to use the word "beaten" so you

5  tell me what word you want to use.

6  A.    Law enforcement individuals are attempting to grab

7  ahold of the defendant.

8  Q.    Let me ask you this:  The dogs were present while the

9  defendant received the injuries to his face, or whatever

10  word you want to use for however they got there; right?

11  A.    The dogs were in the house, yes.

12  Q.    And then those dogs were put in a room together;

13  correct?

14  A.    Yes.

15  Q.    And they were certainly at that point all riled up;

16  correct?

17  A.    Riled up prior to going into that room, yes.

18  Q.    And then while they're riled up, still riled up,

19  they were put in the room together with no one to keep them

20  separate; correct?

21  A.    Correct.

22  Q.    Did any of the marshals kick any of the dogs prior to

23  them going into the room?

24  A.    Yes.

25  Q.    Did that cause a yelping sound from the dog?

David - cross

1    A.    No.

2    Q.    It didn't?

3    A.    No.

4    Q.    You have a sharp clear memory of that to the point

5    where you could say "no?"

6    A.    Very distinctly, yes.

7    Q.    Then how do you know that the swing of the leg made

8    contact with the dog?

9    A.    Because I could see the dog move back a couple

10   inches.

11   Q.    And the dog didn't yelp?

12   A.    No.

13   Q.    Did you see the skin torn on the dog whatsoever from

14   that kick?

15   A.    No.

16   Q.    The damage or the scar or the mark on the dog that

17   is the darker of the two dogs was on the right hind leg;

18   correct?

19   A.    In that photograph, yes.

20   Q.    Now, directing your attention to Government Exhibit

21   No. 2, that is the break in the wall?

22         THE COURT:  I'm not sure that is in evidence,

23   sir.

24         MR. PERUTO:  Oh, all right.

25         May I approach?

David - cross

1          THE COURT:  You may freely approach.

2          MR. PERUTO:  I'd like to have this marked as

3   Defense Exhibit No. 3, if I could.  If I may approach

4   witness, Your Honor?

5          THE COURT:  You may.

6   BY MR. PERUTO:

7   Q.     I'll show you what has been marked as Defense Exhibit

8   No. 3 for identification purposes and ask if you could

9   identify what is depicted there?

10  A.     The wall at the end of the hallway.

11  Q.     Now, could you show us by laser which wall it is?

12  A.     This wall.

13  Q.     Okay.  And would it be a fair statement that it's

14  this side we're talking about?

15  A.     Correct.

16  Q.     Indicating the side closest to the front door;

17  correct?

18  A.     Correct.  On this side of the wall.

19  Q.     Okay.  By the way, there was nobody from the defense

20  there, logically speaking, that was there able to take

21  photographs; correct?

22  A.     No.

23  Q.     All these photographs were taken by someone in the

24  Marshal's Office; correct?

25  A.     Correct.

David - cross

1    Q.    Do you know who that was in the Marshal's Office that

2    took these pictures?

3    A.    Marshal Thomas.

4    Q.    And took these pictures after everything was over?

5    A.    Yes.

6    Q.    Now, marshal, here is where you are; correct?

7    A.    Correct.

8    Q.    And that is the backdoor you claim he was trying to

9    get out, which you know now he was trying to get out;

10   correct?

11   A.    Correct.

12   Q.    This wall that was broken would block your view;

13   correct?

14   A.    Yes.

15   Q.    Marshal, would it be a fair statement that when the

16   defendant ran back inside from the backdoor and came in

17   around here, he was met here and tackled and brought into

18   that wall?

19   A.    No, it's not accurate.

20   Q.    Is it your testimony that the defendant, because

21   of the dogs, was free to go from the front door to the

22   backdoor, back out again, go all the way down the hallway

23   into the bedroom, come down the hallway again and then come

24   out into the living room again?  He was free to go through

25   all those rooms because of the dogs?

David - cross

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And he never came out with any weapon of any sort; am |
| 3 | I correct? | |
| 4 | A. | Not that I could see, no. |
| 5 | Q. | And you never found any weapon in those premises; |
| 6 | correct? | |
| 7 | A. | I don't know your definition of a weapon, sir. |
| 8 | Q. | What did you find? |
| 9 | A. | I didn't find a gun. |
| 10 | Q. | Did you find anything? |
| 11 | A. | A house has many weapons. It has knifes, it has |
| 12 | clubs, it has furniture. A lot of different things can be |
| 13 | used as a weapon. |
| 14 | Q. | Did he go and retrieve any of those items? |
| 15 | A. | No, he did not. |
| 16 | Q. | Was there any other contraband found there, drugs or |
| 17 | anything illegal? |
| 18 | A. | Yes. |
| 19 | Q. | Where was that? |
| 20 | A. | In the kitchen. |
| 21 | Q. | In the kitchen. What was found? |
| 22 | A. | Some marijuana. |
| 23 | Q. | Is that in your report? |
| 24 | A. | No. |
| 25 | Q. | Is that in anybody's report? |

David - cross

1   A.      It was turned over to the Delaware State Police for

2   disposal.

3   Q.      It was?

4   A.      Yes.

5   Q.      Was that put in a property receipt anywhere?

6   A.      If it was, it was under the Delaware State Police.

7   Q.      Have you seen any report whatsoever that indicates

8   that was confiscated?

9   A.      I believe I have, yes.

10  Q.      And was it confiscated in your presence?

11  A.      Yes.

12  Q.      How much marijuana are we talking about?

13  A.      I don't know.  I didn't weigh it.

14  Q.      Well, how much did it look like?

15  A.      75-80 grams, maybe.  A small amount.

16  Q.      Now, this wall that was broken, which is in Defense

17  Exhibit 3 --

18          THE COURT:  And I just want to note it's Defense

19  3 for identification still at this point.

20          MR. PERUTO:  All right.

21          THE COURT:  Do you want it in?

22          MR. PERUTO:  I would move to mark it and

23  introduce it into evidence.

24          MS. BYRD:  I don't think there has been a

25  foundation, but maybe we can just do some testimony about

A-155
David - cross

1    it.

2                    MR. PERUTO:  All right.

3    BY MR. PERUTO:

4    Q.    Do you see what is depicted in Defense Exhibit No. 3?

5    A.    Yes.

6    Q.    Is that an accurate and fair depiction of what the

7    wall looked like when you left the premises?

8    A.    Yes.

9    Q.    And you know how that got there?

10   A.    From a struggle, yes.

11   Q.    And that was from the defendant going into it;

12   correct?

13   A.    From the struggle at the end of the hallway.

14   Q.    Okay.

15   A.    I can't say for sure who went into that hall.

16   Q.    Well, certainly it wasn't a marshal going into it,

17   was it?

18   A.    I don't know.  I was busy in that back bedroom with

19   the dog when the struggle happened at the end of this

20   hallway.

21   Q.    Would it be a fair statement that the bottom of the

22   hole would be about 18 inches from the floor and the top

23   about four or five feet?

24   A.    I don't have a tape measure.  I didn't measure this.

25   I don't know.  If you are saying it's 18 inches, it could

David - cross

1    be.

2    Q.    Well, would you have any gripe on that, looking at

3    the picture and using your own recollection?

4    A.    I would say it was probably a little more than

5    18 inches but fairly close to that.

6    Q.    Okay.  And it goes up as high as five feet; correct?

7    A.    Again approximately, yes.

8    Q.    Pretty big hole?

9    A.    Yes.

10                MR. PERUTO:  I would move for its admission,

11   Your Honor.

12                MS. BYRD:  No objection.

13                THE COURT:  All right.  It's admitted as Defense

14   3.  We'll go ahead and mark over the Government exhibit

15   sticker to avoid any confusion.

16   *    *    *   (Defendant's Exhibit No. 3 was received into

17   evidence.)

18   BY MR. PERUTO:

19   Q.    Now, you have a clear recollection that the defendant

20   apologized?

21   A.    Yes.

22   Q.    Did he say for what?

23   A.    He said "I'm sorry."

24   Q.    He was saying "I'm sorry for being on the run;"

25   correct?

David - redirect

1              MS. BYRD:  Calls for speculation.

2              THE COURT:  Overruled.

3              THE DEFENDANT:  He apologized.  He said "I'm

4    sorry."  He didn't elaborate.  He said "I'm sorry."

5    BY MR. PERUTO:

6    Q.    And that was contemporaneous with many statements he

7    was making for where he had been for the last ten years;

8    correct?

9    A.    Those were some of them, yes.

10   Q.    Did he ever confess in your presence?  As the U.S.

11   Attorney said in her opening, did he ever confess to

12   striking any marshal whatsoever?

13   A.    No.

14   Q.    Did he ever confess to siccing the dogs on any

15   marshal?

16   A.    Siccing the dogs, no.

17   Q.    Did he ever confess to having the dogs attack any

18   marshal?

19   A.    No.

20             MR. PERUTO:  I have nothing further.

21             THE COURT:  All right.  Any redirect?

22             MS. BYRD:  Yes, briefly.

23                     REDIRECT EXAMINATION

24   BY MS. BYRD:

25   Q.    Mr. Peruto asked you a little while ago, when the

David - redirect

1    defendant said "I had to take a shot at it," that you

2    assumed that it meant something.  Do you recall that

3    question?

4    A.    Yes.

5    Q.    And what did you assume that it meant?

6    A.    Getting away.

7    Q.    Getting away?

8    A.    Yes.

9    Q.    And how is it that the defendant attempted to get

10   away?  What did he do?

11            MR. PERUTO:  Objection, asked and answered.

12            THE COURT:  Overruled.

13   BY MS. BYRD:

14   Q.    How is it that the defendant attempted to get away

15   when he was saying "I had to take a shot at it, I've been on

16   the run for 10 years," said that more than once?  How is it

17   that he attempted to get away?

18   A.    He intentionally opened the front door to allow those

19   dogs to come out at me.

20   Q.    And what else did he do, if anything?

21   A.    He attempted to flee out the backdoor, leaving the

22   door open, allowing access for the dog to go out back.

23   Q.    And did he do anything else in the house during the

24   course of trying to put him under arrest?

25   A.    Continued to struggle and fight and flee.

1          MS. BYRD:  I have no further questions.

2          THE COURT:  All right.  Thank you.

3          MR. PERUTO:  I just have one.

4          THE COURT:  You know what?  Let's take a quick

5     side bar.  In the meantime, I'll ask the deputy to go ahead

6     and retrieve the exhibit and mark it with the Government

7     sticker.

8               (Conference held at side bar out of presence of

9     jury.)

10          THE COURT:  I'm sorry we didn't have pretrial

11    conference with you, Mr. Peruto.  I allow direct, cross and

12    redirect.  And I don't typically permit recross unless there

13    is something new that happened on redirect.

14          MR. PERUTO:  There is.

15          THE COURT:  What is it?

16          MR. PERUTO:  The prosecutor just gave three

17    different scenarios of what he may have apologized for.  And

18    I want to ask him if his apology could be very well

19    consistent with running out the backdoor and trying to get

20    away, exclusively.

21          MS. BYRD:  He already did that on cross.

22          THE COURT:  I agree.  That's not a basis for

23    recross.  We're going to go direct-cross-redirect.  It will

24    take the opening of some new door on redirect for me to

25    allow there to be recross.

1              (Conference at side bar ends.  Proceedings

2     continue in open court.)

3              THE COURT:  All right.  I'll ask the Government

4     to call their next witness, please.

5              MS. BYRD:  May the marshal be excused?  May the

6     deputy be excused?

7              THE COURT:  Yes.

8              MS. BYRD:  At this time, the Government calls

9     United States Deputy Marshal Robert Denney.

10                       - - -

11                 GOVERNMENT'S TESTIMONY

12      ... DEPUTY MARSHAL ROBERT DOUGLAS DENNEY, having

13       been placed under oath at 3:00 p.m. as a witness, was

14             examined and testified as follows ....

15                       - - -

16             MS. BYRD:  May I inquire?

17             THE COURT:  Yes.

18                 DIRECT EXAMINATION

19    BY MS. BYRD:

20    Q.    Good afternoon, sir.

21    A.    Good afternoon.

22    Q.    Where are you employed?

23    A.    I'm employed with the United States Marshal Service

24    in the District of Delaware.

25    Q.    And how long have you been employed there?

Denney - direct

1    A.      I've been with the United States Marshal Service over

2    19 years.  I've been here in the District of Delaware for

3    about five.

4    Q.      Will you tell us, please, what your current position

5    is?

6    A.      I'm a supervisory deputy.

7    Q.      And do you have any special responsibilities in that

8    capacity?

9    A.      I'm responsible for supervising all of the

10   operational aspects of the Marshal Service here in the

11   District of Delaware.

12   Q.      When you say all of the operational aspects of the

13   Marshal Service, would that include the Fugitive Task Force

14   function of the Marshal Service?

15   A.      Yes, it does.

16   Q.      And are you charged with -- or as part of your

17   duties, are you charged with affecting or arresting

18   individuals who are subject to federal state and/or local

19   arrest warrants?

20   A.      Yes.

21   Q.      And do you supervise other Deputies U.S. Marshal with

22   regard to making those types of arrests?

23   A.      Yes, I do.

24   Q.      I'm going to direct your attention, Deputy Denney, to

25   April 9th of 2005, a few months back.  Did you participate

Denney - direct

1    on that date in the arrest of an individual named Nelson

2    Lora-Pena?

3    A.      Yes, I did.

4    Q.      Is he in the courtroom today?

5    A.      Yes, he is there.

6    Q.      Will you describe where he is seated, something he is

7    wearing?

8    A.      (Indicating.)

9                MR. PERUTO:   Indicating the defendant, Your

10   Honor.

11               THE COURT:   All right.   Let the record so

12   reflect.

13   BY MS. BYRD:

14   Q.      Next to this lawyer; correct?

15   A.      Yes.

16   Q.      And did that arrest occur at 4 Dunbar Road in Newark,

17   Delaware?

18   A.      Yes, it did.

19   Q.      Now, were you there with other officers?

20   A.      Yes.

21   Q.      Federal, state and local.   Would that be fair to say?

22   A.      Yes.

23   Q.      Including the U.S. Marshal himself and other Deputies

24   U.S. Marshal?

25   A.      Yes, that's correct.

Denney - direct

1    Q.    Now, when you arrived at the residence, about what

2    time was it?

3    A.    Somewhere around 2:00-2:30 in the afternoon.

4    Q.    And what was your assignment with respect to taking a

5    position at or around that residence?

6    A.    I was assigned to cover the rear of the residence.

7    Q.    All right.  I'm going to direct your attention --

8          MS. BYRD:  Your Honor, may we just have the one

9    light dimmed?  I'm going to ask some questions about this.

10         THE COURT:  Yes, you may.

11   BY MS. BYRD:

12   Q.    I'm going to direct your attention to the screen,

13   Deputy Denney.  This has been previously admitted as

14   Government's Exhibit 1A.  And do you recognize this to be a

15   diagram, a rough diagram of the interior of 4 Dunbar Road,

16   Newark, Delaware as it existed on April 9th, 2005?

17   A.    Yes.  It does not depict the fence in the rear but

18   the residence itself is basically like that.

19   Q.    Okay.  It depicts the interior of the residence?

20   A.    Yes.

21   Q.    All right.  Now, if you could, with the laser pointer

22   that is in front of you, hold down the button, show the jury

23   where you were situated?

24   A.    Over that way.

25   Q.    Okay.  And you are indicating kind of the top

Denney - direct

1    right-hand side of the exhibit; is that correct?

2    A.    Yes.

3    Q.    Is that an area of the backdoor, what is marked

4    "backdoor?"

5    A.    Yes.

6    Q.    Is there actually a fence in that area?

7    A.    There was a fence.

8    Q.    Is there a fence on the other side of the yard and

9    back as well?

10   A.    Yes.

11   Q.    Were you with anybody as you were positioned in the

12   rear of the residence?

13   A.    I was with the United States Marshal, Marshal Thomas.

14   Q.    I'd like to ask you, sir, to bring that microphone

15   around a little bit.  Thank you.

16   A.    Thank you.

17   Q.    Now, while you and the marshal, Marshal Thomas, were

18   positioned in the back -- and by the way, why did you go to

19   the back?

20   A.    Deputy David was the case agent on this case and --

21   Q.    What does that mean?

22   A.    It was his case to investigate, to attempt to

23   apprehend or locate the defendant.  Therefore, he made the

24   assignments for how we would approach the residence and he

25   selected the marshal and myself to cover the rear.  We were

1    a two-man vehicle.

2    Q.    Okay.  When you say "cover the rear," what is it that

3    you were doing back there?

4    A.    Preventing escape through the rear of the residence.

5    Q.    Now, did there come a point when you came into

6    contact while still outside with the defendant?

7    A.    Yes.

8    Q.    About how soon after you took up position, as you

9    have described it, near the backdoor did you come into

10    contact with the defendant?

11    A.    Within one or two minutes.

12    Q.    All right.  And describe for us, please, for the jury

13    what happened?

14    A.    We took up a position.  We stayed outside of the

15    fence because there were two smaller dogs inside the fence.

16    We weren't concerned for our safety but we were concerned

17    that they would alert the defendant that we were outside.

18    So we waited on the other side of the fence.

19                Within a minute or two, simultaneously, we hear

20    Deputy David come across a radio, announcing he is coming to

21    the back, and we see the defendant run out the rear of the

22    residence.

23    Q.    All right.  Now, if you could show us on the diagram

24    the manner in which or through what exit the defendant ran?

25    A.    He came straight out the back sliding glass door and

Denney - direct

1    he got about eight-or-ten feet before he saw us coming

2    towards him, screaming for him to "stop, police."  And he

3    turned around and ran back into the residence.

4    Q.    Now, you said that the defendant came out, it's a

5    sliding glass door, so you could actually see through the

6    door?

7    A.    Yes, it's a glass door.

8    Q.    And you got about eight-to-ten feet outside before he

9    encountered you?

10    A.    Yes.

11    Q.    Now, on that date, can you describe whether you had

12    any particular police insignia or gear on?

13    A.    I was wearing my United States Marshal Service vest

14    which says "police" on one side and has a Marshal Service

15    badge on the other side.  And it has "police" in bold

16    letters on the back as well.

17    Q.    What about Marshal Thomas?  Was he wearing the same

18    type of vest?

19    A.    Same vest.  We're always using the same vest.

20    Q.    I'm just going to show you from back here, Deputy

21    Denney, what has been entered as Government's Exhibit 14.

22    The vest.  I'll show you the front.  I'll show you the back.

23         Is that the type of vest that both you and

24    Marshal Thomas were wearing on April 9th?

25    A.    Yes.

Denney - direct

1    Q.    You said when you saw the defendant come running out,

2    first of all, what do you do?  You said what you said but

3    what did you do?  Did you do anything?

4    A.    Yes.  We both jumped the fence and started to run

5    towards the defendant.

6    Q.    And you said there were certain things that were said

7    to the defendant.  Is that right?

8    A.    Yes.  I heard the marshal scream "police, freeze,

9    stop."

10   Q.    And if you could, did you notice anything about the

11   defendant's demeanor or facial expressions?

12   A.    I immediately recognized him from the photograph and

13   I would say he looked -- turned and looked at us with a look

14   of surprise and then turned and ran back into the residence.

15   Q.    The defendant turned and ran back into the residence?

16   A.    Correct.

17   Q.    Is that before or after Marshal Thomas ordered the

18   defendant to "stop, police?"

19   A.    That was after.

20   Q.    The defendant ran back in; is that correct?

21   A.    Yes.

22   Q.    Now, did you see the defendant after that?

23   A.    At some point, yes.

24   Q.    All right.  Now, when the defendant ran back into the

25   residence, did he go back through the same sliding glass

Denney - direct

1    door?

2    A.    Yes.

3    Q.    And when he went back in, did he leave the door open

4    or closed?

5    A.    He left it open.

6    Q.    Did you and Marshal Thomas go into the residence at

7    that point?

8    A.    No, we did not.

9    Q.    Well, why not?

10   A.    As we approached the residence, a large ferocious pit

11   bull was running towards us inside the residence, coming

12   towards that sliding glass door.  Marshal Thomas reached

13   over and slammed the door shut to prevent the dog from

14   getting out into the yard with us.

15   Q.    You said a large ferocious pit bull was running

16   toward the glass door and the marshal slammed it shut?

17   A.    Yes.

18   Q.    Did you attempt to go in at that point?

19   A.    No.

20   Q.    Well, why not?

21   A.    Because we were afraid we would be bitten.

22   Q.    Do you have any experience with pit bulls?

23   A.    Yes, I do.

24   Q.    And what experience do you have with pit bulls?

25   Let's talk about your own experience.  Don't talk about

Denney - direct

1    anybody else's.  No hearsay.

2    A.    I supervised the Fugitive Task Force up in

3    Philadelphia for six years before coming to Delaware.

4          MR. PERUTO:  Objection, unless it's these pit

5    bulls.

6          MS. BYRD:  It goes directly to state of mind,

7    therefore, the actions of the officers I believe that the

8    defendant has put into --

9          THE COURT:  All right.  It's overruled.  Go

10   ahead.

11   A.    I've had numerous encounters with pit bulls in

12   attempting to make arrests.  I was actually chased out of a

13   backyard by a pit bull in Philadelphia for fear of being

14   bit.

15   BY MS. BYRD:

16   Q.    Now, were you armed?

17   A.    Yes.

18   Q.    And to your knowledge, was Marshal Thomas armed?

19   A.    Yes.

20   Q.    Did either one of you attempt to shoot this ferocious

21   pit bull that was at the backdoor?

22   A.    No.

23   Q.    Well, why not?

24   A.    Because we had personnel on the other side of the

25   residence.  And at that point in time, the safest thing to

Denney - direct

1    do was to separate the pit bull from us and not start firing

2    in the direction we had personnel.

3    Q.    Now, you said that there did come a point when you

4    saw the defendant again?

5    A.    Yes.

6    Q.    About how soon after the defendant ran back into the

7    house did you see him again?

8    A.    Again, it would be like a minute or two minutes.

9    Q.    And where did you see him the second time?

10   A.    The second time that I saw him, he had gotten his

11   head and torso out of the back window, attempting to come

12   out the window when Trooper Hahn reached up and tried to

13   grab him, and he slipped his grasp and slid back into the

14   residence again.

15   Q.    If you could show us on Government's 1A where it was

16   that the defendant appeared the second time?

17   A.    That rear window right there.

18   Q.    All right.  So you are pointing to what is marked as

19   the back window of a back bedroom on the exhibit; is that

20   correct?

21   A.    Yes.

22   Q.    And you said the defendant was able to get part of

23   his body, his head and torso out of that window?

24   A.    He had up to his head and part of his torso out of

25   the window.

Denney - direct

1    Q.    And what happened upon getting that much of his body

2    out of the window?

3    A.    He recognized that Trooper Hahn was trying to pull

4    him through the window and he slid back into the residence

5    again.

6    Q.    And Trooper Hahn is with the Delaware State Police?

7    A.    Yes.

8    Q.    And what is his first name?

9    A.    Michael.

10    Q.    Okay.  Now, you said that that is the second time

11    that you saw the defendant; is that correct?

12    A.    That's correct.

13    Q.    Did you see him again?

14    A.    Yes.

15    Q.    How soon after the defendant slipped back in, away

16    from Trooper Hahn into the house did you see the defendant

17    again?

18    A.    Another minute or so.

19    Q.    All right.  And tell us this time where you saw the

20    defendant.

21    A.    The defendant came into the kitchen and faced me.  I

22    was still outside looking through the sliding glass door.

23    He raised his hands in a questioning motion and began to

24    speak to me.

25    Q.    Now, you have your hands up and you can, of course,

Denney - direct

1    see we have a court reporter here.

2    A.    Yes.

3    Q.    You have your hands up.  It appeared you had two

4    hands to the side with palms kind of facing upward.  Is that

5    correct?

6    A.    Yes.

7    Q.    All right.  Is that what you saw?

8    A.    In a questioning motion.  Yes.

9    Q.    Is that what you saw the defendant do?

10   A.    Yes.

11   Q.    And you said he came into the kitchen.  Is that where

12   it's marked "kitchen" on the diagram, 1A?

13   A.    Yes.

14   Q.    And can you see into the kitchen through the sliding

15   glass door?

16   A.    Yes.

17   Q.    All right.  When the defendant went into the kitchen

18   and acted as you described, what happened?

19   A.    I opened the door.  And I told him "police, come to

20   me" and he said "What is this about?  What do you want?"

21   And I kept saying "Come to me."  I then took a step towards

22   the defendant and said again "Come to me."

23        He didn't do anything.  He was still, hands in the

24   same motion, saying "What do you want?  What is this about?"

25        I took one more step toward the defendant and he took

1    off running.

2    Q.    Now, at some point you told us earlier there had been

3    a ferocious pit bull at this backdoor; correct?

4    A.    Yes.

5    Q.    At what point did the pit bull leave?  Or, did the

6    pit bull leave?

7    A.    The pit bull left before I saw the defendant come out

8    the rear window where I said his head and torso had come out

9    the rear window.  The pit bull had left the backdoor by that

10   point.

11   Q.    Now, you said after you took several steps toward the

12   defendant and ordered him to "come here, police."  He fled

13   again?

14   A.    Correct.

15   Q.    And where and what direction did he flee?  And show

16   with the laser, please.

17   A.    He went through this area here.

18   Q.    You're showing he went from the kitchen to the living

19   room?

20   A.    Yes, and down this hallway.

21   Q.    All right.  Now, how do you know that he fled down

22   that hallway?

23   A.    I was chasing him.

24   Q.    All right.  And when you went into the house, to your

25   knowledge, were you the first law enforcement officer in

Denney - direct

1   that house?

2   A.      Yes.

3   Q.      Now, did you see anybody in there before you?

4   A.      No.

5   Q.      And when you came in, what did, to your knowledge,

6   Marshal Thomas do?

7   A.      I don't know.

8   Q.      Well, who were you focusing on?

9   A.      The defendant who was in front of me.

10   Q.      And you said the defendant went down that hallway.

11   What was he doing, walking?

12   A.      No, he was running.

13   Q.      At any time, did you see the defendant walking?

14   A.      Not during the course of the arrest.

15   Q.      Strolling?

16   A.      No.

17   Q.      Was he always running?

18   A.      Yes.

19   Q.      You said you chased the defendant as he fled down

20   that back hallway; is that correct?

21   A.      Yes.

22   Q.      All right.  What happened?

23   A.      When we reached the end of the hallway, the bedroom

24   door, all the way at the end of the hall, was closed.

25   Q.      And if you could, just with the laser, point that out

Denney - direct

1    for the ladies and gentlemen of the jury?

2    A.    That door right there.

3    Q.    That's the far back bedroom; correct?

4    A.    Yes.

5    Q.    The door was closed?

6    A.    Yes.

7    Q.    What happened?

8    A.    As he reached that door, he turned and faced me and

9    I attempted to pin him against the door with my forearm.

10   The door popped open and he and I stumbled into that

11   bedroom.

12   Q.    Okay.  And by the way, as you were going through,

13   from the kitchen into the living room, the front hall, the

14   back hall, finally into this door and now into the back

15   bedroom, were you saying anything?

16   A.    "Stop, police."  Screaming "police, stop, freeze."

17   Q.    And did the defendant stop?

18   A.    No.

19   Q.    Once the defendant turned toward you, you tried to

20   pin him and the two of you tumbled through the door, what

21   happened?

22   A.    I then attempted to gain control of the defendant by

23   placing him on the ground.  I would grab him around his

24   shoulder area and attempt to force him to the ground.  He

25   would pull away from me and ease, try to ease around me back

1    towards the door that we had come through.

2    Q.    Can you describe anything that he was doing?  You

3    said he was trying to ease around you.  Was he doing

4    anything or saying anything else?

5    A.    At that point, he and I were just engaged in a

6    struggle.  I don't recall him saying anything.

7    Q.    All right.  As he was pulling away and trying to ease

8    around you, what happened?

9    A.    Well, at some point, he did get around me.  And when

10    we turned and we were actually back close to or in the

11    hallway, as I turned I saw the pit bull right at my feet,

12    barking, growling, showing his teeth.  And it looked like

13    he was going to bite me.

14    Q.    You said you made your way back into the hallway.

15    Can you tell us, show us on 1A where you were?

16    A.    Yes.  We started struggling right in the area of the

17    doorway, but in the bedroom, and then we eased back into the

18    hallway right here.

19    Q.    Okay.  So it's at the end of the hallway, right next

20    to the bedroom?

21    A.    Yes.

22    Q.    At that point, did I hear you say the defendant got

23    around you?

24    A.    He did get around me.

25    Q.    And was it then that you saw a pit bull was at your

Denney - direct

1    feet?

2    A.    I did.

3    Q.    What was the pit bull doing?

4    A.    Showing his teeth, growling, barking, acting

5    aggressively towards me.

6    Q.    And what did you do?

7    A.    I kicked it away the first time because it was so

8    close that I was afraid I would be bitten.

9          At that point, the second pit bull came in and

10   the two pit bulls began to fight.

11   Q.    What about the defendant?  I mean here, you're with

12   this pit bull?

13   A.    My concern for my safety caused me to focus on what

14   was going on with the pit bull and I lost control and sight

15   of the defendant.

16   Q.    All right.  Now, you said you kicked the pit bull

17   away from you once or twice or more than that?

18   A.    I first kicked it away once.  Then a second pit bull

19   came in and they began to fight.

20   Q.    Sorry.  Go on.

21   A.    As they were fighting, biting each other, scratching

22   each other, they became locked, jaw to jaw, in a bite so

23   both of their mouths were occupied.  At that time, I took

24   the opportunity to kick them again and move them closer and

25   closer to that back bedroom with the assistance of Deputy

Denney - direct

1    David, and we were able to get them in the room far enough

2    to close the door and separate the dogs from us.

3    Q.    How long did all of that take?

4    A.    Seconds.

5    Q.    Now, during this time, did you have your eye on or

6    know where the defendant was?

7    A.    I had no idea where the defendant was at that time.

8    Q.    After you and Deputy David were able to get these

9    fighting pit bulls into the back bedroom, what, if anything,

10   happened?

11   A.    We just finished securing the door with the pit bulls

12   on the other side when I heard a gun shot.

13   Q.    Coming from where, if you could tell?

14   A.    The area of further down the hall towards the living

15   room.

16   Q.    And at the time that you heard the gun shot, was

17   Deputy David still with you?

18   A.    Yes.

19   Q.    What, if anything, did you do in response to hearing

20   this gunshot?

21   A.    We both turned and ran towards the area of the gun

22   shot.

23   Q.    Okay.  And what happened when you got there?

24   A.    When we got there, I saw the defendant, Deputy Leo

25   and Trooper Hahn struggling in the living room and I saw the

Denney - direct

1   marshal patting himself to see if he was all right.  And

2   Deputy Leo was hollering to the marshal, "Marshal, are you

3   okay?  Are you shot?"

4   Q.    And you said you saw the defendant struggling with

5   Deputy Leo and Trooper Hahn.  What was the defendant doing?

6   A.    Well, he was on the ground, attempting to rise back

7   up again, and he was also refusing to give his arms to the

8   officers to be cuffed.  They would try to pull them out.  He

9   would pull them back.  That was what I observed at that

10  time.

11  Q.    All right.  And was anyone saying anything to the

12  defendant at that time?

13  A.    Yes, there was a lot of screaming.  Deputy Leo was

14  telling him, "Give me your hand.  Stop fighting."  Things of

15  that nature were being said.

16  Q.    How long was it before the defendant was finally

17  taken into custody, finally, at the end?

18  A.    From what point?

19  Q.    From the point you arrived in the hall, as you just

20  described -- excuse me.  In the living room area, as you

21  have just described, to the point when he was finally taken

22  into custody.

23  A.    Another minute or so.

24  Q.    And during that time, what was the defendant doing?

25  A.    He was fighting to attempt to not be cuffed, to not

Denney - direct

1    be taken into custody.

2    Q.      And did you participate in attempting to subdue the

3    defendant?

4    A.      I ran to the vehicle and got a set of leg irons, came

5    back in and secured the defendant's legs with leg irons.

6    Q.      And once you secured him with leg irons, was there

7    any other type of security placed on him?

8    A.      Within seconds of getting the leg irons on him, they

9    were finally able to bring both his arms behind his back and

10    put his handcuffs on.

11    Q.      And was there also a waist-chain put around him?

12    A.      A few minutes later after he was covered and was not

13    providing any more resistance, we decided to put a

14    waist-chain on him because it would be easier to transport

15    him.

16    Q.      Now, is it fair to say that the defendant was injured

17    during the course of his arrest?

18    A.      Yes.

19    Q.      And is it fair to say he received multiple injuries

20    to his face and head area?

21    A.      He received injuries to his face and head area.

22    Q.      And --

23    A.      I don't know how many.

24    Q.      All right.  And are you aware of when those injuries

25    occurred?

Denney - cross

1    A.     They occurred after he left me in the hallway and

2    before I returned to the living room.

3    Q.     Thank you.

4            MS. BYRD:  Your Honor, may I have a moment?

5            THE COURT:  Yes.

6            (Pause.)

7            MS. BYRD:  I have no further questions.  Thank

8    you very much, sir.

9            THE COURT:  All right.  Mr. Peruto, again, sir,

10   I'll ask if you will be using this, I'll turn the light off.

11   If not, I'll leave it on.

12           MR. PERUTO:  You can turn it off.

13           THE COURT:  All right.  Thank you.

14                          CROSS-EXAMINATION

15   BY MR. PERUTO:

16   Q.     Deputy, your first contact with the defendant was

17   when he went to the backdoor; correct?

18   A.     When he ran out the backdoor, yes.

19   Q.     Would it be a fair statement it was more or less open

20   the door, "see you guys" and turn around and book the other

21   way?

22   A.     No, sir.  He got about 10 feet out the door before he

23   turned around.

24   Q.     And then he ran back in?

25   A.     Yes, sir.

Denney - cross

1   Q.    Did he walk?

2   A.    He did not walk.

3   Q.    And he just ran right into the premises?

4   A.    Yes.

5   Q.    Clear in.  He didn't stop to get anything in the

6   kitchen?

7   A.    Well, I was chasing him from the other -- I had

8   started on the other side of the fence.  We were chasing

9   towards the residence.  I saw him run back into the

10  residence.  At that point, I lost sight of him.

11  Q.    Okay.  So when you say he left the door open, it's

12  because he was in a running position; correct?

13  A.    I don't know why he did it, but he was running.

14  Q.    Okay.  He didn't stop for anything?

15  A.    I don't know.  I lost sight of him once he got into

16  the residence, but he didn't stop while I saw him.

17  Q.    Okay.  Did you make a report of your observations in

18  connection with this case?

19  A.    No.

20  Q.    You made no report?

21  A.    No.

22  Q.    And would it be a fair statement that you relied on

23  the reports of others?

24  A.    I'm relying on my recollection of the events as I saw

25  them that day.

Denney - cross

1    Q.    Did you read the reports prepared by others?

2    A.    I read a report, an arrest report prepared by one

3    person.

4    Q.    And whose report was that made by?

5    A.    Deputy David.

6    Q.    And that is the chief report; correct?

7    A.    Yes, that is the arrest report.

8    Q.    And that is this individual here?

9    A.    Yes.

10    Q.    You read a report made by Deputy David.  Did you read

11    a report made by anybody else?

12    A.    I may have seen a report by a state trooper.  I don't

13    recall how much I read of it, but I know there is one in

14    existence.

15    Q.    And the reports that you read basically comported

16    with your recollection; correct?

17    A.    At the time, yes.  I don't recall what the report

18    says today.  But at the time, I believe it was what I

19    thought was my recollection.

20    Q.    How about a report by Deputy Leo?  Did you read his

21    report?

22    A.    No, I never saw the report by Deputy Leo, that I

23    recall.

24    Q.    And, to the best of your recollection, can you tell

25    the jury what was contained in the reports that you did

Denney - cross

1    read?

2    A.      Yes, it was.

3                    MS. BYRD:   Objection.   Hearsay and relevance.

4                    THE COURT:   Mr. Peruto?

5                    MR. PERUTO:   I'd rather not answer.

6                    THE COURT:   All right.   I'll see you at side

7    bar.

8                    (Conference held at side bar out of presence of

9    jury.)

10                    MR. PERUTO:   Judge, this is proper

11   cross-examination.   Because if he read the agent's report

12   he is referring to, the only thing that is in his report is

13   about what happened at the hospital.

14                    MS. BYRD:   There is no hearsay, there is no

15   credibility exception to the hearsay rule.   He is being

16   asked to comment on the out-of-court statement of another

17   witness, which is improper, so it's hearsay.

18                    THE COURT:   I disagree.   It's not being offered

19   for the truth of the matter.   It does seem to be a fair

20   inquiry.   The Government has got an issue here that it

21   apparently is going to have to straighten out because I'll

22   just put it like this.   I can understand the line of inquiry

23   Mr. Peruto wants to pursue.   It appears to be a proper one.

24   I'll leave it at that.

25                    (Conference at side bar ends.   Proceedings

Denney - cross

1    continue in open court.)

2                    THE COURT:  All right.  You may continue.

3                    MR. PERUTO:  Thank you.

4    BY MR. PERUTO:

5    Q.    Just to back up.  The only report you read was that

6    prepared by Deputy David; correct?

7    A.    I said I may have read a report by the Delaware State

8    Police with regard to where the round that was fired from

9    the weapon went.

10   Q.    Okay.

11   A.    I don't specifically remember that report.  I know

12   that it exists.

13   Q.    The only thing contained in that report would be in

14   connection with the shot fired; correct?

15   A.    That would be my recollection.

16   Q.    Would it change your testimony if I were to tell you

17   that Deputy David's report contained nothing but a synopsis

18   of what occurred at the hospital?

19   A.    No, it wouldn't change my testimony.

20   Q.    Well, would it change your testimony with regard to

21   having read his report in conjunction with the events in

22   question?

23   A.    No.  I read his report.  I guess I don't understand

24   what the question is.

25   Q.    If I were to tell you that his report contained

Denney - cross

1    nothing but the events in question at the hospital, would it

2    be a fair statement that you must have read other reports if

3    you read a report that contained the events in question in

4    this trial here?

5    A.      No, it wouldn't change my testimony.  I recall

6    reading a report by Deputy David about the arrest incident.

7    I don't recall a report.  It doesn't mean I didn't see one,

8    but I don't recall a report by Deputy David that only

9    addressed the incidence at the hospital.

10   Q.      Okay.  Then, sir, would it be a fair statement that

11   you have a present recollection of reviewing a report made

12   by Deputy David that covered the events in question which

13   are the subject matter of this trial?

14   A.      I read an arrest report which was the subject of this

15   trial.

16   Q.      Okay.  And the subject of this trial being the

17   attempted flight of this defendant?

18   A.      In addition to other things, yes.

19   Q.      Including assaults and pit bulls and everything else?

20   A.      Yes, sir.

21   Q.      Correct?

22   A.      Yes, sir.

23   Q.      Were you interviewed by the Assistant U.S. Attorney

24   in preparation for testimony?

25   A.      Yes.

1    Q.    And did that interview take place alone or in the

2    presence of other deputies who were on this case?

3    A.    The interview of myself took place alone.

4    Q.    Alone.  And did any interview take place in

5    conjunction with other deputies?

6    A.    No interview took place.  We were together at times,

7    yes, but I wouldn't consider what happened an interview.

8    Q.    Okay.  During the times that you were together, would

9    it be a fair statement that the events in question were

10    discussed?

11    A.    Some of the events were discussed.

12    Q.    And some deputies remembered some things and some

13    deputies remembered others; correct?

14    A.    Well, we didn't really get into discussing what each

15    of us remember separately and having discrepancies.  It was

16    more general conversation.

17    Q.    One saying --

18    A.    Not about what our specific testimony was going to

19    be.

20    Q.    Okay.  When you were interviewed by the Assistant

21    U.S. Attorney in preparation for your testimony, did you

22    alert him or her that you had read someone else's report

23    about the events in question?

24    A.    No, it hadn't come up.

25    Q.    The gun shot that you heard, would it be a fair

Denney - cross

1    statement that you did not see whose hands were on the gun

2    when you heard that shot?

3    A.    I didn't see the gun at all when I heard the shot.

4    Q.    So it would be a fair statement?

5    A.    It would be a fair statement.

6    Q.    When you were being barked at and the dog was looking

7    at you and barking and growling, another pit bull attacked

8    that pit bull that was barking at you; correct?

9    A.    When I was being growled at the second time by the

10   pit bull, yes.

11   Q.    Okay.  The second pit bull never attacked you in any

12   way, shape or form; correct?

13   A.    No.

14   Q.    I am correct?

15   A.    You are correct.

16   Q.    And neither pit bull got close enough to you that

17   they were biting you, pulling at your clothing or did any

18   harm to you whatsoever; correct?

19   A.    A pit bull did not bite me and I did not receive any

20   harm.  I don't know that they weren't on my clothing.  The

21   dog was right next to me when I first saw it.

22   Q.    And when you kicked the pit bull, you overpowered the

23   pit bull with your foot; correct?

24   A.    I provided distance between myself and the pit bull

25   with my foot.  I wouldn't call it overpowering it.  It was

Denney - redirect

1    still viciously in an attack.

2    Q.    But when you kicked at it, it didn't jump on you, it

3    moved further back?

4    A.    It did go further backwards when I kicked it, yes.

5    Q.    Did you ever see this defendant, Nelson Lora-Pena,

6    strike any U.S. Marshal?

7    A.    No.

8              MR. PERUTO:  No further questions.

9              THE COURT:  All right.  Redirect.

10             MS. BYRD:  Just briefly.

11                    REDIRECT EXAMINATION

12   BY MS. BYRD:

13   Q.    Mr. Peruto asked you about reports, reports, reports,

14   a bunch of reports.  I'm going to show you a couple of

15   reports, one of which has been previously been marked as a

16   defense exhibit.

17             MS. BYRD:  May I approach, Your Honor?

18             THE COURT:  Yes.

19             MS. BYRD:  May I stand here for a moment, Your

20   Honor?

21             THE COURT:  You may.

22   BY MS. BYRD:

23   Q.    Now, I'm going to show you first, Deputy Denney, what

24   has previously been marked for identification but not

25   admitted as Defense Exhibit No. 1.  And is this not a report

Denney - redirect

1    of investigation prepared by the United States Marshal

2    Service?

3    A.    Yes.

4    Q.    And is it a report prepared by William David?

5    A.    Yes.

6    Q.    Is that a Deputy William David?

7              MR. PERUTO:  Objection.

8               MS. BYRD:  Excuse me?

9              MR. PERUTO:  Leading because it's in the nature

10   of cross.

11             THE COURT:  Sure.  Sustained.

12             MS. BYRD:  And I apologize, Your Honor.

13   BY MS. BYRD:

14   Q.    Who was the report prepared by?

15   A.    William David.

16   Q.    All right.  And that is the same individual who is

17   seated at the table?

18   A.    Yes.

19   Q.    And the day of the report?  Is there a date on the

20   report?

21   A.    Yes.

22   Q.    What is that?

23   A.    The report was prepared on April 12th.

24   Q.    All right.  And is there a block that says "case

25   title?"

Denney - redirect

1   A.    Yes.

2   Q.    And what is written in that block?

3   A.    Last name Lora-Pena, first name Nelson.

4   Q.    Have you ever seen this report before?

5   A.    Yes.

6   Q.    All right.  I want you just briefly review it.  Tell

7   me when you're done.

8   A.    (Witness reviews.)

9   Q.    Are you indicating by shaking that you are done?

10  A.    I'm not completely done.  I'm sorry.  Okay.

11  Q.    All right.  Again, have you seen this report before?

12  A.    Yes.

13  Q.    Is this report regarding the substance about the

14  arrest or by something other than the arrest?

15  A.    No, this was the follow-up report --

16  Q.    About what?

17  A.    -- to the arrest report.  About statements made by

18  the defendant.

19  Q.    All right.  I'm going to now show you what has been

20  marked for identification as Government's Exhibit 15.  Is

21  this also a report of investigation?

22  A.    Yes.  That is the arrest report I was referring to.

23  Q.    And when you say the arrest report that you were

24  referring to, at what point were you referring to it?

25  A.    When I was being questioned by defense counsel.

Denney - redirect

1   Q.      When you were being asked by Mr. Peruto about whether

2   you had read any report at any time regarding the actual

3   arrest?

4   A.      This is the report that I recall reading that I was

5   referring to with Mr. Peruto, yes.

6   Q.      And did you testify earlier that -- who did you

7   testify earlier wrote this report?

8   A.      Deputy David.

9   Q.      And who, according to the document, wrote that

10  report?

11  A.      Deputy Jack Leo.

12  Q.      And were you mistaken that -- or, excuse me.  Were

13  you mistaken in that regard, sir?

14  A.      Obviously, I was mistaken.

15          MS. BYRD:  Thank you.  I have no further

16  questions.

17          THE COURT:  All right.  You may step down, sir.

18          Please call your next witness.

19          MS. BYRD:  Your Honor, at this time the

20  Government calls United States Marshal David Thomas.

21                  - - -

22              GOVERNMENT'S TESTIMONY

23      ... MARSHAL DAVID THOMAS, having been placed

24          under oath at 3:36 p.m. as a witness, was

25              examined and testified as follows ....

Thomas - direct

1                          - - -

2                  MS. BYRD:  May I inquire?

3                  THE COURT:  You may.

4                      DIRECT EXAMINATION

5      BY MS. BYRD:

6      Q.      Good afternoon, sir.

7      A.      Good afternoon.

8      Q.      Where are you employed, sir?

9      A.      With the United States Marshal Service.

10     Q.      What is your position there?

11     A.      I am the United States Marshal for the District of

12     Delaware.

13     Q.      How long have you held that position, sir?

14     A.      It's been about a little over three years.

15     Q.      Were you employed with the U.S. Marshal Service

16     before then?

17     A.      No.  Before three years, no, I was not.

18     Q.      Were you employed in a law enforcement capacity

19     before that?

20     A.      That is correct.  I was with the Delaware State

21     Police for about 19 years and, prior to that, with the

22     University of Delaware Police for two years.

23     Q.      As the United States Marshal, do you have ultimate

24     supervisory responsibility for the individuals who work

25     under your command?

Thomas - direct

1    A.    Yes, I do.

2    Q.    Do you have any supervisory responsibility with

3    regard to the Fugitive Task Force and the deputies that work

4    with that task force?

5    A.    Yes, I do.

6    Q.    Can you describe what your supervisory function with

7    regard to the Fugitive Task Force is?

8    A.    Basically, with the Fugitive Task Force, we try to

9    apprehend anybody who is wanted on an outstanding fugitive

10   charges.

11   Q.    Federal, state or local?

12   A.    All charges.  Federal, state and local charges.

13   Q.    Now, I'm going to direct your attention to April 9th

14   of 2005, a few months back.  Were you connected or, excuse

15   me, involved in the arrest of an individual named Nelson

16   Lora-Pena on that date?

17   A.    Yes, I was.

18   Q.    Is he in the courtroom?

19   A.    Yes, he is.

20   Q.    And will you identify him by where he is seated and

21   what he is wearing?

22   A.    He is seated at the defense table.  He is in the

23   white, not a suit but in a white outfit in the middle of the

24   table.

25   Q.    And did the arrest occur at a residence at 4 Dunbar

Thomas - direct

1    Road in Newark?

2    A.    That is correct.

3    Q.    Now, when you went to that residence, did you have

4    any type of police gear on?

5    A.    Yes, I did.

6    Q.    Will describe for the jury what you had on?

7    A.    I did have a bulletproof vest on.  On the bulletproof

8    vest, it did say, "Police, United States Marshals."  Also on

9    the back of the bulletproof vest, it said "police" or "U.S.

10   Marshal."  And I also had a hat that said "United States

11   Marshal" on it.

12   Q.    I'm going to show you now from my stationary position

13   what had been introduced as Government's Exhibit 14, the

14   vest.  How does this compare?  How does this vest compare to

15   the vest that you had on the date of the defendant's arrest?

16   I'm going to show you the front and the back.

17   A.    It looks exactly like mine.

18   Q.    Now, did you take up a position at or about the

19   residence when you went there?

20   A.    Yes, I did.

21   Q.    And if you will describe for the jury where you

22   positioned yourself?

23   A.    Myself and Supervisor Doug Denney, we were in the

24   rear of the house.

25   Q.    Did there come a point while you were at the rear of

Thomas - direct

1    the house that you came into contact with the defendant?

2    A.    I saw the defendant running out of the house.  As he

3    ran out of the house, he looked at me and his eyes were very

4    wide open, almost like a deer in the headlights, sort of

5    like, "oh no."  And then at that point, he turned around and

6    ran back into the house.

7    Q.    Did you go after him?

8    A.    At that point, I did not go after him.

9    Q.    Why not?

10   A.    Well, there was supposed to be pit bulls inside of

11   the residence.

12   Q.    All right.  So this individual you're coming for --

13   by the way, was there a federal arrest warrant for him?

14   A.    My understanding is there was a federal arrest

15   warrant for him.

16   Q.    So this person runs back into the house.  Now, how

17   did he get out of the house in the first place?  What type

18   of door?

19   A.    It was a sliding glass door.

20   Q.    When he went back to the house, was the door opened

21   or closed?

22   A.    The door was open.

23   Q.    And you said you didn't go in.  Did you observe

24   anything in the house at the time you got to the door?

25   A.    Yes, I did observe the pit bull.

Thomas - direct

1    Q.    And if you could tell us more specifically what this

2    pit bull was doing?

3    A.    It was barking and it was charging towards myself and

4    the supervisor.

5    Q.    And would that be Supervisor Doug -- excuse me --

6    Robert Denney?

7    A.    Yes, that is correct.

8    Q.    And what was your response to this charging pit bull?

9    A.    Well, I was fearful.  I was basically scared with the

10   way the pit bull was barking and charging at me.  At this

11   point, I decided to close the door so the pit bull could not

12   come after us.

13   Q.    Now, did there come a point that you did enter the

14   residence?

15   A.    That is correct.

16   Q.    I'm sorry.  Did you enter before or after Deputy

17   Denney entered?

18   A.    Robert Denney, Supervisor Denney, he did enter the

19   house, and then I did enter behind him.

20   Q.    All right.  And having gone into the house behind

21   Deputy Denney, did there come a point thereafter that you

22   came into contact with or saw the defendant?

23   A.    That is correct.  I did see the defendant.

24   Q.    And where did you see the defendant first?

25   A.    The first I saw him, he was in the hallway, near the

Thomas - direct

1    bathroom.

2    Q.    Is that the rear hallway?

3    A.    It is the rear hallway.

4    Q.    I don't know if you can, it's a little bit dim.  I

5    won't ask the light to turned out.  But on the screen is

6    Government's Exhibit 1A.  You can see there is a rear

7    hallway.  Is that where it was or the front hallway?

8    A.    It was the rear hallway.

9    Q.    What was the defendant doing when you first saw him?

10   A.    He was struggling.  He was flailing his arms.  And at

11   that point, there were some deputies who were trying to

12   restrain him.

13   Q.    Did there come a point when you had physical contact

14   with the defendant?

15   A.    That is correct.

16   Q.    Will you please describe for the jury when that

17   happened?

18   A.    At this point, we were trying to restrain the

19   defendant and he was not being cooperative.  So what I tried

20   to do was try to get like a pressure point up around the

21   shoulders.  And I saw that was not going to work so then I

22   got low, with a little bit of football experience I had, and

23   grabbed him by the knees.  And by just the force, the

24   defendant, as well as the other police officers, fell to the

25   ground.

Thomas - direct

1    Q.     And you said the defendant was not being cooperative.

2    Will you please explain for the ladies and gentlemen of the

3    jury what he was doing?

4    A.     Well, he was throwing his arms.  He was just

5    basically trying to get away, hitting and just flailing his

6    arms.

7    Q.     All right.  During this time that you were in the

8    residence, did you or the other officers within your earshot

9    say anything to the defendant?

10   A.     There was multiple yells, "Police.  Get down.  Get

11   down.  Give up.  You are not going to go anywhere."  There

12   was just so much people yelling, saying that we were the

13   police officers, that he needed to give up.

14   Q.     You are looking again at Government's 1A.  Where in

15   the house did you finally have physical contact with the

16   defendant as you just described?

17   A.     It was in the rear hallway.  And it then went, we

18   kind of fell into the wall that separated the hallway to the

19   living room, and then eventually we wound up in the living

20   room.

21   Q.     All right.  And during that time, did the defendant

22   heed the commands to "stop, police?"  Did he heed the

23   commands to stop resisting?

24   A.     No, he was still resisting and he was very

25   uncooperative.