# Exhibit 1
# Part 3

Thomas - cross

1    Q.    Did there come a point when the defendant was finally

2    subdued?

3    A.    Yes, there was.  We had to physically grab him

4    and handcuff him.  At this point, he was still very

5    uncooperative.  He was kicking.  He was causing such a

6    problem that I actually had to stand on the back of his

7    legs and he was still kicking.

8         With this, we had to go and get leg irons and

9    restrain him with the leg irons.  Even after restraining him

10   with the leg irons, and he was in handcuffs, he was still

11   kicking and causing quite a bit of a problem.

12        MS. BYRD:  I have no further questions.  Thank

13   you very much.

14        THE COURT:  All right.  Mr. Peruto, your

15   cross-examination.  Thank you.

16                    CROSS-EXAMINATION

17   BY MR. PERUTO:

18   Q.    Marshal, did you prepare any report in connection

19   with your testimony today?

20   A.    I did not.

21   Q.    Did you prepare any report regarding your actions at

22   all during this case?

23   A.    No, sir.

24   Q.    Did you, were you able to read the reports prepared

25   by others in connection with this case?

Thomas - cross

1   A.      After the incident first happened, I did read a

2   report.

3   Q.      And whose report was that?  Do you know?

4   A.      I believe it was Deputy U.S. Marshal Jack Leo.

5   Q.      Did you read anybody else's report?

6   A.      I do not believe so.

7   Q.      Who is Deputy Marshal Leo?

8   A.      He is a deputy with the United States Marshals in the

9   District of Delaware.

10  Q.      And he is under your command?

11  A.      That is correct.

12  Q.      When you first saw the defendant inside of the house,

13  who had ahold of him?

14  A.      I really do not know.  At this point, I was fearful

15  that the defendant was going to get a gun or grab a knife.

16  I was looking at his hands.  I was really focused on where

17  were his hands and what exactly was he doing.  So I know

18  somebody was grabbing him.  I could not tell you who it was.

19  Q.      Now, when you are in the back of the house -- you

20  were in the back of the house; is that correct?

21  A.      That is correct.

22  Q.      When you were at the back of the house, the

23  defendant came out of the house, saw you guys and then ran

24  back in; correct?

25  A.      He stopped, he paused, he looked and then he did run

1    back into the house.

2    Q.    And when he ran back in, he didn't turn around and

3    stopped, he just kept going; correct?

4    A.    I really don't know.

5    Q.    Well, what did you see?

6    A.    Exactly what I stated.  I saw him run into the house.

7    Q.    Okay.  And you didn't see him pause; correct?

8    A.    As I said --

9    Q.    You didn't see him run and stop, did you?

10   A.    No, I saw him run into the house.

11   Q.    Okay.  Ran in the house, out of your line of vision;

12   correct?

13   A.    That's correct.

14   Q.    Did you see any dogs at that point?

15   A.    I did see a dog, but I really -- it was towards the

16   back of the house.  I really don't know exactly where they

17   went.

18   Q.    Now, obviously in your experience, you're concerned

19   that when he runs back into the house, he can go in and

20   retrieve a weapon; correct?

21   A.    Yes, sir.

22   Q.    Did anybody go after him?

23   A.    Yes, they did.

24   Q.    Okay.  And they went in immediately; correct?

25   A.    That is my understanding.

Thomas - cross

1  Q.    Well, I don't want your understanding because that

2  could mean to this jury that someone else told you that.

3  What you saw; correct?

4  A.    That is correct.  I did see.

5  Q.    As he runs back into the house?

6  A.    That is correct.

7  Q.    And whether you know exactly who it was, we'll leave

8  for a moment.  But somebody chased right after him; correct?

9  A.    That is correct.

10 Q.    And that somebody was a Deputy U.S. Marshal?

11 A.    It might have been -- yes, I know Deputy Denney did

12 go in before me.

13 Q.    Okay.  And how long a period of time is left between

14 that deputy going in right after the defendant and then you

15 followed him?

16 A.    My guess may be five, maybe ten seconds.

17 Q.    Okay.  So right afterwards; correct?

18 A.    About five or ten seconds.

19 Q.    Okay.  How far did you get into the house?  How far

20 did you get into the house when you first realized there was

21 a dog in there?

22 A.    Well, I saw the dog before I even went into the

23 house.

24 Q.    Okay.  But the dog wasn't, didn't pose a threat;

25 would that be a fair statement?

Thomas - cross

1   A.      No, that would not be a fair statement.  That dog was

2   a threat.  He was charging me when we were in the back of

3   the house.  And if I did not close the door, that dog, I

4   believe, would have bit me and I was in fear of that dog.

5   Q.      Well, now, you said that the defendant ran into the

6   house; correct?

7   A.      Yes, I did.

8   Q.      After seeing you guys outside, he ran back into the

9   house.  And you just told this jury that a deputy followed

10  him into the house immediately thereafter, did you not?

11  A.      That is correct.

12  Q.      And you then followed that deputy five or ten seconds

13  after that; correct?

14  A.      That's correct.

15  Q.      So at what time did you close the door?

16  A.      I think you're mistaken.  I said that the door was

17  closed.  You have it all mixed up.  What happened was the

18  dogs were charging towards us.  At that point, I did close

19  the door.  Myself and Deputy U.S. Marshal Denney, we were

20  still outside.  At that point, Deputy Denney did go back

21  inside the house.

22  Q.      So then Deputy Denney did not follow the defendant

23  immediately into the house; correct?

24  A.      I never said he did.

25  Q.      Did anyone from the Delaware State Police go inside

Thomas - cross

1    the house?

2    A.    I believe there was a trooper there, yes.

3    Q.    Now, when you came inside the house -- strike that.

4    When you say the defendant first ran back into the house,

5    you were fearful that he would be able to retrieve a weapon;

6    correct?

7    A.    That's correct.

8    Q.    And you're telling us that you closed the door so

9    that the dog could not attack you?

10    A.    That is correct.

11    Q.    Before going after the defendant -- who could

12    retrieve this weapon; right?

13    A.    That's correct.

14    Q.    At that point, why didn't you shoot the dog and

15    continue to pursue the defendant before he would be able to

16    get away?

17    A.    At the time, I believed the best thing to do was

18    close the door and not fire.  Because the problem he had

19    was we had a lot of people, the house is relatively small.

20    If we shoot the dog, it's possible that the shot could go

21    through the dog and hit one of our officers.  Any time you

22    start shooting, it's not a good situation.  It's very

23    dangerous.  The ultimate thing is we're trying to create

24    safety here.

25    Q.    All right.  But by the time you got inside the house,

Thomas - cross

1    there were at least two marshals with the defendant on the

2    floor; correct?

3    A.    No, that is not correct.

4    Q.    Where was the defendant?

5    A.    The defendant was in the back hallway by the

6    bathroom.

7    Q.    And where were the marshals?

8    A.    I believe there were some marshals that were on the

9    defendant, in the back hallway near the bathroom.

10   Q.    Did you notice a hole in this wall here?

11   A.    At which point in time?

12   Q.    When you came in.

13   A.    No, I did not.

14   Q.    Did you notice a hole there at any time?

15   A.    Yes, I did.

16   Q.    And did you notice it contemporaneously with it being

17   made or did you notice it after this was all over?

18   A.    After what was all over?

19   Q.    After this arrest.  After the arrest was effectuated.

20   A.    After he was handcuffed, yes, there was a hole in the

21   wall.

22   Q.    And do you know how it got there?

23   A.    Do I know?  I can surmise how it got there.  No, I

24   don't know exactly how it got there.

25   Q.    In surmising, it could have easily gotten there from

Thomas - cross

1    the defendant throwing the defendant into the wall?

2            MS. BYRD:  Objection, speculation.

3            THE COURT:  Overruled.  You can answer the

4    question, if you are able.

5    A.    One can surmise that.

6    BY MR. PERUTO:

7    Q.    Do you have any knowledge that this defendant threw a

8    marshal into that wall?

9    A.    I do not have any knowledge of that.

10   Q.    Would it be a fair statement then, marshal, that you

11   don't know if that hole was there when you came into the

12   house or not?

13   A.    Can you repeat that again?

14   Q.    Would it be a fair statement that you can't tell us

15   with certainty whether or not that hole was in the wall

16   before you entered the house or not?

17   A.    I believe I already testified that I did not know if

18   it was there or not before.

19   Q.    Okay.  Now, the defendant was standing when you first

20   saw inside of the home?

21   A.    Yes, he was.

22   Q.    Did you ever see him strike a Federal Marshal?

23   A.    His hands were hitting -- they were hitting the

24   people trying to restrain him.

25   Q.    And what were those people doing in attempting to

Thomas - cross

1    restrain him?

2    A.      They were trying to get his hands behind his back.

3    Q.      That's all they were doing?

4    A.      They were trying to restrain him.

5    Q.      Did you see anyone strike him in the face?

6    A.      I did not see anybody strike him in the face.

7    Q.      And was there anything obstructing your view?

8    A.      When you say obstruct my view, I mean what I saw, I

9    was pretty much focused on the defendant.

10   Q.      And was there anything obstructing your view of this

11   defendant?

12   A.      No, there wasn't.

13   Q.      Did you see pictures of the defendant subsequent to

14   his arrest?

15   A.      Yes, I did.

16   Q.      And were you able to see substantial damage done to

17   his person and body and face?

18   A.      I think that is a relative term.  What is

19   "substantial?"

20   Q.      What do you think it is?

21   A.      I'm not an expert.  It's relative to everybody.

22   Q.      Did you see any injuries to this defendant that

23   required more than a Band-Aid?

24   A.      Yes, I did.

25   Q.      Did you see how -- did those injuries or were any of

Thomas - redirect

1    these injuries that required more than a Band-Aid, were they

2    above the neck line?

3    A.      That is correct.

4    Q.      And did you see how those injuries were inflicted to

5    this defendant?

6    A.      I did not.

7    Q.      At any time, did this defendant touch a weapon?

8    A.      I never saw him touch a weapon.

9                MR. PERUTO:  I have nothing further.

10                THE COURT:  Any redirect?

11                          REDIRECT EXAMINATION

12   BY MS. BYRD:

13   Q.      You just testified that you never saw the defendant

14   touch a weapon?

15   A.      That's correct.

16   Q.      Do you know, one way or the other, whether he ever

17   touched a weapon?  This is a yes or no.  Do you know one way

18   or the other from your personal observation whether he ever

19   touched a weapon?

20   A.      No, I do not.

21                MS. BYRD:  I have nothing further.

22                THE COURT:  All right.  Thank you, marshal.  You

23   may step down, sir.

24                Your next witness, please.

25                MS. BYRD:  Your Honor, may I have a moment?

```
 1                THE COURT:  Yes.

 2                (Pause.)

 3                MS. BYRD:  I apologize, Your Honor.  At this

 4    time, the Government calls Deputy U.S. Marshal Jack Leo.

 5                THE COURT:  All right.

 6                         - - -

 7                GOVERNMENT'S TESTIMONY

 8       ... DEPUTY MARSHAL JACK LEO, having been placed

 9            under oath at 3:56 p.m. as a witness, was

10            examined and testified as follows ....

11                         - - -

12                MS. BYRD:  Your Honor, may I inquire?

13                THE COURT:  You may.

14                DIRECT EXAMINATION

15    BY MS. BYRD:

16    Q.    Good afternoon, sir.

17    A.    Good afternoon, ma'am.

18    Q.    Where are you employed?

19    A.    I'm employed with the United States Marshal Service

20    here in the District of Delaware.

21    Q.    How long have you been employed in that capacity?

22    A.    Approximately, seven years.

23    Q.    And were you employed in law enforcement before that?

24    A.    I was.  I was in several different positions.

25    Q.    Will you tell us just briefly what those were?
```

1    A.    Yes, ma'am.  I started off my career in Sea Isle

2    City, New Jersey as a Sea Isle Police Officer.

3            From there, I served in the military, in the

4    Navy as a military police officer.

5            After that, I served as a United States Border

6    Patrol Agent, patrolling the American-Mexican border.  And,

7            While I was a Deputy U.S. Marshal, I volunteered

8    for the United States Air Force Reserve, where I served as a

9    special agent for the United States Air Force, Office of

10   Special Investigations.

11   Q.    If I could, deputy, I would like to have you bring

12   the microphone to you a little bit more.

13   A.    Is that better, ma'am?

14   Q.    That is a little bit better.  Speak into the mic.

15   A.    Yes, ma'am.

16   Q.    Wonderful.  Now, what is your current position with

17   the U.S. Marshal Service?

18   A.    I'm a criminal investigator, a Deputy United States

19   Marshal assigned to Fugitive Apprehension Task Force.

20   Q.    You said you are a criminal investigator assigned to

21   the Fugitive Apprehension Task Force.  What is that task

22   force?

23   A.    That consists of Deputy United States Marshal, the

24   Delaware State Police, Wilmington Police Department,

25   Probation and Parole, and County Police.  And our mission is

1    to investigate the whereabouts of fugitives of justice and

2    then to apprehend them.

3    Q.    How much of your time with the Marshal Service is

4    spent currently in connection with the Fugitive Task Force?

5    A.    All of my time.

6    Q.    100 percent?

7    A.    That is my primary mission.

8    Q.    Let me direct your attention to April 9th of this

9    year.  Did you participate with the arrest of an individual

10   named Lora-Pena?

11   A.    I did.

12   Q.    Is he in the courtroom today?

13   A.    He seated at the defense table in the white.

14   Q.    And did that occur at a residence at 4 Dunbar Road in

15   Newark, Delaware?

16   A.    That's correct.

17   Q.    Now, when you went to that residence, where did you

18   go first?

19   A.    We parked the cars and then proceeded to the front

20   door.

21   Q.    And who was with you when you proceeded to the front

22   door?

23   A.    Deputy David.

24   Q.    And were you in front or in back of Deputy David?

25   A.    I was behind him.

Leo - direct

1    Q.    Now, what were you wearing as far as any police gear

2    you may have had on?

3    A.    I had my bulletproof vest on.  It was in a tactical

4    carrier identical to the tactical carrier you have on the

5    desk there.

6    Q.    And just for the record, this would be Government's

7    Exhibit 14, the vest that has been introduced into evidence

8    to which you are referring?

9    A.    Yes, ma'am.

10    Q.    And were you armed in any way?

11    A.    I was.

12    Q.    Will you tell the members of the jury how you were

13    armed?

14    A.    I was carrying a side arm, service pistol, a Glock

15    semiautomatic handgun, and I also had an AR-15 semiautomatic

16    rifle.  The Glock was in a holster.  The rifle was out in

17    front of me.

18    Q.    First of all, you said it was a semiautomatic rifle?

19    A.    Yes, ma'am.

20    Q.    How powerful of a rifle is that?

21    A.    It's fairly powerful.  It's used to hunt small game

22    and things like that if you were in a hunting situation.

23    Q.    Now, did there come a point where the defendant came

24    to the door?

25    A.    Yes, ma'am.

Leo - direct

1    Q.    And was the door a glass door, a screen door or some

2    other type of door?  What type of door was it?

3    A.    The primary door was open, but there was a storm door

4    that had its winter glass inserts, I guess, glass inserts

5    inside.  And that was closed.

6    Q.    And when the defendant came to the door, will you

7    describe please what happened?

8    A.    Well, as we approached the door, we were kind of

9    surprised to see him also crossing the door.  We identified

10    ourselves as police officers and instructed him to show us

11    his hands.

12    Q.    All right.

13    A.    And he did.

14    Q.    All right.  Please proceed.

15    A.    Also at that time, his dogs responded to the door.

16    And they were acting aggressively.  When I say that, they

17    were snarling, showing their teeth and scratching at the

18    door.  They weren't wagging their tail or happy to see us.

19    And Deputy David instructed the defendant to control those

20    dogs.

21    Q.    And you said "his dogs."  Whose dogs?  The

22    defendant's dogs?

23    A.    The defendant's dogs.

24    Q.    And these dogs, what type of dogs are they?

25    A.    They are pit bulls.

A-215

Leo - direct

1    Q.    All right.  And when they came to the door with the

2    defendant and Deputy David instructed the defendant to

3    control the dogs, did the defendant do so?

4    A.    He did not.

5    Q.    Tell the jury please what happened.

6    A.    What he did instead was he paused for a second in

7    this position, then he walked to the door and did basically

8    a simultaneous movement.  He pivoted on his foot, opened the

9    door and ran towards the back of the house.

10   Q.    All right.  You said that he opened the door with one

11   hand?

12   A.    One hand.

13   Q.    All right.  And while he was doing that, what did he

14   do?

15   A.    He pivoted -- as he was reaching for the door, he

16   pivoted and pushed and ran towards the back of the house at

17   the same time.

18   Q.    And where were the pit bulls that you described at

19   the time the defendant pushed the door open and pivoted to

20   run toward the back of the house?

21   A.    They were between him and the door.  They were at the

22   front door.

23   Q.    And what happened with those pit bulls after the

24   defendant pushed the door?

25   A.    They attempted to get out of the door.  They

1    attempted to get out of the residence and Deputy David

2    forced the door shut with his foot.

3    Q.    All right.  Now, did you enter the residence at that

4    point?

5    A.    No, ma'am.

6    Q.    Why not?

7    A.    Because the dogs had us at bay.

8    Q.    Now, you testified that you were armed with a

9    handgun; correct?

10   A.    Yes, ma'am.

11   Q.    And you also had rifle?

12   A.    That's correct.

13   Q.    Semiautomatic rifle?

14   A.    Yes, ma'am.

15   Q.    Did you shoot the dog?

16   A.    I did not.

17   Q.    Why not?

18   A.    It's always a bad idea to shoot a weapon in a

19   residential area if you are not in a position, if you don't

20   have to.  And at that point, we didn't feel that we needed

21   to go through and shoot those dogs.  We had people in the

22   back of the house and we had people at the sides of the

23   house.  So we were hoping that he would see it was covered

24   and just simply surrender without any round being fired.

25   Q.    Did there come a point when you did enter the

Leo - direct

1  residence?

2  A.     Yes, ma'am.

3  Q.     And when was that?

4  A.     Eventually, the defendant ran back across our field

5  of vision from the back of the house and Supervisor Denney

6  and Marshal Thomas were in chase behind him and the dogs

7  were in chase of them, biting at their pant legs and things

8  of that nature.  And at that point, we had to go in.  We had

9  to defend our other officers.

10  Q.     And when you say "we," did someone enter besides

11  yourself with you?

12  A.     Deputy David and I did.  Deputy David entered in

13  front of me and I followed behind.

14          MS. BYRD:  Your Honor, may I ask the one light

15  in the room be darkened now?

16          THE COURT:  Yes.

17  BY MS. BYRD:

18  Q.     Deputy Leo, I think that you will see there is a

19  pointer, a laser pointer in front of you.

20  A.     Yes, ma'am.

21  Q.     I'm going to direct your attention to the screen,

22  Defendant's Exhibit 1A, previously admitted.  If you could,

23  please describe from where in the house you saw the

24  defendant run, being pursued by the U.S. Marshal and Deputy

25  Denney, being pursued by the dogs?

Leo - direct

1    A.    Our field of vision, we were standing here.  We did

2    proceed to basically here.  So that we watched Supervisor

3    Denney and Marshal Thomas run by our field of vision here

4    and go into the hallway and dogs following immediately

5    behind us.

6    Q.  By "here," you are indicating you were standing by the

7    door?

8    A.    Yes, ma'am.  We were standing here, watching it

9    across this area here.

10    Q.    All right.  For purpose of the record, Deputy Leo,

11    the court reporter who may not be able to describe what

12    "here" means, it appears you were pointing the laser at the

13    living room area which would have been to your right and

14    that is where you saw the defendant running from?

15    A.    Yes, ma'am.

16    Q.    And then it appears that you were saying that they

17    ran into what is the front hallway marked on the exhibit and

18    then into the rear hallway?

19    A.    Yes, ma'am.

20    Q.    Once you entered, Deputy Leo, what did you do?

21    A.    I proceeded through the front door and down the rear

22    hallway, about two-thirds of the way down to about right

23    here.

24    Q.    All right.

25    A.    Two-thirds of the way down.

Leo - direct

1   Q.      And what, if anything, did you observe while you were

2   there?

3   A.      At that point, Deputy David and Supervisor Denney

4   were struggling both with the defendant and the pit bulls.

5   Q.      All right.

6   A.      Right here at the end of the rear of the hallway.

7   Q.      Did there come a point when you came into physical

8   contact with the defendant?

9   A.      Yes, ma'am.

10  Q.      Please describe for the ladies and gentlemen of the

11  jury when that happened.

12  A.      The defendant was able to break free from Deputy

13  David, Supervisor Denney.  They were tied up.  They were

14  under assault by the pit bulls, and he charged this way.

15  He charged back out of the rear of the hallway towards the

16  front door.  He encountered me exactly where I stood.  I was

17  in a stationary position when he broke away from them.  He

18  essentially ran right into my chest.  I took up most of

19  the hallway.  He had to go in to me and that is where I

20  encountered him.

21  Q.      You testified earlier you had the two weapons.  Were

22  either of those weapons drawn at that point?

23  A.      The rifle was in a lowered ready position, basically

24  across my chest.

25  Q.      Keep your voice up.

1    A.    Okay.  Let me move up a little bit.  Sorry.

2          The rifle was on a sling, attached to me, and it

3    was held by my right hand and my left hand, my right hand

4    holding the pistol grip and positioned so that the muzzle

5    was down and to the left of me.

6    Q.    Why were you positioning the rifle in that way?

7    A.    Because the threat, which would have been obviously

8    the dogs and possibly the defendant, were in front of me,

9    but also so were my colleagues.  So at that point, it was

10   not a situation where I could have used that weapon.  I

11   could have potentially hurt somebody so I kept it in that

12   safe position.

13   Q.    And you said the defendant ran into you?

14   A.    Yes, ma'am.

15   Q.    Did he physically -- excuse me.  Did he literally run

16   into you, running?

17   A.    Yes.  Yes.  He broke free from two gentlemen that

18   were trying to restrain him and charged right in to me.

19   Q.    All right.  And when the defendant charged into you,

20   what happened?

21   A.    My concerns were to protect the weapon, to protect

22   myself and to keep him from getting by me.  So I had to

23   maintain control of the weapon with my right hand and I

24   grabbed him with my left hand in an effort to keep him from

25   getting away.

1    In doing that, and because I was standing still

2    while he was charging at me or in to me, we started -- his

3    momentum focused both of us backwards into the wall.

4    Q.    And what was he doing while he was taking you both

5    backwards into the wall?

6    A.    He was trying to escape.  He was scratching.  He was

7    clawing.  He was punching.  He was digging his nails into my

8    hands, into my scalp.  He was grabbing the weapon.  And he

9    was, he was basically trying to get it away from me.

10    Q.    All right.  Now, you said that the defendant charging

11    you, acting in this manner testified, threw you both into a

12    wall.  Please demonstrate on Government's 1A what wall you

13    are talking about.  That is the hallway?

14    A.    Our initial contact was here, and the struggle

15    carried all the way down to this wall where we both ran into

16    that wall there.

17    Q.    Okay.  And that wall on Government's 1A would be the

18    wall that is at the far right-hand of the rear hallway on

19    the diagram; is that correct?

20    A.    Yes, ma'am.

21    Q.    And who actually hit the wall?  Whose body?

22    A.    I don't recall.

23    Q.    At that time, was anyone else in the struggle with

24    the defendant?  At that time.

25    A.    I don't recall that either.

Leo - direct

1    Q.      What was going on with your rifle when you and the

2    defendant hit the wall?

3    A.      We hit the wall, it was a split second situation.  We

4    hit the wall and bounced back up.

5    Q.      All right.

6    A.      During the entire course of the struggle, the weapon

7    was kept in tight towards me so that that muzzle didn't go

8    anywhere where it could potentially hurt somebody.

9            As part of the struggle, periodically he would

10   grab that weapon and try to pull it away from me, grab my

11   hand holding that weapon, dig his nails into my hand that

12   was holding that weapon.  Basically, he was trying to get

13   it.

14   Q.      All right.  And once the two of you hit the wall as

15   you described, did it cause any damage to the wall?

16   A.      Yes, ma'am.  It put a hole into the sheet rock.  It

17   put a sizeable hole into the sheet rock.

18   Q.      I'm going to show you what has been admitted into

19   evidence as Defense Exhibit 3, a photograph.  Do you

20   recognize what is depicted in that photograph?

21   A.      Yes, ma'am.

22   Q.      What is depicted?

23   A.      That is the hole we created when we hit the wall.

24   Q.      After the defendant was grabbing at the gun, clawing,

25   resisting and struggling with you in the way that you

1    described and the two of you were driven into the wall and

2    "bounced" I think is the word you used off the wall, did the

3    defendant stop struggling and submit to arrest?

4    A.      Not at all, ma'am.

5    Q.      Well, what did he do?

6    A.      When we hit the wall, we didn't fall to the ground.

7    It was still an ongoing standing struggle.

8    Q.      Let me actually back you up there.  You testified the

9    defendant charged you, as in the manner you described.  Did

10   you strike him in any manner at any time prior to hitting

11   the wall?

12   A.      Repeatedly.

13   Q.      Tell the jury what you did.

14   A.      Well, when he charged at me and we came into contact,

15   we didn't, in one fluid motion, go fall back up against the

16   wall.  It was a foot at a time.  It was two feet at a time.

17   It was a staggered progression until we ultimately got to

18   the wall.  During that time, I was without the use of my

19   right hand because I had to maintain control of that weapon.

20   Oftentimes, I was without the use of my left hand because I

21   had to try to prevent him from getting away.  I struck him

22   in the nose area or in the upper face area with my forehead

23   very hard, very hard on a couple of occasions, at least two

24   that I can recall distinctly.

25   Q.      And after you struck the defendant at least two times

Leo - direct

1     very hard with your head, your forehead -- like a head butt?

2     A.     Sure, except for I didn't hit his head.

3     Q.     Did he stop struggling?

4     A.     No, ma'am.

5     Q.     All right. What else happened?

6     A.     I also struck him with my elbow, I struck him with

7     my fist, I struck him with my forearm, with no avail. He

8     continued to struggle after that.

9     Q.     Now, Deputy Leo, is it fair to say you're a pretty

10     tall guy?

11     A.     I am.

12     Q.     Pretty big guy?

13     A.     Yes, ma'am.

14     Q.     Would it be fair to say you are bigger and taller

15     than the defendant?

16     A.     I am.

17     Q.     And you were bigger than him earlier this year?

18     A.     I was.

19     Q.     It's not like he lost a whole lot of weight since

20     then; right?

21     A.     No, ma'am.

22     Q.     Now, you testified that the defendant was driving you

23     down the hallway kind of bits and pieces at a time. Can you

24     explain how it is that he was able to do that, given your

25     size?

Leo - direct

1    A.    Sure.  He was in a low position with momentum behind

2    him.  I was standing up straight.  He is very strong.  He is

3    not a push over.  He did a good job.  He was a strong guy.

4    He wanted to get away and clearly he was able to force me

5    backwards.

6    Q.    Now, you described how after hitting the wall and

7    bouncing off the wall.  Where is it that the two of you

8    ended up after hitting the wall?

9    A.    From there, from the wall, at the end of the hallway

10   or front of the rear hallway, the struggle continued on out

11   into this area right here, between the entrance of the house

12   and the entrance to the rear hallway.

13   Q.    And during that time, what was going on with the

14   rifle?

15   A.    At that time, he continued exactly the same thing.

16   He was pulling at my weapon.  He was clawing at my head.

17   He was clawing at my hands.  He was trying to get away.

18   Although at that point, it really got stepped up because

19   while he was clawing at my hands and trying to get the

20   rifle, he caused it to discharge or fire a round through

21   this door here and out into the neighborhood.

22   Q.    The door here you are referring to is the front door?

23   A.    I apologize.  Yes, it's the front door.

24   Q.    All right.  You can put that down for a moment.

25   A.    Okay.

Leo - direct

1    Q.     Let's talk about that.  That is after you bounced off

2    the wall; correct?

3    A.     Yes, ma'am.

4    Q.     And you said you ended up between the living room and

5    the front hallway area?

6    A.     Yes, ma'am.

7    Q.     All right.  At what point was it?  What was the

8    defendant doing at the time he caused the discharge?

9    A.     Pulling at the gun, trying to get the gun away from

10    me.

11    Q.     By the way, during this entire time or during the

12    entire time that you were in the residence, did you hear

13    anybody say anything to the defendant?

14    A.     I don't recall.

15    Q.     All right.  He was pulling, the defendant was pulling

16    at the gun at the time that he caused the discharge.  And

17    when you say "caused it to discharge," tell us what you mean

18    by that.

19    A.     He had hit the trigger, basically.  He had to pull

20    that trigger.  We are not just handed these weapons.  We are

21    trained over and over and over and over and over, hundreds

22    and hundreds of times and we deploy, we use them in the

23    field all of the time, hundreds of times.  When we carry

24    these weapons, until that muzzle is pointed in the direction

25    of a threat, our trigger finger is stiff, it is straight, it

Leo - direct

1    is not anywhere in that trigger area.  It is above it.  So

2    he would have had to pull the trigger or he would have had

3    to manipulate my hand in a way that it hit the trigger.

4    Q.    Did the defendant, in causing this discharge, inflict

5    any injury to you?

6    A.    To me?  Well, in trying to take the weapon and the

7    whole situation that resulted in the discharge, he caused

8    cuts in my hand from his fingernails, because he was, like I

9    said, grabbing and clawing.

10    Q.    And you testified earlier about the defendant.  I

11    believe you said may have been digging fingernails.  Did you

12    experience any type of pain or discomfort as a result of the

13    defendant's actions at that time?

14    A.    Yes, ma'am.

15    Q.    And what was that as a result of?  What was he doing

16    when you experienced pain or discomfort?

17    A.    He was grabbing.  He had his nails dug into the hand,

18    into my right hand which was holding that rifle, causing --

19    that caused me to look down, that pain.  And also I felt his

20    nails into my scalp.

21    Q.    You testified that the bullet that was caused to be

22    discharged by the defendant went through the front door?

23    A.    Yes, ma'am.

24    Q.    Was that bullet, the bullet itself, actually ever

25    recovered?

1    A.    It was not.  But it was the Delaware State Police

2    who came out and determined where it hit and that it had

3    fragmented.

4    Q.    And was there a shell casing that was ever recovered?

5    A.    There was, ma'am.

6              MS. BYRD:  Your Honor, may I approach?

7              THE COURT:  You may freely approach.

8    BY MS. BYRD:

9    Q.    Deputy Leo, I'm going to show you exhibits marked for

10   identification as Government's Exhibits 5, 6 and 7.  Let's

11   start with 5.  Is that a photograph, sir?

12   A.    Yes, ma'am.

13   Q.    What that is a photograph of?

14   A.    It's of the storm door located at the front entrance

15   of the residence.

16   Q.    Was there anything specific about the storm door of

17   which there is a photograph?

18   A.    Sure.  That is the entry of the path of the bullet

19   which is located on the inside of that door.

20             MS. BYRD:  And, Your Honor, may I just stand

21   here for a moment to inquire?

22             THE COURT:  Sure.

23   BY MS. BYRD:

24   Q.    And does Government's 5 fairly and accurately depict

25   how the bullet hole on the interior of the storm door looked

Leo - direct

1    at the time that the photo was taken?

2    A.    Yes, exactly.

3    Q.    And that was some time after it was discharged?

4    A.    Yes, ma'am.

5    Q.    Let's go to Government 6.  Is that again a

6    photograph?

7    A.    It is, ma'am.

8    Q.    Of what?

9    A.    That is the exit wound or the exit -- that is the

10   where the bullet exited the door.

11   Q.    Again, does Government 6 fairly and accurately depict

12   the condition of the door, having had the bullet pass

13   through it?

14   A.    That is correct.

15   Q.    Government Exhibit 7, is that a photograph?

16   A.    It is, ma'am.

17   Q.    And a photograph of what?

18   A.    That is the cartridge or the shell casing portion of

19   the entire round that was discharged from the weapon at the

20   time it was fired.

21   Q.    And was that photograph as it existed on the floor

22   after it was discharged?

23   A.    Exactly.  It's as it was.

24            MS. BYRD:  Your Honor, at this time, the

25   Government moves the admission of Government's 5, 6 and 7.

Leo - direct

1          MR. PERUTO:  No objection.

2          THE COURT:  They're admitted without objection.

3   *    *    *  (Government's Exhibit Nos. 5, 6 and 7 were

4   received into evidence.)

5   BY MS. BYRD:

6   Q.     Government's 5, Deputy Leo, would you please point

7   out on the screen where the bullet hole is?

8   A.     Yes, ma'am.  It was right there located above the

9   plunger mechanism of the door.

10  Q.     And this is the inside of the door?

11  A.     Yes, ma'am.

12  Q.     And if you would now, looking at Government 6, show

13  us where, with the laser, the bullet hole is on this side

14  the door?

15  A.     That is the exterior of the door and that is the exit

16  of the round.

17  Q.     And there is a dollar bill above that, is there not?

18  A.     Yes, ma'am.

19  Q.     And what is that for?

20  A.     We put that there to demonstrate the size, for scale.

21  Q.     And I'm showing now Government's 7.  Where is the

22  shell casing there?

23  A.     It's on the carpeted area.

24  Q.     Now, after the defendant caused discharge of the gun

25  as you described, the bullet going through the door, did he

1    give up?

2    A.      No, ma'am.

3    Q.      What did he do?

4    A.      He continued to struggle.  He continued to do the

5    same thing.  He continued to punch and scratch and claw.

6    However, at that time, the marshal was assisting me and we

7    were able to direct the defendant to the ground.

8    Q.      And keep your voice up, okay?

9    A.      Okay.

10   Q.      All right.  And the marshal, that would be Marshal

11   Thomas?

12   A.      Yes, ma'am.

13   Q.      And you said you were able to direct the defendant to

14   the ground?

15   A.      Yes, ma'am.

16   Q.      Get him on the ground?

17   A.      Yes, ma'am.

18   Q.      Once you and the marshal were able to get the

19   defendant on the ground, did the defendant then get up?

20   A.      Not at all.

21   Q.      What did the defendant do?

22   A.      At that point, he continued to kick.  He continued to

23   try to get up, and again grabbing our arms, grabbing at our

24   faces, things of that nature.

25   Q.      All right.  Did there come a point in time when you

Leo - direct

1    were able or you and the others were able to take the

2    defendant into custody?

3    A.    Yes, ma'am.  Shortly after he was on the ground,

4    seconds, Deputy David and Supervisor Denney were able to

5    assist Marshal Thomas and I and we were able to roll the

6    defendant over onto his stomach in an effort to handcuff him

7    behind his back.  When we did that, the defendant's struggle

8    was different.  Now he would not show us his hands.  He kept

9    them tucked underneath of him.  He refused to give them up.

10         And that was important because the defendant at

11   that is point had ran all over the house.  We didn't know

12   what he had in his hands.  Frankly, I didn't know.  He

13   could have potentially have had one of the other officer's

14   weapons.  He could have had anything in his hands.  So we

15   needed to insure there was nothing in his hands that could

16   potential hurt us and he refused to give them up.  He kept

17   them tucked underneath him.  He continued to try to get up.

18   He continued to kick his feet.  Things of that nature.

19   Q.    Did there come a point where the defendant was

20   handcuffed and leg cuffed and subdued?

21   A.    Yes, ma'am.

22   Q.    And how many officers did it take to accomplish that?

23   A.    I can recall five.

24   Q.    Deputy Leo, I'm going to show you now what has been

25   marked for identification as Government's Exhibits 8 and 9.

Leo - direct

1    Again, let's start with 8.  Is that a photograph, sir?

2    A.    It is, ma'am.

3    Q.    Of what?

4    A.    Exhibit 8 is my right hand, the hand that I hold the

5    rifle with.

6    Q.    And does it depict how your hand appeared after the

7    defendant's arrest?

8    A.    Yes, ma'am.

9    Q.    And Government's Exhibit No. 9, is that also a

10    photograph?

11    A.    It is.

12    Q.    Of what?

13    A.    Of both my hands.

14    Q.    And does that depict how your hands, both hands

15    appear after the defendant's arrest?

16    A.    It does.

17            MS. BYRD:  Your Honor, at this time the

18    Government moves the admission of Government's 8 and 9.

19            MR. PERUTO:  No objection.

20            THE COURT:  All right.  Thank you.  They're

21    admitted without objection.

22    *    *    *   (Government's Exhibit Nos. 8 and 9 were received

23    into evidence.)

24            THE COURT:  Let me see counsel at the sidebar

25    for a moment, please.

Leo - direct

1              (Side bar conference takes place out of presence

2    of jury.)

3              THE COURT:  We're going to have to wrap here at

4    4:30.  What can you tell me about the length you are

5    expected to go with --

6              MS. BYRD:  Deputy Leo?

7              THE COURT:  Yes.

8              MS. BYRD:  I think once I put these in, I'm

9    going to be done.

10             THE COURT:  So I can't go past 4:30.

11             MS. BYRD:  Five minutes.

12             THE COURT:  4:30.  Okay.  Do you know whether or

13   not you are going to be -- are you prepared to say whether

14   or not your client will take the stand.

15             MR. PERUTO:  He wants to.

16             THE COURT:  Will you be calling anybody else?

17             MR. PERUTO:  No, sir.

18             THE COURT:  All right.  So if I tell the jury,

19   after we finish with Deputy Leo today, that we'll be back

20   tomorrow with cross and redirect and then perhaps evidence

21   from the defense -- well, let me tell you, instead of

22   framing it like that, I can't start tomorrow morning at

23   9:00.  I have a commitment in the morning so we won't be

24   able to start until probably 10:30-10:45.  It sounds like we

25   shouldn't have a problem getting through it and getting them

Leo - direct

```
 1    charged and deliberating.  Is that fair?
 2              MR. PERUTO:  That's fair.
 3              MS. BYRD:  Yes, Your Honor.
 4              THE COURT:  All right.
 5              MS. BYRD:  Your Honor, I'll talk to you after we
 6    finish this witness.
 7              THE COURT:  All right.
 8              (Side bar conference over; proceedings continue
 9    in open court.)
10    BY MS. BYRD:
11    Q.    Government's Exhibit 8, Deputy Leo, that you
12    testified is a photo of your right hand?
13    A.    Yes, ma'am.
14    Q.    And I recognize that you are from a distance and the
15    jury can't see this up close.  But can you point out whether
16    there were any injuries to your right hand that are taken in
17    this photo?
18    A.    On my index finger, I'll circle it with the laser
19    pointer, right above my knuckle.
20    Q.    What is that?
21    A.    That is a cut, a small cut that was inflicted by the
22    fingernail of the defendant.  Also, here is another small
23    cut inflicted by the fingernail of the defendant.
24    A.    And there is abrasion here.
25    Q.    All right.  I'm going to show you Government's 9.  If
```

1    you could do the same thing, sir, with regard to the left

2    hand?  Were you able to see from that distance?

3    A.    Yes, ma'am.  This is my left hand here.  That cut

4    there is another cut inflicted by the fingernail of the

5    defendant.

6          The defendant was not responsible for this.  I

7    closed it on a door.

8    Q.    By this, you have a discolored nail?

9    A.    Yes, ma'am.  That is over a month old.

10         MS. BYRD:  Thank you.  At this time, I have no

11   further questions.

12         THE COURT:  All right.  Before we proceed to

13   cross-examination, ladies and gentlemen, we're going to

14   go ahead and excuse you for the day.  When we get back

15   tomorrow, the defense will have an opportunity to

16   cross-examine Deputy Marshal Leo and then there will be

17   redirect.  If the defense chooses to put on evidence, that

18   will take place after that point.  My expectation is that

19   we'll be able to conclude the taking of evidence and get

20   you charged, deliberating by the afternoon.

21         We cannot begin, however, until 10:30 tomorrow.

22   So I'll ask you to be here in the jury room slightly in

23   advance of 10:30 so we can have you in the box and start

24   taking testimony again at 10:30.  Thank you for your time

25   and attention.

1    Overnight, please remember my instruction.

2    Don't talk to anybody about the case.  Don't read or listen

3    to any reports.  We stand in recess.

4    (Jury left courtroom.)

5    THE COURT:  All right.  Please be seated.

6    Deputy marshal, you are excused.

7    THE WITNESS:  Thank you, sir.

8    THE COURT:  Thanks.

9    Okay.  Is there anything we need to address

10    before we break overnight?

11    MS. BYRD:  Just one matter, Your Honor.  In

12    response to the defense opening and the anticipated

13    testimony of the defendant, the Government is tracking down

14    an additional witness from the Animal Control Department

15    and, if successful, intends to adduce testimony of that

16    witness tomorrow in rebuttal, Your Honor.

17    THE COURT:  All right.  Well, I guess we'll wait

18    and see what the defense actually puts on --

19    MS. BYRD:  Yes, Your Honor.

20    THE COURT:  -- on the basis of evidence rather

21    than attorney argument or statement.  So we'll see what

22    happens in the defense case.  All right?

23    MS. BYRD:  I just wanted to alert the Court of

24    the fact this person is not on the witness list.

25    THE COURT:  Right, I appreciate that.

1              MS. BYRD:  Thank you, Your Honor.

2              THE COURT:  It would probably be helpful, if you

3    haven't already done it, if you would advise Mr. Peruto of

4    the name of the Animal Control officer.

5              MS. BYRD:  Yes, Your Honor.

6              THE COURT:  Okay.  Is there anything from the

7    defense perspective, Mr. Peruto?

8              MR. PERUTO:  No, sir.

9              THE COURT:  All right.  Thank you very much.

10    I'll see you in the morning at 10:30.  We're in recess.

11              (Proceedings adjourn at 4:32 p.m.; to reconvene

12    on Frisday, September 16, 2005 at 10:30 a.m.)

13

14                          INDEX

15    DEPUTY MARSHAL WILLIAM DAVID

16    DIRECT EXAMINATION BY MS. BYRD              83
      CROSS-EXAMINATION BY MR. PERUTO            135
17    REDIRECT EXAMINATION BY MS. BYRD           157

18    DEPUTY MARSHAL ROBERT DOUGLAS DENNEY

19    DIRECT EXAMINATION BY MS. BYRD             160
      CROSS-EXAMINATION BY MR. PERUTO           181
20    REDIRECT EXAMINATION BY MS. BYRD          189

21    MARSHAL DAVID THOMAS

22    DIRECT EXAMINATION BY MS. BYRD             193
      CROSS-EXAMINATION BY MR. PERUTO           200
23    REDIRECT EXAMINATION BY MS. BYRD           209

24    DEPUTY MARSHAL JACK LEO

25    DIRECT EXAMINATION BY MS. BYRD             210

1

2

3

## EXHIBITS

4

Government's Exhibit No. 1                          90
Government's Exhibit No. 14                         92
Government's Exhibit No. 1A                         96
Government's Exhibit Nos. 3, 4 and 12             126
Government's Exhibit No. 10                        130
Defendant's Exhibit No. 3                          156
Government's Exhibit Nos. 5, 6 and 7              230
Government's Exhibit Nos. 8 and 9                 233

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25