# Exhibit 2
# Part 1

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4    UNITED STATES OF AMERICA,        :      CRIMINAL ACTION
                                      :
5              Plaintiff,             :
                                      :
6         v.                          :
                                      :
7    NELSON LORA-PENA,                :
                                      :
8         Defendant.                  :      NO. 05-47 (KAJ)

9                              - - -

10                        Wilmington, Delaware
                   Friday, September 16, 2005 at 10:34 a.m.
11                      JURY TRIAL - VOLUME B

12                             - - -

13   BEFORE:  HONORABLE **KENT A. JORDAN**, U.S.D.C.J., and a jury

14                             - - -

15   APPEARANCES:

16

17        APRIL M. BYRD, ESQ.
          Assistant United States Attorney
18
               Counsel for Government
19

20        LAW OFFICES OF CHARLES PERUTO, JR.
          BY:  CHARLES PERUTO, JR., ESQ., and
21             RAYMOND C. DRISCOLL, ESQ.
               (Philadelphia, Pennsylvania)
22
               Counsel for Defendant
23

24

25                                  Brian P. Gaffigan
                                    Registered Merit Reporter

```
 1                          - oOo -

 2                    P R O C E E D I N G S

 3              (REPORTER'S NOTE:  The following jury trial was

 4    held in open court, reconvening at 10:34 a.m.)

 5              THE COURT:  Please be seated.

 6              Marshal, do you want to go ahead and take the

 7    stand again.

 8              THE WITNESS:  Yes, sir.

 9              (Witness, DEPUTY MARSHAL JACK LEO, having

10    previously been sworn, retakes the witness stand.)

11              MS. BYRD:  Your Honor, I apologize.

12              THE COURT:  That's all right.

13              If I remember correctly, we concluded the direct

14    examination.  We were starting the cross on this witness.

15              MS. BYRD:  Yes, Your Honor.

16              THE COURT:  We're beginning the cross; right?

17              MR. PERUTO:  I think so.

18              THE COURT:  All right.

19              (Jury returned.)

20              THE COURT:  Good morning, ladies and gentlemen.

21    Please be seated.  Thank you for being back here.

22              We'll ahead and continue with the examination of

23    Marshal Leo.  Mr. Peruto, your cross.

24              MR. PERUTO:  Thank you, sir.

25
```

Leo - cross

1                    CROSS-EXAMINATION

2    BY MR. PERUTO:

3    Q.      Good morning, Marshal Leo.

4    A.      Good morning, sir.

5    Q.      Marshal Leo, in your duties, after this arrest took

6    place, I take it you filed a report?

7    A.      I did, sir.

8    Q.      And what is the purpose of filing a report, for the

9    ladies and gentlemen of the jury?

10   A.      To document what happened at the scene.

11   Q.      And it's normal, if you are involved in an

12   altercation like this, that you file a report of what

13   occurred?

14   A.      Yes, sir.

15   Q.      And you may have to rely on that to refresh your

16   recollection for testimony at trial some day?

17   A.      Yes, sir.

18   Q.      Do you have any personal knowledge of why no one else

19   filed a report in this case?

20   A.      I do not.

21   Q.      You do have directives from the Marshal's Service

22   that when you are involved in an altercation like this, it

23   should be documented, don't you?

24   A.      We do.

25   Q.      Now, in this particular case, you initially went to

Leo - cross

1    the door without your AR-15 rifle; correct?

2    A.    That is incorrect.

3    Q.    You went with a rifle?

4    A.    Yes, sir.

5    Q.    Are you telling us that you already knew the dogs

6    were in there?

7    A.    We did know that there was a dog in the house, yes,

8    sir.

9    Q.    And how did you know that?

10   A.    Prior to myself being called to report to the scene,

11   Deputy David had witnessed the defendant walk out into the

12   front yard with a dog.

13   Q.    He walked out with a dog?

14   A.    Yes, sir.

15   Q.    Do you know why -- do you have any personal knowledge

16   of why that is not contained in any report?

17   A.    I do not.

18   Q.    Now, when you approached the door, what position was

19   this AR-15 rifle in?

20   A.    It was in a sling.  And the sling inherently

21   positions the weapon so the barrel is down to the left and

22   it sits about mid-chest with, my hand was on the pistol

23   grip, my left hand was on the fore grip, much like this

24   right here.

25   Q.    Okay.  I would take it that is a readied position?

Leo - cross

1    A.    In the Marshal Service, we have two types of ready

2    positions:   one where a round is not chambered and the

3    weapon is off of safety so you could chamber a round, and

4    then one where a round is chambered and then the weapon is

5    put on safety.

6    Q.    Is it your testimony before this jury that you would

7    term a rifle in the readied position if a bullet was not in

8    the chamber?

9    A.    I guess not.   I apologize.

10   Q.    Readied inherently means there is a bullet chambered;

11   correct?

12   A.    No.

13   Q.    It doesn't?

14   A.    No, the rifle is in a position for me to chamber a

15   bullet and deploy it very quickly.   In this situation, when

16   we approached the house, we didn't know.

17   Q.    I'm not asking that question.

18   A.    Okay.

19   Q.    Is it your testimony that if there is not a bullet in

20   the chamber, it's readied?

21   A.    It cannot be fired.   It is not readied then, if there

22   is a condition that we carry the weapon in, approaching

23   situations where there isn't a round in the chamber.   It is

24   not readied to be fired.   I would have to go through the

25   process of chambering a round.

Leo - cross

1    Q.    And in the Marshal Service, the Marine Corp., police

2    department or anyplace, there has to be a chambered round

3    for a gun to be readied; correct?

4    A.    I guess it would -- define "ready," sir.  Every time

5    I carry a weapon, it's ready to be deployed.  When I was in

6    the service, for instance, we didn't carry a weapon with a

7    round in the chamber.  We were taught to draw from the

8    holster, chamber the round and deploy all in one smooth

9    motion.  We were also taught that in the Marshal Service.

10   Q.    I understand that is what you were taught.

11              So you are saying?

12   A.    If your definition of readied is ready to fire, pull

13   the trigger, it's done, a round would have to be in the

14   chamber.  Not to be argumentive, it's just that it is a

15   little bit.  There are two ways to carry a weapon in which

16   they're ready to be deployed.  In order for it to be fired,

17   it would have to a round chambered, sir.

18   Q.    Well, at any rate, according to your definition, when

19   you approached the door, your rifle, AR-15, was readied;

20   correct?

21   A.    It was, sir.

22   Q.    Can you tell the ladies and gentlemen of the jury why

23   it is that upon approaching -- this is your report.  "Upon

24   approaching the front of the residence, Pena attempted to

25   release two ferocious pit bull terriers in an apparent

Leo - cross

1    effort to harm Leo and David.  Leo subsequently readied --

2    subsequently readied an AR-15 rifle."

3    A.    In saying that --

4    Q.    So it wasn't readied.  When you say -- in your words.

5    You took the time to type out subsequently.

6    A.    That's correct.

7    Q.    So when you approached the front of the door, it

8    wasn't readied; correct?

9    A.    I had to chamber a round.  That's correct, it was not

10   readied.

11   Q.    It was not readied.  So why do you write the words

12   out "subsequently readied" when typing your report?

13   A.    I guess I used a poor choice of words, sir.

14   Q.    Well, what choice of words should you have used?  I

15   did it before that?

16   A.    No, I could have said that I chambered a round.

17   Q.    But you used the word "subsequently."

18   A.    I did, and that is because I was carrying it in one

19   ready position, which is a safer position.  And when I saw

20   the ferocity of the pit bulls, I made it into a position

21   where I was ready to fire.

22   Q.    Is your recollection of the events from April 9th

23   better today than it was then?

24   A.    No, sir.  Like I said, I used a bad choice of words.

25   Q.    And that bad choice of words would be the word

Leo - cross

1  "subsequently;" correct?

2  A.    Probably "readied."  I should have said I

3  subsequently chambered a round.

4  Q.    Now, sir, directing your attention now, if you have

5  it up there, to Government Exhibit 2.

6  A.    I do not, sir.

7         (Counsel confer.)

8         MR. PERUTO:  Judge, it's labeled Government

9  Exhibit 2 but I think it's a defense exhibit.  May I

10 approach?

11        THE COURT:  You may freely approach.

12 BY MR. PERUTO:

13 Q.    I refer your attention to Defense Exhibit No. 3 and

14 ask if you recognize what is depicted in that photograph?

15 A.    I do, sir.

16 Q.    First of all, do you know who took that photograph?

17 A.    I believe it was Marshal Thomas.

18 Q.    Okay.  And he was at the scene?

19 A.    He was, sir.

20 Q.    And what is depicted in that photograph, so the jury

21 knows what we're talking about?

22 A.    It is a hole in the sheet rock, in the wall that was

23 at the front of the hallway that leads back to the bedroom.

24 Q.    Can you tell the jury how that got there?

25 A.    During the struggle, the defendant and I smashed into

Leo - cross

1    or fell into that wall and I believe caused a hole.

2    Q.    Well, who is the one that hit the wall, you or the

3    defendant?

4    A.    I can't say, sir.

5    Q.    You can't say?

6    A.    No, sir.

7    Q.    Did you have any sheet rock on you?

8    A.    I did.

9    Q.    Now, directing your attention to Government

10    Exhibits 8 and 9.

11            MR. PERUTO:  May I approach?  They're already

12    marked.

13            THE COURT:  Yes, you may freely approach.

14    BY MR. PERUTO:

15    Q.    I show you what is marked as Government's Exhibits 8

16    and 9.

17    A.    Thank you.

18    Q.    Now, yesterday you were shown them --

19            THE COURT:  I just want to note I believe they

20    were marked for identification.  I don't believe they're in

21    the record.

22            MR. PERUTO:  All right.

23            MS. BYRD:  They are in the record.

24            THE COURT:  Are they?

25            MS. BYRD:  Yes, your Honor.

Leo - cross

1          THE COURT:  I apologize.

2    BY MR. PERUTO:

3    Q.    Directing your attention to Government's Exhibits 8

4    and 9.  Would it be a fair statement that those photographs

5    give a much clearer picture of your hands than did the

6    overhead projector?

7    A.    They're the same picture.

8    Q.    I understand they're the same picture.

9    A.    I don't feel that that is true.  I think it's pretty

10   much the same.

11   Q.    You think it's pretty much the same?

12   A.    Yes, sir.

13          MR. PERUTO:  I would ask that Exhibits 8 and 9

14   may be published to the jury.

15          THE COURT:  They may be published.  I'll ask the

16   courtroom deputy to help you with that; all right?

17          (Exhibits published to the jury.)

18          MR. PERUTO:  May the record reflect the

19   photographs have been published?

20          THE COURT:  Yes, it so reflects.

21          MR. PERUTO:  Now if I could hand them back to

22   the witness.

23          THE WITNESS:  Thank you.

24   BY MR. PERUTO:

25   Q.    First of all, Marshal Leo, what was the purpose in

Leo - cross

1   having Government's Exhibits 8 and 9 taken?

2   A.      To document the injuries.

3   Q.      I take it, the person with the camera, whoever it

4   was, said "where is your injuries," you pointed them out and

5   they were photographed; correct?

6   A.      Yes, sir.

7   Q.      Did you have him photograph your scalp?

8   A.      No, sir.

9   Q.      Did you have him photograph any other body part?

10  A.      No, sir.

11  Q.      Now, are you familiar with the term "blood spatter?"

12  A.      I am.

13  Q.      And what is your understanding of that term?

14  A.      When somebody is struck, blood droplets would be

15  projected off of the body and in the direction, depending on

16  the type of blood spatter.  I mean the seminars we always

17  see is the stab wound and it goes up and down.

18  Q.      And can you tell, when you were in this struggle with

19  the defendant, when blows were inflicted to his face, can

20  you tell the jury again where this occurred?

21  A.      It occurred throughout the entire course of the

22  struggle from the hallway, from -- from the rear hallway, I

23  apologize, to the small entryway, to the foyer, if you will,

24  that is in front of the door, and then also when we had all

25  gone to the ground where the defendant was ultimately

Leo - cross

1    handcuffed.

2    Q.      Now, sir, since this deputy marshal was there with a

3    camera, certainly he photographed the scene; correct?

4    A.      I believe he did, sir.

5    Q.      And do you have any present recollection, because I

6    don't have any photographs of this, of any blood being on

7    any wall?

8    A.      No, I recall just blood on the carpet.

9    Q.      Referring your attention to Government Exhibit

10   No. 10, which is in evidence.

11             MR. PERUTO:  May I approach?

12             THE COURT:  You may freely approach, sir.

13             THE WITNESS:  Thank you, sir.

14   BY MR. PERUTO:

15   Q.      Would it be a fair statement that all blood that was

16   ejected from the defendant's face came when he was lying on

17   the ground?

18   A.      I don't know if that is true or not.

19   Q.      Certainly, in that photograph, it shows blood at

20   least two feet behind his head, heavy?

21   A.      There is blood behind his head on the carpet, yes,

22   sir.

23   Q.      And it's not a little bit, is it?

24   A.      It covers a large area.  I don't know how much blood

25   there is.  He was moving about.

Leo - cross

1    Q.    If the defendant were to testify that you punched his

2    face repeatedly while he was laying on the ground,

3    semiconscious, is that a lie?

4    A.    That would be partially true.

5    Q.    Why would a person be punched in a semiconscious

6    state?

7    A.    It would be partially true because he was not

8    semiconscious and he was not punched repeatedly throughout

9    the entire time he was on the floor.    I struck him when we

10   were on the floor together and he was grabbing at me.    But

11   when he began to comply, I no longer needed to defend myself

12   and he was no longer punched.

13   Q.    Marshal, did any other marshals have to come to this

14   defendant's aid and bring you off of him in a choke hold?

15   A.    Absolutely not.

16   Q.    If the defendant were to testify in this court that

17   the two marshals, without knowing their name, who were at

18   the front door are the ones that beat him until the two

19   marshals at the backdoor came in to pull you off, that is a

20   lie?

21   A.    That would be untruthful.

22   Q.    Marshal, isn't it a fact that you and the other

23   marshal who were at the front door tackled the defendant on

24   his re-entry into the home from the rear door when you saw

25   him reappear?

1    A.      That is not at all true.

2    Q.      Now, you said this defendant is the one that

3    discharged your weapon?

4    A.      Yes, sir.

5    Q.      Can you tell the judge -- the jury how long this

6    weapon is?

7    A.      This weapon is approximately, from the very end of

8    the stock, which is the part that rests upon your shoulder,

9    to the barrel of the weapon, in its collapsed state, it's

10   probably 30 inches long.  Yes, about 30 inches long.

11   Q.      In its collapsed state.  Was this in a collapsed

12   state?  And what does that mean for this jury?

13   A.      Okay.  I apologize.  The stock of the weapon that

14   rests upon your shoulder has the ability to get longer or

15   shorter.  When we're in a house or in a tight quarters

16   situation, we do collapse the weapon so that we can keep it

17   in tight quarters without having the weapon getting grabbed.

18   Q.      So you are saying it's about 30 inches?

19   A.      Yes, sir.

20   Q.      How come you didn't put that in your report when you

21   said that it was readied?

22   A.      I didn't think that it was necessary.

23   Q.      Do you have this rifle here so we could demonstrate

24   for the jury?

25   A.      It is, sir.

Leo - cross

1    Q.      And where is it?

2    A.      I believe Deputy David has it.

3                MR. PERUTO:  I would ask for production of this

4    rifle.

5                THE COURT:  Position?

6                MS. BYRD:  That is why I brought it.

7                THE COURT:  All right.  Fine.

8                MR. PERUTO:  Preferably in an unloaded state.

9                MS. BYRD:  I think it's been made safe already,

10   Your Honor.

11               THE COURT:  I'm sure they would not bring it

12   into the courtroom were it otherwise.

13               (AR-15 rifle produced.)

14               THE COURT:  Mr. Peruto.

15               MR. PERUTO:  I'd like to have this marked as the

16   next defense exhibit, if I may.  I don't know if we have to

17   put anything on it.  Do you want to keep track of it?

18               THE DEPUTY CLERK:  Four.

19               MR. PERUTO:  Defense Exhibit No. 4.

20   BY MR. PERUTO:

21   Q.      And I'm showing you Defense Exhibit No. 4 --

22               THE COURT:  For identification.

23   BY MR. PERUTO:

24   Q.      -- for identification and ask if you recognize that

25   weapon?

Leo - cross

1   A.      I do, sir. This is the weapon I used that day.

2   Q.      Okay.

3   A.      The day of the incident.

4   Q.      Now, could you tell the ladies and gentlemen of the

5   jury how you were positioned that made it possible for this

6   defendant to grab that gun and discharge it?

7   A.      Would you like me to stand up and demonstrate?

8   Q.      Whatever you're going to need, you do.

9   A.      Okay. For the benefit of everybody in the courtroom,

10  this weapon cannot be fired with this orange tag.

11              For your benefit as well.

12  BY MR. PERUTO:

13  Q.      Since I am the one cross-examining, I appreciate

14  that.

15  A.      As I stated, the sling inherently -- when I have a

16  bulletproof vest, I'm a little thicker and it brings it up

17  to about here. When we're in the hallway, I had the weapon

18  like this and when the defendant came in, the weapon was

19  squashed between him and I. Okay? As he was pulling at

20  it and pulling at my hands, his finger slipped into the

21  trigger. Well, I assume. I don't know for sure. I don't

22  know how he discharged the weapon. All I know is that I'm

23  trained to maintain a straight trigger finger and I've done

24  so hundreds of times before, but the weapon did go off and

25  it could only have went off from somebody depressing that

Leo - cross

1    trigger in there.

2    Q.    All right.  Now, you were standing when this

3    occurred?

4    A.    Yes, sir.

5    Q.    Okay.  And I'm the defendant; correct?

6    A.    Okay.

7    Q.    If you can remove the weapon?

8    A.    Yes, sir.

9    Q.    For the record, I have the gun the way you had it;

10   correct?

11   A.    Except for your finger is in the finger well.

12            THE COURT:  You are blocking the jury's view of

13   your hand, sir.

14   BY MR. PERUTO:

15   Q.    I have the weapon the way you had it; correct?

16   A.    The only difference --

17   Q.    I want you to change me.  I want to you make it the

18   way you had it.

19   A.    Take your index finger, keep it pressed against the

20   top metal.  That is how I had the weapon.

21   Q.    Okay.  Position my body the way your body was.

22   A.    That's going to be difficult because it was not a

23   static situation.  If you don't mind me getting up close and

24   personal, I'll show you how we were engaged at the time.

25   Q.    I don't mind.

Leo - cross

```
1    A.    Okay.  It was probably, I had the weapon along here

2    and I was holding on to your client, trying to force him

3    from going or force him to the ground.

4    Q.    Okay.

5    A.    And the weapon was sandwiched between us.

6    Q.    I want you to tell them.

7    A.    Well, just --

8    Q.    So you got your hand on my back?

9    A.    Yes, sir.

10   Q.    You are trying to force me to the ground?

11   A.    Yes, sir.

12   Q.    And somehow he must have gotten his finger into the

13   trigger and pulled it because you didn't?

14   A.    Undoubtedly, yes.

15   Q.    Okay.

16   A.    Okay.  And in the meantime, while we were going

17   through the struggle, I could feel the weapon being pulled

18   away from me.  I could feel his fingers digging into my

19   hand.

20   Q.    Okay.  Do you know what a strike mark is from a

21   projectile?

22   A.    A strike mark from a projectile?

23   Q.    Yes.

24   A.    No, sir.

25   Q.    If I were to tell you that a strike mark is where --
```

Leo - cross

1    first of all, do you know what a projectile is?

2    A.    Of course.

3    Q.    And for the purposes of the jury, what we commonly

4    call a bullet is made up of the shell casing, gun powder and

5    projectile; correct?

6    A.    Yes, sir.

7    Q.    And the projectile exits the weapon, travels down the

8    barrel and out the gun; correct?

9    A.    That's correct, sir.

10   Q.    A strike mark -- if I were to tell you that a strike

11   mark is the mark made on wherever the projectile strikes,

12   whether it be wood, concrete, glass, grass, anything; if

13   I were to tell you that is a strike mark, with that

14   understanding, can you tell this jury how it is that this

15   weapon, fired straight out a storm door, didn't go on an

16   angle down and hit the concrete outside to make a strike

17   mark but traveled through and through and kept on going,

18   never to be discovered again?  Can you tell the jury how it

19   is that if you are standing, the projectile didn't fire

20   down?

21   A.    You have the path of the projectile incorrect, sir.

22   It was fired in a downward position.  It hit the concrete

23   pad immediately outside the door.  And from there, they were

24   unable to determine where its path was because the Delaware

25   State Police speculated that the round fragmented.  It was

Leo - Cross

1    fired in a downward direction.

2    Q.    It was?

3    A.    Yes, sir.

4    Q.    And, certainly, the person with the camera who took

5    great pains to photograph the door five or six times with

6    dollar bills and inside and outside just didn't bother to

7    photograph the strike mark?

8    A.    I don't know what he photographed.  I didn't see a

9    picture of that.

10   Q.    And do you know why there is no strike mark contained

11   in anybody's report from the top of this case to the bottom?

12   A.    Reference my report.  I think I might have referenced

13   that it struck the concrete outside of the door.  I'm not

14   certain but I believe that I did.  I believe it may have

15   been the second page.

16   Q.    What you are telling us is this is what the Delaware

17   State Police found?

18   A.    Yes.  In fact --

19   Q.    That's a yes or a no.

20   A.    Yes, sir.

21   Q.    You are telling us this is what the Delaware State

22   Police found?

23   A.    Yes, sir.

24   Q.    Do you know why that wasn't photographed?

25   A.    I do not know.

Leo - cross

1    Q.    And that was their theory, that it struck the

2    concrete and it fragmented; correct?

3    A.    Yes, sir.

4    Q.    Let me show you what has previously been marked as

5    Government's Exhibit 5 and 6.

6              MR. PERUTO:  They've been admitted, judge.  May

7    I approach?

8              THE COURT:  You may.

9              THE WITNESS:  Thank you.

10   BY MR. PERUTO:

11   Q.    Directing your attention to those exhibits, would it

12   be a fair statement that the entrance of that projectile and

13   the exit are the same height on the screen door?

14   A.    I'm not able to tell that from this picture.

15   Q.    Well, since somebody put a dollar bill when

16   photographing it, did anybody put a ruler on both sides?

17   A.    No, sir.

18              MR. PERUTO:  If I may approach?

19   BY MR. PERUTO:

20   Q.    Now, you put in your report that the defendant

21   grabbed your hand in a manner that resulted in lacerations

22   to your hand apparently inflicted by his fingernails?

23   A.    Yes, sir.

24   Q.    Are those lacerations that you referred to in your

25   report, if somebody were to pick it up, what the jury just

1   viewed?

2   A.      Yes, sir.

3   Q.      Would it be a fair statement that those lacerations

4   are the sum and substance of all injuries inflicted to all

5   four deputies in this case?

6   A.      I don't know if that is true or not.

7   Q.      Did you see any injuries to any other deputy?

8   A.      No, I did not.

9   Q.      Marshal, it says in your report that your safety was

10  on?

11  A.      Yes, sir.

12  Q.      And nowhere in your report does it ever say you took

13  the safety off; correct?

14  A.      That's correct.

15  Q.      Are you telling this jury then that not only, during

16  this struggle with this defendant, as big as you are, he was

17  not only able to pull the trigger but he also had knowledge

18  that the safety was on and took it off?

19  A.      I wouldn't say that at all.

20  Q.      Then how did it fire if the safety was on?

21  A.      I believe it's because the weapon was sandwiched

22  between us and it was getting pulled and subsequently

23  rubbing in between us.  The safety is very easy to take off

24  of these weapons and the safety was up against my stomach.

25              MR. PERUTO:  No further questions, judge.

1          THE COURT:  All right.  Thank you.

2          Ms. Byrd, your redirect.

3          MS. BYRD:  I have nothing further, Your Honor.

4          THE COURT:  All right.  Marshal Leo, thank you

5     sir.  You may step down.

6          THE WITNESS:  Thank you, sir.

7          THE COURT:  Any other witnesses or evidence,

8     ma'am?

9          MS. BYRD:  Your Honor, may I approach to confirm

10    the admission of the Government's exhibits?

11         THE COURT:  Yes, you may.

12         (Government's counsel and the deputy clerk

13    confer.)

14         MS. BYRD:  Your Honor, may I have a moment?

15         THE COURT:  Yes.

16         (Pause.)

17         MS. BYRD:  Your Honor, at this time, the

18    Government rests.

19         THE COURT:  All right.  Ladies and gentlemen,

20    those words have special significance so I need to take a

21    moment and see counsel at side bar.

22         (Conference held at side bar out of presence of

23    jury.)

24         THE COURT:  Is there any application that you

25    want to make, sir?

1          MR. PERUTO:  Yes, sir.

2          THE COURT:  Okay.  I want to give you a chance

3    to make your record.

4          MR. PERUTO:  I would request under Rule 29

5    of the Federal Rules of Evidence to dismiss the counts

6    involving the dogs since there is insufficient evidence to

7    show that he used the dogs in a manner that would elevate

8    to a weapon.

9          THE COURT:  Okay.

10         MR. PERUTO:  And that it was intentional and

11   knowing.

12         THE COURT:  And I'm sure you intended to say

13   Federal Rules of Criminal Procedure.  We're on the same

14   page, I think.  You said Federal Rules of Evidence.

15         MR. PERUTO:  Yes, I did.

16         THE COURT:  All right.  Your response?

17         MS. BYRD:  The Government simply submits on

18   the record and states in the light most favorable to the

19   Government, which is the standard at this point, there is

20   evidence from which a reasonable juror could find guilt

21   beyond a reasonable doubt, including the testimony regarding

22   the defendant's actions at the front door and subsequent

23   actions.

24         THE COURT:  All right.  I agree with the

25   Government.  So the motion is overruled.  All right?

Lora-Pena - direct

1              (Conference at side bar ends.  Proceedings

2      continue in open court.)

3              THE COURT:  All right.  Mr. Peruto.

4              MR. PERUTO:  We call the defendant.

5              THE COURT:  All right.  Mr. Lora-Pena.

6                           - - -

7                     DEFENDANT'S TESTIMONY

8          ... NELSON LORA-PENA, having been placed

9          under oath at 11:09 a.m. as a witness, was.

10             examined and testified as follows ....

11                          - - -

12             THE COURT:  All right.  Mr. Peruto, you may

13     inquire.

14                     DIRECT EXAMINATION

15     BY MR. PERUTO:

16     Q.     Good morning, sir.  Mr. Lora-Pena, you heard

17     testimony in this courtroom that you were on the run for

18     about 10 years?

19     A.     Yes.

20     Q.     Is that true?

21     A.     Yes.

22     Q.     Now, sir, directing your attention to April 9th of

23     2005, did you notice any what turned out to be Federal

24     Marshals at your front door?

25     A.     Yes.

1   Q.      Can you tell the judge what, if anything, you did

2   upon -- what they did and what you did when you noticed

3   them?

4   A.      I remember it was a nice day.  When I seen them

5   approach the door, I panicked.  I panicked, went to the

6   backdoor.

7   Q.      Now, where were you standing exactly?  The jury was

8   not there.  I need you to bring them to it.  Where were you

9   standing when you first noticed them?

10  A.      By the screen door, the glass door, when they came.

11  Q.      The glass door?

12  A.      Right.

13  Q.      Okay.  How far from the glass door?

14  A.      Six-seven feet, eight feet.

15  Q.      Six-seven feet, eight feet max?  You have to bring

16  your voice up.

17  A.      Like eight feet.

18  Q.      Okay.  What was done by them and what was done by

19  you?

20  A.      When I saw them, I panicked because I was on the run.

21  I panicked.  Been on the run for ten years, so, you know.

22  So what I tried to do, I tried to run to the backdoor, to

23  the slide door, open the slide door, went outside.  And they

24  were there, too.

25  Q.      When you say "they were there, too," who?

Lora-Pena - direct

1    A.    Marshals.

2    Q.    Marshals?

3    A.    Yes.

4    Q.    Okay.

5    A.    And I ran back in the house.  And when I ran back in

6    the house, went through a hallway, the marshal grabbed me.

7    Q.    Which marshal?

8    A.    The one that just testified.

9    Q.    The one that just testified?

10   A.    Him (indicating).

11   Q.    The most recent witness?

12   A.    That one over there.  Him.  The one recent, the one

13   that was just now on the stand.

14   Q.    The one that was just on the stand?

15   A.    Right.  Big guy.

16   Q.    Where did he come from?

17   A.    The front door.

18   Q.    He came from the front door?

19   A.    Yes.

20   Q.    This is after you came back from the rear door?

21   A.    Yes.

22   Q.    And what happened?

23   A.    He tackled me.

24   Q.    Okay.  And where did he tackle you?

25   A.    Right in the hallway.  In the hallway, next to just

B-28

Lora-Pena - direct

1    like the closet there.  When he tackled me, he put me to the

2    wall.  He started hitting me for no reason, like it was

3    personal.  He started beating me up.  And I cover myself.

4    The only thing I could do is cover myself but he kept

5    constantly hitting me for no reason, and I have been

6    arrested before but I didn't think it was going to be like

7    this.

8    Q.       All right.  Slow down.  Did you see the hole in the

9    wall in the pictures?  Did you see the hole in the wall in

10   the pictures in this courtroom?

11   A.       Yes.

12   Q.       How did that happen?

13   A.       When he tackled me.  When he tackled me, when he put

14   me into the wall, he punched me and he kept punching me.

15   Then after he punched me, he started kicking me.  And he

16   threw me towards the living room, where -- the living room

17   is between, like there is this little hallway between where

18   the outside door is.  And he started punching me, kicking

19   me, telling me, "I finally got you after ten years."  You

20   know, he did it constantly.  And I was praying to God to

21   please stop him hitting me, and he kept hitting me for no

22   reason.  And one of the marshals there, he didn't even try

23   to stop him from hitting me.  I'm by myself.  I have no

24   mercy.  I'm helpless.  And he just, he kept hitting me.  And

25   then the marshal --

Lora-Pena - direct

1    Q.    Now, time out.  Calm down.  I know that you are

2    upset.

3                The marshal, when he was hitting you, how many

4    marshals were around you at the time he was hitting you in

5    the living room?

6    A.    Two.

7    Q.    Two marshals?

8    A.    No, just one.  Him and one other guy.

9    Q.    And one other guy?

10   A.    Right.

11   Q.    Was that the guy that you first saw at the front

12   door?

13   A.    Yes.

14   Q.    What happened to the guys at the backdoor?

15   A.    They were back there like a couple of minutes.

16   Q.    So they weren't there yet?

17   A.    No.  They were there, but they were like, they came

18   in, they came in like after maybe five-ten minutes.  Five

19   minutes, probably.

20   Q.    Okay.  So you are in the living room with the two

21   marshals?

22   A.    Right.

23   Q.    And the marshal that just testified was the one

24   striking you?

25   A.    Yes.

Lora-Pena - direct

1    Q.    What was the other marshal doing?

2    A.    He was just standing there.

3    Q.    Did he help you at all?

4    A.    No, he didn't.

5    Q.    Did he strike you at all?

6    A.    Yes, he did.

7    Q.    Now, what happened after the other marshals came in?

8    A.    Basically, they the one that, they the one that

9    helped.  They try to help me.

10    Q.    They tried to help you?

11    A.    Yes.

12    Q.    How did they do that?  The jury wasn't there.

13    A.    They tried to get him off of me.

14    Q.    And how did they try to do that?

15    A.    They tried from behind, but he just kept, like an

16    animal, just constantly kept hitting me.

17    Q.    I'll show you what has been previously marked as

18    Government Exhibit No. 10.

19         MR. PERUTO:  If I could approach?

20         THE COURT:  Yes.

21    BY MR. PERUTO:

22    Q.    Do you recognize that photograph?

23    A.    (Nodding yes.)  That's me.

24    Q.    That's you?

25    A.    That's me.

Lora-Pena - direct

1   Q.    Is that the room where he was hitting you?

2   A.    Yes.

3   Q.    Do you see the blood behind your head?

4   A.    Yes.

5   Q.    To the best of your knowledge, is that your blood?

6   A.    That's my blood.  I can't forget it.

7   Q.    Now, is that what your face looked when he was done

8   punching you?  Is that what your face looked like after he

9   was done punching you?

10  A.    Yes.

11  Q.    At the time he was punching you and having a

12  struggle, did you see any gun around his body?

13  A.    I didn't see no gun.

14  Q.    The record is silent.  You have to speak up and

15  answer.

16  A.    I didn't see no gun.

17  Q.    You didn't see any gun?

18  A.    I didn't see no gun.

19  Q.    Okay.  Tell the jury when the marshals from out back

20  came in, what they did.

21  A.    They tried to get him off of me because he didn't

22  stop hitting me.

23  Q.    Sir, when you say to this jury they tried to do this,

24  tell the jury what actions they did so that you could let

25  them know what occurred.

Lora-Pena - direct

1    A.      Well, they tried to do -- they tried to help me,

2    when the marshal was hitting me, try to get him off me but

3    he would not stop.

4    Q.      And how is it that you concluded -- how is it that

5    they demonstrated they were trying to help you?  What did

6    you see?

7    A.      Excuse me?

8    Q.      What did these other marshals who came from the back

9    do to help you?

10   A.      They tried to get them off of me.

11   Q.      How?

12   A.      By --

13   Q.      Did they throw water on him?  Did they paint his

14   eyes?  Did they do something to him?

15   A.      No.  What they tried to do -- I'm just -- what they

16   tried to do was they tried to get him off of me, but he

17   would not stop.

18   Q.      Did they try with their hands or with their voices?

19   A.      With their voices and their hands.

20   Q.      And where did they put their hands on that last

21   marshal to demonstrate they were trying to help you?

22   A.      Around his neck.  Around his shoulders.

23   Q.      All right.

24           MR. PERUTO:  May I approach the witness?

25           THE COURT:  You may.

Lora-Pena - direct

1    A.      Around his shoulders.

2    BY MR. PERUTO:

3    Q.      I'm the marshal.  You're down on the ground.

4    A.      Uh-huh.

5    Q.      You come down here.

6    A.      (Witness leaves witness stand.)

7    Q.      What did the marshals who came from the back do to

8    me?  I'm the last marshal.  Pretend I'm the marshal.  What

9    did they do as I'm down here?

10   A.      They tried to stop him but he kept going.

11          MR. PERUTO:  All right.  For the record,

12   indicating grabbing from behind the marshal, the last

13   marshal, Leo.

14          (Witness resumes witness stand.)

15   BY MR. PERUTO:

16   Q.      Was anything being said by the marshals trying to

17   help you at that time?

18   A.      Yes.

19   Q.      What was being said?

20   A.      "Look what you are doing.  Look what you did.  You're

21   going to get us all in trouble."

22   Q.      All right.  And do you recognize -- did you recognize

23   the person who testified in this courtroom who said he is

24   "the" marshal?  The black gentleman who testified in this

25   courtroom?

Lora-Pena - direct

1    A.    (Nodding yes.)

2    Q.    Did he hurt you in any way?

3    A.    No, he didn't.  Basically, he is the one that helped

4    me.

5    Q.    Basically, he is one that helped you?

6    A.    Not basically.  He helped me.

7    Q.    And what about the other marshal that was in the back

8    of the house when you ran out?

9    A.    The other marshal in the back, they were just trying

10   to get him off me.

11   Q.    So was he helping you or hurting you?

12   A.    He was helping me.

13   Q.    He was helping you?

14   A.    Yes.

15   Q.    So the two in the back helped you, the two in the

16   front didn't?

17   A.    No, exactly.

18   Q.    Did you ever strike any marshal?

19   A.    No, sir.

20   Q.    Did you ever threaten to strike any marshal?

21   A.    No.

22   Q.    Now, when all of this was occurring -- strike that.

23   Let me take it from the beginning.  When you first saw the

24   marshals at your front door, where were your dogs?

25   A.    I don't know where the dogs are at.

Lora-Pena - direct

1    Q.    Did you ever sic the dogs on the marshals?

2    A.    No.

3    Q.    Did you ever open the doors so dogs could go out and

4    bite them?

5    A.    No.

6    Q.    Did you ever order the dogs to attack?

7    A.    No, they're good dogs.  They're pets.  They're nice

8    dogs.

9    Q.    Have you -- do you have any knowledge whatsoever of

10   these dogs ever biting anyone?

11   A.    No.  My son with his friends in the neighborhood,

12   they used to play with them all the time on the trampoline,

13   jumping.  They're good dogs, lovable dogs.  Everybody think

14   pit bulls are bad dogs.  Not my dogs.  They're good dogs.

15   Q.    Now, did you ever hear a gunshot during this

16   altercation?

17   A.    Yes, I did.

18   Q.    And when you heard that, what went through your mind?

19   A.    I thought they shot my dogs.

20   Q.    Did you have your hand on any gun when you heard that

21   gunshot?

22   A.    No.

23   Q.    Where were you when you heard that gunshot?

24   A.    I was laying down.  I was laying down.  I never

25   forget that.  I was laying down.

Lora-Pena - cross

1              MR. PERUTO:  I have no further questions, Your

2      Honor.

3              THE COURT:  All right.  Cross-examination, Ms.

4      Byrd.

5                     CROSS-EXAMINATION

6      BY MS. BYRD:

7      Q.      Good morning, sir.  John Battista, that is the fake

8      name that you used during the decade that you were on the

9      run; correct?

10     A.      Yes, ma'am.

11     Q.      And that is a name you obtained so that you could

12     hide your identity; correct?

13     A.      Yes.

14     Q.      In fact, you got some fake documents in that name,

15     too, so you could help yourself out in concealing your

16     identity from law enforcement or other people who might be

17     out to get you; correct?

18     A.      Yes.

19     Q.      And you're a fugitive out of the state of Rhode

20     Island; is that right?

21     A.      Yes.

22     Q.      And you were around a bit before you came to

23     Delaware; is that correct?

24     A.      Yes.

25     Q.      You went to New York; right?

Lora-Pena - cross

1   A.      Yes.

2   Q.      You went --

3   A.      Yes.

4   Q.      Thank you, sir.  You went to Florida?

5   A.      Yes.

6   Q.      You came to Delaware; correct?

7   A.      Yes.

8   Q.      In a house on Dunbar Road in Newark, in Delaware;

9   correct?

10  A.      Yes.

11  Q.      Knowing all the time you were a fugitive; correct?

12  A.      Yes, ma'am.

13  Q.      Did you enjoy your freedom?

14  A.      I love my freedom.

15  Q.      You love your freedom?

16  A.      Uh-huh.

17  Q.      I'm sorry, sir?

18  A.      I love my freedom.

19  Q.      You wouldn't want to go back to jail, would you?

20  A.      No, ma'am.

21  Q.      Now, you said on April 9th of this year you were

22  in your house or in the house on Dunbar Road in Newark,

23  Delaware; correct?

24  A.      Yes.

25  Q.      And you saw some people at the front door or coming

1    toward the front door; correct?

2    A.    That's correct.

3    Q.    And they had police vests on, did they not, sir?

4    A.    Yes, they did.

5    Q.    I mean they didn't come walking up there looking like

6    myself and Mr. Peruto with suits, did they?

7    A.    No.

8    Q.    They didn't come looking like they were selling Girl

9    Scout cookies?

10    A.    No, ma'am.

11    Q.    In fact, they had on the vest that I'm holding up or

12    vests similar to what I'm holding up; is that correct?

13    A.    Yes, ma'am.

14              MS. BYRD:  For the record, that is the vest that

15    has been admitted in evidence as Government's 14, a navy

16    blue vest that says "police" on the front.

17    BY MS. BYRD:

18    Q.    Do you see that, sir?

19    A.    Yes, ma'am.

20    Q.    And when you saw them at the front, you knew they

21    were police officers or law enforcement officers; correct?

22    A.    Yes.

23    Q.    In fact, that's why you were so upset, wasn't it?

24    You "panicked" was the word you used.  That is why you were

25    panicked; is that correct?

Lora-Pena - cross

1   A.    Yes, ma'am.

2   Q.    Because, after all, if they were just selling Girl

3   Scout cookies, there would be no reason to panic; right?

4   Correct?

5   A.    I think -- will you phrase that again?

6   Q.    After all, if they were just selling Girl Scout

7   cookies, there would be no reason to panic unless they

8   were bad cookies or something like that?

9   A.    Yes.

10  Q.    You were panicking because here come law enforcement

11  officers, probably with guns, and you thought they were

12  coming to arrest you; correct?

13  A.    I thought they were going to kill me.

14  Q.    Oh.  You thought they're going to kill you?

15  A.    Yes.

16  Q.    Just come to the door and they were going to kill

17  you?

18  A.    Right.

19  Q.    Because you had been on the run for a decade?

20  A.    Yes, of course.  I was scared.

21  Q.    Now, your reaction, you testified when Mr. Peruto was

22  asking you some questions, was to flee; correct?  Was to

23  run?  Was to run to the back of your house; correct?

24  A.    Yes.

25  Q.    All right.  And that is because you love, and

Lora-Pena - cross

1    you said just a minute ago, your freedom; right?

2    A.    Yes.

3    Q.    And you wanted to stay free; correct?

4    A.    Yes.

5    Q.    Now, let's talk about your testimony about what

6    happened.  You testified that Deputy U.S. Marshal Jack Leo;

7    and that is the big guy, okay?

8    A.    Yes.

9    Q.    The big guy.  That is the gentleman that is seated

10   right back here in the dark suit with the interesting

11   grayish-looking tie.  Do you see that?

12   A.    Yes.

13   Q.    All right.  Deputy U.S. Marshal Jack Leo, he grabbed

14   you when you come running back into the house.  Did I

15   understand your testimony right?  I want to make sure I got

16   it right.

17   A.    No.  When I came back, he tackled me.

18   Q.    Tackled you.  Thank you for correcting me.  He

19   tackled you when you came back into the house?

20   A.    When I came back into the house.

21   Q.    From the back, running back into kind of the front

22   area, that is when you testified that Deputy U.S. Marshal

23   Jack Leo tackled you?

24   A.    Right.

25   Q.    And then your testimony was that he started beating

Lora-Pena - cross

1    you?

2    A.    Yes, he did.

3    Q.    And by beating, I assume you mean punching you?

4    A.    Yes.

5    Q.    Anything else?

6    A.    Kicking me.

7    Q.    Punching and kicking you?

8    A.    Right.

9    Q.    And you testified that while he was punching and

10   kicking you, he then threw you into a wall; is that correct?

11   A.    Yes.

12   Q.    That is Deputy U.S. Marshal Jack Leo; right?

13   A.    Yes.

14   Q.    All right.  And then he proceeded to -- after you

15   were thrown into the wall, was he still on you at that

16   point?

17   A.    When he threw me on the floor, yes, not on the wall.

18   He was still on me when he was punching me.  When he was

19   punching me, he threw me on the floor.  He was still hitting

20   me.

21   Q.    All right.  Threw you at the wall, on the floor and

22   the Deputy U.S. Marshal continued to hit you?

23   A.    Yes.

24   Q.    Now, let's talk about, for a second, your testimony

25   about before you were thrown into the wall and Deputy U.S.

Lora-Pena - cross

1    Marshal Jack Leo was punching you.  Did it hurt your face?

2    A.    Of course he did.

3    Q.    Maybe it might have broken something, maybe some

4    blood was caused or bruising before he threw you into the

5    wall; correct?

6    A.    No.  I mean when he tackled me, he was hitting me.

7    Q.    Right.  So when he initially tackled you, he is

8    punching you, he is causing injury to your face is what

9    you are testifying and telling the jury; correct?

10   A.    Correct.

11   Q.    That occurred before he threw you into the wall;

12   correct?

13   A.    That occurred when he started hitting me.

14   Q.    All right.  Both before and after, he threw you into

15   the wall; is that correct?

16   A.    No.  When he hit, when he tackled me, that's when he

17   started hitting me.  He started hitting me.  Then he threw

18   me, fling me like a bubble bath, as big as he is, threw me

19   on the floor and started hitting me.

20   Q.    I understand, sir.

21   A.    He kept hitting me.

22   Q.    I understand, sir.  Now, you testified and I want to

23   make sure I got this right.  That it was personal or seemed

24   like it was personal; is that correct?

25   A.    Yes.

Lora-Pena - cross

1    Q.      It seemed like this person, Deputy U.S. Marshal Jack

2    Leo had some kind of personal vendetta or issue with you; is

3    that correct?

4    A.      Yes, that's correct.

5    Q.      Now, it's fair to tell the ladies and gentlemen of

6    the jury that you had never seen Deputy U.S. Marshal Jack

7    Leo before April 9th of 2005; isn't that correct?  You had

8    never met him before, had you?

9    A.      As of met him like?

10   Q.      Met him, talked to him, had any contact with him

11   before that date, had you?

12   A.      That date?

13   Q.      No, before.

14   A.      Before, no.  The only time I had contact was when he

15   came in.

16   Q.      That's what why I'm asking.

17   A.      To arrest me as a fugitive.  That's the only time I

18   had contact.

19   Q.      And just so the record is clear, so before that

20   day -- forget that day.  Before the day of your arrest, you

21   had never laid eyes on Deputy U.S. Marshal Jack Leo before

22   that day; is that correct?

23   A.      No, ma'am.

24   Q.      No, you had never laid eyes on him?

25   A.      If I saw him?

Lora-Pena - Cross

```
1   Q.      Yes.

2   A.      No.  No.

3   Q.      What about Supervisor Deputy U.S. Marshal Doug

4   Denney -- excuse me -- Robert Denney who is seated next to

5   Deputy U.S. Marshal Jack Leo, the other individual who

6   testified?  You heard his testimony he was at the backdoor.

7   You had never seen him before that day, had you?

8   A.      I remember him.

9   Q.      You remember him from before that day?

10  A.      No, from the day of the arrest.  He was there.

11  Q.      Right.  I said before that day, sir.

12  A.      No.  No.

13  Q.      Okay.  And Deputy U.S. Marshal William David, who is

14  seated right to my right, before the day of your arrest, you

15  had never seen him either; correct?

16  A.      No.  No.

17  Q.      And before the day of your arrest, you had never met

18  the African-American gentleman who testified, David Thomas

19  the U.S. Marshal for the District of Delaware, you had never

20  met him before or seen him before the day of the arrest;

21  correct?

22  A.      No.

23  Q.      But, somehow, you felt that Deputy U.S. Marshal Jack

24  Leo had something out for you; is that your testimony?

25  A.      Yes, I felt that.
```

Lora-Pena - cross

1    Q.      In fact, you testified that you felt Deputy Marshal

2    Jack Leo was like an animal.  Was that your word, an animal?

3    A.      Yes, he was.  Yes.  Yes.

4            MS. BYRD:  May I have a defense exhibit -- the

5    hole in the wall exhibit?  I don't know what number that is.

6            May I approach, Your Honor?

7            THE COURT:  You may freely approach.

8            MS. BYRD:  May I be here for a moment?

9            THE COURT:  Yes, you may.

10   BY MS. BYRD:

11   Q.      Now, you testified, sir, that Deputy U.S. Marshal

12   Jack Leo tackled you, was beating you on the floor, threw

13   you into the wall, you fell down, he was beating you on the

14   floor again.  Is that more or less what happened?

15   A.      Correct.

16   Q.      Okay.  And you testified to Mr. Peruto's question

17   that this picture I'm holding you in front of you, which has

18   been admitted as Defense 3 --

19   A.      That's the hole.

20   Q.      Right.  (Continuing):  -- is the wall and actually

21   there is kind of a hole in that wall; right?

22   A.      Yes.

23   Q.      Show me the blood on that wall.  Will you point it

24   out?

25   A.      (Inaudible response.)

1  Q.      I'm sorry.  I didn't hear you.

2  A.      I can't see it.

3  Q.      You can't see any blood on the wall?  Is that a no,

4  sir?

5  A.      (Pause.)  The blood wasn't on the wall but the blood

6  was on me.

7  Q.      Okay.  The blood wasn't on the wall?

8  A.      The blood was on me.  I started bleeding in my face.

9  Q.      So it's fair to say, sir, that the photograph that

10  you identified as being the hole caused by you being thrown

11  into it doesn't show any blood on that; right?  Right, sir?

12  If there is blood, I want you to point it out to me.

13  A.      The blood was on me.

14  Q.      All right, sir.  Now, was your testimony -- make sure

15  I got it right -- that you never saw a gun?

16  A.      I saw other marshals with the gun.

17  Q.      Okay.  You saw other marshals.  When you say "other,"

18  you mean other than Deputy U.S. Marshal Jack Leo, the big

19  guy?

20  A.      It happened so fast.

21  Q.      I'm just going with your testimony when Mr. Peruto

22  was asking you questions.  Do you remember testifying you

23  never saw a gun?

24  A.      I never saw a gun.

25  Q.      Okay.  But you heard a shot at some point; correct?

Lora-Pena - cross

1    A.    Correct.

2    Q.    All right.  Now, let's talk for a minute about the

3    two marshals that were at the backdoor, okay?  Do you recall

4    those two?

5    A.    (Nodding yes.)

6    Q.    And you testified that they never hurt you; correct?

7    A.    They never did.

8    Q.    They only tried to help you; correct?

9    A.    Correct.

10   Q.    And it was your testimony that they tried to help you

11   by getting their colleague, Deputy U.S. Marshal Jack Leo to

12   release you when you were on the floor; is that correct?

13   A.    Yes, that's correct.

14   Q.    Now, let's talk first about the U.S. Marshal, the

15   African-American gentleman who testified yesterday.  You

16   recall him; right?

17   A.    Yes.

18   Q.    All right.  Did he ever stand on your legs to keep

19   you down?  Did he ever stand on your legs at any time during

20   the day of your arrest?

21   A.    The day of my arrest, no.

22   Q.    Did he ever grab your arm at any time the day of your

23   arrest?

24   A.    Not that I remember.  No.  No, he didn't.  No.

25   Q.    Did he ever put an elbow into you at any part of your

Lora-Pena - cross

1    body, elbow you at any time the day of your arrest?

2    A.       No, no.  No, ma'am.

3    Q.       Did this man who tried to help you, as you testified,

4    at any time grab you around your waist, like he testified

5    yesterday, any time during your arrest?

6    A.       To be honest, I was unconscious when I was on the

7    floor.  He helped me.  I mean he tried to help me.  He tried

8    to get him off of me.  I don't remember saying that -- he

9    tried to -- he tried to help me.  He tried to get him off of

10   me.  He didn't try to harm me.

11   Q.       I'm sorry.  I didn't hear that last part.

12   A.       No, he didn't try to harm me.

13   Q.       All right.  So you were here obviously throughout all

14   of yesterday; correct?

15   A.       Excuse me?

16   Q.       You were here yesterday; correct?

17   A.       Yes.

18   Q.       And you heard the gentleman testify yesterday;

19   correct?

20   A.       Yes.

21   Q.       Now, what about Deputy U.S. Marshal Doug Denney, the

22   gentleman back in the third row -- excuse me -- third

23   individual in the last row.  Also, you heard testimony he

24   came from the back?

25   A.       Right.

Lora-Pena - cross

1    Q.    He didn't hurt you either.  That's your testimony;

2    correct?  I'm sorry, sir.

3    A.    No.

4    Q.    He didn't hurt you either.  He also tried to help

5    you; correct?

6    A.    Not him.

7    Q.    He didn't try to help you, just the U.S. Marshal, the

8    African-American gentleman?

9    A.    Yes.

10   Q.    All right.  Now, you testified that -- strike that.

11   You said at some point you heard a gun shot; is that

12   correct?

13   A.    Correct.

14   Q.    And what went through your mind is what you told

15   Mr. Peruto and the jury that maybe a dog was going to be

16   shot or had been shot; is that correct?

17   A.    They were crying.  I heard the gunshot.

18   Q.    I didn't hear you.

19   A.    I heard the gunshot.  I heard a dog cry.  That's what

20   I heard.

21   Q.    So I want to make sure I heard your testimony.  Are

22   you saying that you heard the gunshot and then you heard the

23   dog cry?

24   A.    I heard the gunshot, then the dog.  When I heard the

25   gunshot, I heard the dog cry.  I thought he shot the dog.

Nora - Pena    Cross

1    Q.    Okay.  Gunshot, the dog cry.  Where were your dogs?

2    You have two pit bulls; correct?

3    A.    I was -- I don't remember where the dogs are at.

4    Q.    Okay.  You don't know where the dogs were at the time

5    you heard the shot?

6    A.    No.  No.

7    Q.    You were, however, somewhere in maybe the front

8    hallway area?  Did I get that right?

9    A.    The hallway?  No.  I was in between the hall, the

10    door -- the outside door and the living room.

11    Q.    All right.  So in the living room/front hallway area,

12    that area?

13    A.    Right.

14    Q.    Okay.  And it's fair to say then that if you didn't

15    see the dogs -- I'm sorry.  It's fair to say you didn't see

16    the dogs running around that area at the time you heard the

17    shot; is that correct?

18    A.    No.

19    Q.    Is it correct that you -- let me ask it a different

20    way.  Did you see the dog running around the area where you

21    were at the time that you heard the shot?

22    A.    No.

23    Q.    Okay.  Ever take boxing lessons?  Have you ever taken

24    boxing lessons?

25    A.    Yes.

Lora-Pena - cross

1    Q.    When?

2    A.    Excuse me?

3    Q.    When?

4    A.    Last year.  It was on and off.

5    Q.    On and off.  Why did you take them?

6    A.    I have no friends.

7    Q.    Trying to get in shape?  Were you in shape?

8    A.    No.  I didn't have no friends.  I had nobody, so I

9    wanted something to do.

10   Q.    So you decided to take some boxing lessons?

11   A.    Yes.

12   Q.    And go boxing a little bit?

13   A.    Yes.

14   Q.    That was before your arrest; right?

15   A.    Yes.

16         MS. BYRD:  May I have a moment?

17         THE COURT:  Yes.

18         (Pause.)

19         MS. BYRD:  Thank you, sir.  I have nothing

20   further.

21         THE COURT:  Your redirect, Mr. Peruto.

22         MR. PERUTO:  Thank you.

23         I have no questions.

24         THE COURT:  All right.  Mr. Lora-Pena, you may

25   step down, sir.

1              Do you have any other witnesses or evidence,

2    Mr. Peruto?

3              MR. PERUTO:  No, sir.  The defense would rest.

4              THE COURT:  All right.  Any rebuttal, ma'am?

5              MS. BYRD:  Your Honor, no.

6              THE COURT:  All right.  Then that concludes the

7    taking of evidence.

8              I will see counsel at side bar for just a

9    moment.

10             (Conference held at side bar out of presence of

11   jury.)

12             THE COURT:  I assume you are prepared to proceed

13   to closing argument.

14             MS. BYRD:  Are we going to go straight to

15   closing and have both the Government and the defense do

16   their close?

17             THE COURT:  That's my anticipation.  How long do

18   you expect to be?

19             MS. BYRD:  Give me a half hour, Your Honor.

20   Give me a half hour.

21             I need to request, unfortunately --

22             THE COURT:  Personal comfort break.

23             MS. BYRD:  Yes.

24             THE COURT:  Got you.  Okay.  I'll give the jury

25   five, maybe ten.  But that is how we'll work it; all right?

1    (Conference at side bar ends.  Proceedings

2    continue in open court.)

3            THE COURT:  All right.  Ladies and gentlemen, at

4    this juncture, we'll take a short break, give counsel a

5    chance to get the exhibits and things together, and then

6    we'll return the courtroom and you will hear the closing

7    arguments from counsel, summing up their view of the

8    evidence on your behalf.  When they're finished with that,

9    it will be, depending on the hour, I will most likely go

10   ahead and instruct you on the law.

11           While you are on this break, I'm going to have

12   the courtroom deputy speak to you about lunch plans.  After

13   I have instructed you on the law, the case will be yours to

14   deliberate on.  So we'll go ahead and take a recess now for

15   about five minutes, maybe ten; okay?

16           (Jury left courtroom.)

17           THE COURT:  Thanks.  We'll go ahead and stand in

18   recess.

19           MS. BYRD:  I'm sorry, Your Honor.  There is a

20   matter with regard to the jury instruction.

21           THE COURT:  All right.  Please be seated.

22           MS. BYRD:  Your Honor, when the jury

23   instructions were submitted, they were submitted reserving

24   the opportunity to amend in conformity with the evidence.

25   In particular, the Government did supply the defense with

1    a lawful self-defense jury instruction, reserved based on

2    the testimony at trial.  Under the law, as has been

3    acknowledged by both parties, the defendant is not entitled

4    to a self-defense instruction or is only entitled to a

5    self-defense instruction if there is some evidence that

6    he did not know that the individuals who are victims of

7    the assault or alleged victims of the assault were law

8    enforcement officers.  If he knew that they were law

9    enforcement officers, he doesn't have to know they were

10   federal but law enforcement officers, then he is not

11   entitled to an instruction on lawful self-defense.  That is

12   one critical element, and he is not entitled if that element

13   is not met.

14            Here, although we are waiting to see whether

15   in fact the defense was in fact conceding, as Mr. Peruto

16   said in his opening, it is now been established from the

17   defendant's testimony, and there is no contest apparently,

18   that he knew the individuals who were allegedly assaulted in

19   this case were law enforcement officers.

20            MR. PERUTO:  Judge, if I could interrupt.  I

21   don't want it any way.  If we could just talk for two

22   seconds?

23            MS. BYRD:  Well, it was in there.  It's in the

24   instructions that have been approved by both parties so I

25   assumed you wanted it.

1          MR. PERUTO:  I don't want it.

2          MS. BYRD:  Well, good.  We're done.

3          MR. PERUTO:  Let me ask if there is anything

4     else so we can save time.

5          MS. BYRD:  That's it.  I don't.

6          THE COURT:  All right.  It's out.  Thanks very

7     much.  We'll take a break.  Let's be back in five minutes.

8               (Brief recess taken.)

9          THE COURT:  Thanks.  Please be seated.  You

10    should have final copies of the jury instructions with you.

11              (Jury returned.)

12         THE COURT:  Thanks.  Please be seated.  We're

13    prepared to proceed at this point with closing argument.

14              Ms. Byrd.

15         MS. BYRD:  May it please the Court, counsel,

16    ladies and gentlemen of the jury, it's still good morning.

17              A fugitive on the run for a decade.  A fugitive

18    who fled from New England, ran to New York, ran to Florida,

19    before settling in the State of Delaware on a residential

20    street in Newark.  A fugitive who had an alias, an assumed

21    identity, an identity he used to conceal his whereabouts

22    from authorities, to continue to be a fugitive, to protect

23    the freedom that he loved.  That fugitive, ladies and

24    gentlemen, was the defendant, Nelson Lora-Pena.

25              You have heard that the defendant is charged

1    with four counts of one crime:   forceable assault or

2    resistance of a federal officer while that officer

3    was engaged in the performance of his duties.

4              And yesterday, ladies and gentlemen, I stood

5    before you and I told you this case was about determination.

6    And, indeed, I am here now to submit that that is what the

7    evidence has proven.   This case was indeed about

8    determination.   The determination of one man, the defendant,

9    to protect the freedom that he had grown to love over the

10   course of a decade, bouncing up and down the East Coast

11   before landing in Delaware.   The freedom that he would do

12   anything and everything to continue to protect.

13             But, ladies and gentlemen, the evidence has

14   also shown that this case is about something else in

15   addition to the determination of the defendant.   It's also

16   about restraint.   Restraint.   The restraint shown by the

17   federal law enforcement officers who came to effect the

18   lawful arrest of the fugitive.   The restraint they showed in

19   conducting themselves in making that arrest.

20             And so throughout the closings, ladies and

21   gentlemen, I ask you to consider the two prevailing

22   recurring themes in the evidence:   The determination of

23   the defendant fugitive to continue to be on the run and the

24   restraint of the officers who are attempting to bring that

25   decade of flight to a lawful end.

1              Now, ladies and gentlemen, Judge Jordan is going

2    to tell you that there are elements of the crimes that the

3    defendant is charged with.  Elements are simply things that

4    the Government has to prove and prove beyond a reasonable

5    doubt.  Now, I told you that the defendant is in fact

6    charged with one crime, four counts of that crime, one for

7    each of the federal law enforcement officers whom he either

8    assaulted, resisted, or otherwise impeded:  United States

9    Marshal for the District of Delaware, David Thomas;

10   Supervisor Deputy United States Marshal, Robert Denney;

11   Deputy United States Marshal Jack Leo; and Deputy United

12   States Marshal William David.  One count for each of those

13   individuals.  And there are elements to those crimes.  And

14   I'm going to summarize those elements for you.

15             Now, if anything I say differs from what Judge

16   Jordan says later, what Judge Jordan tells you is the law.

17   But I anticipate he will tell you that the elements of the

18   crime are as follows.  And they're pretty straightforward.

19             That, first:  Each of these individuals was,

20   at the time of the assault or the resistance, a federal

21   officer.

22             And Judge Jordan will instruct you, I

23   anticipate, that both a United States Marshal and a Deputy

24   United States Marshal is indeed a federal officer within the

25   meaning of that term.

1          And you know, ladies and gentlemen, from the

2     testimony of the officers in this case that indeed they were

3     each either the U.S. Marshal for this District or Deputy

4     U.S. Marshal.  And you know something else.  You know that

5     at the time of April 9th of 2005, at the time of the

6     defendant's arrest, they weren't just there on a personal

7     frolic, they weren't there to drive by on a Saturday

8     afternoon, but they were there to arrest the defendant

9     pursuant to a federal arrest warrant.

10         Judge Jordan will tell you -- first element --

11    that each of the individuals was a federal officer.  And you

12    know the evidence has shown that indeed each was.

13         The second element.  That at the time of the

14    events that are charged in the Indictment, the events which

15    we will discuss in a moment, that each of the individuals

16    that I mentioned was in fact engaged in the performance of

17    his duties.  And that simply means that he was there to do

18    what he was charged to do, within the nature of his federal

19    employment.

20         And you know from the evidence, ladies and

21    gentlemen, that once again that each of the individuals,

22    Marshal Thomas and Deputies David, Denney and Leo, were each

23    at 4 Dunbar Road in Newark, Delaware to effect a federal

24    arrest warrant of that man, the defendant, Nelson Lora-Pena.

25         You know that Deputy Leo and Deputy David serve

1    on the U.S. Marshal Service's Fugitive Task Force.  That

2    Deputy Leo spends 100 percent of his time and Deputy David a

3    majority of this time working with that task force and they

4    are charged with effecting the arrests of federal, state and

5    local fugitives just like the defendant.  You also know that

6    Supervisory Deputy U.S. Marshal Robert Denney supervises the

7    function of that task force, as does Marshal Thomas,

8    himself.

9              Therefore, ladies and gentlemen, you know from

10   the evidence, the evidence has proven the second element

11   that the Government must show, that each of those gentlemen

12   was engaged in the performance of his official duties at the

13   time of the event on April 9th of 2005.

14             Judge Jordan will tell you, the third element, I

15   anticipate he will say, is that with respect to the four

16   individuals, the defendant forcibly assaulted or resisted or

17   impeded those officers in the course of their duties.

18             Fourth element.  That the defendant, in doing

19   so, in acting, acted intentionally.  And that simply means,

20   ladies and gentlemen, that he did not do so by accident or

21   mistake.  And,

22             Finally, ladies and gentlemen, with regard to

23   Deputies David and Denney, the Government has to show that

24   the defendant used a dangerous weapon.

25             With regard to Deputy Leo, the Government must

1  show that the defendant inflicted bodily injury during the

2  course of the assault or resistance.  And Judge Jordan will

3  instruct you as to that element.

4         So let's talk about what you know from the

5  evidence over the course of the last day and-a-half or so.

6  Let's go back.  Let's go back to April 9th of 2005.

7         You know that about 2:30-or-so in the afternoon,

8  Deputy David went to the residence at 4 Dunbar Road in

9  Newark, Delaware in search of the defendant and in fact saw

10  the defendant coming out of the residence, a single family

11  ranch home, one floor, fenced-in backyard and upon seeing

12  the defendant, Deputy David radioed to other officers,

13  including the other U.S. marshals and other state and local

14  authorities who came to the house to effect the arrest

15  warrant and they positioned themselves in different areas

16  around the house.

17         You know from the evidence that Deputies David

18  and Leo positioned themselves in the front of the house and

19  that Marshal Thomas and Deputy Denney positioned themselves

20  to the right rear of the house, outside of the right

21  fenced-in portion of the backyard, near, as you know now,

22  the sliding glass door that permitted exit into the

23  backyard.

24         And you know that as Deputy Leo and Deputy David

25  approached the front door of the residence, they're able to

1    see inside because although the front storm door was closed,

2    it was glass, the interior door was open and therefore they

3    could see into the hallway.  And what did they see?  You

4    know that they saw the defendant coming out of a rear

5    hallway, turning the corner and walking toward the front

6    hallway, front door area.

7           And what happened when they saw each other?

8    Their eyes met for a moment.  And you know from the

9    testimony that Deputy David identified himself as "police,

10    let me see your hands."  He said that because the defendant

11    had a towel in his hands.

12           You know that all of the marshals that day were

13    outfitted in a navy blue bulletproof vest that said on the

14    front "police" in large white letters.  That said, on an

15    insignia on the shoulder, "U.S. Marshal Service."  That on

16    the rear of that vest, again in large white letters,

17    "police."  And under that, "U.S. Marshal."  They were all

18    wearing that.

19           And Deputy David announced "police, let me see

20    your hands."  And you know that initially this defendant,

21    the fugitive was initially compliant.  He did raise his

22    hands in a manner that you might be familiar with from TV.

23    And he did initially comply.  And then he initially complied

24    again when Deputy David instructed him to come toward the

25    door.

1          But, ladies and gentlemen, what you know from

2     the evidence is that is the absolute last time during the

3     course of the day that the defendant complied with the

4     orders of these Federal Marshals who were there to arrest

5     him.  The last time.

6          Ask yourselves, might the defendant have just

7     have been just a little surprised?  I mean after all, ladies

8     and gentlemen, he had been on the run successfully not for

9     one year, for four years or eight years but for a decade.

10    He was in the state far away from the scene of his escape.

11    He was down in Delaware.  He had been at this residence we

12    don't know how long.  But he was comfortable enough to walk

13    around.

14         Might he have been a little surprised?  Might he

15    have been a little surprised and needed a little time to

16    think about a plan?  And what must have been going through

17    his head?  "The jig is up."  After all of this time?  For a

18    man who loves freedom, the jig is up.  Might that have been

19    going through his head as he was approaching the door,

20    approaching the door?

21         And then what happened, ladies and gentlemen?

22    We know what happened.  We know that the defendant's two

23    barking, snarling, snapping, growling and ferocious, as

24    we've heard the word many times in this courtroom, pit

25    bulls join his side, either side of the defendant, as he

1    approached the door.

2            And we know that they were acting in such a

3    frenzied manner that it caused the two fully armed, fully

4    trained deputies U.S. Marshal in the front, one with a

5    semiautomatic rifle, to be fearful for their safety, so

6    fearful in fact they did not open the door.  Instead, Deputy

7    David told you he instructed, he commanded in a loud voice,

8    "control your dog."

9            And maybe then, ladies and gentlemen, ask

10   yourselves, is that when the light bulb went off?  Is that

11   when the light bulb went off in the defendant head?  The

12   jig might not be up.  Because now you have two snarling pit

13   bulls.  They weren't attacking the defendant; clearly under

14   his control.  But might they be used to attack these

15   marshals and facilitate that fugitive's escape so he can

16   perpetuate his run for yet another decade?

17           And how do you know that was going through the

18   defendant's mind?  Well, consider what he did, ladies and

19   gentlemen.  Instead of controlling his dogs as he had been

20   ordered to do, he looked dead at Deputy David, made eye

21   contact with him, looked at him, looked down at the dogs,

22   looked back at the deputy and, bingo, pushed open the door

23   while simultaneously pivoting to run back.  Push, pivot,

24   run.

25           What a great idea.  One last stand with these

1    two ferocious pit bulls.  And in fact, ladies and gentlemen,

2    it almost worked.  The defendant attempted to unleash these

3    pit bulls and it almost worked because one was coming right

4    out through that door.  They were already in a frenzy, ready

5    for an attack.  You know that from the description of their

6    demeanor, from the description of their action.  And you

7    know one made it far enough out the door to have its face in

8    the door when Deputy David was able to kick the door, catch

9    the dog in the face and push it backwards, thus securing the

10   door.

11            But not only did they secure the dog, it also

12   allowed the defendant to flee.  And where did he go?  We

13   know he ran back, outside the sliding backdoor.  And you

14   know that the deputies out front were fearful because they

15   didn't go in.  I mean you heard them asked by both myself

16   and Mr. Peruto.  They're armed.  They're at the front door.

17            This fugitive has now tried to unleash these

18   dogs.  He is now escaping.  Who knows where he is going.  He

19   could be going for a weapon.  What must have been going

20   through these deputies minds?  He might be going for a

21   weapon, yet they don't enter?  Well, you know why they

22   didn't enter.  Because those dogs were so frenzied, they

23   feared for their safety, and they didn't enter because

24   they also knew there were people covering the rear of the

25   residence.

```
 1              What happened then, ladies and gentlemen?  Well,
 2     we know the defendant ran to the back.  The defendant, you
 3     might infer from his actions, didn't know there was anyone
 4     back there.  He thought that he had made good on his escape
 5     like he did a decade ago, except that he was wrong.  Because
 6     when he ran out through the sliding glass door -- and he
 7     ran.  You heard testimony repeatedly that he ran, he got so
 8     far, he was eight-to-ten feet outside and lo and behold the
 9     jig is up again.  Because this time, you have Marshal Thomas
10     and Deputy Denney.  And they jump over the fence and they
11     again are outfitted with the police vests.  "Stop.  Police.
12     Stop."  He is commanded again.
13              And he stops.  And remember what Marshal Thomas
14     said about the defendant's expression?  It was like deer in
15     the headlights.  Imagine how he must have felt.  Here he
16     thought he had one more chance by unleashing those pit
17     bulls.  Here he thought he was the luckiest guy on the
18     planet and he runs outside only to be confronted by two more
19     federal marshals.  "Deer in the headlights."
20              But it didn't take that long for that deer to
21     jump back and keep on going.  And that is exactly what he
22     did, ladies and gentlemen.  He ran back into the house.  But
23     this time he left the door open.  And what happened?  One of
24     those pit bulls stayed in the front, as you know from the
25     testimony of Deputy David.  But the other came charging at
```

1    the backdoor.  And so Marshal Thomas and Deputy Denney could

2    not enter, just like their colleagues in the front.

3    Instead, Marshal Thomas had to close that backdoor.

4         And you heard about that dog's demeanor.   It

5    hadn't changed.  These dogs didn't change for the entire

6    time.  They were frenzied.  They lunged at the door, they

7    snapped, they barked, they bared their teeth, they snarled.

8    And for a few more moments, ladies and gentlemen, the

9    defendant was still a free man.

10         Because you know that no one entered the house

11    at that point.  You know that the defendant was still free

12    to run around.  And run, did he.  You know he ran back from

13    the kitchen area, back through the living room, through the

14    front hall, into the back hall, into the back bedroom and

15    attempted to go out the back window.

16         This is a man whose determination you might

17    conclude was unparalleled to anyone's.  Because he attempts

18    to go out the back window, only to be foiled again by a

19    state trooper who was out there at the ready, who attempts

20    to grab on to the defendant as he got his head and part of

21    his torso out.  But the defendant, in his determination, in

22    his love of his freedom, was able yet again to escape by

23    turning away and went back into the house.

24         Now, at this point he has a problem, ladies and

25    gentlemen.  Because there is only three ways to get out.

1    There is three ways to get out and he has used those three

2    ways.  And he has been foiled at each turn.

3              And so what does he do?  What might have been

4    going through his head at that point?  Gee, I tried the

5    front door.  That didn't work.  Tried the backdoor, almost

6    made it, hmm, didn't.  I tried the back window, got there.

7    What am I going to do?  What am I going to do?

8              So what does he do?  He runs into the back

9    hallway, front hallway, living room and kitchen.  And he

10   stops because he sees that the Marshal and Deputy Denney

11   were still there.  And he has a few minutes or a few moments

12   to think about what to do.  And we know that, ladies and

13   gentlemen, from Deputy Denney's testimony.

14             The defendant stops.  He stopped in the kitchen

15   area.  He sees the marshals, they see him, and he puts up

16   his hands in kind of a questioning way.  And he must have

17   been breathing.  And thinking about what he is thinking.

18   "What do you want," he says?  "What do you want?"  "What do

19   you want?"  And what is he told?  "Police.  Stop.  Give up.

20   Police."

21             The defendant stands there perhaps a moment to

22   take a break.  And so Deputy Denney begins to open the door,

23   begins to come in, take the step, takes another step.  The

24   defendant looks like he is going to be compliant finally.

25   Finally, the jig is really up, but it's not because he takes

1    off again.  This time, however, the marshals are finally

2    able to enter the residence because at least momentarily the

3    dogs don't appear to be around.

4              And we know the defendant then ran back from the

5    kitchen to the living room, to the back hallway.  But this

6    time, finally, finally, the marshals enter.  We know that

7    Deputy Denney went in.  He pursued the defendant, followed

8    by Marshal Thomas.  But they were being pursued as well

9    because those two pit bulls the defendant had unleashed were

10   chasing after the Marshal and Deputy Denney.  And it was at

11   that point, ladies and gentlemen, when Deputy David and

12   Deputy Leo saw their colleagues lives were potentially in

13   danger, from seeing these dogs chase after them, that's when

14   they went in as well.

15             And we know what the defendant did.  We know

16   that when he got to the end of the hallway, he was seized

17   by Deputy Denney.  Did he submit?  You know he didn't.

18   Instead, you know that Deputy Denney tried to pin him

19   against the door, was unable to do so because the door swung

20   in, opened into the bedroom, causing the two of them to

21   fall.

22             Did the defendant submit?  No, he did not.  You

23   know from Deputy Denney's testimony that Deputy Denney

24   tried to gain control of the defendant.  The defendant was

25   struggling.  He was moving his arms.  He was pushing, he was

1   pulling, such that Deputy Denney and the defendant began to

2   come back out of the bedroom, back into the hallway.

3              Imagine what the defendant must have been doing,

4   pushing, turning, twisting, trying to get around, trying to

5   move.  This is a man who loves freedom.  This is a man who

6   has four, at this point, armed U.S. Marshals in the house,

7   U.S. Marshals on their back, guns, rifles and he is still

8   twisting, turning, trying to get away, a man who is

9   determined.

10             What happens at that point, ladies and

11   gentlemen?  We know the defendant is aided by his dogs.

12   What a good idea that was.  What a good idea he had.  What

13   a brilliant plan.  He is home alone but he has got two

14   ferocious pit bulls.  And they came to his aid yet again,

15   did they not, ladies and gentlemen?  Because in the hallway,

16   as Deputy David was going to aid his colleague who was

17   twisting and turning with the defendant, Deputy David was

18   confronted by one of the pit bulls who lunged at him.

19   Lunged at him so that it forced Deputy David to go back into

20   the back bedroom with that back window.  Forced him to go in

21   there.

22             And do you recall the term that Deputy David

23   used?  He said it was a standoff.  The dog was in the

24   doorway snarling, bearing its teeth, acting as if it were

25   about to attack again and Deputy David was forced to draw

1    his gun.

2    And let's talk about -- we talked about

3    determination.  Let's talk about restraint.  You may have

4    heard them, the deputies and the marshal asked many times

5    "you were armed.  You had a what kind of rifle?  You had how

6    many guns?  But you didn't shoot the dog.  Why didn't you

7    shoot the dog?  Why didn't you shoot the dog?  Why didn't

8    you shoot the dog?"  Well, ladies and gentlemen, think about

9    the restraint it must have taken not to shoot the dog, not

10    to shoot the defendant, not to shoot anyone, the restraint

11    it must have taken.

12    And we know why.  Because it was safety first.

13    This is a small one-story residence.  There were numerous

14    people inside.  There were numerous people outside.  The

15    rifle that Deputy Leo had, he testified, was powerful.  This

16    is a small, enclosed place.  And the deputies wanted to make

17    sure, absolutely sure that it was absolutely necessary

18    before they discharged their guns.  Instead, they stood in

19    a standoff.

20    And while the pit bull had Deputy David in a

21    standoff in the bedroom, we know that the other pit bull was

22    going after Deputy Denney.  We know that it went at his

23    feet.  At one point, it appeared it may be grabbing his pant

24    leg.  And once again, the defendant was lucky because Deputy

25    Denney had to let go and the defendant was able to charge on

1    down the hall.  Unfortunately, Deputy Denney and Deputy

2    David weren't able to follow him because they had to deal

3    with the defendant's confederates, his pit bulls, both of

4    which had the deputy cornered in other words.

5              Now, we know that these dogs were so in a

6    frenzy.  We know that from the testimony about what they

7    were doing with the officers.  But consider, consider what

8    they did to each other.  Consider what happened.  You heard

9    that Deputy Denney kicked the pit bull from around its feet.

10   The dog necessarily backed up.  But when that happened, the

11   two pit bulls, worked up into a frenzy, attacked each other.

12   And not just that playful stuff that all of us have seen

13   with our pets as we have them but they actually viciously

14   attacked each other.  They bit, they scratched, they pulled.

15   And in fact, Deputy Denney told you that at one point while

16   they were in the back hallway, the two dogs locked jaws.

17             Imagine how frenzied these dogs must have been,

18   having been let loose by the defendant and running around

19   the house, all the agitation.  Imagine how frenzied they

20   must have been to turn to each other at a point where a

21   they're not just biting and taking skin and flesh but

22   locking jaws.  And it was only then, ladies and gentlemen,

23   that Deputy Denney and David were able to finally secure the

24   dog in the back bedroom and close the door.

25             We know then, ladies and gentlemen, while

1    they were being occupied by the defendant's pit bulls, the

2    defendant again had a brief moment of freedom.  He had a

3    brief moment as he was charging down the hall, breath,

4    breath, breath, charge, charge, until he hit Deputy Leo.

5    Deputy Leo, big guy, in the hallway.

6              He testified that the defendant couldn't get

7    out of the hallway without going through him.  You've seen

8    Deputy Leo.  You saw the hallway.  You can envision how that

9    might very well the case.  So the defendant who was running

10   certainly knew that was the case and that is why he ran.  He

11   charged, Deputy Leo told you.  He charged at the deputy.

12             Now, Deputy Leo, unlike the other officers, had

13   a rifle.  You got to see the rifle.  It's a big gun.  Deputy

14   Leo has been trained to use that gun.  Deputy Leo exercised

15   enormous restraint in continuing to hold the gun down,

16   pointing toward the ground.  He demonstrated to you, when

17   Mr. Peruto was asking him the question how he held the gun,

18   how he had his trigger finger, how he was steadying the gun

19   and how he was trained to and in fact did control that gun.

20             And the defendant took that opportunity.

21   Because when he charged Deputy Leo, the defendant began

22   to grab at the gun.  And the two of them struggled.  They

23   struggled to the fact, point where they inched and inched

24   and inched down the hall.  It wasn't just a straight run but

25   back, and then back some more, and then back some more, and