# Exhibit 2
# Part 2

1   back some more.

2           And imagine that, Deputy Leo being pushed

3   backwards, backwards, backwards; the defendant pushing,

4   pulling, struggling, trying to get that gun, digging his

5   nails in, causing the deputy pain, as you heard him testify.

6           Deputy Leo, he told you candidly.  Evaluate his

7   credibility.  Evaluate his demeanor.  He looked at you and

8   said yes, he absolutely did defend himself and protect that

9   gun.  And, yes, he did headbutt the defendant multiple

10  times.  Yes, he did punch the defendant with his one free

11  arm.  He only had one free arm.  He only had his left arm

12  because his right arm was holding the gun.  And he used his

13  left arm.

14          And imagine that restraint.  He didn't grab some

15  object as they passed by and hit the defendant with it, beat

16  him with a club, beat him with a stick.  He didn't try to

17  use the gun and swing it up into the defendant's chin.  He

18  used the one thing he had, the two things he had:  his own

19  head and his fist, with this man trying to disarm him of a

20  rifle while they were struggling.

21          And this went on, ladies and gentlemen, and on

22  and on and inched back farther and farther until they banged

23  into the wall.  And Deputy Leo told you about that and he

24  said they he didn't know which one hit the wall.  He is not

25  sure which way it went.  They both ran into the wall.  He

1    had sheet rock on him, the defendant may have had sheet rock

2    on him as well, they both went into the wall with such

3    force.

4              You got to see the picture.  You got to see the

5    picture of how they hit the wall and the indentation and

6    break that it caused.  And you can imagine, imagine the

7    struggle, imagine the defendant's determination, that

8    resulted in him being able to drive a man that is absolutely

9    bigger and taller than he is into that wall.

10             Did the defendant submit at that point?  He did

11   not.  He continued to go on and on, determined, determined

12   to get his beloved freedom.  And what did he do?  After

13   bouncing off the wall, Deputy Leo and the defendant began

14   to enter into the front hallway, into the living room area.

15   The defendant continued to pull at the gun, scratching the

16   marshal.  You got to see --

17             And, ladies and gentlemen, let me just say right

18   now, perhaps the restraint that was showed by these marshals

19   resulted in the fact that they didn't have any massive

20   injuries.  And no one is saying that a scratch on the hand,

21   two scratches, indentations of nails is a major injury.  No

22   one is saying that.  You haven't heard Deputy Leo say that.

23   You haven't heard anybody else say it.  But it is an injury

24   and it was caused in a way that caused a gun to discharge.

25   Because you know and you heard that while Deputy Leo and the

1    defendant were in the hallway, or living room area and the

2    defendant kept pulling on the gun, not submitting, pulling

3    on the gun, scratching and digging his nails in, that his

4    hand slipped and the gun discharged.

5         Now, the gun didn't just discharge into the

6    floor.  The gun didn't discharge into the ceiling.  The gun

7    discharged such that it went through the front door and on

8    to the concrete outside, fragmenting.  It went through the

9    front door, in the front hallway, and outside.  You got to

10    see pictures of the entry and the exit.  You will get to

11    seem them again, should you wish, during your deliberations.

12         And imagine, ladies and gentlemen, the restraint

13    that was showed by Deputy Leo in being able to control that

14    gun such, so much so that it only went into the ground as

15    opposed to somewhere else on this residential street.

16         Did the defendant submit then, ladies and

17    gentlemen?  He did not.  Because after, even after the shot

18    was fired, thus alerting Deputy Denney and David in the back

19    to come and help their colleague, the defendant continued to

20    struggle.  And it took five officers to get him to finally

21    submit.

22         It took Marshal Thomas, who testified to you

23    that he, at one point, grabbed the defendant around -- he

24    went low.  He called it going low -- went low and grabbed

25    around his lower section.  At one point, tried to pin him

1   with an elbow.  Another point, was standing on his legs.

2   Imagine that, ladies and gentlemen.

3           Now, Marshal Thomas isn't a small guy either.

4   Imagine having him on your legs.  Would that make you stop

5   twisting and turning?  Imagine having Marshal Thomas on your

6   legs, having Deputy Denney try to get your left arm, having

7   Deputy Leo trying to get your right arm and having, --

8   sorry -- Deputy David having your left arm, Deputy Leo with

9   the right arm and Deputy Denney going out to get leg chains.

10          Might you stop struggling then?  Did the

11  defendant submit?  He did not.  Because it took five of them

12  to finally pull his arms out from under him.  And imagine

13  what they must have been thinking.  Does this guy have a

14  gun?  Does he have another weapon?  Has he been able to grab

15  something?  Has he been able to grab some of the sheet rock

16  that broke?  What is he holding under there?  Why won't he

17  give them his arms?

18          Well, why wouldn't he give them his arms is

19  because he loves freedom.  Even to the bitter end he fought.

20  And it wasn't until they put him in handcuffs behind his

21  back, in leg irons, and a waist-chain.  Imagine how chained

22  up this man was, that he finally stopped.  Finally.

23          Ladies and gentlemen, we know that once the

24  marshals were able to do what they came there to do at 2:30

25  in the afternoon, the defendant's jig was finally up.  And

1  he admitted that the jig was up.

2        And he did confess, ladies and gentlemen, as I

3  said the evidence will show when I said this in my opening

4  statement.  Because we know he went to the hospital.  We

5  know he went to the hospital because he was injured.  He had

6  injuries.  You saw the picture.  He absolutely had injuries

7  to his face inflicted by Deputy Leo when the defendant was

8  trying to disarm him.  And they went to the hospital.  And

9  in the room with the defendant was Deputy David.  And the

10  defendant started talking.

11        And remember Deputy David said, when I asked for

12  him to describe the defendant's demeanor, as nonchalant.

13  Nonchalant.  Imagine that, nonchalant.  Why might that have

14  been?  Might that have been the demeanor of a person who is

15  finally resigned to what has happened?  I mean he fought.

16  He fought and fought and fought and fought.  I mean he took

17  on the law, as the song said, and he lost and now he was

18  resigned to the fact that he was finally in custody again

19  after a decade.  And he was nonchalant.

20        And what did he say?  He said "I was on the run

21  10 years."  "I had to give it a shot."  "I had to give it a

22  shot."

23        Now, Mr. Peruto may say, well, that is not a

24  confession.  Well, ladies and gentlemen, if that's not a

25  confession, well, then what is it?  "I had to give it a

1    shot." Give what a shot? What is it that he did for which

2    he apologized for -- you heard that testimony -- and then

3    said "I had to give it a shot." "After all, I've been on

4    the run for 10 years."

5        The "it," ladies and gentlemen, was the fact he

6    tried to escape, as Deputy David testified. And he didn't

7    just flee. He tried to escape by forcibly resisting arrest

8    and forcibly assaulting Deputy Leo. That is the "it,"

9    ladies and gentlemen.

10       And when the jig was up, the defendant, the

11   nonchalant fugitive no longer, said and acknowledged that he

12   had to give it a shot. But oh, well, it's destiny. He said

13   that, lucky for them, they got there just then because he

14   was about to get in the shower and go in New York and once

15   he heard they were at his house, he would never come back.

16       That is how determined he was. He told them he

17   would never come back. How lucky they were. He wondered

18   how they found them. This is a man who loved life. This is

19   a man who loved freedom. But his freedom was taken away and

20   he recognized that and he admitted what he had done.

21       Ladies and gentlemen, the evidence has proven

22   the defendant did in fact forceable assault Deputy U.S.

23   Marshal Jack Leo. He ran into him. He charged him. He dug

24   his nails into Deputy Leo's hands. He caused Deputy Leo

25   pain. He caused the two of them to go slamming into a wall.

1    He continued to struggle on the ground, to flail.

2         You heard the testimony of Marshal Thomas that

3    as the defendant was flailing, his arms were hitting the

4    various people, including Deputy Leo, who were holding him.

5    The evidence, ladies and gentlemen, has proven the defendant

6    forceable assaulted Deputy Leo.

7         The last element with regard to Deputy Leo's

8    count, and that is Count I of the indictment, is that --

9    and Judge Jordan I anticipate will instruct you -- that the

10   defendant inflicted bodily injury to Deputy Leo.  Now, Judge

11   Jordan is going to tell you what that means, what "bodily

12   injury" means.

13        I anticipate he is going to tell you that to

14   inflict "bodily injury" means any injury, including a cut,

15   an abrasion, or a bruise.  Any physical pain.  An injury

16   includes any physical pain, or any other injury to the body,

17   no matter how temporary.

18        Well, ladies and gentlemen, as to that fifth

19   element, the evidence has proven just that.  You got to see

20   the pictures of Deputy Leo's hands where the defendant dug

21   in his nail, any cut, any abrasion, any bruise, any physical

22   pain.  You know he experienced pain, as you very well might

23   experience pain, when the defendant, himself in a frenzy, is

24   digging his nails into your hand to try to disarm you.

25        The evidence has proven the defendant in fact

1    forcibly assaulted Deputy U.S. Marshal Jack Leo, inflicting

2    bodily injury, Count I of the Indictment, and therefore is

3    guilty of that count.

4         In the same manner, ladies and gentlemen, the

5    evidence has proven that the defendant forceable assaulted

6    or resisted or impeded Deputies U.S. Marshal Denney and

7    David.

8         Now, we know assault.  And, resist or impede.

9    Resist, I anticipate Judge Jordan will tell you, means to

10   obstruct or oppose.  To interfere, I anticipate Judge Jordan

11   will tell you, means to obstruct or hinder.

12        Ladies and gentlemen, can there be any doubt

13   in your mind that the defendant in fact forcibly resisted

14   Deputies U.S. Marshal Denney and David?  Running throughout

15   the house.  He first unleashed pit bulls on them -- excuse

16   me -- on Deputy David.  He ran throughout the house.  When

17   Deputy Denney tried to subdue him, the defendant twisted and

18   turned.

19        Resist, obstruct or oppose?  Of course he was

20   obstructing, of course he was opposing, of course he was

21   hindering.  He didn't want to be taken into custody.  And he

22   did so by moving his body, by doing so in a physical,

23   forcible way.

24        When Deputy David tried to assist in finally

25   subduing the defendant, Deputy David tried to grab his arm,

1    the defendant again, flailing his legs, wouldn't allow the

2    deputy initially to grab his arm, again using his body,

3    using force, using physicality to obstruct, to hinder, to

4    oppose, to resist arrest.

5         So, ladies and gentlemen, that element of the

6    crime with regard to Counts II and III, Deputies U.S.

7    Marshal Denney and David has been proven by the evidence.

8         The last element with respect to Deputies Denney

9    and David is that in resisting or interfering or opposing

10    the deputies, the defendant used a dangerous weapon.  And I

11    anticipate Judge Jordan will describe for you or define for

12    you what a dangerous weapon is.  I anticipate he will define

13    a dangerous weapon as follows:

14         A dangerous weapon means anything, anything

15    capable of inflicting serious bodily injury or causing

16    someone's death.

17         And when you are considered whether something is

18    a dangerous weapon, I anticipate Judge Jordan will instruct

19    you that both the physical capabilities of the thing, the

20    item as well as the manner in which it was used should be

21    considered.

22         Ladies and gentlemen, what is more dangerous

23    than a pit bull who is in a frenzy?  What is more dangerous

24    than a snarling, snapping dog?  Any dog; Lassie.  Any dog

25    who is worked into a frenzy, snarling, bearing its teeth,

1    lunging, biting and snapping.  It's an inherent quality, the

2    dog, whether it be Lassie or the two ferocious pit bulls the

3    defendant had, inherently dangerous.  But it's not just

4    inherently dangerous.

5            Think about how the dogs were used by the

6    defendant.  Think about it.  What did he do after the light

7    bulb went off?  He pushed the door open so they could

8    escape.  And why did he do that, ladies and gentlemen?

9    Because he knew the dogs were already worked up.  They got

10   more and more and more worked up but maybe they were already

11   worked up.  They're under his control.  They're not lunging

12   at him, they're lunging at the door.  And he threw that --

13   pushed that door open so that they could escape, so that

14   they could attack the officers.

15           There is no other reason in the world.  His

16   actions show the defendant himself recognized they were

17   dangerous and tried to use them.  He pushed the door open.

18   And, ladies and gentlemen, he didn't say "sic," he didn't

19   say "get them."  He didn't have to.  He pushed the door open

20   and fled, hoping they would be released.  And, in fact, they

21   almost were.  That is how those dogs were released.

22           And then, having been "sicced," if that is the

23   word, ladies and gentlemen, maybe not, on the deputies in

24   the front, the dogs continued that pattern throughout the

25   house.  And we know that eventually they cornered both of

1    the Deputies U.S. Marshal Denney and Doug in respective

2    bedrooms and put them in a situation where they were in a

3    standoff.

4            Ladies and gentlemen, the evidence has proven

5    the defendant did exactly what he is charged with, exactly

6    what he thought of when the light bulb went out.  He used

7    the only really dangerous weapon at his disposal, the ones

8    that might very well facilitate his escape, the ones which

9    in fact did facilitate his attempts at escaping:  Those two

10   pit bulls which later tore each other apart.

11           Do you have any doubt, ladies and gentlemen,

12   about the state those dogs were in, the docile dogs to which

13   the defendant refers, the pets to which he testified?

14   Consider what they did to each other.  Consider the

15   photograph that you saw of the back bedroom where they were

16   put after cornering the deputies, after snarling and almost

17   attacking the deputies, after lunging at the deputies.  They

18   turned on each other and they tore each other to bits.

19           You got to see the blood all over the floor, all

20   over the mattress.  You will get to see it again, should you

21   so choose.  You got to see pictures of these docile dogs

22   with blood on their backs, blood n their hind quarters.  You

23   got to see a picture.  If you didn't see it on the

24   projector, you will get to see it when you get the hard

25   copy:  Pieces of ear bitten off, flesh and skin torn because

1    that was the type of dog, were the type of dogs they were,

2    and that was the state they were in, the defendant put

3    them in by unleashing them on these officers.  That is a

4    dangerous weapon, ladies and gentlemen.  And the evidence

5    has proven that.

6          And, finally, ladies and gentlemen, with respect

7    to Marshal Thomas, there are only four elements.  There is

8    no need to find that he was injured.  There is no need to

9    find there was any dangerous weapon used.  You need only

10    find that he was acting within the scope of his federal

11    employment and that the defendant forceable assaulted or

12    resisted or impeded or obstructed him and did so

13    intentionally.  And the evidence has in fact, for the

14    reasons we discussed, done that.

15          Now, ladies and gentlemen, before I leave you,

16    and I give my colleague Mr. Peruto an opportunity to stand

17    before you, we really do have to talk about the defendant's

18    testimony.  But we have to talk about the defendant's

19    testimony, ladies and gentlemen, because sometimes you might

20    have a case where you can reconcile certain things you hear

21    from one witness you hear from another witness.  The stories

22    aren't exactly consistent but they're not mutually

23    exclusive.

24          Well, that is not this case.  That's not this

25    case.  It's not this case because what the defendant

1    testified and what the four federal marshals testified to

2    is mutually exclusive.  So let's talk about what the

3    defendant said.

4         The defendant testified that he immediately

5    fled to the back upon seeing the marshals.  And by the way,

6    ladies and gentlemen, he doesn't dispute that he knew that

7    they were law enforcement officers.  He knew it.  That's why

8    he ran.  According to him, though, he ran immediately.  He

9    didn't unleash the pit bulls in the front, not like the

10   sworn testimony of Deputies Leo and David.  He didn't let

11   loose those pit bulls.  Instead, he ran to the back, saw he

12   was cornered, came back and then it was then that the

13   animal, the animal, Deputy Jack Leo approached and tackled

14   him.  The animal.

15        Now, you got to see Deputy Leo testify yesterday

16   and you got to see him testify again today.  You judge for

17   yourself.  Judge for yourself the demeanor.  You judge for

18   yourself whether his demeanor is consistent with the animal

19   the defendant said he was.

20        You heard the defendant say that Deputy Leo

21   tackled him, and didn't just tackle him, but then, in a very

22   personal way or in a way that appeared personal to the

23   defendant, began to beat him, punch him, punch a man while

24   he is down, punch him, punch him, punch him in the face,

25   inflicting injuries to his face.

1              But then that is not enough, not enough for the

2    animal.  Because then Deputy Leo picked him up and threw him

3    into the wall, causing, causing -- and I think the word the

4    defendant used was "flung" -- flung him into the wall,

5    causing the dent, excuse me, causing the break that you see

6    in Defense Exhibit 3.  And then the animal was not satisfied

7    with that.  He had the defendant on the ground and was still

8    hitting him, hitting him until his colleagues, Marshal

9    Thomas and Deputy Denney had to pull him off.

10             Now, think about that, ladies and gentlemen.

11   Think about a couple things.  How about that blood on the

12   wall?  Do you see any?  Because, after all, according to

13   the defendant, the hole in the wall happened after he had

14   already been beaten or started to be beaten by Marshal --

15   excuse me -- by Deputy Leo, the animal, after the animal

16   tackled him, and had him down on the ground and was hitting,

17   hitting and hitting and hitting and then he flung him -- not

18   threw, not pushed, not hastened, but flung him into a wall?

19             How did that blood splatter Mr. Peruto was

20   talking about?  Might there be blood spatter on the wall

21   after a defendant who was beaten savagely on the floor was

22   flung into it?  Ask yourself if you saw any, because the

23   defendant didn't.  You see how hard he was looking.  What

24   might have been going through his mind when he was asked

25   that question?

1    How about Marshal Thomas?  Did you find it

2  interesting what the defendant said about Marshal Thomas?

3  Marshal Thomas was his friend.  Marshal Thomas did not hurt

4  him, he tried to help him.  He didn't stand on his legs.  He

5  tried to help him.

6    Ladies and gentlemen, you heard Marshal Thomas

7  testify yesterday.  Did you hear him say anything about

8  trying to help the defendant?  Or did you hear him testify

9  about how, when he ran in after, after Deputy Denney, he

10  saw Deputy Denney and others engaged in a struggle with

11  the defendant, because the defendant was struggling.

12  Eventually, the defendant charged up the hall.  And he has

13  to aid Deputy Leo.  Aid Deputy Leo.  That is what Marshal

14  Thomas told you.

15    How does that reconcile, ladies and gentlemen?

16  The man who was to help the defendant testified to you that

17  he had to help hold the defendant down, after going low,

18  grabbing him and trying to help take him to the ground.

19  Think about that, ladies and gentlemen.

20    The defendant said, testified he didn't see a

21  gun.  He didn't see a gun.  He didn't know anything about a

22  gun.  Gun?  No gun here.  No gun.

23    He also testified that he was in this front

24  area, the living room area.  That is one thing, ladies and

25  gentlemen, that is corroborated by everybody else.  That the

1    defendant and Deputy Leo were in the living room area when

2    the shot rang out.  The defendant said that, too.  He heard

3    the shot while he was in the living room area with Deputy

4    Leo.  And we know actually that is true because that is when

5    he discharged the gun.

6                   But the defendant said that at the time that he

7    was in this area, being beaten by the animal and heard the

8    gunshot, there were no dogs there.  In fact, he testified he

9    heard a gunshot -- never saw a gun, heard a gunshot and then

10   heard a yelp.  And that made him think his dogs or dog had

11   been shot.  But, ladies and gentlemen, if there are no dogs

12   in this area where the defendant is when the gunshot rings

13   out, how is it that the gunshot went out the front door?

14   I don't understand if, in that area, no dogs.  You know

15   the gunshot went out the front door because you saw the

16   pictures.  How is that, ladies and gentlemen?  How did

17   that work?  Think about that when you are evaluating the

18   defendant's testimony.

19                   Ladies and gentlemen, again my name is April

20   Byrd.  I'm an Assistant U.S. attorney for the District of

21   Delaware.  At the table, I didn't introduce before, this is

22   Barbara Lotharp, who is a paralegal specialist at our

23   office, who we are very happy to have.  And Deputy U. S.

24   Marshal William David.  He is the case agent in this case.

25   It's our privilege to represent the United States of America

1    in this matter.

2            The evidence in this case, ladies and gentlemen,

3    the testimony of the witnesses, the physical evidence that

4    you have gotten to see and will get to see again, has proven

5    one thing.  It has proven, ladies and gentlemen, that on

6    April 9th of 2005, the decade-long flight of a fugitive from

7    justice came to an end, but it didn't come to an end without

8    cost.  It came to an end at the cost of an assault and the

9    forcible resistance of four federal law enforcement officers

10    by a man who refused to go down.  He refused to go down and

11    he is guilty of the crimes for which he is charged.  And

12    that man, ladies and gentlemen, is the defendant Nelson

13    Lora-Pena, and the evidence has in fact proved him guilty as

14    charged.  I thank you very much for your time.

15            THE COURT:  Mr. Peruto.

16            MR. PERUTO:  I would like to say this with a

17    straight face but "I am the greatest" and "I am pretty,

18    too."

19            Now, my buddy, my buddy Greg back there, is

20    saying "now Chuck has totally lost his mind."  And he went

21    in front of a jury and he said he is the greatest, that he

22    is pretty.  And I am kind of crazy.  This is how I act

23    outside the courtroom.  But I'm not crazy and I haven't lost

24    my mind.  I might be pretty.

25            Ladies and gentlemen, have you ever heard that

1    before?  "I am the greatest and I'm pretty too?"  Muhammad

2    Ali, after every fight, nothing over here.  Nothing over

3    here.  Nobody ever photographed his hands after a fight.

4    When Howard Cosell was interviewing him back in the day, he

5    was pretty.  He was in a fight.  He was in several fights.

6              Now, the defendant is charged with assault.  He

7    is charged with assault.  He is not charged with losing a

8    fight.

9              The Government just wrapped up its summation by

10   telling you this arrest came at a cost, at a cost, because

11   these marshals were assaultive.  So we'll make a federal

12   case out of it.  Not a state court case for resisting

13   arrest, a federal case for assaulting marshals.

14             And you have the Government's pictures that

15   the Government people took at the scene or subsequently

16   thereto of the injuries to these marshals.  This cost to the

17   Government.  A lot of injuries.  I would suggest to you

18   Muhammad Ali suffered more injuries.  There was no cost to

19   the Government.

20             The Government tells you, doesn't the evidence

21   prove this or hasn't the evidence proven that?  Ladies and

22   gentlemen, this is not an automobile accident case where the

23   burden of proof is more likely than not.  We're not closing

24   down a factory to put people out of work, where the burden

25   is clear and convincing.  This is a criminal case, where the

1    burden is beyond a reasonable doubt, the highest burden in

2    this land.  The judge will define for you what a reasonable

3    doubt is.  And he will tell you that it's proof so positive

4    that you don't hesitate.  Simple.

5          My job is to show you the different things that

6    you should look at in this case in the deliberation room

7    with each other.  That should make you hesitate at the

8    least.

9          I asked Marshal Leo:  "You file a report in this

10   case?"  "Yes."  "And it's your duty to do so when involved

11   in an incident?"  "Yes."  "`And you file your report and it

12   stays with the case file and you could use it to refresh

13   your recollection when the time comes for trial?"  "Yes."

14         Well, I intentionally didn't ask the other

15   marshals if that is your duty because they didn't file

16   reports.  So you know what their answer is going to be.

17   Their answer is no.  It's going to be no.  Logic.  You

18   didn't strap the juror button on and become stupid.  There

19   is no magnetic field to it.  They're going to say we don't

20   have to file one.  And the marshal who is involved in this

21   very case will certainly back them up.  "Oh, I don't require

22   that anymore."

23         Common sense.  Common sense.  You are an

24   eyewitness to a crime, you file a report.  Don't take my

25   word for it, it's in evidence.  Detective Leo told you.

1    "Yes."  That is your requirement.

2              Now, why is it that when we have local

3    authorities, state authorities and federal marshals involved

4    in this takedown that we only call the federal marshals?

5    Why is it that we just call the home team and don't rely on

6    any discrepancies coming from the State Police or the local

7    police?  Is it my burden of proof, all of a sudden, that the

8    burden of proof just shifts to the defendant?

9              You have Marshal Leo's word that there was a

10   strike mark outside on that concrete.  One of the biggest

11   pieces of physical evidence in this case that you don't

12   have.  You mean to tell me, you dummies, that you can bend

13   down, take out a dollar, photograph it on the door, and just

14   overlook, don't bother with, forget to photograph the strike

15   mark of a projectile on concrete?  Or was there none?  Or

16   was there none?  Or was it because the person who shot fired

17   the gun in a laying position?

18              These ferocious pit bulls -- not dogs because,

19   let's face it, the Government has earned the right to call

20   them ferocious pit bulls because they presented evidence

21   from the marshals of the drastic damage they did to them.

22   They proved beyond all doubt that these dogs were able to

23   bark.  They proved it.  They proved to you that because

24   they're pit bulls and some of the jurors may have heard of

25   pit bulls that you're automatically expert on what a pit

1   bull is and, therefore, they don't have to call anybody from

2   K-9 on how they were acting.  They don't have to call these

3   police dog people who put them into this vehicle.  It

4   relieves them of that burden because, guess what?  It's a

5   pit bull.  Proof beyond a reasonable doubt.

6          The Government took great pains to define for

7   you what the word "bodily injury" is.  It doesn't have to

8   be life threatening.  They didn't tell you what "serious

9   bodily injury" is.  And why is it important that you know

10  that?  Because in the definition of "deadly weapon," which

11  this defendant has used, is accused of in some of these

12  counts, it has to be an instrument commonly used to cause

13  substantial risk of death or death itself.  Because the

14  Government alleges that these are pit bulls.  That's proof

15  beyond a reasonable doubt that they were capable of

16  implementing serious bodily injury.

17         Listen to the judge's definition of "serious

18  bodily injury" and determine for yourself whether getting

19  bitten by a dog meets that requirement.  Is that the loss of

20  a limb?  The permanent disfigurement as required by law?  Or

21  death?

22         I know one thing.  I don't hate Marshal Leo.  If

23  I'm going into a room to kick some ass, I don't want these

24  pit bulls, I want Marshal Leo with me.

25         Now, does the Government have evidence, when he

1    was on the run and tracking this man down where he is, that

2    he took boxing lessons?  Socializing or for whatever

3    reasons?  Sure.  The Government is powerful.  This is the

4    United States of America.  They knew where he had been and

5    they tracked him down.  You don't get a badge, Marshal Leo,

6    by having this information and coming in and giving him this

7    country ass kicking.  You don't get a badge for that.

8              THE COURT:  Mr. Peruto, refrain from the

9    profanity, please.

10              MR. PERUTO:  Oh.  The Government knows about

11    this individual.  We don't know anything else he has been

12    doing for the last ten years except traveling.  Is he

13    training pit bulls to attack somebody?

14              Where is the photographer?  Who took these

15    pictures and where is this photographer?  What was taken?

16    What wasn't taken?  Or would I be able to cross-examine him?

17    And why wasn't this taken?  Why wasn't that taken?

18              Now, I cross-examined Marshal Leo.  What does

19    the term "readied" mean?  Because he knows, he read his

20    report before he took the stand.  Oh, ready could mean two

21    things.  It could mean that I got my gun at the store and

22    it's ready to be picked up in case I need to use it in a

23    couple of weeks, or it could mean that the gun is loaded and

24    ready.

25              He can get away with that with the jury because

1    you're idiots.  Look in the mirror during deliberations, if

2    you have to go to the bathroom, and look in there and say

3    "you idiot," because that is what you are.

4            How come, in covering himself, by saying

5    there is two definitions of readiness, he is that hip on

6    cross-examination with the word "subsequently?"

7    Subsequently.  I subsequently readied my gun.

8            The defendant is charged with assaulting federal

9    officers.  He is also charged with assaulting federal

10    officers with a deadly weapon.  Is he charged with putting

11    his hands up so he wouldn't be beaten anymore, or protecting

12    himself?  No.

13            What federal officer did he assault?  What

14    federal officer did he assault?  I asked the questions of

15    the other officers.  Did he swing at him?  Did he assault

16    anybody else?  Did you see him inflict any injury to anybody

17    else or swing at anybody or assault anybody?  No.  That is

18    what he is charged with.

19            On top of that, if that is not serious enough,

20    he is accused of using a deadly weapon.  The only evidence

21    in this case, the only evidence in this case that the

22    Government has proffered from the witness stand is that he

23    opened the door a little bit.

24            Well, then why is it this most crucial part of

25    using a deadly weapon, that he opened door a little bit, not

1   contained in anybody's report?  Why is it that nobody even

2   wrote a report?  Is that because it's Marshal Leo's problem?

3   It's Marshal Leo's case?

4             The defendant doesn't have to testify.  You know

5   that.  The judge is going to instruct you to that.  But he

6   took the stand.  Did it make sense to you?  Did he just come

7   in here, such a genius that he is, you saw him on the stand.

8   Is he a professional witness?  Is he a marshal that comes in

9   and testifies day in and day out on cases?  Or is this new

10  to him?

11            Why would he say, of all the people he could

12  say, that they had to pull Marshal Leo off of him?  That in

13  his frame of mind that they were trying to help him?  Why

14  would he say that?  Why would he say?  What is his purpose?

15  What is his conscious object?  That he didn't see and that

16  Agent Leo, well, or Marshal Leo did not have a rifle around

17  his body?  Is he just making that up or is that what is in

18  fact logical?  That he didn't have it around him?

19            The Government has the burden of proof.  Let

20  the Government show you how Marshal Leo's version that this

21  rifle was around him during this altercation.  And as big as

22  he is, Marshal Leo, this defendant was able to not only get

23  his hands around the gun, not protect his face, not use his

24  hands to cover up but get his hands around the gun, take the

25  safety off and fire it.  Show us, demonstrate for us how

1  that is possible, let alone likely, let alone clear and

2  convincing, let alone beyond a reasonable doubt.

3        We have pictures of the room where the dogs were

4  put.  I take it we're going say that the dogs went in the

5  drawers and took everything out of the drawers and dumped it

6  on the bed.  That is how that stuff got there?

7        What we do have in Marshal Leo's report is that

8  the defendant, and this is the word used, your recollection

9  counts, "dug" his fingernails into my hands.  You saw those

10  hands.  You saw those hands.  Reasonable doubt.  Proof so

11  convincing you would not hesitate to rely and act on it.

12        Now, the Government, in its definition of these

13  terms or the elements of the crimes, was accurate in the

14  words they used but they sort of jumped over the words they

15  don't want you to dwell on and land on words you know they

16  want you to dwell on.

17        Well, an assault can't occur by accident.  An

18  assault can't occur by protecting yourself.  An assault has

19  to be intentional.  You don't commit a crime by accident.

20  It has to be the defendant's conscious object to assault

21  these federal marshals.  It doesn't -- it cannot be his

22  conscious object to run out the door or to flee.  It has

23  to be his conscious object to assault him with force.

24  Intentionally, with force.  And the marshal has to be acting

25  in his official duty.

1      When you're laying there and you're pounding

2   somebody's face in and you're pounding him and you're

3   pounding him, I don't care what you are wearing that says

4   "police."  You're not acting in your official duty.  That is

5   not what you are sworn to do.  Whether this guy is a boxer

6   or an actor or a soprano, that is not what your official

7   duty is.

8      I hope you picked up on the way the prosecutor

9   just summed up her case when she said "and the defendant

10   did confess."  The defendant did confess.  You heard the

11   defendant when he was in the hospital room, while the

12   marshal was in the room, saying certain things.  She didn't

13   say that the defendant was talking to that marshal.

14      Now, the defendant didn't blame the whole world

15   for this altercation.  He said two guys, the two guys at the

16   front door.  And one of the guys at the front door wants to

17   interpret what he said at the hospital his way.  "You know I

18   had to take a shot at it."  "It?"  It is not a face.  It's

19   not your body.  Or is it referring to "I had to take a shot

20   at it" and run?  You interpret it the way you want to

21   interpret it.

22      Couldn't we bring anybody in from ballistics to

23   show the trajectory or the fire line of that bullet?  How

24   could he get a safety off?  Do you have any evidence of

25   that?  How was he able to fire?  Any evidence of that?

1          Ladies and gentlemen, I am using my notes to

2   refresh my recollection because I can't remember everything

3   that is said.  I'm not pretty and I'm not a genius.  I'd ask

4   you to be my lawyer in the deliberation room and remind

5   each other what it is I forgot that struck you as important,

6   because I can't possibly cover everything.

7          And use your common sense.  Figure out at what

8   point Marshal Leo had this rifle.  They go to the front

9   door.  They see the defendant right there.  They give him

10  orders.  And the defendant acknowledges that, that he gave

11  him orders.  The defendant acknowledges he sees their vests.

12         The defendant takes off into another room, by

13  everybody's account.  And by everybody's account, you

14  can't see the backdoor from the front door.  These trained

15  marshals don't know if he is going for a weapon.  So they

16  allow him to run further in to a house so that he could

17  barricade himself, so he could retrieve a weapon or do

18  something else that could bring them harm when they have a

19  clear path to get him right then and there?  You don't think

20  they're going to do what they did later on and just kick the

21  dogs out of the way, if they don't want to fire at them?

22         And if these dogs are so ferocious and they're

23  so worried about it, how did the marshals come in from the

24  backdoor?  How did they come in from the backdoor?  Did

25  anybody have these dogs restrained or put in a room at that

1    time?

2             And if Deputy David wants to have his cake, then

3    force him to eat it.  Force him to eat it.  Because if he

4    wants you to believe everything that the defendant did at

5    the hospital, then believe everything.

6             Acting nonchalantly, as the prosecutor called

7    it, in a cool, calm manner.  "You know I had to give it a

8    shot."  Are they words of a violent man?  Are they words

9    that of somebody that hates all marshals?  Are they words of

10   somebody who has it in for law enforcement?  Or are they

11   somebody who is under arrest and he is talking freely, like

12   a gentleman?

13            It's assumptions vs. proof beyond a reasonable

14   doubt, especially with these dogs and the allegation that

15   they're deadly weapons.  If the dogs, in this melee of

16   everything happening to their owner, fought in that room and

17   hurt each other, that's his fault?  That's his fault?  We're

18   going to hold the defendant responsible for assaulting with

19   a deadly weapon?  That's his fault?  That is proof beyond a

20   reasonable doubt?

21            The prosecutor makes a big thing out of the fact

22   that the defendant didn't get blood on the wall when he was

23   first thrown into it.  Well, there is a couple things you

24   could say to yourself.  Common sense.

25            One.  To get blood on the wall, you have to

1    first be bleeding.  You have to first be bleeding.  I think

2    that is step one.  Does he know that he is bleeding yet?

3    Did he testify I'm already bleeding?  He is already busted

4    up?  Was his face already pushed into the wall so the blood

5    would stay on the wall?  Or was his back thrown into the

6    wall and that is why there is no blood on it?  And was his

7    back thrown into the wall and one of the first things that

8    already occurred and he is not bleeding yet?

9            One thing we know for sure.  One thing we know

10    for sure, which is in evidence at Government's Exhibit 10,

11    we know he is bleeding there.  And we can see the blood

12    behind his head there.  And we know the blood that is behind

13    his head.

14            THE COURT:  Mr. Peruto, I need to have you stand

15    back, sir.  I can't have you that close to the box.

16            MR. PERUTO:  We know that the blood behind his

17    head is his.  And we know the busted up mouth and the eyes

18    and blood, and everybody standing around him, that is the

19    defendant.  It's in evidence.

20            This case has come at tremendous cost.  You

21    can't just bust somebody up and do nothing about it.  There

22    has got to be a prosecution.  There has got to be.  There

23    has got to be.

24            Use your common sense.  Is the marshal pleased

25    at the way his deputies acted that day?  That is for you to

1    determine.  Is he going to come in and sell them out?  That

2    is another story.  However, were there other eyewitnesses

3    there from other agencies that don't have to answer to that

4    marshal, that aren't part of this group?  Yes, there were.

5    You didn't hear from them.  It's not my burden of proof.

6    It's the Government's burden of proof.

7            And just ask yourself why is it that we don't

8    have a single witness from outside the group to testify that

9    it was this defendant's conscious object, his intent to

10   assault federal marshals, not to just run?  And why is it

11   that we don't have independent witnesses to testify that his

12   conscious object was to not only assault them but assault

13   them with a deadly weapon?

14            Thank you.

15            THE COURT:  Ms. Byrd, your rebuttal.

16            MS. BYRD:  The United States Marshal for the

17   District of Delaware, David Thomas, is a liar.  If you

18   believe that, ladies and gentlemen, then you must acquit.

19   You must acquit Nelson Lora-Pena, the defendant.

20            Marshal Thomas is not just a liar, he is also a

21   criminal.  He is a criminal because he took an oath to swear

22   to tell the truth subject to the penalty of perjury, and he

23   got up there and he told you the defendant resisted arrest.

24   He forcibly resisted arrest.  He described to you the

25   defendant's actions.

1        But, ladies and gentlemen, if he is not just a

2   liar but also a criminal, and you believe that, then you

3   must acquit the defendant.

4        Supervisory Deputy U.S. Marshal, Robert Denney,

5   is a liar.  He too is a criminal, a perjurer.  If you

6   believe that, ladies and gentlemen, then you must acquit the

7   defendant, because that is your duty.

8        Deputy United States Marshal Jack Leo is a liar.

9   He is a liar and a criminal -- a criminal who lied to you

10  under oath.  If you believe that, it is your duty, your duty

11  to acquit the defendant.

12       Deputy United States Marshal William David is a

13  liar and a criminal, like his counterparts, because he too

14  testified under penalty of perjury to tell you the truth.

15  He too described to you the defendant's actions, his

16  resistance, his assaults, his profanity, his determination.

17  And if that too was a lie, then, ladies and gentlemen, it is

18  indeed your duty to acquit the defendant.

19       Is it logical?  Mr. Peruto asked you is it

20  logical?  Was the defendant's testimony logical?  Well,

21  ladies and gentlemen, let's think about what is logical.  Is

22  it logical?  Does it make sense to you that four United

23  States Marshals, three deputies and the U.S. Marshal

24  himself, who had never laid eyes on the defendant before,

25  for whom they regarded the defendant as just another

1    fugitive, is it logical that they would come into court

2    and lie and perjure themselves?

3              Is it logical for Deputy U.S. Marshal Jack Leo,

4    who never laid eyes on the defendant before, to bear a

5    grudge against him so terrible that it turned him into an

6    animal, beating and beating and beating this poor helpless

7    fugitive who was on the ground, throwing him into the wall?

8    This man he had never seen before in his life.  Turning U.S.

9    Deputy Marshal Jack Leo into this animal, this crazed being

10    such that his colleagues had to pull him off?  Does that

11    make any sense?

12              Does it make any sense that the bullet went

13    through the front door if in fact the marshals were shooting

14    at dogs that weren't in the room?  By the defendant's own

15    testimony, what did the bullet do?  Travel from the back

16    hallway through the bedroom wall, out through the hallway

17    wall, then through the wall?  Is it the most miraculous

18    bullet that ever existed?  Does that make any sense?

19              And although my colleague Mr. Peruto is indeed

20    eloquent, ladies and gentlemen, does it make any sense that

21    after this, after being beaten by Deputy Leo -- and it's

22    your recollection that counts, but did not the defendant,

23    when asked, say that he was tackled by Deputy Leo, he

24    was beaten on the floor, then he was flung, using the

25    defendant's words, into the wall causing this concave.  Then

1    he was put back on the floor and beaten some more.  Had some

2    injuries.  He was injured during the time before and after.

3    Does it make any sense?  Does it make any sense that there

4    is nothing, not a smear, not a drop.  Forget the smear.

5    That might note a lot of blood.  How about a drop?  A drop

6    of blood on the wall into which he was flung, whether it was

7    front, forwards, backwards?  What about this splatter?  Does

8    that make any sense, ladies and gentlemen?

9              Ladies and gentlemen, Mr. Peruto talked about

10   serious bodily injury.  And again, what Judge Jordan tells

11   you is the law and that controls, but I anticipate he is

12   going to read from page 21 of the jury instructions which

13   you will receive and he will define dangerous weapon in the

14   following way:

15             The last element the Government must prove

16   beyond a reasonable doubt as to counts two and three -- and

17   that would be counts that involve Deputies U.S. Marshal

18   Denney and David -- is that the defendant used a dangerous

19   weapon to assault, resist or interfere with those deputies.

20   The term "dangerous weapon" means anything capable of

21   inflicting serious bodily injury or causing the death of a

22   person.

23             Now, didn't you hear Mr. Peruto say that that

24   means commonly used to cause a substantial risk of death or

25   death itself?  Ask yourself if you heard that when Judge

1  Jordan reads the instructions to you or when you see them

2  for yourselves.

3           Judge Jordan I anticipate will further instruct

4  you as I stated before that both "the physical capabilities

5  of the thing used and manner in which it is used may be

6  considered in determining whether the thing is a dangerous

7  weapon."

8           Well, ladies and gentlemen, if you were to

9  find, as is your right, that a snarling, crazed, growling,

10 barking, lunging, frenzied pit bull is not capable of

11 inflicting serious bodily injury; if you were to find that

12 a snarling, growling, lunging, frenzied pit bull who was

13 baring its teeth, running after various officers, cornering

14 them in standoffs, was not used by the defendant when he

15 pushed open the door, to facilitate his escape, to resist

16 arrest because the defendant himself recognized that they

17 were dangerous weapons; then Mr. Peruto is right, you have

18 to acquit on counts two and three of the Indictment.  But

19 ladies and gentlemen.  When you are considering that, use

20 your common sense.

21           The defendant himself recognized the physical

22 capabilities of the thing used.  The thing being his dogs.

23 He recognized the opportunity to escape because they weren't

24 Lassie, because they weren't Chihuahuas, because they

25 weren't cats, because they weren't docile, because they were

1    frenzied, and he recognized that and he seized upon the

2    opportunity.  And he didn't just push the door open, he

3    pushed the door open and he simultaneously pivoted and ran

4    to the back.  And he did that, ladies and gentlemen, because

5    he knew those dogs, which were in a crazed state, would

6    attack and they tried to attack.  And when they were foiled

7    the first time around, they continued to try to attack until

8    they finally attacked themselves.

9              Mr. Peruto said many times during his closing

10   that this is assault on a federal officer, assault on a

11   federal officer, assault on a federal officer.  And, indeed,

12   the crime is called forcible assault on a federal officer, I

13   anticipate Judge Jordan will say to you, but as I discussed

14   during my closing, there are four different counts for the

15   four different individuals that are involved and there are

16   different things that must be shown with regard to the fifth

17   element.

18             With regard to Jack Leo, the Government has to

19   prove he in fact was assaulted.  And, ladies and gentlemen,

20   has the evidence not done just that?  What do you call it

21   when a fugitive who is determined to escape again charges at

22   you and runs into you?  What do you call that?  What do you

23   call it when that fugitive, after charging and running into

24   you, starts to grab your gun?  What do you call it when

25   that charging fugitive digs his nails into your skin because

1    he is trying to take the gun from you?  What do you call

2    it when that fugitive flails his arms at you?  What do you

3    call it when that fugitive twists and turns around you while

4    digging his nails into your skin?  Ladies and gentlemen,

5    if you call it assault, then that is precisely what the

6    evidence has shown.

7            And, ladies and gentlemen, again, bodily injury

8    is any injury, cut, abrasion or pain, no matter how

9    temporary.  And the evidence has indeed shown with regard

10   to Deputy Leo that the defendant did assault him and cause

11   injury.

12           And, ladies and gentlemen, when we're talking

13   about intentionally, how does someone accidently run down

14   the hall and charge a person?  How does that happen?  How

15   does a person accidently dig their nails into someone's

16   skin?  How does a person accidently try to pull a gun away?

17   Common sense.

18           With regard to counts two and three, it's

19   slightly different, ladies and gentlemen.  Those are the

20   counts that talk about the dangerous weapon.  And in

21   those the Government must show that the defendant forcibly

22   assaulted or resisted or --

23           MR. PERUTO:  I'm sorry.

24           THE COURT:  Side bar?

25           MR. PERUTO:  Yes.

1          (Conference at side bar out of presence of

2    jury.)

3          MR. PERUTO:  With all due respect judge, this is

4    rebuttal.  A summation is not rebuttal.

5          MS. BYRD:  Yes, Your Honor.  I'm responding

6    directly to what Mr. Peruto said about we have to show, in

7    order to establish the assault, what the elements were.  We

8    showed the elements.  I'm showing there were different

9    crimes -- well, different versions of the crime.  I don't

10   know how else to do it.  I think it's directly responsive

11   to Mr. Peruto's lengthy statements about the assault.  "Was

12   there any evidence of an assault?"  I think he said that

13   several times.  He made mention about no one saw anybody

14   hitting or other things.  I mean I think it's directly

15   responsive.

16         THE COURT:  Well, I would agree with you to

17   this extent.  It called into question whether there was an

18   assault.  However, I'm pretty sure you are being repetitive

19   at this point.  I wish you would focus and let's be done

20   because I think the jury understands both sides' positions.

21         MS. BYRD:  Got it.

22         (Conference at side bar ends.  Proceedings

23   continue in open court.)

24         MS. BYRD:  And as I was saying, ladies and

25   gentlemen, with regard to counts two and three, Deputy David

1    and Denney, it's assaulted or obstructed or resisted.  And

2    the evidence has shown that the defendant did just that.

3         Mr. Peruto asked how was it, what evidence was

4    there of how the safety on Deputy Leo's gun could ever have

5    been disengaged?  Ladies and gentlemen, you heard Deputy

6    Leo tell you, you heard him show with Mr. Peruto how he was

7    holding, how he was holding the gun, how he was trained to

8    hold the rifle and how the defendant was right up against

9    him as he demonstrated and how the gun was running back and

10   forth between them.  There was a lot of pulling of the gun

11   and he testified the safety is easy to disengage certainly

12   under those circumstances.

13        Ladies and gentlemen, I do agree with Mr. Peruto

14   on the following points.  And that it is in fact the

15   Government's burden to prove the elements of the crimes

16   beyond a reasonable doubt.  And, ladies and gentlemen, you

17   took an oath.  You took an oath to hold the Government to

18   its burden of proof beyond a reasonable doubt.  Because that

19   is how it is in this country and that is the way it should

20   be.

21        But, ladies and gentlemen, your oath did not

22   require you to leave your common sense at the door.  And

23   your common sense, when used to evaluate the evidence in

24   this case, I submit, shows that the defendant is indeed

25   guilty of the crimes with which he is charged and should

1    therefore be found guilty.  Thank you very much for your

2    time.

3              THE COURT:  All right.  Give me one moment so I

4    can have the easel moved.  Thanks.  That way, I can see you

5    all of you.

6              (Pause.)

7              THE COURT:  Now, if anybody needs a break right

8    now, we could take a break.  I'm reluctant to let you go in

9    that room with that food, though.  I'm afraid I won't get

10   you back out again.  So if you can hang in here for 10 to

11   15 minutes, I need to read you these jury instructions.  I

12   want to assure you that you going to have a copy of these

13   in the jury room with you so you don't have to take notes

14   unless you really want to.  And, of course, you are free to

15   do so if you like.  And I acknowledge that reading is not

16   an interesting thing to listen to but I need to give these

17   to you carefully so I'm going to read them.

18             Members of the jury, now it is time for me to

19   instruct you about the law that you must follow in deciding

20   this case.

21             I will start by explaining your duties and the

22   general rules that apply in every criminal case. Then I will

23   explain the elements, or parts, of the crimes that the

24   defendants are accused of committing.

25             Then I will explain some rules that you must use

1   in evaluating particular testimony and evidence.

2         And last, I will explain the rules that you must

3   follow during your deliberations in the jury room, and

4   possible verdicts you may return.

5         Please listen very carefully to everything I

6   say.

7         You have two main duties as jurors.  The first

8   one is deciding what the facts are from the evidence that

9   you saw and heard here in court.  Deciding what the facts

10   are is your job, not mine, and nothing that I have said or

11   done during this trial was meant to influence your decision

12   about the facts in any way.

13         Your second duty is to take the law that I give

14   you, apply it to the facts, and decide if the Government has

15   proved of the defendant guilty beyond a reasonable doubt.

16   It is my job to instruct you about the law, and you are

17   bound by the oath that you took at the beginning of the

18   trial to follow the instructions that I give you, even if

19   you personally disagree with them.  This includes the

20   instructions that I gave before and during the trial, and

21   these instructions.  All the instructions are important, and

22   you should consider them together as a whole.

23         The lawyers may have talked about the law during

24   their arguments.  But if what they said is different from

25   what I say, you must follow what I say.  What I say about

1    the law controls.

2                Perform these duties fairly.  Do not let any

3    bias, sympathy or prejudice that you may feel toward one

4    side or the other influence your decision in any way.

5                As you know, the defendant has pleaded not

6    guilty to the crimes charged against him in the Indictment.

7    The Indictment is not any evidence at all of guilt.  It is

8    just the formal way that the Government tells the defendant

9    what crime he is accused of committing.  It does not even

10   raise any suspicion of guilt.

11               Instead, a defendant starts the trial with a

12   clean slate, with no evidence at all against him, and the

13   law presumes that he is innocent.  This presumption of

14   innocence stays with him unless the Government presents

15   evidence here in court that overcomes the presumption and

16   convinces you beyond a reasonable doubt that he is guilty.

17               This means that a defendant has no obligation to

18   present any evidence at all, or to prove to you in any way

19   that he is innocent.  It is up to the Government to prove

20   that he is guilty, and this burden stays on the government

21   from start to finish.  You must find the defendant not

22   guilty unless the Government convinces you beyond a

23   reasonable doubt that he is guilty.

24               The Government must prove every element of the

25   crime beyond a reasonable doubt.  Proof beyond a reasonable

1  doubt does not mean proof beyond all possible doubt.

2  Possible doubts or doubts based purely on speculation are

3  not reasonable doubts.  A reasonable doubt is a doubt based

4  on reason and common sense.  It may arise from the evidence,

5  the lack of evidence, or the nature of the evidence.

6       Proof beyond a reasonable doubt means proof

7  which is so convincing that you would not hesitate to rely

8  and act on it in making the most important decisions in your

9  own lives.  If you are convinced that the Government has

10  proved a defendant guilty beyond a reasonable doubt, say so

11  by returning a guilty verdict.  If you are not convinced,

12  say so by returning a not guilty verdict.

13       You must make your decision based only on the

14  evidence that you saw and heard here in court.  Do not let

15  rumors, suspicions, or anything else that you may have seen

16  or heard outside of court influence your decision in any

17  way.

18       The evidence in this case includes only what the

19  witnesses said while they were testifying under oath, the

20  exhibits that I allowed into evidence, and stipulations that

21  the lawyers agreed to.

22       Nothing else is evidence.  The lawyers'

23  statements and arguments are not evidence.  Their questions

24  and objections are not evidence.  My legal rulings are not

25  evidence.  And my comments and statements and questions are

1    not evidence.

2          In addition, the Indictment is not evidence. As

3    I said, it is merely a formal manner of accusing a person of

4    a crime in order to bring him to trial. You must not

5    consider the Indictment as any evidence of the guilt of the

6    defendant, or draw any inference of guilt from it.

7          During the trial I may not have let you hear

8    answers to some of the questions that the lawyers asked. I

9    also may have ruled that you couldn't see some exhibits that

10   the lawyers wanted you to see. As I think about that, I

11   don't think it happened, but if it did, I want you to

12   understand that you should disregard or ignore such things

13   completely. Don't even think about them. Don't speculate

14   about what a witness might have said or what an exhibit

15   might have shown. If it's not in evidence, you are bound by

16   your oath not to let that influence your decision in any

17   way.

18         Make your decision based only on the evidence,

19   as I have defined it here, and nothing else.

20         You should use your common sense in weighing the

21   evidence. Consider it in light of your everyday experience

22   with people and events, and give it whatever weight you

23   believe it deserves. If your experience tells you that

24   certain evidence reasonably leads to a conclusion, you are

25   free to reach that conclusion.

1          Now, some of you may have heard terms "direct

2     evidence" and "circumstantial evidence."

3          Direct evidence is simply evidence like the

4     testimony of an eyewitness which, if you believe it,

5     directly proves a fact.  If a witness testified that he saw

6     it raining outside, and you believed him, that would be

7     direct evidence that it was raining.

8          Circumstantial evidence is simply a chain of

9     circumstances that indirectly proves a fact.  If someone

10    walked into the courtroom wearing a raincoat covered with

11    drops of water and carrying a wet umbrella, that would be

12    circumstantial evidence from which you could infer that it

13    was raining.

14         It is your job to decide how much weight to give

15    the direct and circumstantial evidence.  The law makes no

16    distinction between the weight that you should give to

17    either one, nor does it say that one is any better evidence

18    than the other.  You should consider all of the evidence,

19    both direct and circumstantial, and give it whatever weight

20    you believe it deserves.

21         You have seen the witnesses and have heard them

22    testify.  It is your duty to reconcile all the testimony of

23    all the witnesses, both on direct and cross-examination,

24    with all of the facts, if you are able to do so.  If, after

25    weighing the matter carefully, and viewing it in light of

1    your best judgment as reasonable men and women, you find you

2    are unable to reconcile a conflict in the testimony, then it

3    is for you to say who has been mistaken, who has told the

4    truth, who has testified falsely, and whom you will believe.

5    In other words, it is for you to determine whether the

6    Government has proved beyond a reasonable doubt whether the

7    defendant committed the offenses charged in the Indictment,

8    and in making that determination, it is for you to decide

9    which testimony is most worthy of belief, and you may

10    disregard any testimony which cannot be reasonably and

11    fairly reconciled with the testimony you do believe.

12          That concludes the part of my instructions

13    explaining your duties and the general rules that apply in

14    every criminal case.  In a moment, I am going to explain the

15    elements of the crimes that the defendant is accused of

16    committing.

17          But before do I that, I want to emphasize that

18    the defendant is only on trial for the particular crimes

19    charged in the Indictment.  Your job is limited to deciding

20    whether the Government has proved the particular crimes

21    charged.

22          The defendant has been charged in four counts.

23    The number of charges is no evidence of guilt and this

24    should not influence your decision in any way.  It is your

25    duty to separately consider the evidence that relates to

1    each charge and to return a separate verdict for each one.

2    For each charge, you must decide whether the Government has

3    presented proof beyond a reasonable doubt that the defendant

4    is guilty of that particular charge.

5            Your decision on one charge, whether it is

6    guilty or not guilty, should not influence your decision on

7    any of the other charges.

8            Next, I want to say a word about the date

9    mentioned in the Indictment.  The Indictment charges that

10   the crime happened "on or about" April 9, 2005.  The

11   Government does not have to prove that the crime happened on

12   that exact date.  But the Government must prove that the

13   crime happened reasonably close to that date.

14           Count I of the Indictment charges that on or

15   about April 9, 2005, in the District of Delaware, the

16   defendant, Nelson Lora-Pena, forcibly assaulted Deputy

17   United States Marshal Jack Leo, while Deputy Leo was engaged

18   in the performance of official duties with the United States

19   Marshals Service, and inflicted bodily injury to Deputy Leo.

20           For you to find the defendant guilty of this

21   crime, you must find that the Government has proved each of

22   the following five elements beyond a reasonable doubt:

23           First:  That on or about April 9, 2005, Jack Leo

24   was a federal officer as I will define that term for you;

25           Second:  That at that time, the defendant

1  forcibly assaulted Jack Leo;

2             Third:  That at the time of the assault, Jack

3  Leo was engaged in the performance of his official duties;

4             Fourth:  That the defendant acted intentionally;

5  and

6             Fifth:  That the defendant inflicted bodily

7  injury to Jack Leo.

8             Counts II and III of the Indictment charge that

9  on or about April 9, 2005, in the District of Delaware, the

10  defendant, Nelson Lora-Pena, used a dangerous weapon to

11  forcibly assault, resist, or interfere with Deputy United

12  States Marshal Robert Denney in Count II, and Deputy United

13  States Marshal William David in Count III, while those

14  deputies were engaged in the performance of official duties

15  with the United States Marshals Service.

16             For you to find the defendant guilty of these

17  crimes, you must find the Government has proved each of the

18  following five elements beyond a reasonable doubt:

19             First:  That on or about April 9, 2005, Robert

20  Denney and William David were federal officers as I will

21  define that term for you;

22             Second:  That at the time, the defendant

23  forcibly assaulted, resisted or interfered with Robert

24  Denney or William David;

25             Third:  That at the time of the assault, Robert

1   Denney and William David were engaged in the performance of

2   their officials duties.

3              Fourth:  That the defendant acted intentionally;

4   and

5              Fifth:  That the defendant used a dangerous

6   weapon to commit such acts.

7              Count IV of the Indictment charges that on or

8   about April 9th, 2005, in the District of Delaware, the

9   defendant Nelson Lora-Pena forcibly assaulted, resisted, or

10  interfered with United States Marshal David Thomas, while

11  Marshal Thomas was engaged in the performance of official

12  duties with the United States Marshals Service.

13             For to you to find the defendant guilty of this

14  crime, you must find the Government has proved each of the

15  following four elements beyond a reasonable doubt:

16             First:  That on or about April 9, 2005, David

17  Thomas was a federal officer as I will define that term for

18  you;

19             Second:  That at the time, the defendant

20  forcibly assaulted, resisted, or interfered with David

21  Thomas;

22             Third:  That at the time of the crime, David

23  Thomas was engaged in the performance of his official

24  duties; and

25             Fourth:  That the defendant act intentionally.

1          Now, the first element that the Government

2     must prove beyond a reasonable doubt is that on or about

3     April 9th, 2005, the person named as the victim of the crime

4     was a federal officer.   I instruct you that a federal

5     officer includes a United States Marshal or Deputy United

6     States Marshal.   However, it is up to you to determine

7     whether the person named as the victim held that title at

8     the time in question.

9          The Government does not have to prove that the

10    defendant knew that the person named as the victim was a

11    federal officer.   The crime of assault on a federal officer

12    is designed to protect federal officers acting in pursuit of

13    their official functions, and therefore, it is sufficient to

14    satisfy this element for the Government to prove that the

15    person named as a victim was a federal officer at the time

16    of the alleged assault.   Whether the defendant knew that the

17    victim was a federal officer at the time is irrelevant to

18    such a determination, and should not be considered by you.

19         The second element that the Government must

20    prove beyond a reasonable doubt is that the defendant

21    forcibly assaulted, resisted, or interfered with the federal

22    officer.   I will define these acts for you.   These acts --

23    assault, resist, or interfere -- are modified by the word

24    "forcibly".   Thus, before you can find the defendant guilty

25    you must find, beyond a reasonable doubt, that he acted

1    forcibly.  "Forcibly" means by use of force.  The use of

2    force may be actual or threatened.  If the defendant

3    threatened the federal officer in a way that would inspire

4    fear of pain or bodily harm, then he would have acted

5    "forcibly".

6         To "assault" is to threaten to inflict injury

7    upon the person of another which, when coupled with an

8    apparent present ability, causes a reasonable apprehension

9    of immediate bodily harm.  To "resist" means to obstruct or

10   to oppose.  To "interfere" with means to obstruct or hinder.

11        The third element the Government must prove

12   beyond a reasonable doubt is that at the time of the alleged

13   assault, the federal officer was engaged in the performance

14   of his official duties.  You may find that the federal

15   officer was engaged, if you find at the time of the alleged

16   assault, he was acting within the scope of what he was

17   employed to do.  On the other hand, if you find that the

18   federal officer was involved in a personal venture of his

19   own, you must find that he was not engaged in the perform-

20   ance of his official duties, and you must acquit the

21   defendant of the crime charged.

22        The fourth element that the Government must

23   prove beyond a reasonable doubt is that the defendant

24   committed the acts charged intentionally.  In other words,

25   you must be persuaded that the defendant acted voluntarily

1    and intentionally, and not by mistake or accident.

2              To inflict "bodily injury" means any injury,

3    including a cut, an abrasion, or a bruise; any physical

4    pain, or any other injury to the body, no matter how

5    temporary.

6              The last element that the Government must prove

7    beyond a reasonable doubt, as to Counts II and III, is that

8    the defendant used a dangerous weapon to assault, resist,

9    or interfere with a federal officer.  The term "dangerous

10   weapon" means any thing capable of inflicting serious bodily

11   injury or causing the death of a person.

12             Both the physical capabilities of the thing

13   used and the manner in which it is used may be considered in

14   determining whether the thing is a dangerous weapon.

15             The law permits the jury to determine whether

16   the Government has proven the guilt of the defendant for any

17   other offense which is, by its very nature, necessarily

18   included in the crime that is charged in Counts I through

19   III of the Indictment.

20             Let me try to explain this more carefully.

21   We're talking here about lesser included offenses.  So

22   let me repeat this for you.  You're permitted to determine

23   whether the Government has proven the guilt of the defendant

24   for any offense which, by its nature, is included in the

25   crimes charged in Counts I through III of the Indictment.

1          If the jury should unanimously find that the

2    Government has proven each of the essential elements of

3    the offense that is charged in Counts I through III of the

4    Indictment beyond a reasonable doubt, the foreperson should

5    write "guilty" in the space provided and your consideration

6    of that count is concluded.

7          Now at this point, and the parties have seen

8    this, I'm going to hold up for you this special verdict form

9    that you are going to have in the jury room with you.  So

10   what I'm telling you is, as to each count, there is going to

11   be a question.  And it will say, as to Count I, for example,

12   charging the defendant Nelson Lora-Pena with assault on Jack

13   Leo, we, the jury, find the defendant ... and there is a

14   space for you to mark for guilty or for not guilty as you

15   find.

16         There is also, however, as to the first three

17   counts, not the fourth count, but as to the first three

18   counts, the one says, to which there is a fifth element to

19   be proved, another question for this lesser included

20   offense.  And it says:  If the jury finds the defendant not

21   guilty as to Count I with respect -- excuse me.  If the jury

22   finds the defendant not guilty as to Count I, with respect

23   to the lesser included offense, we find the defendant Nelson

24   Lora-Pena guilty or not guilty.

25         There are those two questions for each of the

1    first three counts, not for the fourth count which only has

2    four elements.    Okay?

3         If the jury should find unanimously that the

4    Government has not proven each element of the offense that

5    is charged in Counts I through III of the Indictment beyond

6    a reasonable doubt, then the foreperson should write "not

7    guilty" in the space provided and the jury should then

8    consider the guilt or innocence of the defendant for the

9    other offense necessarily included in the offense charged in

10   Counts I through III of the Indictment.

11        The crimes charged in Counts I through III of

12   the Indictment in this case necessarily include another

13   offense which has the same elements of proof as Counts I

14   through III except for the fifth element, either, as in

15   Count I, that the defendant inflicted bodily injury or, as

16   in Counts II and III, used a dangerous weapon.    Thus, if you

17   are convinced beyond a reasonable doubt that the Government

18   has proven the first four elements of the Counts I through

19   III of the Indictment, but not the fifth element, you should

20   return a verdict of guilty on the lesser included offense on

21   those charges.

22        The jury will bear in mind that the burden is

23   always upon the Government to prove, beyond a reasonable

24   doubt, each and every essential element of any other offense

25   which is necessarily included in the crimes charged in

1    Counts I through III of the Indictment.  The law never

2    imposes upon a defendant in a criminal case the burden or

3    duty of calling any witnesses or producing any evidence.

4         Now, that concludes the part of my instructions

5    explaining the elements of the crime charged.  Next I'm

6    going to explain some rules that you must use in considering

7    the testimony and evidence.

8         The defendant's testimony should be considered

9    by you just as any other witnesses in the case and in

10    evaluating his credibility, you should use the same

11    guidelines which you apply to the testimony of other

12    witnesses.  In no event should you give either greater or

13    lesser credence to the testimony of the defendant merely

14    because he is the accused.

15         Now, let me finish up by explaining some things

16    about your deliberations in the jury room and your possible

17    verdicts.

18         Once you start deliberating, do not talk to the

19    jury officer, or to me, or to anyone else except each other

20    about the case.  If you have any questions or messages, you

21    must write them down on a piece of paper, sign them and then

22    give them to the jury officer.

23         Now, the jury officer is going to be one these

24    nice gentlemen with the blue blazer and gray slacks that

25    you have seen coming in and out of the court, been here in

1    the courtroom with us.  We're going to swear one of them

2    to be your jury officer and protect the secrecy of your

3    deliberations.  By custom of this court, your foreperson

4    is Juror No. 1, the lady seated on the front row, furthest

5    to your right.  So what do you do, if you have a question, is

6    you would write it down and your foreperson would sign that

7    note, date it, and then hand it to the jury officer who will

8    be sitting right outside the door who would bring it to me.

9    Okay?  I'll respond as soon as I can.  I may have to talk to

10   the lawyers about what you have asked, so it may take some

11   time to get back to you.  Any questions or messages, as I'd

12   said, should be sent through your foreperson.

13         One more thing about messages.  Don't ever

14   write down or tell anyone how you stand on your votes.  For

15   example, don't write down or tell anyone that you are split

16   6-6, or 8-4, or whatever your vote happens to be.  That

17   should stay secret until you are finished.

18         Your verdict, whether it is guilty or not

19   guilty, must be unanimous.  So ultimately, it would require

20   for a verdict of guilty or not guilty, all 12 votes.

21         To find a defendant guilty, every one of you

22   must agree that the Government has overcome the presumption

23   of innocence with evidence that proves his guilt beyond a

24   reasonable doubt.

25         To find him not guilty, every one of you must

1    agree that the Government has failed to convince you beyond

2    a reasonable doubt.

3         Either way, guilty or not guilty, your verdict

4    must be unanimous.

5         After you have reached unanimous agreement as to

6    guilt or innocence of the defendant with respect to each of

7    the counts in the Indictment, you then return to the

8    courtroom.  Your foreperson, who by custom of this Court, as

9    I noted, is Juror No. 1, will then hand this verdict form to

10    the Courtroom Deputy, who is here in the courtroom with us,

11    and then your verdict of not guilty or guilty with respect

12    to each charge will be published or stated in open court.

13         Now that all of the evidence is in and the

14    arguments are completed, you are free to talk about the case

15    in the jury room.  In fact, it is your duty now to talk

16    about the case in the jury room and to make every effort you

17    can to speak with each other about the evidence and reach

18    unanimous agreement.  Talk with each other, listen carefully

19    and respectfully to each other's views and keep an open mind

20    as you listen to what your fellow jurors have to say.  Try

21    your best to work out your differences.  Don't hesitate to

22    change your mind if you are convinced that other jurors are

23    right and your original position was wrong.

24         But do not ever change your mind just because

25    other jurors see things differently, or just to get the case

1    over.   In the end, your vote must be exactly that -- your

2    own vote.   It is important for you to reach unanimous

3    agreement, but only if you can do so honestly and in good

4    conscience.

5           No one will be allowed to hear your discussions

6    in the jury room and no record will be made of what you say.

7    So you should all feel free to speak your minds.

8           Listen carefully to what the other jurors have

9    to say and then decide for yourself if the Government has

10   proved the defendant guilty beyond a reasonable doubt.

11          If you decide that the Government has proved the

12   defendant guilty, then it will be my job to decide what the

13   appropriate punishment should be.

14          Deciding what punishment should be is my job,

15   not yours.   It would violate your oaths as jurors to even

16   consider the possible punishment in deciding the verdict.

17   Your job is to look at the evidence and decide if the

18   Government has proved the defendant guilty beyond a

19   reasonable doubt.

20          As I noted, I prepared this verdict form that

21   you should use to record your verdict.   The form will be

22   given to the foreperson.

23          If you decide that the Government has proved

24   the charge beyond a reasonable doubt, say so having your

25   foreperson mark the appropriate place on the form.   If you

1    decide the Government has not proved it, again, you say so

2    by having the appropriate portion of the form marked.  At

3    that stage, you have your jury foreperson sign the form and

4    date it and return it to me.

5        Let me finish up by repeating something that I

6    said to you earlier.  Nothing that I have said or done

7    during this trial was meant to influence your decision in

8    any way.  You decide for yourselves if the Government has

9    proved the defendant guilty of the charges beyond a

10   reasonable doubt.

11       Okay.  You need to indulge me for about 60

12   seconds while I talk to the lawyers at side bar.

13       (Conference held at side bar out of presence of

14   jury.)

15       THE COURT:  Is there any objection to the jury

16   instructions as delivered?

17       MR. PERUTO:  One.

18       THE COURT:  Okay.

19       MR. PERUTO:  Judge -- and this an oversight on

20   my part previously.  In defining "deadly weapon," it's

21   inherent in its definition.  In other words, "serious bodily

22   injury" and not "bodily injury."  The words "serious bodily

23   injury" have not been defined for the jury and that's

24   different than "bodily injury" and I'm asking for a

25   definition of "serious bodily injury."

1          THE COURT:  Okay.

2          MS. BYRD:  I think we're going to have to add,

3     Your Honor, and prepare one.  One hasn't been submitted.

4          MR. PERUTO:  Just a standard one.

5          THE COURT:  Well --

6          MS. BYRD:  The term "bodily injury" is modified

7     by "serious."

8          THE COURT:  Yes, I'm going to preserve for the

9     record.  I believe that "serious bodily injury" is one that

10    the jury -- the word "serious" that modified "bodily injury"

11    is one that the jury ought to be able to understand on its

12    own.

13          I will do this.  I'm going to swear the jury

14    officer and submit the case long enough for these folks,

15    who have now been here for more than three hours, to go

16    into the room.  I'm not going to tell them that they can't

17    start deliberating.  I'm going to tell them there is one

18    additional instruction that the lawyers and I will discuss,

19    and that we may call them back briefly for that purpose.

20    That will give us a chance to do that without slowing them

21    down; all right?

22          MR. PERUTO:  Yes.

23          MS. BYRD:  Yes.

24          MR. PERUTO:  Thank you.

25          (Conference at side bar ends.  Proceedings

1    continue in open court.)

2              THE COURT:  Okay.  Here is how we're going to

3    proceed.  We're going to swear the jury officer, send you

4    back, the case will be yours to deliberate.  There is

5    one point in the instructions that may require slight

6    additional elaboration.  If it does, we'll call you back in,

7    I'll give you that additional instruction and I'll send you

8    back to continue your deliberations but we won't hold you up

9    from beginning your deliberations.  Those will start now.

10             Let's go ahead and swear the jury officer.

11             (Jury officer placed under oath at 2:06 p.m.)

12             THE COURT:  All right.  Ladies and gentlemen, at

13   this juncture the case is yours.  And our alternate jurors,

14   you know, sometimes people, having sat through a trial, they

15   wanted to deliberate and may be frustrated at being excused.

16   However you feel about it, I express on behalf of all

17   parties this sincere gratitude for your service.

18             You are now excused.  If you have anything in

19   the jury room, you should collect it and members of the jury

20   should not begin to deliberate until these colleagues that

21   have been with you have had a chance to do that and depart.

22   Okay?

23             Let's have the jury out.

24             (Jury left courtroom.)

25             THE COURT:  All right.  Please be seated.

1          Here is what I'm going to do.  I've got a copy

2     of Devitt and Blackmar or whatever the correct name of the

3     federal jury instructions treatise is.  And I will go and I

4     will go and see if there is something on "serious bodily

5     injury."  I don't know if you want to wait to see what I'm

6     able to bring out to you, because it might be just my

7     Xeroxing of that.  The two of you can look at it and say

8     fine or not.  If you think you need more time after that

9     because you want to check something at your office or you

10     want to contact somebody back at your office, within bounds

11     of reason I'll give you time to do that.  All right?

12          MS. BYRD:  Yes, Your Honor.

13          THE COURT:  Okay.  So I'll ask you folks then

14     to hesitate here, give me five or ten minutes, and stay in

15     the courtroom.  I'll ask the Marshal Service, if you would,

16     to keep the defendant in here while I do that so he can be

17     present while I discuss that issue with Mr. Peruto and

18     Ms. Byrd.  Again, it shouldn't take me more than five or ten

19     minutes, okay?

20          U.S. DEPUTY MARSHAL LONG:  Yes, Your Honor.

21          THE COURT:  We're in recess.

22          (Brief recess taken.)

23          THE COURT:  All right.  Please be seated.

24          I've handed or had handed to each of you page

25     106 from the treatise that I referenced earlier, Section

1    25.09 to the note section, of which quotes 18 U.S.C.,

2    Section 113(b)(2) and I have incorporated the language about

3    serious bodily injury into the dangerous weapon jury

4    instruction so that it now would have the additional

5    sentence:

6                 "'Serious bodily injury' means bodily injury

7    which involves a substantial risk of death, extreme physical

8    pain or protracted loss or impairment of the function of a

9    bodily member, organ or mental faculty."

10                Are you content with that, Mr. Peruto?

11                MR. PERUTO:  Yes.

12                THE COURT:  Do you have any objection to that?

13                MS. BYRD:  No, Your Honor.

14                THE COURT:  Why don't we --

15                MR. PERUTO:  Can I just -- excuse me.  I would

16    object to the statute.

17                THE COURT:  No, the statute is not going in.

18                MR. PERUTO:  Okay.

19                THE COURT:  That was for you to see what I was

20    working off of.

21                MR. PERUTO:  No problem.

22                THE COURT:  Here is what I intend to do.  We'll

23    bring them back in, I'll tell them I'm going to read one of

24    the instructions over again that has an addition.  It's not

25    to be taken out of context as having any more or less weight

1    than anything else, it's simply to note for them this

2    additional language.  And they'll have the full jury

3    instructions which are to be considered in their entirety

4    when they go into the jury room.  All right?

5                   MS. BYRD:  Yes, Your Honor.

6                   THE COURT:  Are you satisfied with that, Ms.

7    Byrd?

8                   MS. BYRD:  Yes, Your Honor.

9                   THE COURT:  Mr. Peruto?

10                  MR. PERUTO:  Yes.

11                  THE COURT:  All right.  Let's bring them back

12   in.  We'll make it quick.

13                  You folks have seen the copy the special verdict

14   form, both sides; right?

15                  MS. BYRD:  Yes, Your Honor.

16                  THE COURT:  Mr. Peruto?

17                  MR. PERUTO:  I think so.   (Nodding yes.)

18                  THE COURT:  The only difference in the form from

19   the way it was submitted to me is it has a signature for

20   jury foreperson; all right?

21                  MS. BYRD:  Yes, Your Honor.

22                  THE COURT:  I should also note while we're

23   waiting, I have made some typographical error corrections

24   to the jury instructions, some of which you noticed as I was

25   reading where it said "a" defendant and we only have one

1    defendant, it should "the" defendant, et cetera, et cetera.

2    I'll make those corrections before we send it back to the

3    jury; all right?

4                 MS. BYRD:  Yes, Your Honor.

5                 THE COURT:  Thanks.

6                 (Jury returned.)

7                 THE COURT:  Thanks.  Be seated.

8                 Welcome back.  I'm going to re-read for you one

9    of the instructions that now has some additional language.

10   You should not give this any greater or lesser weight than

11   any other instructions.  Indeed, you should consider all of

12   the instructions together as a whole.  I inserted additional

13   language.  I'm going to read one instruction to you again

14   and then I'm going to send back to you the full set of the

15   jury instructions; okay?

16                This is with the respect to Counts II and III,

17   dangerous weapon.

18                The last element the Government must prove

19   beyond a reasonable doubt as to Counts II and III is that

20   the defendant used a dangerous weapon to assault, resist,

21   or interfere with a federal officer.  The term "dangerous

22   weapon" means any thing capable of inflicting serious bodily

23   injury or causing the death of a person.  "Serious bodily

24   injury" means bodily injury which involves a substantial

25   risk of death, extreme physical pain or protracted loss or

1    impairment of the function of a bodily member, organ or

2    mental faculty.

3            Both the physical capabilities of the thing used

4    and the manner in which it is used may be considered in

5    determining whether the thing is a dangerous weapon.

6            All right.  Thanks.

7            (Jury left courtroom.)

8            THE COURT:  Please be seated.

9            I'll make a request.  I know that the hour is

10   late but I would ask counsel, if you would -- counsel, not

11   the defendant.  If he needs to be taken down, that's fine.

12   But I would ask counsel if you wouldn't hesitate here for

13   maybe 10 minutes or so.  Sometimes right after they go out,

14   a jury will have a quick question.  And if we have to find

15   you and bring you back, what we could have handled very

16   rapidly ends up taking a lot of time.  So if you don't mind

17   giving until, you know, just until 12:30; all right?  And

18   then you are free to go get a bite to eat, whatever you need

19   to do.

20           I will need, however, a contact number where you

21   can be reached rapidly in case the jury has a question or in

22   the event we get a verdict so that you can be brought back

23   quickly.  Okay?  So please make sure you give that to one of

24   the clerks here before me and we'll want to have you close

25   enough to the courthouse that once that call is made it

1    would take no more than ten minutes for you to get here; all

2    right?

3                    All right.    Thanks.    We're in recess.

4                    (Off the record from 2:23 p.m. until 4:38 p.m.)

5                    THE COURT:    Please be seated.

6                    As I'm sure you've been told by now, we received

7    a note from the jury indicating that they have a verdict, so

8    we'll bring the jury in and take the verdict.

9                    (Jury returned.)

10                   THE COURT:    Thank you.    Please be seated, ladies

11   and gentlemen.

12                   I received a note from your foreperson

13   indicating that you have a verdict.

14                   Madam Foreperson, is this your verdict?

15                   THE FOREPERSON:    Yes, Your Honor.

16                   THE COURT:    All right.    And the verdict of the

17   jury?

18                   THE FOREPERSON:    Yes, Your Honor.

19                   THE COURT:    All right.    I'll ask the courtroom

20   deputy to publish the verdict.

21                   THE DEPUTY CLERK:    As to count one, charging the

22   defendant, Nelson Lora-Pena, with assault Jack Leo, the jury

23   find the defendant guilty.

24                   As to count two, charging the defendant, Nelson

25   Lora-Pena, with assault on Robert Denney, the jury finds the

1    defendant guilty.

2           As to count three, charging the defendant,

3    Nelson Lora-Pena, with assault on William David, the jury

4    finds the defendant guilty.

5           As to count four, charging the defendant, Nelson

6    Lora-Pena, with assault on David Thomas, the jury finds the

7    defendant guilty.

8           THE COURT:  All right.  Mr. Peruto, any

9    applications?

10          MR. PERUTO:  I ask the jury be polled, Your

11    Honor.

12          THE COURT:  All right.  Ladies and gentlemen,

13    let me explain this to you.  Polling of the jury simply

14    means I will ask each of you whether the verdict represents

15    your vote; okay?  And I'll ask you individually by juror

16    number and I'll ask you as to each count.  So it will take

17    a couple minutes to roll through it but the defense is

18    entitled to be assured that this verdict represents all of

19    your votes as to all of the counts.  All right?

20          So Juror No. 1, is this your verdict?

21          JUROR NO. 1:  Yes.

22          THE COURT:  You have to stand.

23          Is this your verdict as to count one?

24          JUROR NO. 1:  Yes, Your Honor.

25          THE COURT:  As to count two?

1          JUROR NO. 1:  Yes, Your Honor.

2          THE COURT:  As to count three?

3          JUROR NO. 1:  Yes, Your Honor.

4          THE COURT:  As to count four?

5          JUROR NO. 1:  Yes, Your Honor.

6          THE COURT:  Thank you.

7          Juror No. 2, is this your verdict as to count

8      one?

9          JUROR NO. 2:  Yes, Your Honor.

10         THE COURT:  As to count two?

11         JUROR NO. 2:  Yes.

12         THE COURT:  As to count three?

13         JUROR NO. 2:  Yes, Your Honor.

14         THE COURT:  As to count four?

15         JUROR NO. 2:  Yes, Your Honor.

16         THE COURT:  Thank you, ma'am.

17         Juror No. 3, is this your verdict as to count

18     one?

19         JUROR NO. 3:  Yes, Your Honor.

20         THE COURT:  As to count two?

21         JUROR NO. 3:  Yes, Your Honor.

22         THE COURT:  As to count three?

23         JUROR NO. 3:  Yes, Your Honor.

24         THE COURT:  As to count four?

25         JUROR NO. 3:  Yes, Your Honor.

1              THE COURT:  Thank you, sir.

2              Juror No. 4, is this your verdict as to count

3     one?

4              JUROR NO. 4:  Yes, Your Honor.

5              THE COURT:  As to count two?

6              JUROR NO. 4:  Yes, Your Honor.

7              THE COURT:  As to count three?

8              JUROR NO. 4:  Yes.

9              THE COURT:  And as to count four?

10             JUROR NO. 4:  Yes.

11             THE COURT:  Thank you.

12             Juror No. 5, is this your verdict as to count

13    one.

14             JUROR NO. 5:  Yes, Your Honor.

15             THE COURT:  As to count two?

16             JUROR NO. 5:  Yes, Your Honor.

17             THE COURT:  As to count three?

18             JUROR NO. 5:  Yes, Your Honor.

19             THE COURT:  As to count four?

20             JUROR NO. 5:  Yes, Your Honor.

21             THE COURT:  Thank you.

22             Juror No. 6, is this your verdict as to count

23    one?

24             JUROR NO. 6:  Yes, Your Honor.

25             THE COURT:  As to count two?

1            JUROR NO. 6:  Yes, Your Honor.

2            THE COURT:  As to count three?

3            JUROR NO. 6:  Yes, Your Honor.

4            THE COURT:  As to count four?

5            JUROR NO. 6:  Yes, Your Honor.

6            THE COURT:  Thank you.

7            Juror No. 7, is this your verdict as to count

8    one.

9            JUROR NO. 7:  Yes, Your Honor.

10           THE COURT:  As to count two?

11           JUROR NO. 7:  Yes, Your Honor.

12           THE COURT:  As to count three?

13           JUROR NO. 7:  Yes, Your Honor.

14           THE COURT:  As to count four?

15           JUROR NO. 7:  Yes, Your Honor.

16           THE COURT:  Thank you, ma'am.

17           Juror No. 8, is this your verdict as to count

18   one.

19           JUROR NO. 8:  Yes, sir.

20           THE COURT:  As to count two?

21           JUROR NO. 8:  Yes, sir.

22           THE COURT:  As to count three?

23           JUROR NO. 8:  Yes, Your Honor.

24           THE COURT:  As to count four?

25           JUROR NO. 8:  Yes, sir.

1          THE COURT:  Thank you, ma'am.

2          Juror No. 9, is this your verdict as to count

3    one.

4          JUROR NO. 9:  Yes, it is, Your Honor.

5          THE COURT:  As to count two?

6          JUROR NO. 9:  Yes, Your Honor.

7          THE COURT:  As to count three?

8          JUROR NO. 9:  Yes, Your Honor.

9          THE COURT:  As to count four?

10          JUROR NO. 9:  Yes.

11          THE COURT:  Thank you.

12          Juror No. 10, is this your verdict as count one?

13          JUROR NO. 10:  Yes, Your Honor.

14          THE COURT:  As to count two?

15          JUROR NO. 10:  Yes, Your Honor.

16          THE COURT:  As to count three?

17          JUROR NO. 10:  Yes.

18          THE COURT:  As to count four?

19          JUROR NO. 10:  Yes.

20          THE COURT:  Thank you, ma'am.

21          Juror No. 11, is this your verdict as to count

22    one?

23          JUROR NO. 11:  Yes, Your Honor.

24          THE COURT:  As to count two?

25          JUROR NO. 11:  Yes, Your Honor.

1     THE COURT:  As to count three?

2     JUROR NO. 11:  Yes, Your Honor.

3     THE COURT:  As to count four?

4     JUROR NO. 11:  Yes, Your Honor.

5     THE COURT:  Thank you, sir.

6     Juror No. 12, is this your verdict as to count

7 one?

8     JUROR NO. 12:  Yes, Your Honor.

9     THE COURT:  As to count two?

10     JUROR NO. 12:  Yes, Your Honor.

11     THE COURT:  As to count three?

12     JUROR NO. 12:  Yes, Your Honor.

13     THE COURT:  As to count four?

14     JUROR NO. 12:  Yes, Your Honor.

15     THE COURT:  Thank you.

16     Ladies and gentlemen of the jury, it's not an

17 easy thing to sit in judgment.  Thank you very much for your

18 service in this matter.  You are now free to go.  And if you

19 have a moment or two, you can hesitate, I'd be pleased to

20 have a chance to thank you in person, but you sure don't

21 have to wait for me if you don't want to.  You are all

22 excused with the gratitude of the Government and all

23 involved in these proceedings.

24     Okay.  Let's have them out.

25     (Jury left courtroom.)

1          THE COURT:  All right.  Please be seated.

2          Mr. Peruto, Ms. Byrd, are there any other

3   matters that need to come before the court at this time?

4          MR. PERUTO:  No, Your Honor.

5          MS. BYRD:  No, Your Honor.

6          THE COURT:  All right.  I thank counsel for all

7   parties involved for an efficiently tried case.  We'll set a

8   sentencing date at some point in the future and communicate

9   it to the parties.

10         MS. BYRD:  Yes, Your Honor.

11         THE COURT:  We stand in recess.

12         (Jury trial concludes at 4:48 p.m.)

13

14                         INDEX

15

16  NELSON LORA-PENA

17     CROSS-EXAMINATION BY MR. PERUTO               3
       DIRECT EXAMINATION BY MR. PERUTO             25
       CROSS-EXAMINATION BY MS. BYRD               36

18

19  CLOSING ARGUMENT BY MS. BYRD                    55

20  CLOSING ARGUMENT BY MR. PERUTO                  89

21  REBUTTAL ARGUMENT BY MS. BYRD                  102

22  INSTRUCTIONS TO THE JURY                       111

23  JURY VERDICT                                   138

24

25