# Exhibit 3

1            IN THE UNITED STATES DISTRICT COURT

2            IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4    UNITED STATES OF AMERICA,        :    CRIMINAL ACTION
                                      :
5              Plaintiff,             :
                                      :
6              v.                     :
                                      :
7    NELSON LORA-PENA,                :
                                      :
8              Defendant.             :    NO. 05-47 (KAJ)

9                          - - -

10                     Wilmington, Delaware
               Tuesday, December 20, 2005 at 3:17 p.m.
11                     SENTENCING HEARING

12                         - - -

13   BEFORE:        HONORABLE **KENT A. JORDAN**, U.S.D.C.J.

14                         - - -

15

     APPEARANCES:
16

17             RICHARD ANDREWS, ESQ.
               First Assistant United States Attorney
18
                    Counsel for Government
19

20             LAW OFFICES OF CHARLES PERUTO, JR.
               BY:  CHARLES PERUTO, JR., ESQ.
21                  (Philadelphia, Pennsylvania)

22                  Counsel for Defendant

23

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter

```
1
2
3
4
5                              - oOo -

6                       P R O C E E D I N G S

7            (REPORTER'S NOTE:  The following sentencing

8    hearing was held in open court, commencing at 3:17 p.m.)

9            THE COURT:  Good afternoon.  Please be seated.

10           MR. ANDREWS:  Good afternoon, Your Honor.  This

11   is the time the Court has set for sentencing in the United

12   States vs. Nelson Lora-Pena, Criminal Action 05-47-KAJ.

13           Mr. Lora-Pena and his attorney, Mr. Peruto are

14   present in the courtroom.  And at this time, we're prepared

15   to move forward with sentencing on that matter.  Even though

16   I'm not sure there actually appears anything in the docket,

17   I also understand the Court might address the supervised

18   release violation that has been transferred from Rhode

19   Island and given a separate number, even though, based on my

20   discussions with Mr. Peruto, I'm not sure that it doesn't

21   make since to postpone consideration of that until the Court

22   has sentenced him on the main charge and then see where

23   things stand.

24           THE COURT:  All right.  Well, Mr. Peruto, why

25   don't I have you come forward, please.
```

1          My understanding was that the Presentence and

2     Probation Office had been in touch with your colleague,

3     Mr. Driscoll.  Have I got that correct?

4          MR. PERUTO:  That's right.

5          THE COURT:  I believe I have his name right.

6     And there had been some conversation about the supervised

7     release violation indicating that charge was not going to be

8     contested.

9          MR. PERUTO:  It's not going to be.  It's not

10    going to be, judge.  It's a supervised release violation and

11    it speaks for itself.

12         THE COURT:  Well, I agree, so I'm not sure

13    why we would postpone.  Mr. Andrews, do you want to help

14    me out?

15         MR. ANDREWS:  Your Honor, maybe I just

16    misunderstood the conversation I had with Mr. Peruto before

17    we got started.

18         THE COURT:  Well, why don't we do this?  It

19    makes sense to me, actually, to just take of that; okay?

20    Let's get that taken care of because you may have some

21    issues with the presentence report and discussion I'll have

22    on that.  So let's deal with what is not contested at this

23    point.  And for that purpose, I'm going to ask Mr. Lora-Pena

24    to come forward, if you would, please.

25         Hold on just a minute.  Let me explain.  You may

1    well understand already, Mr. Lora-Pena.  Let me explain what

2    is going on.  We have two things we have to deal with.  You

3    were convicted of the charges that you were tried for in

4    this court but you also face a penalty associated with your

5    plea in Rhode Island and a supervised release violation

6    order that you be held to account for that was issued in

7    Rhode Island that was transferred down to this court by the

8    judge up there, to be addressed by me at the same time,

9    basically, as we're dealing with this.  So I just need

10   to ascertain or make sure that if in fact you are not

11   contesting that you violated your supervised release up

12   there that the record is clear on that.

13               THE DEFENDANT:  Yes, Your Honor.  I admit to it,

14   that I violated my probation.  I admit to it.

15               THE COURT:  All right.  Well, here is what I

16   need to do.  I'm going to go ahead have the courtroom deputy

17   swear you in, ask a few questions in that regard and make a

18   record.  All right?

19               (Defendant, NELSON LORA-PENA, placed under oath

20   at 3:07 p.m.)

21               THE COURT:  All right.  Now, the specific charge

22   here is that you violated condition two of your supervised

23   release by failing to report to the probation officer,

24   condition four of the supervised release by failing to make

25   child support payments as ordered, condition six by failing

1    to report a change of address, condition 11 by failing to

2    report a new arrest, and a violation of condition seven

3    regarding possession of a controlled substance.  However,

4    the Probation Office has asked that we dismiss that

5    condition seven.  So we're here talking about conditions

6    two, four, six and eleven.  Do you understand what I just

7    said, sir?

8              THE DEFENDANT:  Yes, Your Honor.

9              MR. PERUTO:  If I could just interject here,

10   judge.

11             THE COURT:  Sure.

12             MR. PERUTO:  The defendant's wife was here

13   throughout the proceedings for the trial, and I can

14   represent to the Court that she was not pushing for the

15   child support enforcement in light of the fact that he had

16   sent her as much money as he could along the way.  So he

17   was not prepared to admit -- I don't know if it's going to

18   make a great deal of difference -- admit on that condition

19   or on any cocaine charge, but the other charges he would

20   in fact be admitting to.

21             THE COURT:  All right.

22             MR. PERUTO:  I don't know if it will make any

23   difference.

24             THE COURT:  All right.  But as to condition two,

25   the failure to report to the probation officer; condition

1    11, failure to report an arrest; condition six, failure to

2    report a new address?

3                MR. PERUTO:  It's admitted to.

4                THE COURT:  Mr. Andrews, do you have any problem

5    with proceeding on those three and leaving the other two?

6                MR. ANDREWS:  Your Honor, Mr. Selvaggi told me

7    before the hearing that he would be perfectly amenable

8    dropping the charge of the violation of condition number

9    four, also.  So I'm perfectly happy to proceed on the basis

10   of those three admissions.

11                THE COURT:  All right.  Now, just real

12   quickly.  I want you to understand that if you wanted to,

13   Mr. Lora-Pena, you could contest the facts here.  In other

14   words, you don't have to admit to these violations.  So I'm

15   going to ask you a few questions to make sure you understand

16   what your rights are and that you are knowingly --

17                THE DEFENDANT:  Your Honor, excuse me.  Can

18   you speak up a little?  Because I got hearing problem, so

19   I can't hear clear what you say to me.

20                THE COURT:  All right.  Is that better for

21   you?

22                THE DEFENDANT:  Yes.  Thank you.

23                THE COURT:  Okay.  First, I want you to tell

24   me how far -- well, tell me how old you are today.

25                THE DEFENDANT:  I'm 39.

1         THE COURT:  When is your birthday?

2         THE DEFENDANT:  August 2nd, 1966.

3         THE COURT:  And how far did you go in school?

4         THE DEFENDANT:  I graduated, 1985.

5         THE COURT:  High school?

6         THE DEFENDANT:  Yes.

7         THE COURT:  Okay.  Have you been hospitalized

8    or treated for any mental illness or addiction to drugs?

9         THE DEFENDANT:  Yes, I did.  When I was on

10   supervised release from my probation officer, he sent me

11   to --

12        THE COURT:  Okay.  Several years ago?

13        THE DEFENDANT:  Yes.

14        THE COURT:  Are you suffering from, today, from

15   any mental illness or addiction to drugs that you are aware

16   of?

17        THE DEFENDANT:  You could say, yes.  I'm sorry.

18   Yes, I am.  I'm a drug addict, Your Honor.

19        THE COURT:  All right.  Are you under the

20   influence of drugs at this time?

21        THE DEFENDANT:  No, sir.

22        THE COURT:  All right.  Are you under the

23   influence of any alcoholic beverage of any kind at this

24   time?

25        THE DEFENDANT:  No, Your Honor.

1          THE COURT:  And do you understand the purpose

2     of our discussion here is to establish whether or not you

3     violated supervised release and that that has some penalties

4     associated with it?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Okay.  Now, those three charges that

7     we're here talking about:  condition number two, failure

8     report to a probation officer; condition number six, failure

9     to report a change of address; and condition number eleven,

10    failure to report a new address.  Do you understand that

11    those are the things that the Government is now arguing that

12    you should be held to account for violating on your previous

13    supervised release?  Do you understand that?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Are you satisfied with the

16    representation that Mr. Peruto has given you in the course

17    of the case you had here and any discussions you had with

18    him about the supervised release violation?

19         THE DEFENDANT:  Yes.

20         THE COURT:  And is your willingness to admit

21    or acknowledge that you violated your supervised release

22    something that you had an opportunity to discuss fully with

23    Mr. Peruto?

24         THE DEFENDANT:  Yes.  I mean I'll admit to that,

25    Your Honor.

1          THE COURT:  Has anybody attempted to force you

2     to admit to this violation?  Are you doing it of your own

3     free will?

4          THE DEFENDANT:  I'm doing it of my own free

5     will.

6          THE COURT:  Let me just ask you real quickly, if

7     I could.  Mr. Andrews, if we had to go to a hearing on this,

8     how would you prove these violations?

9          MR. ANDREWS:  Your Honor, I would call Probation

10    Officer John Selvaggi who has been in contact with Kurt

11    O'Sullivan who was the supervising U.S. Probation officer at

12    the time and who was familiar with the case, and basically

13    he would say what the records of the Probation Office up

14    there showed, combined with the fact Mr. Lora-Pena was

15    arrested here for being a fugitive for nine years last year

16    or earlier this year.  And, more specifically, that he

17    basically dropped out of contact with the probation officer,

18    Probation Office there.  January 5th, 1996 was the last time

19    that they saw him and he just dropped off the face of the

20    earth from that point forward.

21          THE COURT:  All right.

22          Mr. Peruto, is there anything you want to

23    contest or argue with respect to that?

24          MR. PERUTO:  No, sir.  They are the facts.

25          THE COURT:  All right.  Now, then I'm going to

1    go ahead and make a finding based on a preponderance of the

2    evidence, including Mr. Lora-Pena's statement that in fact

3    he is guilty of those supervised release violations.   I

4    heard you correct on that, didn't I, sir?

5                    THE DEFENDANT:  Yes, sir.

6                    THE COURT:   That he is in violation of those

7    three conditions:   numbers two, six and eleven, all of

8    which are classified as grade C violations pursuant to U.S.

9    sentencing guideline 7B1.1a3 and which then call for a term

10   of imprisonment of at least five months but no more than

11   11 months based on the criminal history category

12   Mr. Lora-Pena had at the time of that conviction.

13                   Do you have any disagreement with that guideline

14   range, Mr. Peruto?

15                   MR. PERUTO:  I do not, sir.

16                   THE COURT:  Mr. Andrews?

17                   MR. ANDREWS:  No, Your Honor.

18                   THE COURT:  All right.  Well, then we have

19   established that and we have established the guideline range

20   for that.  We'll go ahead and talk about the right sentence

21   for that after we now deal with the guideline range

22   associated with the offense of conviction for which you were

23   tried in this Court, Mr. Lora-Pena; okay?

24                   So at this point, let me just ask, do you have

25   any factual dispute or legal dispute, Mr. Peruto, with the

1    presentence report?  And if we're going to have some legal

2    argument for awhile, I don't know, Mr. Peruto --

3              MR. PERUTO:  You can sit down.

4              THE COURT:  Okay.  Why don't you go ahead and

5    have a seat, Mr. Lora-Pena, and I'll have you back up here

6    in a few minutes.

7              MR. PERUTO:  Judge, my office has been in

8    contact with Mr. Durkin.  As a matter of fact, we just spoke

9    again today.  I understand how he arrived at the guideline

10   calculation which we respectfully disagree with.  We believe

11   that they can be grouped and that his original calculation

12   was correct on the 70-to-87 month calculation.

13             THE COURT:  Well, explain to me.  Explain to

14   me why you think they can be grouped.  This is not an

15   insignificant amount.

16             MR. PERUTO:  Yes, I know.  Judge, the guidelines

17   go back and forth.  I understand there are specific language

18   on this because there were four marshals.  But also, it's

19   one criminal episode.  If it was 100 marshals, it wouldn't

20   be calculated any differently than one criminal episode.

21   It's how many people were trying arrest him would not,

22   should not affect the guideline calculation.

23             THE COURT:  What guideline provision are you

24   relying on?

25             MR. PERUTO:  The basic offense level of the --

1    I'm looking at the language, which I didn't bring my book

2    but I'm looking at the language and the basic calculation

3    where --

4                 THE COURT:  Hold on a minute.  I'm happy to lend

5    you this.  Why don't I have the courtroom deputy hand this

6    to you, if it would be of assistance to you.

7                 (Sentencing guidelines book passed back.)

8                 MR. PERUTO:  And I apologize.  I was on trial

9    and I sent a letter saying I couldn't look this up.  I

10   didn't have enough time.

11                THE COURT:  That's all right, Mr. Peruto.  I

12   know this is important to you and your client.  I'm happy to

13   take the time here that you would like to have.

14                (Pause.)

15                THE COURT:  If it's of any assistance to you,

16   let me just mention that Section 3D1.4 is the multiple count

17   adjustment section used in the presentence report.

18                MR. PERUTO:  That's the page I'm on, judge.

19                THE COURT:  All right.

20                MR. PERUTO:  The 3A1.4 seems to indicate that it

21   cannot be grouped.  That's conceded.

22                THE COURT:  Yes.

23                MR. PERUTO:  I'm looking at the general.  When I

24   was looking at the Base Offense Level, my argument is it

25   wouldn't matter how many marshals were involved.

```
 1              THE COURT:  All right.  So let me make sure I
 2   understand.  I'll reflect this back to you.  It's not -- you
 3   are not relying on a specific guideline section but on a
 4   general principle as you have just articulated it, that one
 5   episode as you have described it or criminal event should be
 6   treated as amenable to grouping.  Have I understood you
 7   right?
 8              MR. PERUTO:  Yes, sir.
 9              THE COURT:  Okay.  Thank you.  I'll go ahead and
10   take back my book, if you are willing to give it back.  And
11   I'll ask the Government, Mr. Andrews, if you would please
12   respond to this argument.
13              (Sentencing guideline book passed forward.)
14              MR. ANDREWS:  Your Honor, I'm looking at -- I
15   don't know whether you have the 2005 book in front of you
16   but I'm looking at page 338 which is under Section 3D1.2,
17   and it says groups of closely related counts and it has two
18   lists.  One offense is covered by the guidelines that are
19   to be grouped and one they're specifically excluded.  And
20   under specifically excluded, the first thing listed is all
21   offenses in chapter two, part A, which is the assault
22   provisions that are at issue in this case.
23              Further, when I had provided the case to the
24   U.S. Probation Office, United States vs. Johnson, which is
25   at 931 F2d 238, and that involved the armed robbery of three
```

1    Assistant U.S. Attorneys so I had a particular interest in

2    the case.  That occurred in Newark, New Jersey.  And I

3    haven't looked at the case for awhile, but basically the

4    part that I think that I've got in front of me that is

5    highlighted in yellow talks about applying the section 3D1.2

6    procedure to the facts of this case.  The assault of the

7    three Assistant U.S. Attorneys are treated as distinct

8    groups because they involve different victims.  And I think

9    the case is perhaps more complex so I may be glossing over

10   it a little bit, but I thought this was pretty much directly

11   on point.

12            And, essentially, it's the same thing here.

13   You have an assault on four U.S. Marshals.  They're each a

14   separate victim and so they should be treated as distinct

15   groups.  So I believe not only is the guideline fairly

16   specific but I believe the case law supports that

17   interpretation.

18            THE COURT:  Okay.  Mr. Peruto, I don't know

19   whether there is anything you want to add above that and if

20   not, we'll move to what, if any, other issues you want to

21   raise.

22            MR. PERUTO:  Just in 10 seconds, judge.  When

23   you rob somebody, it's an intentional act.  You see your

24   victims, you know who it is and you are going to rob them.

25   If there are five people there, that's five counts of

1    robbery.  But in this particular case, if a hundred marshals

2    came to arrest him ... you know the rest of my argument.

3               THE COURT:  Okay.  Yes.  Any other points with

4    respect to either the factual or legal issues addressed in

5    the presentence report?

6               MR. PERUTO:  Well, you heard the defendants'

7    testimony, judge.  The discharge of the weapon had nothing

8    to do with him and it was discharged, and you saw where it

9    landed with the physical evidence where it was pointing, and

10   it went out straight which means it would have to be on the

11   ground.  So it was a factual thing.  He denied he had

12   anything to do or his hands were not on the rifle when it

13   was discharged.  And I understand he is getting a five level

14   enhancement because that rifle was discharged.  It had

15   nothing to do with the case at bar, but I understand to the

16   victor goes the spoils so I'm just making the objection.

17              THE COURT:  Okay.  Is there anything else?

18              THE DEFENDANT:  No, not on the calculations.

19              THE COURT:  Okay.  Mr. Andrews, with respect to

20   the discharge of the weapon.

21              MR. ANDREWS:  Your Honor, as you know, I wasn't

22   at the trial.  I did talk to the marshals beforehand and my

23   belief is that the trial testimony and the trial verdict

24   pretty much established that the gun went off while the

25   defendant was reaching for it and that he caused it to go

1       off and, therefore, I think the guideline applies.

2               THE COURT:  Okay.  Well, I don't know.

3       Mr. Peruto, again I'll give you the last word, if you want

4       it.

5               MR. PERUTO:  (Stands up and sits back down,

6       indicating no.)

7               THE COURT:  Okay.  Mr. Peruto is indicating he

8       doesn't have anything he wants to add, so I'll go ahead and

9       rule on these two points.

10              First, as to the grouping, I think I understand

11      the policy argument that you have made, Mr. Peruto, but the

12      guidelines are very explicit.  3D1.2d tells me I'm not to

13      group these counts.  And that is a product of the reflection

14      of the Commission, and the rationale to that is as has been

15      described with counsel for the Government and is essentially

16      that which is laid out in the case that the Government has

17      cited here today.  So I'm not grouping the counts.

18              I accept the calculations as set forth in the

19      presentence report, and including the calculation associated

20      with the discharge of the weapon.  Given the verdict of the

21      jury and the evidence which I, myself heard at least to a

22      preponderance of the evidence, I conclude that that weapon

23      was discharged as a result of and as a direct consequence of

24      the struggle which was going on between the marshal and the

25      defendant.  I should say the particular deputy marshal who

1    was involved in that struggle with the defendant.  And so

2    that five level increase is applicable by the terms of the

3    guideline, itself.

4         So on the basis of those decisions, let me say

5    that I believe the presentence report is correct in

6    reflecting a Total Offense Level of 29 and a Criminal

7    History Category of I today.

8         Now, having said that, I should also note that

9    the guideline range that yields is 87-to-108 months.  And I

10   will now hear you, Mr. Peruto, and your client for any

11   comments that you want to make.

12        MR. PERUTO:  May it please the Court, I'm not

13   going to call them individually as witnesses but I would

14   like the record to reflect.  And when I call their name, I'd

15   ask them to stand.

16        Matilda Lora, the defendant's mother.

17        Brendan Alberto Carrera, the defendant's nephew.

18        Tanya Lora, his sister.

19        Brigese Lora, his sister-in-law (phonetic).

20        And, Ernesto Lora, his brother.  His oldest

21   brother.

22        You can all sit down.

23        I want the record to reflect that you may have

24   recognized them when they came up.  Some of them were here

25   for all of the proceedings.  Some of them were here for the

1    last day.

2                    THE COURT:  I certainly recognize some of them

3    and their names from the letters, which I received and which

4    I have had a chance to look at.  I want to assure the family

5    I've had a chance to see the things they sent to me.  All

6    right?

7                    MR. PERUTO:  Judge, if I may, Ernesto just

8    wanted to address you briefly on this matter, if he could.

9                    THE COURT:  All right.  I'll hear from him.

10                   MR. LORA:  Good afternoon, Your Honor.

11                   THE COURT:  Good afternoon.

12                   MR. LORA:  This is a moment that I never had,

13   but this is an opportunity for a new life for my brother.

14   That gentleman that is sitting there could be an honor to me

15   and my father, could be a good man in society.  It was wrong

16   for him flee, I believe in that, but what he has done, okay,

17   in the past.  He has his friends to come here and tell you

18   that he is innocent.

19                   THE COURT:  Okay.  All right.

20                   MR. LORA:  And one last thing is I know my

21   brother did not do what he was being charged, what he is

22   being here, just as simple as that.  His four -- the four

23   marshals are in their houses.  There is no injury, with no

24   expense of medical, and that is very important to see.  And

25   if my brother touch that pistol that they say that was

1    discharged, they would have shot my brother.  I guaranteed

2    you that.  Anybody that reaches an arm here in the United

3    States is directly going to get shot, no matter what.  And I

4    believe in my brother 100 percent, because we are taught as

5    a family in this country, where we have 40 years that we're

6    all United States American citizens.  And that's the only

7    thing that I want to tell you.  Just look at him.  We all

8    have families here.  There's always -- like America, there's

9    always an opportunity.  Thank you, Your Honor.

10              THE COURT:  All right.

11              MR. LORA:  Thank you, Your Honor.

12              THE COURT:  All right.

13              MR. PERUTO:  Judge, I do have a few remarks.

14   This defendant is not an American citizen.  He didn't know

15   that himself, which is the ironic twist here.  He thought he

16   was born in New York City.  As it turns out, he was three

17   months old when he came to this country but he has obviously

18   no way of knowing that.  Never applied for citizenship.

19   Never knew that he was a foreigner.  He has no contacts

20   whatsoever with the Dominican Republic.  He doesn't know

21   anybody there.  Yet there is an immigration detainer on him

22   and he is going to be deported, we all know that, and there

23   is nothing that this Court can do about that.  No matter if

24   you give him probation or you give him a million years,

25   there is nothing that is going to affect that.

1      It's just ironic whatever punishment he serves

2      here, he is then banished to the Dominican Republic, which is

3      more punishment than any of us can envision, including him.

4      I would ask that you take that into consideration.  You know

5      that the guidelines are advisory.  It's a strong advisory

6      but they're advisory.  He is going to be deported.  If his

7      family wants to join him, that is on them, and Your Honor

8      knows that.  But it's an added punishment because of those

9      three months time where he believes he was born in New York

10     but there is no paperwork to prove it.  Matter of fact, the

11     paperwork seems to indicate otherwise, and that is what I'm

12     told by the immigration lawyer, that it's a losing case, so

13     I want Your Honor to keep that under distribution.

14          Secondly, there were no injuries here.  We're

15     not here to relitigate the case and you know that.  And I

16     tried to tell the defendant today is not the day to

17     relitigate this case.  But there were no injuries.  The pit

18     bulls did not attack anybody but each other.  The pit bulls

19     were put in a room.  They attacked each other, if you

20     remember.  They were injured somewhat themselves.

21          THE COURT:  Well, I remember hearing testimony a

22     little bit differently than that, but I certainly understand

23     that that is the defendant's perspective on the evidence.

24          MR. PERUTO:  Nobody was injured except the

25     defendant.  I think there was a great deal was made out of a

1    minor scratch that was on one of the hands of one of the

2    marshals, so I know that this Court would give a more severe

3    sentence if any of them were in fact injured.  I believe

4    that the marshal himself in this particular case was not

5    trying to exaggerate what happened and he was trying to be

6    as candid as possible.  And this defendant testified that it

7    was his observation that two of the marshals were excessive

8    and two of them were trying to help him, especially the

9    marshal.  I don't know what sense that would make unless he

10   really felt that way, that two of them were overreacting.

11   And the marshal himself I believe was the last Government

12   witness.  The defendant didn't have much of a quarrel with

13   he had to say, if Your Honor will recall.  The trial wasn't

14   that long ago.

15          I will ask to you take all of this into

16   consideration.  The guidelines are severe, especially in

17   light of the deportation.  He knows he -- I mean his life,

18   it's just been ridiculous.  To walk away from the supervised

19   release problem in Rhode Island and to turn it upside down

20   for a few months is totally ridiculous, and it's just one

21   thing that compounded itself, compounded itself, compounded

22   itself to where we're now here.  It's a real snowball

23   effect.

24          I believe the defendant wants to address you

25   before sentencing and that's all the remarks I would like to

1    say.

2              THE COURT:  All right.  Mr. Lora-Pena, if you

3    would come forward again, sir.  You don't have to say

4    anything, but if you would like to say something, now is

5    your opportunity to do it, sir, and I'm happy to hear you.

6              THE DEFENDANT:  Thank you, sir.

7              I'm nervous, Your Honor.

8              THE COURT:  That's all right.

9              THE DEFENDANT:  Can I address the Court about my

10   PSI?  May I, please?  Just a little article?  Is that okay?

11             THE COURT:  You know what?  This is an important

12   day for you and I'm ready to hear what you would like to

13   say.

14             THE DEFENDANT:  Thank you, Your Honor.  I'm a

15   little nervous.

16             You got the same paperwork, right, Your Honor.

17             THE COURT:  I do.

18             THE DEFENDANT:  Can you look at number 40,

19   please?

20             MR. PERUTO:  He is referring to paragraph number

21   40, judge.

22             THE COURT:  Okay.  I have that in front of me.

23             THE DEFENDANT:  The first PSI, the first paper,

24   on November the 17th.

25             THE COURT:  I'm sorry.  I have the revised one,

1   the December 20th one.  If you want to wait just a moment,

2   we'll see if I can put my hand on that.

3                    THE DEFENDANT:  Yes, please.

4                    MR. PERUTO:  I didn't know he was going to refer

5   to that one, judge.  I have mine.

6                    (Documents passed forward to Court.)

7                    THE COURT:  All right.  The presentence officer

8   was kind enough to give me a copy of the November 17th

9   version of this report so I'm now looking at page eight,

10  paragraph 40 of that document.

11                    Go ahead, if you would like, Mr. Lora-Pena.

12                    THE DEFENDANT:  It says Nelson Lora-Pena was

13  born on August the 2nd, 1996.

14                    THE COURT:  It appears to be a typographical

15  error.

16                    THE DEFENDANT:  That would make me 10 years old.

17  10.  So that means to say the marshals been looking for a

18  kid since he was two years old.  Right?

19                    THE COURT:  Well --

20                    THE DEFENDANT:  This is the Government.

21                    THE COURT:  That would be the case I guess if I

22  were inclined to look at a typographical error and give it

23  much credence but I'm not.

24                    Is there anything else about the presentence

25  report?

1          THE DEFENDANT:  So I mean this kid is not me.

2          And look at number 34, please.

3          THE COURT:  Okay.

4          THE DEFENDANT:  According to court record

5    document, on July 6th, 1972, the defendant presented an

6    application for passport in the name of Bubois B. Aviles.

7          July the 6th, 1972.  That makes me six years

8    old.

9          THE COURT:  All right.

10          THE DEFENDANT:  I just wanted to prove a point

11    here.

12          THE COURT:  All right.  Is there anything else

13    you want to point to in the presentence report or this

14    earlier version of it?

15          THE DEFENDANT:  Your Honor, I admit that I'm

16    in for 10 years.  I'm in for 10 years.  I'm human.  Humans

17    make mistakes.  I admit to that.  But I'm tired of getting

18    in trouble, constantly influenced by friends.  I wasn't

19    trying to get in trouble, trouble always haunt me.  If you

20    can see my records, I pled guilty to everything that I have

21    done because I admit that I did it.  But in this case, how

22    was I going to plead guilty to something I haven't done and

23    I am still innocent.  I know I am.  And you just said

24    yourself -- number seven.  Would you look at seven, please,

25    sir?

1                THE COURT:  Sure.  Go ahead.

2                THE DEFENDANT:  I'm sorry.  16.

3                THE COURT:  All right.  Mr. Lora-Pena, I have it

4  in front of me.

5                THE DEFENDANT:  I'm sorry.  I'm just a little

6  nervous.

7           It says by virtue of evidence presented in

8  trial, the defendant was responsible for grabbing at the

9  marshal's shotgun and cause it to discharge.  And at the

10  end, I'll make it short, it says based on information.  Your

11  Honor, I'm trying to ask myself this question.  What is

12  justice about?  Justice about the truth.  I'm asking, is it

13  about the truth?

14                THE COURT:  Well, I'm not here to answer your

15  question.  I'm here to hear what you would like to say, sir,

16  so if there is something you want to say, go ahead.

17                THE DEFENDANT:  I'm just asking because it says

18  information.  I thought justice was about the truth.  I'm

19  asking you, Your Honor.  You just said it yourself.  You

20  heard the evidence.  What evidence?  What evidence is

21  information?  It was saying information that he said.

22  Basically I'm accused by, he say, information.  Where is it?

23  Where is my fingerprints on the weapon?  Where is it?  No

24  fingerprints, nothing.  Just by information?

25           That is one thing the TV teaches you a lot.

1   Teaches you so much.  TV is knowledge and you learn so much.

2   That's all I did was watch TV, and I was watching last week.

3   It came to my attention.  I watch Numbers.  Numbers about

4   how Federal Bureau of Investigation, they investigate crime

5   scene investigation.  How can I be convicted of a crime,

6   there is no evidence?  Where is it?  Where?  Where is my

7   fingerprints?  Where is my gun powder?  Where is the

8   analysis?  If you can find my fingerprints on that weapon,

9   I will plead guilty to that.  And you can charge to that

10  crime whatever the guidelines come into that crime.  Where

11  is it?  Where?  This is information.  Basically, this court,

12  this trial is about he say.  This is about the truth.

13  That's what I'm trying to figure this out.  Information.

14  Where is it?

15          Look at my face, Your Honor.  I'm scarred for

16  life.  Look at my face.  I'm scarred for life.  Look at my

17  face.  My appearance is different.  My teeth is chipped.

18  Sometimes I pee blood, I piss blood.  My health is not -- my

19  health is not right.  I need to see a doctor.  Mentally, I'm

20  not okay, you know, because the marshals could have --

21  agents, trained agents, trained agents, official agents,

22  they could have handled that.  They could have handled that

23  better.  These are trained agents.

24          My cousin was in the Marines for six years.  He

25  was an E-3, a lance corporal, and you mean to tell me I

1    could have taken that weapon?  There is no way.  He was

2    trained for combat.  And I know it's a fact, it's fact.  You

3    show me those fingerprints and the gun powders -- the gun

4    powder.  Did I shoot that weapon?  I will plead guilty to

5    it.  I did not touch that weapon.  I didn't.  But based on

6    information?  That is not justice.  That is not the truth.

7    That is information.

8         And that's -- if I would had done it, when my

9    first lawyer came to me, and I took the plea for 33

10   mandatory, I would have took it because I would have done

11   it, but I didn't do it.  I haven't done nothing.  Look at my

12   face.  I'm scarred for life.  Why?  Why I have to pay for

13   something they did to me?  I got brutally beaten, throw me

14   in jail for nine, almost nine months.  For what?  Because

15   of what they demonstrate?  That's justice?  That is not

16   justice.  What I'm asking, justice to be served today.

17        Where is his medical bills?  Where is the

18   medical bills?  Why didn't he go to a doctor?  For all he

19   knows, I had hepatitis, HIV.  Nothing like that.  Nothing.

20   It's all about information.

21        THE COURT:  All right.  Mr. Lora-Pena, I think I

22   have your position.  Is there anything other than contesting

23   your innocence, which I hear you?

24        THE DEFENDANT:  Nothing, Your Honor.  I just

25   want the truth.  That's all, Your Honor.

1    THE COURT:  All right.

2    THE DEFENDANT:  Please, I'm begging.  I'm

3    begging.  The only hope I have is you.  You're the only one.

4    I'm asking for hope and mercy.  It seems like the whole

5    world is coming down like I'm the baddest guy in the world.

6    I didn't get in trouble for ten years.  I don't want no more

7    trouble.  I don't, Your Honor.  Find the way in your heart,

8    please, to forgive me.  I know the Government is mad because

9    I ran for 10 years.  I don't want no more trouble.  I just

10   want to be with my family.  I said I'm 40 years old.  I know

11   from right and wrong.  I know I can be a better person.  I

12   know I can.  Please.

13   THE COURT:  All right.

14   THE DEFENDANT:  Forgive me.

15   THE COURT:  I've heard what you had to say.

16   Thank you.

17   Mr. Lora-Pena and Mr. Peruto, go ahead and be

18   seated.

19   Mr. Andrews, the sentencing position on behalf

20   of the Government.

21   MR. ANDREWS:  Your Honor, basically we recommend

22   the sentence within the guideline range.  I think one thing

23   that is important to note is in the presentence report, as a

24   result of Mr. Lora-Pena's conduct, someone could have been

25   killed that day and that "someone" could have been him or

1    it could have been one of the marshals or other law

2    enforcement officers who were at the scene.  He caused the

3    gun to discharge and he could be facing -- so, in fact,

4    the injuries that the marshal suffered was fairly

5    inconsequential but his conduct was extremely serious

6    because it could have resulted in much more serious injury

7    than it did.

8         THE COURT:  And would you agree that that is

9    captured at least in part in the functioning of the

10   guidelines with the addition of the five points for the

11   discharge of the weapon and the lack of grouping?

12        MR. ANDREWS:  I believe it is, Your Honor.

13        THE COURT:  All right.  Let me explain to you

14   how we're going to proceed from this point, Mr. Lora-Pena.

15   I'm going to talk to you about the sentence I intend to

16   impose.  I'll state the sentence I intend to impose.  I'll

17   give your and the attorney for the Government an opportunity

18   to tell me if there is any reason why that sentence as

19   stated ought not be imposed, and if there isn't a legal

20   reason that we have already covered, why it ought not be

21   imposed, I'll go ahead and order it imposed as stated.

22        First, I'll take a moment to speak directly to

23   your family who are in the courtroom and who took the time

24   to write letters on your behalf.

25        It's evident that whatever else, good or bad has

1    happened to you in your life, you have been lucky enough to

2    have a supportive family unit.  Not everybody is blessed to

3    have that.  They need to understand, though, what we're here

4    to do today and so do you.

5              You continue to contest your innocence.  Your

6    brother who I permitted to speak contests your innocence as

7    well.  It may be that you persuade an appellate court that

8    there was some flaw in the trial proceeding itself that

9    requires the evidence to be looked at anew.  You have

10   appellate rights which I will mention to you at the close of

11   this.  But today is, as your own lawyer has aptly put it,

12   not a day to talk about guilt or innocence because a jury

13   has spoken on that issue.  And it said, after hearing the

14   evidence, you're guilty of the offense.  So I'm not at

15   liberty to ignore that verdict.

16             And I sat through the trial myself.  And I heard

17   the evidence myself.  And I don't think that the jury went

18   amiss.  It sounded to me like you fled.  You're used to

19   living as a fugitive and you preferred to live as a fugitive

20   than to live in jail and that as a consequence of your

21   decision to flee, there was a fight.  Your dogs, attack dogs

22   were in the melee for awhile.  The gun was discharged.  And

23   it is only by the grace of good fortune, in a series of

24   events that could be called very sad and unfortunate for

25   you, it's only by good fortune that no one was hurt more

1    badly than they were.

2            I understand your statements here today that you

3    certainly feel like you were injured.  And that is a most

4    unfortunate thing.  That out of all of this event, your

5    focus is, continues to be thoroughly and entirely and

6    totally upon yourself.  So I don't know anything that I can

7    say here today will help you understand this sentencing

8    process any better, but I'm taking a shot at it anyway.

9            In our society, we have to abide by certain

10   basic norms, and among those norms are a respect for people

11   who operate, work in law enforcement and help keep the rest

12   of us free and safe.  I'm going to be dealing with a

13   sentence for you on the supervised release violation.  I'll

14   be talking about that in a moment as well.

15           It was obviously a serious mistake for you to

16   flee Rhode Island and violate your supervised release.  But

17   when you were found, lo these many years later, the offense

18   was made tremendously worse by the decision to put law

19   enforcement officers at risk.  That's something that our

20   society cannot tolerate.  And that's why you face a

21   significant period of incarceration for this offense.  It

22   can be accepted, and it won't be accepted.

23           So I'm going to sentence you within the

24   guideline range.  I'm going to sentence you toward the lower

25   end of that range, not because I take lightly what you did

1    but because it's a severe range.  At a minimum, you've got

2    87 months in front of you for this offense.  The guideline

3    policy statements tell me that the supervised release

4    violation should be added consecutively.  So if I do, that

5    the minimum you are facing is 92 months in prison.  And then

6    when that is all done, in all likelihood, as your attorney

7    has said, you face deportation.

8           So even at the lowest end of the guideline

9    range, you face very severe consequences.  And since I

10   believe that those consequences are warranted, this is the

11   sentence I intend to impose:

12          On the supervised release offense, a term of

13   five months, which I will get to in greater detail in a

14   moment.

15          On the offense of conviction in this case,

16   pursuant to the Sentencing Reform Act of 1984, it is the

17   judgment of the Court that the defendant Nelson Lora-Pena is

18   hereby committed to the custody of the Bureau of Prisons, to

19   be imprisoned for a term of 87 months on each of counts one

20   through three and 12 months on count four, all counts to be

21   served concurrently.

22          Upon release from imprisonment, the defendant

23   shall be placed on supervised release for a term of three

24   years.  This term consists of terms of three years on each

25   of counts one through three and one year on count four, all

1  such terms to run concurrently.

2              Within 72 hours of release from the custody of

3  the Bureau of Prisons, the defendant shall report in person

4  to the Probation Office in the District to which the

5  defendant is released.

6              While on supervised release, the defendant shall

7  not commit another federal, state or local crime, shall

8  comply with the standard conditions that have been adopted

9  by this Court and shall comply with the following additional

10  conditions:

11             The defendant shall not illegally possess a

12  controlled substance.

13             The defendant shall not possess a firearm or

14  destructive device.

15             The defendant shall cooperate in the collection

16  of DNA as directed by the probation officer.

17             In addition, the defendant shall comply with the

18  following special conditions:

19             The defendant shall participate in a drug

20  aftercare treatment program at the direction of the

21  probation officer which may include testing.

22             If deported, the defendant's term of supervised

23  release shall run inactively as long as he remains outside

24  the United States.  Should he reenter the United States

25  illegally after deportation, such actions shall be

1    considered a violation of supervised release.

2              I find that the defendant does not have the

3    ability to pay a fine and will waive the fine in this case.

4              It is further ordered that the defendant shall

5    pay to the United States a special assessment of $325 which

6    shall be due immediately.

7              Now, as to that sentence as stated, let me ask,

8    Mr. Peruto, is there any legal reason why that sentence as

9    stated ought not be imposed?

10             MR. PERUTO:  No, sir.

11             THE COURT:  All right.  Mr. Andrews?

12             MR. ANDREWS:  Not that I know of, Your Honor.

13             THE COURT:  All right.  I also state that a five

14   month term of imprisonment is imposed on the supervised

15   release, as I mentioned earlier, to run consecutive to the

16   term of imprisonment imposed under docket number 05-Criminal

17   Action-47-KAJ.

18             No term of supervised release will follow that

19   term of imprisonment since the defendant will be on

20   supervised release for a new offense.

21             Do you have any legal reason why that sentence

22   ought not be imposed, Mr. Peruto?

23             MR. PERUTO:  No, sir.

24             THE COURT:  Mr. Andrews?

25             MR. ANDREWS:  No, Your Honor.

1        THE COURT: All right. Then I order those

2    sentences imposed as stated.

3        Now as I mentioned earlier, Mr. Lora-Pena, you

4    have appellate rights. I'm going to put what I've talked to

5    you about here today into a written document called a

6    Judgment and Commitment Order. It might take a few days for

7    me to get that filed, but as soon as it's filed, once it's

8    filed, you have 10 days. The clock starts to run and you

9    have 10 days within which to file a notice of appeal. If

10   you want to take this up to the Third Circuit, which is the

11   Court of Appeals over this Court. And I'm sure that

12   Mr. Peruto will be speaking to you about that further, if

13   you would like.

14       All right. Is there anything further to come

15   before the Court at this time? Mr. Andrews?

16       MR. ANDREWS: No, Your Honor.

17       THE COURT: Mr. Peruto?

18       MR. PERUTO: Yes, sir. Judge, the defendant is

19   indigent. He can file whatever papers the Court requires of

20   him but he does not have the wherewithal to obtain the

21   transcripts and to file the necessary fees and for counsel,

22   so we would ask that those steps be taken to obtain an

23   affidavit from him of indigency so he could qualify.

24       THE COURT: Certainly if that paperwork is filed

25   and it's in order, you can be assured that the necessary

1    steps will be taken.  Now, I tell you candidly, sitting

2    here, I don't know whether he files that here or in the

3    Court of Appeals, but wherever it's supposed to go, I'm sure

4    you will have to make sure it gets to the right spot, and it

5    will be acted on accordingly.  All right?

6              MR. PERUTO:  Yes, sir.

7              THE COURT:  All right.  We stand in recess.

8              (Sentencing hearing ends at 3:55 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25